**GREENBERG TRAURIG, LLP**
Michael Burshteyn (SBN 295320)
Marcelo Barros (SBN 339069)
101 Second Street, Suite 2200
San Francisco, California 94105-3668
Telephone: 415.655.1300
Michael.Burshteyn@gtlaw.com
Marcelo.Barros@gtlaw.com

Jake Evans (*pro hac vice* forthcoming)
Jordana R. Sternberg (*pro hac vice* forthcoming)
Terminus 200, 3333 Piedmont Road NE, Suite 2500
Atlanta, Georgia 30305
Telephone: 678.553.2100
Jake.Evans@gtlaw.com
Jordana.Sternberg@gtlaw.com

*Attorneys for Plaintiffs Beagle Labs, Inc., Beagle Technologies, Inc., Big Beagle, Inc., Rental Property Managers Association LLC, and YRIG Risk Retention Group, Inc.*

## UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

### COUNTY OF SAN FRANCISCO

| | |
|---|---|
| BEAGLE LABS, INC., a Delaware corporation, BEAGLE TECHNOLOGIES, INC., a Delaware corporation, BIG BEAGLE, INC., a Delaware corporation, RENTAL PROPERTY MANAGERS ASSOCIATION LLC, an Alabama limited liability company, and YRIG RISK RETENTION GROUP, INC., an Alabama corporation,<br><br>     Plaintiffs,<br><br>v.<br><br>APPFOLIO, INC., a California corporation,<br><br>     Defendant. | CASE NO.<br><br>**PLAINTIFFS' MOTION FOR EX PARTE TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION** |

1

ACTIVE 717347307v1

## I.  **INTRODUCTION**

Unless this Court enjoins AppFolio, Inc. within the next 24 hours, this Tuesday December 16, 2025, AppFolio will destroy Beagle's business[1] through unlawful tortious interference with contract, violation of California's Unfair Competition Law and multiple federal statutes and common law doctrines.

AppFolio plans to block Beagle's access to its customers' data inside the AppFolio app on December 16, 2025.  This is critical data that Beagle's customers own, that they contract with Beagle for access so that Beagle can provide vital services to renters across America, such as insurance for catastrophes like fire, and that Beagle has accessed lawfully with AppFolio's knowledge for over a year.

AppFolio's action will immediately destroy more than 80% of Beagle's business, valued in excess of hundreds of millions of dollars.  It will be an extinction-level event for Beagle and cause it irreparable harm to its reputation, countless customer relationships, and put renters across the country at risk.

AppFolio is committed to its unlawful data-blocking plan and has refused to change course.  It is doing so for one reason only:  Beagle is growing and winning through fair market competition despite AppFolio's attempts to build its own copy-cat solution.  AppFolio has now decided that instead of competing fairly, it will target Beagle and block its lawful access to customer data.

The Ninth Circuit has made clear that data blocking and targeting a competitor in precisely the way AppFolio plans to do is unlawful. *See WPEngine, Inc. v. Automattic Inc.,* No. 24-CV-06917-AMO, 2024 WL 5077610, at *16 (N.D. Cal. Dec. 10, 2024) (granting injunctive relief enjoining defendant from "blocking, disabling, or interfering with [plaintiff's] and/or its . . . customers' . . . access to wordpress.org" and from otherwise interfering with plaintiff's use of websites built with defendant's software, finding that "the termination of WPEngine's access to WordPress, the interference with the ACF plugin, and the additional burdens imposed on WPEngine's customers . . . demonstrates that WPEngine has a significant interest in obtaining preliminary injunctive relief"); *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022) (affirming preliminary injunctive relief that required LinkedIn to "remove any existing technical barriers to hiQ's access" and "to refrain from putting in place any legal or technical measures

---

[1] Plaintiffs are Beagle Labs, Inc., Beagle Technologies, Inc., Big Beagle, Inc., Rental Property Managers Association LLC, and YRIG Risk Retention Group, Inc. ("Beagle").

2

with the effect of blocking hiQ's access").[2]

Beagle consequently seeks a narrow injunction to stop AppFolio from unilaterally pulling the rug out from residential real-estate buildings across America and blocking their ability to use Beagle's services that they use on a daily basis. All the *Winters* factors support granting emergency relief here:

**First,** Beagle is likely to succeed on its claims for tortious interference and violation of California' UCL because AppFolio has no legitimate basis for its threatened action. Beagle's customers create accounts for Beagle to use in AppFolio—something AppFolio explicitly designed its platform to allow. The platform permits customers to create accounts for building employees, contractors, and vendors like Beagle. Many other third-parties use the exact same workflow as Beagle, including a company called Second Source that AppFolio works with to compete against Beagle.

AppFolio has lied to customers claiming that Beagle poses security risks, but this is a fabricated pretext. It is incoherent given that Beagle does not even create the accounts at issue, its customers do, and there is no automation or technical circumvention involved. Nor can AppFolio point to any security incidents or risks. AppFolio's planned blocking measures will interfere with customer contracts that comprise over 80% of Beagle's business, implicating more than $10 million dollars in revenue and hundreds of millions of dollars in enterprise value. AppFolio is doing this for no other reason than to unfairly promote its own competing service.

**Second**, Beagle will be irreparably harmed if AppFolio is allowed to enact its pretextual targeting plan. Beagle will immediately lose the ability to service all of its customers who use AppFolio. This is more than 80% of Beagle's business. This is precisely the sort of extinction level event that the Ninth Circuit has found merits emergency relief. Beagle's reputation in the market will be eviscerated on Tuesday if AppFolio is permitted to proceed—no amount of money in a judgment later on will remedy this. Beagle will be unable to perform the obligations its customers contracted with it to perform. This will leave thousands of renters in the lurch who rely on services Beagle facilitates for things like fire

---

[2] *See also Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*, 131 F.4th 205, 215 (4th Cir. 2025) (affirming injunctive relief enjoining defendant from blocking plaintiff where "for roughly eight years, [plaintiff] accessed [defendant]'s systems using bots without [defendant] raising any concerns about the practice" even though "the standard agreement [defendant] has used with its customers for at least five years instructed that" customers shall not use or permit bots).

3

insurance, plumbing services, electrical services, and other critical day-to-day necessities.

**Third**, the balance of equities leans heavily in Beagle's favor. AppFolio has known about Beagle and its operations for over a year. The two companies discussed a potential partnership as long ago as November 2024. AppFolio has manufactured urgency with no basis, insisting on the December 16, 2025 date. AppFolio tried to file an sweepingly overbroad TRO of its own to restrain Beagle from even talking to AppFolio's customers several days ago in Santa Barbara Superior Court.[3] The Superior Court denied AppFolio's TRO.

**Fourth**, the public interest supports Beagle's request for emergency relief. Renters should not have access to vital services cut off overnight. Further, online platforms that contain data belonging to their customers (here, data such as renter names and rent prices—nothing proprietary to AppFolio) should not be permitted to block competitor access to that data based on pretextual targeting. Allowing AppFolio to proceed would throw the Internet economy into chaos, as companies like mobile app stores, payment processors, social media platforms, and others would simply block any competitor that is gaining traction from access. This is not and should not be the law.

Beagle seeks a very narrow TRO that maintains the status quo—the status quo that has existed for over a year and has been driven by the market and AppFolio's own customers who select Beagle.

Beagle's request serves the most essential purpose of a TRO: to preserve the status quo and prevent AppFolio from destroying Beagle while this Court considers the merits. Courts, including this one, have repeatedly enjoined dominant platforms from terminating data access in precisely these circumstances, where the cutoff threatens immediate, irreparable harm to an existing business and interferes with customer relationships, and where the platform's asserted justifications are pretextual and constitute unlawful targeting.

If AppFolio abruptly severs Beagle's access to its customers, as it says it plans to do, this will immediately wipe out Beagle's ability to serve the vast majority of its customers, causing Beagle to breach existing contracts with those customers. This would likely force Beagle out of business altogether.

Notably, AppFolio's threatened shutdown is not motivated by security, privacy, or system integrity

---

[3] AppFolio filed in state court and did not assert federal claims. (Santa Barbara Superior, Case no. 25CV07670.)

4

concerns.  There is no emergency for AppFolio.[4]  Rather, AppFolio's threat is part of a coordinated campaign to target Beagle as a competitor, falsely label Beagle as a security risk, pressure shared customers to abandon Beagle's services, and foreclose competition in downstream markets that depend on access to AppFolio's platform.

Absent emergency relief, Beagle faces an existential threat to its business that cannot be remedied later by payment of damages.  Although Beagle would have preferred to avoid requesting the Court's intervention, the alternative would be immediate extinction of a giant painstakingly built business beloved in the market this Tuesday December 16, 2025.  Given the timing, the Court can put a narrow TRO in place to preserve the status quo before Tuesday while the parties prepare for a preliminary injunction hearing.

## II.    FACTUAL BACKGROUND[5]

### A.    Beagle's Innovative Offering is Winning in the Market.

"Beagle was exactly the solution I was looking for when I was searching for a way to manage renters insurance."

Raven Reinmuth
Founder & CEO
RAVEN REAL ESTATE MANAGEMENT

"Beagle has been helping us increase our bottom line since we joined. The easiest program ever to launch."

John Szymanski
President
URBAN EQUITIES

Beagle provides insurance-related compliance services to property managers nationwide, including tenant liability waiver programs, renters' insurance verification, deposit alternative services, and pet damage waiver offerings. These services help property managers satisfy lease requirements, manage risk, and provide cost-effective protection to renters. Beagle's platform serves over 40,000 properties in all 50 states and helps property managers ensure coverage compliance, automate administrative tasks, and unlock new revenue streams.  Property managers throughout the country voluntarily select Beagle because they prefer Beagle's products and service model over competing offerings, and they report real operational benefits:[6]

---

[5] The declarations of Anthony D'Angelo and Michael Brown, submitted concurrently here, support Beagle's factual allegations.

[6] https://www.joinbeagle.com/beagle-vs-second-nature (last visited 12-14-2025) (Declaration of Marcelo

5

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

ACTIVE 717347307v1

To administer these programs, Beagle needs access to limited categories of the property managers' operational data, including tenant rosters, unit identifiers, lease and billing information, and insurance-compliance status.  Property managers and their residents store and use this data for a wide variety of purposes through AppFolio's platform.  AppFolio does not own or create this data; rather, AppFolio merely hosts the data on its software platform. In fact, AppFolio's terms and conditions specifically provide: "You represent and warrant that you are the rightful owner of your data and have the requisite authority to perform the migration of such data. *You will retain all right, title and interest in and to your data*." (Declaration of Michael Brown ISO TRO ("Brown Decl.") Ex. A at 2 (2025 AppFolio Terms and Conditions, Section 1.4) (emphasis added).)

**B.    AppFolio's User Account System Permits Beagle's Access.**

AppFolio is one of the principal providers of property management software in the United States. Industry research consistently ranks AppFolio among the largest property management SaaS vendors. AppFolio's gateway position in this market gives it substantial control over access to customer property data.  For years, Beagle has relied on transparent, legitimate, customer-authorized access to the AppFolio Property Manager ("APM") platform pursuant to AppFolio's ordinary login and data-access functionality, with the express authorization of AppFolio's users.  Beagle uses this access to provide insurance-related compliance services selected by hundreds of property managers and relied upon by thousands of renters. Beagle does not hack AppFolio, evade technical safeguards, scrape public data, or circumvent any security measures.  Instead, Beagle provides a "soft" integration that operates exactly as AppFolio's customers direct it to operate, through channels AppFolio provides for this purpose.

In fact, AppFolio built its software so that property managers can permit outside vendors to see their information.  Using AppFolio's system, a property manager can create separate user accounts for employees, accountants, auditors, or outside service providers and choose what each user is permitted to view or do.  In fact, AppFolio's website touts this as an advantage of using their platform:[7]

---

Barros ("Barros Decl.") Ex. A).

[7] https://www.appfolio.com/property-manager/communication-service (last visited 12-14-2025) (Barros Decl., Ex. B).

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

ACTIVE 717347307v1

**Online Portal for Vendors**
Give vendors access to view work order details, upload invoices, add notes and photos, and mark their work as complete all within the fully mobile Vendor Portal in AppFolio.

In addition, AppFolio's terms and conditions further state: "You are solely responsible for determining the appropriate set-up and configuration of the Services." Indeed, Second Nature, a company that AppFolio has promoted as an alternative to Beagle, accesses AppFolio in the same way that Beagle does.

Beagle's access works through these permissions that AppFolio has provided. Property managers themselves create a separate AppFolio user account for Beagle and choose the permissions Beagle receives. The property manager—not Beagle—controls that access at all times and can change or revoke it whenever they wish.

Moreover, Beagle never asks for a customer's password, never shares login credentials, and never bypasses AppFolio's security features. Beagle can see only the information the property manager has chosen to make available through AppFolio's own permission settings. Beagle also provides customers with a written Data Access Statement that clearly explains what information Beagle uses and why. Beagle's access has always followed this same process and has not changed over time.

**C.    AppFolio Permitted Beagle's Access Without Objection Until It Was A Competitor.**

As early as November 2024, AppFolio was aware that customers granted Beagle access through additional user roles. Beagle operated openly, with full disclosure to customers, in reliance on AppFolio's longstanding acceptance of this access method. AppFolio never raised any objection, did not warn customers, and did not suggest any security concern. In fact, in 2024, AppFolio even discussed potential partnership with Beagle.

But AppFolio recently began selling its own insurance products that compete with Beagle, called FolioGuard and Smart Ensure. Because these in-house products are inferior to Beagle's offerings, AppFolio has struggled to convince customers to adopt them. Once Beagle's growth accelerated, with customers selecting Beagle over AppFolio's competing offerings, AppFolio abruptly reversed its prior position. Suddenly, and without any prior notice or warning to Beagle, AppFolio used its platform to send mass emails and dashboard alerts *to Beagle's customers* asserting that Beagle poses "security risks," made

"false claims," and was engaged in "noncompliant access."  Reputational harm *alone* in a compliance-sensitive, insurance-adjacent industry like Beagle's can swiftly destroy a business, but then, AppFolio announced it would disable all Beagle-related user accounts within five business days, culminating in the December 16 cutoff date.

Specifically, on December 9 – the same day that AppFolio filed the application for TRO that was denied – AppFolio began emailing Beagle's customers to say that Beagle's access poses "serious security risks."  An example of the AppFolio email[8] and a concerned response from a Beagle customer reads as follows:



(Declaration of Michael Brown ("Brown Decl."), Ex. C at 3.)

This blast email that AppFolio sent to Beagle's customers warned them of the December 16 cutoff, as follows:[9]

---

[8] Beagle has received additional copies of this AppFolio email blast from several of its customers.
[9] In the context of evaluating the balance of the equities here, it is important to note that AppFolio's own messages prove there is no emergency for AppFolio.  Instead, AppFolio has the time and flexibility to provide its customers notice and time "to facilitate any transition for your business."

ACTIVE 717347307v1

> To keep our ecosystem safe, we cannot allow Beagle's noncompliant access. We have notified Beagle we are removing their access and outlined a path to provide you continued service that is compliant with our terms of service and does not create security risk. **To facilitate any transition for your business, we will allow them maintain access to your database (should you so choose) for 5 business days, until December 16, 2025, before removing those users.**

(Brown Decl., Ex. C at 1-3.)

Beagle's customers then began emailing Beagle with confusion and concern:

> See below, what are the steps moving forward ?
>
> **From:** AppFolio <updates@hello.appfolio.com>
> **Sent:** Tuesday, December 9, 2025 12:01:14 PM
> **To:**
> **Subject:** Attention Required: Beagle Access to Your Account
>
> Hi
>
> We have received reports from several customers that Beagle – an insurance and resident services company – recently made false claims about AppFolio, representing themselves as an AppFolio partner in an attempt to win business and gain noncompliant access to customer accounts. Beagle is not an AppFolio integration partner and we have no plans to partner with them in the future.
>
> Third-party providers are an important part of our industry and we support multiple safe methods for you to work with them, including AppFolio Stack, Database API, and scheduled reports. All of our **integration partners** go through a rigorous vetting process to ensure they meet our standards and share in our commitment to provide a high-quality experience to you and your customers.
>
> We value your ability to choose providers, but the method by which Beagle has chosen to operate their business places you at risk. By creating user accounts in your database, Beagle has the ability to:
>
> - access the personally identifiable information of your residents
> - issue payments through the AppFolio payments platform
> - view and take action across your entire account database
>
> In addition to the serious security risks this noncompliant access poses for you, your residents, and your customers, it also constitutes a breach of AppFolio's terms of service, which are in place both to protect your account and to safeguard AppFolio's intellectual property.
>
> To keep our ecosystem safe, we cannot allow Beagle's noncompliant access. We have notified Beagle we are removing their access and outlined a path to provide you continued service that is compliant with our terms of service and does not create security risk. **To facilitate any transition for your business, we will allow them maintain access to your database (should you so choose) for 5 business days, until December 16, 2025, before removing those users.**
>
> As your trusted technology partner, we work to protect the integrity of your data and provide integrated experiences that enable you to have stable, seamless user experiences. If we can provide any additional support, please contact our Customer Care team by clicking on Support from your AppFolio database and a dedicated representative would be happy to follow up.

(*Id.* at 2.)

Then, AppFolio broadly announced to its customers inside its application, through a banner, that it would disable all Beagle-related user accounts on December 16–exactly one week after its attempted TRO:

> ⚠
>
> **Attention Required: Beagle Access to Your Account**
>
> We recently identified that Beagle has been accessing AppFolio accounts in a way that violates our Terms of Service and creates risk for your business. To keep your account safe, we're removing their access on December 16, 2025. You can continue working with Beagle using approved options such as scheduled reports. For more information, please reference our full communication or contact Support if you need assistance.

(Brown Decl., Ex. D at 6.)

### D.    AppFolio's Threatened December 16 Cutoff is an Existential Threat to Beagle.

AppFolio's communications have set a firm deadline: on December 16, AppFolio will disable Beagle's customer-authorized APM user accounts.  If AppFolio carries out this threat, Beagle will immediately lose access to the data on which it relies to serve more than eighty percent of its customers. This cutoff would prevent Beagle from verifying coverage, administering tenant-liability programs,

9

processing compliance data, and performing other essential functions.  In addition, AppFolio's cutoff will harm not only Beagle and its customers, but also AppFolio's own customers.  Customers who have contracted with Beagle would face sudden service disruptions, and renters could lose required liability coverage or fall out of compliance with lease requirements.  Renters would be impacted too—they would be unable to move in, set up utilities, have air filters delivered, and would lose the ability to secure identity theft protection.

The December 16 lockout is therefore an existential threat to Beagle as a going concern.

**E.      AppFolio's Accusations Have Already Triggered Irreparable Harm for which Beagle Needs Immediate Injunctive Relief.**

AppFolio's false and alarming statements caused immediate market disruption.  Property managers forwarded AppFolio's messages to tenants, revoked Beagle's access, and terminated their relationships with Beagle.  Some property managers described Beagle as a "scam" based on AppFolio's statements; others expressed concern that AppFolio's actions would leave their renters without coverage.  Immediately, Beagle customers contacted Beagle about AppFolio's lies, terminating their contracts with Beagle and calling Beagle names like "scumbags":



(Brown Decl., Ex. D at 3.)

As this example plainly demonstrates, reputational harm *alone* in a compliance-sensitive,

ACTIVE 717347307v1

insurance-adjacent industry like Beagle's causes swift and irreparable destruction. Monetary damages cannot restore the lost trust, lost customers, or lost market position AppFolio has abruptly begun to inflict on Beagle. The impending December 16 cutoff threatens to compound that harm by eliminating Beagle's ability to serve the vast majority of its customers before this Court can hold a preliminary-injunction hearing.

Absent an immediate temporary injunction to preserve the status quo, AppFolio will proceed with the December 16 lockout, permanently disrupting Beagle's customer relationships, destroying goodwill Beagle has earned, and foreclosing Beagle's ability to compete in the market. For these reasons, a temporary restraining order is necessary to preserve the status quo and prevent irreparable harm pending further proceedings. Due to the timing and urgency, no notice should be required, and the Court can set the status quo in place while the parties prepare briefing and evidence for a preliminary injunction hearing.

## III.    PROCEDURAL BACKGROUND

Less than one week ago, on Tuesday, December 9, AppFolio threatened Beagle with a TRO and lawsuit. This threat came out of the blue, with no warning. AppFolio did not send a demand letter or any prior communications, and it refused Beagle's request to hold off on its lawsuit in order to negotiate.

AppFolio filed its motion for TRO in the Superior Court of Santa Barbara that evening. The Court denied AppFolio's motion for TRO.

Beagle asked AppFolio to hold off before following through on its threat to cut off Beagle's access to the platform. AppFolio refused. Accordingly, facing the existential threat described in this motion, Beagle had no choice but to seek Court intervention and injunctive relief.

## IV.    ARGUMENT

### A.    Legal Standard

"A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022) (affirming preliminary injunction in favor of hiQ and against LinkedIn, preventing LinkedIn from blocking data-scraping bots sent by hiQ to LinkedIn's website). *See also Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20, 129 S. Ct. 365, 374, 172 L. Ed. 2d 249 (2008).

11

"The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction." *Cmty. Legal Servs. in E. Palo Alto v. United States Dep't of Health & Hum. Servs.*, 777 F. Supp. 3d 1039, 1044 (N.D. Cal. 2025), appeal dismissed, No. 25-2358, 2025 WL 1189827 (9th Cir. Apr. 18, 2025) (granting TRO).  The Ninth Circuit uses a "sliding scale" approach to these factors, whereby "a stronger showing of one element may offset a weaker showing of another . . . So, when the balance of hardships tips sharply in the plaintiff's favor, the plaintiff need demonstrate only serious questions going to the merits." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022) (citation modified). *Accord Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (reversing denial of preliminary injunction).  Under the "sliding scale" approach, "'serious questions going to the merits' and a balance of hardships that tips sharply toward the plaintiff can support the issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."  Alliance for the Wild Rockies, 632 F.3d at 1135.

**B.      Beagle is Likely to Succeed on The Merits of Its Claims Against AppFolio.**

To establish a likelihood of success, Plaintiffs "need not conclusively prove their case or show that they are 'more likely than not' to prevail." *Stewart v. City & Cnty. of S.F., Cal.*, 608 F. Supp. 3d 902, 911 (N.D. Cal. 2022) (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)), aff'd sub nom. *Stewart v. City & Cnty. of S.F.*, No. 22-16018, 2023 WL 2064162 (9th Cir. Feb. 17, 2023).  Instead, Plaintiffs need only show a "fair chance" of success. *Stewart*, 608 F. Supp. 3d. at 911 (citing *Benda v. Grand Lodge of IAM*, 584 F.2d 308, 315 (9th Cir. 1978)).  Here, AppFolio's tortious and unfair conduct provides a clear basis for imposing a TRO.

**1.      AppFolio is Tortiously Interfering with Beagle's Contracts.**

"The elements which a plaintiff must plead to state the cause of action for intentional interference with contractual relations are (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126, 791 P.2d 587, 589–90 (1990). In addition, "[b]ecause interference with an existing contract receives greater solicitude than does interference with prospective economic advantage, it is not necessary that the defendant's conduct be

12

ACTIVE 717347307v1

wrongful apart from the interference with the contract itself. Moreover, the tort of intentional interference with performance of a contract does not require that the actor's primary purpose be disruption of the contract." *Quelimane Co. v. Stewart Title Guar. Co.,* 19 Cal. 4th 26, 32, 960 P.2d 513 (1998), *as modified* (Sept. 23, 1998).

Here, there is no question that Beagle is likely to succeed on the merits as to the first two elements: Beagle has contracts with its customers and AppFolio unquestionably knows about those contracts. The emails that AppFolio sent to Beagle's customers demonstrate that AppFolio knows Beagle has contracted with these third parties because AppFolio specifically directed emails to those customers because they are Beagle customers. In addition, AppFolio's emails explicitly recognize the contractual relationship by stating to those customers that Beagle has "create[ed] user accounts in your database" and offering to these third party customers of Beagle: "we will allow them maintain (sic) access to your database . . . for five business days to facilitate any transition for your business[.]" (Ex. A at 1-3.)

As to the third element, there can be no question that AppFolio has taken intentional acts designed to induce a breach or disruption of the contractual relationship because AppFolio has announced that it plans to deliberately sever Beagle's ability to serve these customers through the AppFolio platform. Moreover, AppFolio explicitly recognizes that the customer may need to "transition . . . [its] business" and even notes in parenthetical that the customer may choose to end its contract with Beagle as a result, where AppFolio says "we will allow them maintain access to your database **(should you so choose)** for five business days[.]" (Ex. A at 1-3 (emphasis added).) *See hiQ Labs,* 31 F.4th at 1192 ("LinkedIn's threats to invoke the CFAA and implementation of technical measures selectively to ban hiQ bots could well constitute 'intentional acts designed to induce a breach or disruption' of hiQ's contractual relationships with third parties.")[10] AppFolio is making statements about Beagle's security that it knows are false, and its shut down of Beagle is pretextual. The real reason is that AppFolio wants to promote its own competing products.

Beagle can also prove the fourth element, actual disruption or breach of the contractual

---

[10] In addition to AppFolio's "threats to . . . implement[] . . . technical measures selectively" to sever Beagle's use of its platform, AppFolio's counsel explicitly threatened to bring a CFAA claim during a telephone call with counsel for Beagle on Friday, December 12. (Barros Decl. at ¶ 7.)

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

ACTIVE 717347307v1

relationships, as this disruption has already begun. As described above, if AppFolio severs Beagle's access to its customers' data on the AppFolio platform, this will disrupt Beagle's contracts because it will not be able to serve 80% of its customers. In addition, the facts above show that AppFolio's actions have *already* caused disruption of Beagle's contracts with the customers who have contacted Beagle with their concerns about AppFolio's messages and threatened cutoff, and also with customers who have simply ended their relationships with Beagle in favor of AppFolio's options or those of some other provider. *hiQ Labs,* 31 F.4th at 1192 (noting that "the contractual relationships between hiQ and third parties have been disrupted and 'now hang[ ] in the balance.' Without access to LinkedIn data, hiQ will likely be unable to deliver its services to its existing customers as promised."). *See also Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.,* 131 F.4th 205, 239 (4th Cir. 2025) (affirming grant of preliminary injunction where "the disruption of Real Time's ability to do its work with hundreds of facilities at a time . . . puts it at immediate risk of breach of its contracts with its customers and presents a real and imminent threat to its continued ability to do business." (citation modified)).

Finally, Beagle is likely to succeed on the merits of the fifth element: resulting damages. As explained above, 80% of Beagle's business is with customers that use AppFolio. AppFolio's threatened destruction of Beagle's ability to run 80% of its business is an existential threat to Beagle's entire business and goodwill. *hiQ Labs*, 31 F.4th at 1192 (finding fifth element of tortious interference satisfied where "hiQ is harmed by the disruption to its existing contracts and interference with its pending contracts. Without the revenue from sale of its products, hiQ will likely go out of business").

Therefore, Beagle has a high likelihood of success on its claim for tortious interference with contractual relations.

### 2.    Beagle is Likely to Prevail on its Tortious Interference Claim.

Beagle is likely to prevail on its claims against AppFolio for tortious interference with prospective economic relations. In California, a claim for tortious interference with prospective economic relations is similar to that of tortious interference with contractual relations. To prevail, a party must establish: "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and

14

ACTIVE 717347307v1

(5) economic harm to the plaintiff proximately caused by the acts of the defendant." *CRST Van Expedited, Inc. v. Werner Enters., Inc.,* 479 F.3d 1099, 1108 (9th Cir. 2007). In addition, "a plaintiff seeking to recover for alleged interference with prospective economic relations has the burden of pleading and proving that the defendant's interference was wrongful "by some measure beyond the fact of the interference itself." *Della Penna v. Toyota Motor Sales, U.S.A., Inc.,* 11 Cal. 4th 376, 392–93 (1995).

First, Beagle has already shown, above, that it has economic relationships with its customers, and 80% of Beagle's business is with customers who use AppFolio. "The tort of interference with prospective economic advantage protects the same interest in stable economic relationships as does the tort of interference with contract, though interference with prospective advantage does not require proof of a legally binding contract." *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990).

Beagle has also established the other four elements: AppFolio's knowledge of the relationship, AppFolio's intentional acts designed to disrupt the relationship, actual disruption of the relationships, and economic harm to Beagle proximately caused by the acts of AppFolio. (*See* §IV(B)(1), *supra.*)

To establish the "independently wrongful act," the Ninth Circuit has held that a plaintiff need not allege different acts than those giving rise to the claim for tortious interference with prospective economic relations, the plaintiff need only show that the acts alleged "were unlawful for a reason other than that they interfered with [Beagle's] prospective economic advantage." *CRST Van Expedited, Inc. v. Werner Enters., Inc.*, 479 F.3d 1099, 1110 (9th Cir. 2007). In reaching that conclusion, the Court found that violation of the California Unfair Competition Law (the "UCL") could satisfy this burden because the violation "is illicit" and that "even though the act that constitutes the violation of tort duties—the alleged solicitation []—is the same, it also violates the law, to wit, the UCL, independent of those tort duties." *CRST Van Expedited, Inc. v. Werner Enters., Inc.,* 479 F.3d 1099, 1111 (9th Cir. 2007). Apart from the UCL, Beagle's interference is based on false statements and is pretextual—its real reason for interference is to promote its own competing products and services.

For these reasons, Beagle has a high likelihood of success on the merits as to all elements of its claim for tortious interference with prospective economic relations.

///

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

### 3. Beagle is Likely to Succeed in its Claim Against AppFolio for Violations Of California's Unfair Competition Law.

Blocking Beagle from access to AppFolio's platform based on pretextual targeting violates California's Unfair Competition Law.  Conduct that constitutes "unlawful, unfair[,] or fraudulent business act or practice and unfair, untrue or misleading advertising" violates the UCL.  Cal. Bus. & Prof. Code § 17200.

AppFolio's targeting of Beagle would violate all three prongs of the UCL.

California courts define "Unfair" conduct as that which "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *NJOY, LLC v. iMiracle (HK) Ltd.*, 760 F. Supp. 3d 1070, 1080 (S.D. Cal. 2024) (granting preliminary injunction for UCL violations).

Here AppFolio's conduct is patently unfair.  AppFolio is targeting Beagle pretextually—in reality AppFolio is seeking to block Beagle to promote its own competing in-house products and other preferred partner.  Doing so under the guise of security concerns and concerns about payment processing, that are false, is classic unfair competition under the UCL.  *See, e.g.*, *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1193–94 (9th Cir. 2022).  In *hiQ*, the Ninth Circuit did not reach the UCL issue fully, because the conduct at issue constituted tortious interference and that was sufficient to impose a preliminary injunction to stop blocking.  But the Ninth Circuit did observe that where the defendant "knew about" the "reliance" on its platform and the defendant "planned to leverage the data on its platform to create a new product" that had "some similarities," then as to the act of "selectively [working] to ban only potential competitors from accessing and using" data on the platform, the result "may well be considered unfair competition under California law." *Id.*[11]

In another case involving data access, the Fourth Circuit applied a standard for unfair competition

---

[11] That the data on LinkedIn was public is of no import here.  Beagle's customer data in AppFolio does not belong to AppFolio—it belongs to the customers, as made clear by AppFolio's own terms.  Those customers willingly contract with Beagle and require that Beagle access the data at issue to provide them services.  The Ninth Circuit's logic is on-point in this situation given the nature of the relationships and data at issue.

16

under Maryland law that is similar to California's UCL, finding that unfair competition constituted "damaging or jeopardizing another's business by fraud, deceit, trickery, or unfair methods of any sort" based on a "case-by-case" analysis. *See Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*, 131 F.4th 205, 225 (4th Cir. 2025). There, where a software platform similar to AppFolio in that it locked in customer data leveraged the control over its software system to lock out a third-party based on "cited reasons for its actions (security and system performance)" that "were a cover for its true motivations (hurting a competitor)," that constituted unfair competition. So too here. AppFolio's security rationale for blocking Beagle is completely fabricated. Beagle does not hack or circumvent any technical measures— it uses functionality that AppFolio designed into its app to permit third-party accounts. And Beagle's customers create the account for Beagle, not Beagle. There is no hiding on Beagle's part, as it uses its regular domain for the accounts. The pretext is even more egregious given that one of Beagle's services to renters, that AppFolio intends to unilaterally cut off this Tuesday, is facilitating identity theft protection.

AppFolio's conduct is also fraudulent under the UCL because AppFolio is making knowingly false statements about Beagle's security and payment processing to Beagle's customers *en masse.* Where the "public" is "likely to be deceived," that satisfies the fraudulent prong of the UCL. *Watson Laboratories, Inc. v. Rhone-Poulenc Rorer, Inc.*, 178 F.Supp.2d 1099, 1121 (2001).

The Court need not even reach the unlawful prong, but AppFolio's conduct is also unlawful because AppFolio is tortiously interfering with Beagle's contracts, making false statements in violation of the Lanham Act, violating California's False Advertising law, and violating the Sherman Act. Under the UCL, "[v]irtually any law—federal, state or local—can serve as a predicate for an action under [the UCL]." *Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal.App.4th 700, 718 (Nov. 20, 2001).

Where a UCL violation risks irreparable harm, such as AppFolio's plan to pretextually block all of Beagle's access to its platform this Tuesday, this supports granting early injunctive relief. *See, e.g.*, *NJOY, LLC v. iMiracle (HK) Ltd.*, 760 F. Supp. 3d at 1081 (S.D. Cal. 2024); *see also Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1079 (N.D. Cal. 2016) (granting TRO in part based on likelihood of success on UCL claim).

### C.    AppFolio's Threats are Causing and will Cause Beagle Irreparable Harm

The Ninth Circuit has held that "the threat of being driven out of business is sufficient to establish

17

ACTIVE 717347307v1

irreparable harm . . . The loss of an ongoing business representing many years of effort and the livelihood of its owners, constitutes irreparable harm.  What plaintiff stands to lose cannot be fully compensated by subsequent monetary damages.  Thus, showing a threat of 'extinction' is enough to establish irreparable harm, even when damages may be available and the amount of direct financial harm is ascertainable." *hiQ Labs,* 31 F.4th at 1188 (9th Cir. 2022) (citation modified) (citing *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985) and *Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co. of New York, Inc.*, 749 F.2d 124, 125–26 (2d Cir. 1984) (per curiam).).

Here, Beagle faces extinction if AppFolio abruptly cuts its access to 80% of its business within 24 hours.  The Ninth Circuit has affirmed injunctive relief in similar circumstances, noting that "hiQ's entire business depends on being able to access public LinkedIn member profiles" in concluding that the district court did not abuse its discretion when it concluded that hiQ "has demonstrated a likelihood of irreparable harm absent a preliminary injunction." *hiQ Labs*, 31 F.4th 1180, 1189 (9th Cir. 2022).

**D.  The Balance of Equities and Public Interest Tips Heavily in Beagle's Favor.**

AppFolio, with the click of a button, will destroy the business Beagle has spent years painstakingly building, collapse more than $10 million dollars of revenue, and eviscerate hundreds of millions of dollars in enterprise value.  As to AppFolio, though, if Beagle merely continues the status quo where its customers contract with Beagle to help them offer services for renters, nothing bad will happen to AppFolio.  It will simply have to continue competing in the market against Beagle, nothing more.  There is no imminent security risk.  No collapse of AppFolio's business.  AppFolio is valued in excess of $8 billion dollars as of this filing, despite Beagle's continued business operations—which AppFolio has known about for over a year.  In such situations, requiring AppFolio to permit Beagle its lawful access "imposes a minimal burden" that does not shift the balance of equities towards AppFolio in any way.  *See, e.g.*, *WPEngine, Inc. v. Automattic Inc.,* No. 24-CV-06917-AMO, 2024 WL 5077610, at *16 (N.D. Cal. Dec. 10, 2024) (Finding balance of hardships weighed in favor of injunctive relief where "WordPress has been, until recently, available to WPEngine on the same terms as other users, or at least on the terms that were in place up until September 25, 2024. Requiring Defendants to restore access on those terms while this action proceeds imposes a minimal burden."); see also HiQ, 31 F.4th at 1202 ("we cannot, on the record before us, conclude that . . . LinkedIn's interest in preventing hiQ from scraping those profiles—are significant enough to

18

outweigh hiQ's interest in continuing its business, which depends on accessing, analyzing, and communicating information derived from public LinkedIn profiles"). The Ninth Circuit emphasized in the HiQ case that LinkedIn had "no protected property interest in the data contributed by its users, as the users retain ownership over their profiles." *Id.* That is the same as the situation here.

Just as the balance of equities weighs heavily in favor of granting Beagle's TRO request, so does the public interest. Beagle's services implicate day-to-day life for renters, including their insurance coverage for catastrophic events like fire. It helps them move in. It helps them connect their utilities—water, electricity, and Internet. It helps them protect themselves from identity theft. AppFolio seeks to unilaterally cut this off—tomorrow. In similar situations, courts in the Northern District and the Ninth Circuit have found that the public interest weighed in favor of early injunctive relief. *WPEngine, Inc. v. Automattic Inc.*, No. 24-CV-06917-AMO, 2024 WL 5077610, at *16 (N.D. Cal. Dec. 10, 2024) (granting injunctive relief) ("users rely on the stability of the plugin, and WordPress more broadly, to operate their websites, run their businesses, and go about their day online. Maintaining that continuity and preventing arbitrary disruption stemming from a corporate dispute is in the public interest."); *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th at 1202 ("the district court properly determined that, on balance, the public interest favors hiQ's position. We agree with the district court that giving companies like LinkedIn free rein to decide, on any basis, who can collect and use data—data that the companies do not own, that they otherwise make publicly available to viewers, and that the companies themselves collect and use—risks the possible creation of information monopolies that would disserve the public interest.").

### E.    An Ex Parte TRO is Merited Given the Urgency and Timing

Beagle found out about AppFolio's intent to shut off its access just days ago. Beagle has attempted to persuade AppFolio that its planned attack on Beagle is unlawful and that it should not do it. AppFolio has declined to stop—instead asking for Beagle's rationale. Beagle provided this rationale in the early hours of Thursday morning in its opposition briefing to AppFolio's TRO in Santa Barbara, which has been denied. AppFolio reiterated its request for more rationale on Friday, through counsel, and has not indicated any intent to change course or not shut Beagle's access off. Beagle is filing this TRO the next court day, Sunday evening / Monday morning, as soon as it possibly can. It has continued fielding confused customer calls and messages based on AppFolio's campaign of falsehoods in the meantime.

19

While there are "'very few' circumstances justifying the issuance of an ex parte TRO," *Rovio Entm't Ltd. v. Royal Plush Toys, Inc.*, 907 F. Supp. 2d 1086, 1094 (N.D. Cal. 2012) (quoting *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006)), those circumstances are present here. Rule 65 permits courts to enter a temporary restraining order without notice to the adverse parties if "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury . . . will result to the movant before the adverse party can be heard in opposition" and the movant's counsel "certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b). The Barros declaration explains that AppFolio was put on notice of the unlawful nature of its conduct and that Beagle intended to seek injunctive relief through the TRO Opposition papers. Also, Beagle's counsel is conveying these papers to AppFolio concurrent with the filing. There is simply no time for full briefing before AppFolio brings the hammer down on Beagle's business. A reasonable course of action under Rule 65(b) would be issuance of a narrow status-quo preserving in junction while the parties brief and prepare for a preliminary injunction hearing.

## V.    CONCLUSION

AppFolio should not be able to destroy more than 80% of a business valued in the hundreds of millions and impact more than 10 million dollars in revenue by pretextually blocking all access to its platform as part of a targeted campaign to tortiously interfere with Beagle's customer contracts and unfairly compete in violation of California and federal law. A narrow TRO is appropriate to maintain the status quo while the Court considers whether preliminary injunctive relief is appropriate.

DATED: December 15, 2025                    Respectfully Submitted,


By    */s/ Michael Burshteyn*

**GREENBERG TRAURIG, LLP**
Michael Burshteyn (SBN 295320)
Marcelo Barros (SBN 339069)
101 Second Street, Suite 2200
San Francisco, California 94105-3668
Telephone: 415.655.1300
Michael.Burshteyn@gtlaw.com
Marcelo.Barros@gtlaw.com

ACTIVE 717347307v1

Jake Evans (*pro hac vice* forthcoming)
Jordana R. Sternberg (*pro hac vice* forthcoming)
Terminus 200, 3333 Piedmont Road NE, Suite 2500
Atlanta, Georgia 30305
Telephone: 678.553.2100
Jake.Evans@gtlaw.com
Jordana.Sternberg@gtlaw.com

*Attorneys for Plaintiffs Beagle Labs, Inc., Beagle Technologies, Inc., Big Beagle, Inc., Rental Property Managers Association LLC, and YRIG Risk Retention Group, Inc.*

21

PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

ACTIVE 717347307v1