Brian Procel (Cal. Bar No. 218657)
Brian@Procel-Law.com
Jeremiah Levine (Cal. Bar No. 288377)
Jeremiah@ProcelLevine.com
Marty Pritikin (Cal. Bar No. 210845)
Marty@Procel-Law.com
**PROCEL LEVINE LLP**
401 Wilshire Blvd, Fl 12
Santa Monica, CA 90401-1456
Phone: 424-788-4538

*Attorneys for Defendant*
*AppFolio, Inc.*

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BEAGLE LABS, INC., a Delaware corporation, BEAGLE TECHNOLOGIES, INC., a Delaware corporation, BIG BEAGLE, INC., a Delaware corporation, RENTAL PROPERTY MANAGERS ASSOCIATION LLC, an Alabama limited liability company, and YRIG RISK RETENTION GROUP, INC., an Alabama corporation,<br><br>                    Plaintiffs,<br><br>v.<br><br>APPFOLIO, INC., a California corporation,<br><br>                    Defendant. | Case No. 2:25-cv-12248-JFW-SSC<br><br>**APPFOLIO'S OPPOSITION TO PLAINTIFFS' MOTION FOR AN EX PARTE TEMPORARY RESTRAINING ORDER**<br><br>**[Declarations of Sean Saxena, Nate Delage, and Jeremiah Levine Filed Concurrently Herewith]** |

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 4

STATEMENT OF FACTS ...................................................................................... 7

    A.    AppFolio. ................................................................................... 7

    B.    AppFolio's Terms of Service. ...................................................... 7

    C.    Point Solutions. ......................................................................... 8

    D.    Beagle's Campaign of False Advertising...................................... 10

    E.    Beagle's Unauthorized Use of AppFolio's Platform. ..................... 11

    F.    AppFolio's Action to Protect its Customers. ................................. 12

    G.    Beagle's Forum Shopping and Abuse of a Court Order. ................. 13

LEGAL STANDARDS ......................................................................................... 13

ARGUMENT......................................................................................................... 14

    I.    Beagle Admits There Is No Need for "Emergency" Relief......... 14

    II.    The Balance of Equities Favors Denial of the TRO.................... 14

        A.    Beagle Has Not Established That It Will Sustain Any Harm. ................................................................................. 15

        B.    This TRO Should Be Denied Because Beagle Has Acted Inequitably................................................................. 16

    III.    Beagle Cannot Establish a Likelihood of Success on the Merits. ................................................................................. 18

        A.    Beagle's Tortious Interference Claims Fail As A Matter of Law.......................................................................... 19

        B.    AppFolio Is Not Violating Any Antitrust Laws. ................ 22

    IV.    It Is Not In The Public Interest To Reward Beagle's Devious Conduct. ................................................................. 28

CONCLUSION ..................................................................................................... 29

## TABLE OF AUTHORITIES

**Cases**

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171 (9th Cir. 2016)..........22

*Apache Stronghold v. United States*, 38 F.4th 742 (9th Cir. 2022) .....................12

*Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.,* 47 Cal. App. 4th 464 (1996) ..................................................................................................................20

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585(1985)...........22

*Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668 (9th Cir. 1988) ...........12

*Damabeh v. 7-Eleven, Inc.*, 2013 WL 1915867. *9 (N.D. Cal. May 8, 2013)....20

*Frank B. Hall & Co. v. Alexander & Alexander, Inc.*, 974 F.2d 1020 (8th Cir. 1992) ...........................................................................................................16, 27

*Herrejon v. Ocwen Loan Servicing, LLC*, 980 F. Supp. 2d 1186 (E.D. Cal. 2013) ...........................................................................................................14, 27

*hiQ Labs v. LinkedIn Corp.*, 31 F.4th 1180 (9th Cir. 2022) ...............................24

*Ixchel Pharma, LLC v. Biogen, Inc.,* 9 Cal. 5th 1130 (2020) ........................17, 19

*MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124 (9th Cir. 2004)..............22

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438 (2009) ............21, 23

*Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26 (1998) ......................19

*Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*, 131 F. 4th 205 (4th Cir. 2025) ...............................................................................................................25

*Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995).......................21

*Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981 (N.D. Cal. 2020) ..............................................................................................................14

*Stormans, Inc. v. Selecky*, 586 F.3d 1109 (9th Cir. 2009) ..................................16

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004)21

*Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7 (2008)..................................13

*WPEngine,* 2024 WL 5077610, at *2 (N.D. Cal. Dec. 10, 2024)........................23

*Xport Forwarding LLC v. Mesitis DWC LLC*, 694 F. Supp. 3d 1258 (C.D. Cal.
2023) ................................................................................................................26

**<u>INTRODUCTION</u>**

Beagle seeks an emergency Court order entitling it to free access to AppFolio's proprietary, customer-only software. With this access, Beagle would continue to use functionality available only to AppFolio's paying customers to run its own business and recruit AppFolio's customers.

Beagle gets access to AppFolio's functionality by improperly convincing AppFolio customers to provide it with user accounts[1] in their AppFolio databases. This violates AppFolio's Terms of Service and creates significant security risks for both AppFolio and its customers. When AppFolio announced its intent to disable these unauthorized user accounts, Beagle sued and filed the present TRO motion (the "Motion").

From these facts, Beagle cannot establish a single element required for a TRO, let alone *all* of them. Beagle instead, relies on a multitude of demonstrably false claims. Three in particular tell the story.

***First***, Beagle claims that if it loses access to AppFolio's customers' databases, it will have "catastrophic consequences for Beagle" and "will destroy Beagle's business." Not so. As Beagle's own CEO wrote to customer(s) *the week before* filing this Motion: "The fix is simple and already in motion. We can continue to run your Beagle program using scheduled reports from AppFolio instead of direct logins if you prefer." Indeed, Beagle is *already* running its

---

[1] "User accounts" refers log-in credentials that allow Beagle to access the customer's AppFolio database under the customer's subscription.

program this way for at least one AppFolio customer. ***Beagle's claim of "irreparable harm" is fabricated.[2]***

***Second,*** Beagle claims that, by disabling user accounts that violate the Terms of Service, AppFolio is "data blocking." This is also false. AppFolio's platform is specifically designed to provide customers with *secure* methods of sharing their data with third parties, such as Beagle. The method referenced by Beagle's CEO—scheduled reports—allows Beagle to receive exactly the same data it receives through its unauthorized user accounts. And Beagle knows this method works because it has *already implemented it* with at least one AppFolio customer. ***Because disabling the unauthorized Beagle user accounts will not block any data, Beagle cannot show a likelihood of success on its unfair competition claim.*** Beagle can get the data it needs without placing AppFolio and its customers at risk.

***Third,*** Beagle claims that AppFolio is disabling the unauthorized user accounts for the sole purpose of harming Beagle. This is, again, false. AppFolio is merely asking its customers to share data with Beagle via one of the multiple *secure* methods designed for this exact purpose. The unauthorized user accounts, by contrast, allow Beagle to take action across the entire database, including accessing the personally identifiable information of the customer's residents and issuing payments from the customer's bank account. When AppFolio notified its customers of these security risks, Beagle's CEO confirmed they are "things a user *could* technically do in your account" (emphasis in original). In other words,

---

[2] And without a showing of harm, the balance of the equities preclude an injunction that would perpetuate Beagle's unauthorized access and the risk it presents to AppFolio and its customers.

Beagle admits that it has the ability to engage in security violations. Security risk is not a pretense for disabling the unauthorized user accounts, it is the reason such accounts are prohibited in the first place. Because AppFolio is rightfully enforcing its Terms of Service (and even offering Beagle alternative methods of working with its customers), Beagle cannot show a likelihood of success on its interference claims.

In addition to these false claims, Beagle has and continues to prove itself untrustworthy, heightening the need for AppFolio's prompt action. As detailed in AppFolio's first-filed complaint in Santa Barbara Superior Court, Beagle has falsely advertised itself as a partner of AppFolio, inducing customers to provide the unauthorized user accounts that AppFolio now seeks to disable. And rather than abide by the status quo during the transfer of this case, Beagle attempted to hide those user accounts by systematically changing their usernames from the identifiable reports@beagleforpm.com (which it touts as a sign of its honesty) to a host of generic, untraceable names such as support@portfoliopm.cc. A Beagle affiliate even went so far as to create a fictional property management company to pose as a prospective customer and gain information about AppFolio's platform.

So why has Beagle expended such effort to gain and maintain unauthorized access to AppFolio's customers' databases when scheduled reports can provide the data it needs? Functionality. AppFolio's user logs show Beagle is not just accessing data, it is *using AppFolio's platform* to issue charges to residents for its products. This functionality is offered only to AppFolio's paying customers; and Beagle is using it, for free, to run its competing business. Beagle's conduct is neither permitted by the Terms of Service nor protected by the law. Beagle's motion should be denied.

## STATEMENT OF FACTS

### A.    AppFolio.

AppFolio Property Manager is a software platform that helps property management companies run their businesses. (Saxena Decl., ¶ 3.) To access AppFolio Property Manager, property managers must pay a monthly subscription fee. (*Id.* ¶ 5.) The software is not available to non-customers. (*Id.*)

When a property manager subscribes to AppFolio Property Manager, they receive a database, which provides them with a wide range of functionality, including accounting, payments, tenant screening, insurance-related services, maintenance management, and more. (*Id.*)

In connection with these services, a property manager's database will contain a large amount of data. (*Id.* ¶ 4.) This data comes from a number of sources, including the property manager, their tenants, and vendors of both AppFolio and the property manager. (*Id.*)

AppFolio's customers manage approximately nine million units on its software platform. (*Id.* ¶ 6.) These nine million units (not all of which are residential rental) account for less than 17% of the estimated 52 million residential rental units in the United States. (*Id.* ¶ 6.) AppFolio believes at least two property management software platforms have a bigger market share: Real Page, Inc. and Yardi Systems, Inc. (*Id*. ¶ 7.)

### B.    AppFolio's Terms of Service.

The Terms of Service for AppFolio Property Manager are available on AppFolio's website. (*Id*. ¶ 17.) Two sections of those terms, in particular, are relevant to this case: Sections 1.4 (Migration of Data) and Section 5.2 (Authorized Users).

Section 1.4 provides that customers "retain all right, title and interest in

7

and to [their] data." (Saxena Decl., Exh. C, ¶ 1.4.) AppFolio strongly believes in its customers' right to use and share their data with whomever they see fit, and so identifies their retention of this right in the Terms of Service. (*Id.*)

Section 5.2, entitled Authorized Users, provides that "[t]hird parties are not permitted to access or use the Services or any application programming interface we may make available to you without [AppFolio's] prior consent." (*Id.*, Exh. C, ¶ 5.2 "Authorized Users"). While customers have the right to share their data with others by exporting it from the database, customers do not have the right to share AppFolio's services. (*See* Saxena Decl. Exh. C ¶¶ 1.4, 5.2.) Under this section, customers are not permitted to give third parties, like Beagle, user accounts that access the database. (*Id.*) AppFolio's services are available only to AppFolio's paying customers. (*Id.*)

In the event a customer violates Section 5.2, for example by giving a third party a user account in its database, Section 5.2 provides AppFolio the right "to disable or delete [that] access to the Services and any application programming interface for any of your authorized users." (*Id.*, ¶ 5.2).

In sum, customers may freely share their data with Beagle, but may not give Beagle user accounts in their database. (*See* Saxena Decl., Exh. C ¶¶ 1.4, 5.2.) AppFolio has the right to disable that access if they do. (Saxena Decl., Exh. C ¶ 5.2.) These provisions have been in place, as written, since at least 2019. (Saxena Decl., ¶ 21.) That is before AppFolio knew Beagle existed. (*Id.*)

### C.    Point Solutions.

AppFolio offers its customers the ability to work with "**Point Solutions**". (*Id.* ¶ 8.) Point Solutions are companies that offer a particular service to the property

manager. (*Id*.) These include internet listing sites, tenant screening companies, debt collection agencies, and maintenance management services. (*Id*.)

While these Point Solutions sometimes compete with AppFolio's own offerings, AppFolio does not prohibit or penalize its customers for working with whatever Point Solutions they choose. (Saxena Decl., ¶ 9.) Thus, any Point Solution is free to work with AppFolio's customers. (*Id*.) AppFolio has, in fact, created multiple *secure* methods by which Point Solutions can work with its customers. (*Id*. ¶¶ 10-13.)

First, customers can work with Point Solutions in the AppFolio Stack Marketplace. (*Id*. ¶ 10.) The Stack Marketplace includes Point Solutions that AppFolio has vetted for security and performance, and with whom it has built dedicated integrations into its platform. (*Id*.) The Stack Marketplaces includes Point Solutions that compete directly with AppFolio. (*Id*.)

Second, customers can use AppFolio's Database API[3] offering to build an automated data link between their database and any Point Solution they like. (*Id*. ¶ 11.) Again, customers are free to use Database API to share their data with direct competitors of AppFolio. (*See id*.).

Third, customers can use scheduled reports to automate data sharing with Point Solutions. (*Id*. ¶ 12.) Scheduled reports allow the customer to create a report of almost any data in their database and automatically send that report on the schedule of their choosing. (*Id*.) Scheduled reports can include the data Beagle says its needs to operate: tenant rosters, unit identifiers, lease and billing

---

[3] An API, or application programming interface, is an automated means for two computer programs to communicate.

data, and insurance compliance status. (Dkt. 4 at 5; Saxena Decl., ¶ 12, Exh. B (showing example scheduled report conveying this data.)

Customers can also work with Point Solutions outside the AppFolio platform, exchanging data through other means. (Saxena Decl., ¶ 13.)

AppFolio provides these secure methods of sharing data precisely so customers do not have to give third parties user accounts in their database, which, as explained below, creates considerable risk. (*Id*. ¶ 14.)

### D.      Beagle's Campaign of False Advertising.

Beagle is a Point Solution that offers an insurance program that competes with AppFolio's insurance offering. (Levine Decl., Ex. A; Saxena Decl. ¶ 11.) To promote their program, Beagle has engaged in a campaign of misrepresentations about AppFolio. (Levine Decl., Ex. A; Saxena Decl. ¶¶ 12-16, Hohler Decl. ¶¶ 3-5.)

Specifically, Beagle tells AppFolio's customers that it has "partnered with" or "integrated with" AppFolio; and, in some cases, Beagle has gone so far as to claim that AppFolio "failed an audit" and so was no longer offering insurance products (which is why customers should ostensibly switch to Beagle's insurance offering).[4] (*Id.*)

---

[4] Beagle also misappropriated AppFolio's name and logo on its own website to falsely imply affiliation or endorsement. (Levine Decl. Ex. A Saxena Decl. ¶ 31.) Beagle only took it down once AppFolio filed suit. (Levine Decl. ¶ 3.) A Beagle affiliate also posed as a property manager interested in a demo to gain information about AppFolio's platform, and even went so far as to generate fake company information to bolster this fake identity. (Levine Decl. Ex. A Saxena Decl. ¶¶ 31-35.)

### E.      Beagle's Unauthorized Use of AppFolio's Platform.

Rather than use the secure methods of working with AppFolio's customers, Beagle uses these misrepresentations to induce AppFolio's customers to provide it with user accounts. (Saxena Decl. ¶ 24.) User accounts are intended for the customers' employees, not third parties. (*Id.*)

By design, a customer can create user accounts to give their employees access to their database. (Delage Declaration., ¶ 6.) For example, an employee tasked with monitoring rent payments can use their user account to perform that function. (*Id.*) For security and audit purposes, the actions of each employee's user account are logged in the system. (*Id.*) And when an employee leaves the company, the user account is deleted. (*Id.*)

Beagle, in part through the false advertising described above, induces customers to create user accounts for it. (Levine Decl., Ex. A; Saxena Decl. ¶¶ 23.) These user accounts also create considerable security risk for the customer. Unlike employee user accounts, which are tied to a specific individual, Beagle shares one user account across its company, with everyone using the same username and password. (Delage Dec. ¶¶ 20-22.) Because Beagle shares the user account (including username and password), actions within the database are not traceable to any individual (*Id.*) This provides bad actors with anonymity within the database. (*Id.*) In addition, because the username and password are shared, former Beagle's employees can retain their ability to access the database even after leaving Beagle. (*Id.*) Any Beagle employee (current or former) with the password could take any number of nefarious actions in the database, such as stealing residents' personal identifying information or accessing the customers' bank accounts. (*Id.* ¶ 23.) Beagle's CEO has admitted that Beagle's access to a

11

customer's AppFolio database enables Beagle to harm the customer. (Saxena Decl., Exh. D) (responding to AppFolio's email listing security risks from Beagle and admitting that "AppFolio's message listed things a user *could* technically do in your account.") (original emphasis).

When Beagle obtains user accounts, it allows Beagle to use the functionality AppFolio provides only to its customers. (Saxena Decl. ¶ 25.) For example, Beagle uses AppFolio to create charges to residents for its offerings. (Delage Decl. ¶ 25.) Beagle has never asked for permission to access AppFolio's application programming interface. (Saxena Decl. ¶ 29.) And Beagle has never paid or provided any consideration to access AppFolio's software. (*Id.*)

### F.    AppFolio's Action to Protect its Customers.

The Terms of Service allow AppFolio to disable unauthorized user accounts without prior notice. (Saxena Decl., Exh. C, ¶ 5.2). But to minimize disruption and provide its customers the opportunity to transition to the *secure* methods of working with Beagle, AppFolio gave a week of advanced notice before disabling Beagle's unauthorized user accounts. (Brown Decl. iso Motion, Exh. C (Dkt. 4-5).) In that notice (sent only to customers who use Beagle), AppFolio explained that Beagle can access customer data in a way that does not violate the Terms of Service or create security risk (i.e., Beagle cannot continue using unauthorized accounts). (*Id*.) As AppFolio explained:

> We have notified Beagle we are removing their access and outlined a path to provide you continued service that is compliant with our terms of service and does not create security risk. To facilitate any transition for your business, we will allow them [to] maintain access to your database (should you so choose) for 5 business days, until December 16, 2025, before removing those users.

(Brown Decl. iso Motion, Exh. C (Dkt. 4-5).)

In response, Beagle's CEO sent an email in which he conceded that Beagle would suffer no harm from AppFolio disabling Beagle's unauthorized accounts. He explained: "**The fix is simple and already in motion. <u>We can continue to run your Beagle program using scheduled reports</u>** from AppFolio instead of direct logins if you prefer." (Saxena Dec. Exh. D) (original emphasis). In the same email, he conceded that Beagle is a security risk, writing that AppFolio's security concerns were "listed things a user *could* technically do in your account." (*Id.*) (original emphasis). In sum, the security concerns arising from Beagle are grave and unnecessary. Beagle admitted that it has the *ability* to cause substantial harm to customers; and could avoid this risk by using scheduled reports. (*Id.*)

### G.    <u>Beagle's Forum Shopping and Abuse of a Court Order.</u>

Prior to transferring this case to the Central District, which was based in part on her holding that "the apparent forum shopping by Beagle strongly favors transfer," Judge Martinez-Olguin held a status conference on December 19, 2025. (Dkt. 24.) At that status conference, AppFolio agreed to delay disabling its customers' unauthorized Beagle user accounts until December 22. (Dkt. 15.) Beagle has taken advantage of that delay to change the usernames on its user accounts in AppFolio's customers' databases to prevent AppFolio from finding and disabling them. (Delage Decl., ¶ 16.)

### LEGAL STANDARDS

"A party seeking a preliminary injunction must show that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in [its] favor; and (4) an injunction is in the public interest." *Apache Stronghold v. United States*, 38 F.4th 742, 751 (9th Cir. 2022).

## ARGUMENT

### I.     Beagle Admits There Is No Need for "Emergency" Relief.

"A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (original emphasis).

Here, Beagle's own CEO admitted, in writing, that there is no need for emergency relief. (Saxena Decl., Exh D.) Shortly after AppFolio's notice that the unauthorized user accounts would be disabled, Beagle CEO, Michael Brown, sent an email to some or all of Beagle's AppFolio-based customers. (Saxena Decl. ¶ 31, Exh. D.) In that email, Brown emphasized that "**The fix is simple and already in motion. <u>We can continue to run your Beagle program using scheduled reports</u>** from AppFolio instead of direct logins if you prefer." (Saxena Decl. Exh. D.) (original emphasis).) In other words, ***Beagle admits that it has an effective alternative in the event AppFolio disables the unauthorized user accounts.***

Beagle is now telling this Court precisely the *opposite* of what it told its own customers. The truth is that Beagle faces no "extinction event" or impending "catastrophe" that will destroy its business. In Beagle's own words, the solution is "simple." (Saxena Decl. Exh. D.) Beagle can use AppFolio's scheduled reports. (Saxena Decl. ¶ 12, Exh. D.) There is no need for a TRO.

### II.     The Balance of Equities Favors Denial of the TRO.

Before issuing preliminary injunctive relief, courts "must balance the competing claims of injury and must consider the effect on each party of the

granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 24 (2008) (quotation omitted).

### A.     <u>Beagle Has Not Established That It Will Sustain Any Harm.</u>

Beagle claims that if AppFolio enforces its Terms of Service and disables the unauthorized user accounts in its customers' databases, it "will end Beagle's business overnight." (Dkt. 4-2, ¶ 10.) As detailed above, its own CEO says otherwise. But as importantly, Beagle offers no actual evidence of its impending "extinction."

Beagle contends that the "cutoff would prevent Beagle from verifying coverage, administering tenant-liability programs, processing compliance data, and performing other essential functions." (Dkt. 4 at 9-10.) But Beagle does not explain how or why. Beagle does not explain how it uses user accounts to perform these functions, or why they cannot be performed without them. The only indication in Beagle's papers is that it uses the user accounts to obtain certain data from customers' databases. But Beagle can obtain that data without user accounts. (Saxena Decl., ¶ 12.) It is available, *securely,* through other means, including scheduled reports (as its CEO recognizes). (Saxena Decl. ¶ 12, Exh. D.)

To make the point plainly: Beagle's alleged harm cannot be based on lost access to data because *Beagle has access to the data*. The four categories of data Beagle says it needs, "tenant rosters, unit identifiers, lease and billing information, and insurance compliance," can be included in a scheduled report. (Dkt. 4 at 5; Saxena Decl. ¶ 13, Exh. D.) AppFolio has even attached a sample scheduled report showing the data Beagle claims to require. (Saxena Decl., Exh. A.) When Beagle's CEO says the solution is "simple," he is right. Customers could automate these scheduled reports in about 5 minutes. (Saxena Decl. ¶ 12.)

Beagle's arguments amount to nothing more than the conclusory claim that it "faces extinction if AppFolio abruptly cuts its access"[5] (Dkt. 4 at 18); a claim directly refuted by its CEO and by its ability to obtain the required data by other means. Its motion should be denied.

**B.      This TRO Should Be Denied Because Beagle Has Acted Inequitably.**

When a party tries to use a TRO to facilitate wrongful conduct, the balance of equities necessarily tips against it. *See Herrejon v. Ocwen Loan Servicing, LLC*, 980 F. Supp. 2d 1186, 1210 (E.D. Cal. 2013) ("[T]he balance of equities weighs in defendants' favor as the record suggests that plaintiffs may have unauthorized access to the property without payment of outstanding amounts owed and seek to delay foreclosure to extend their possession of the property.").

Through its false advertising and disregard for AppFolio's Terms of Service, Beagle has placed AppFolio in a position where, if the TRO is granted, AppFolio will be forced to permit ongoing breaches of its Terms of Service and provide software functionality (which it reserves for its paying customers) to a competing company for free.

In addition, Beagle has already demonstrated it will use the time afforded by a TRO to prevent AppFolio from ever enforcing its rights. Beagle has already used the standstill intended for the Court to address Beagle's "apparent forum shopping" to begin hiding its access to AppFolio's platform. (Delage Decl. ¶ 16.)

---

[5] It is well-settled that such conclusory allegations of competitive harm are insufficient to sustain a lawsuit, much less justify injunctive relief. *See Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 1002 (N.D. Cal. 2020) (granting motion to dismiss Sherman Act claim on ground that allegations of harm were conclusory).

16

Specifically, Beagle entered customers' AppFolio databases and began taking Beagle's identifiable reports@beagleforpm.com email domains and changing them to generic email domains without the word "Beagle", such as support@portfoliopm.cc. (*Id.* ¶¶ 9-10.) As detailed in the declaration of AppFolio engineer Nathanial Delage, Beagle systematically created at least seven new generic domain names — pmportfolio.cc, portfolioanalysis.cc, portfolioreview.cc, portfoliopm.cc, fortwaynegroup.cc, scheduledreports.info, and residentliability.com — to hide its unauthorized user accounts from AppFolio. (*Id.* ¶¶ 15-16.) ***As of December 24, 2025, Beagle had hidden at least 60 user accounts in this manner.*** (*Id.* ¶ 15.)

Beagle's subterfuge undermines its representation to this Court that its access to AppFolio's platform is "transparent." (Dkt. 1 ¶ 25). Beagle told this Court it does not hide, but uses "accounts with Beagle email domains," so that "AppFolio has full visibility into this through its own administration of the AppFolio platform." (*Id.*) Those representations, if they were ever true, are no longer.[6] Given this conduct, there is every reason to expect that Beagle will attempt to use further delay to find new ways to hide its accounts and activities within customers' databases.

A TRO would allow Beagle to continue to wrongly advertise its access to AppFolio's platform, force AppFolio into permitting ongoing violations of its Terms of Service, and require AppFolio to continue spending time and resources to combat Beagle's efforts to hide its presence in AppFolio's propriety software platform. Meanwhile, Beagle has failed to establish any harm of its own. The

---

[6]AppFolio has no reason to believe that Beagle's attorneys are intentionally making misrepresentations. They may be unaware of Beagle's subterfuge.

balance of equities therefore favors denying the injunction. *Frank B. Hall & Co. v. Alexander & Alexander, Inc.*, 974 F.2d 1020, 1025 (8th Cir. 1992) ("[A]n illusory harm to the movant will not outweigh any actual harm to the non-movant.").[7]

### III.   Beagle Cannot Establish a Likelihood of Success on the Merits.

Although Beagle's Complaint contains nine causes of action, the Motion focuses on the claims for interference with contract and prospective economic relations, and unfair competition.[8] Beagle cannot show a likelihood of success on any of these claims.

Beagle's interference claims fail because AppFolio is merely enforcing its preexisting contractual right to prohibit third parties from accessing its platform; and because it engaged in no "independently wrongful" conduct when enforcing these rights. AppFolio merely seeks to protect the security of its platform and its customers' databases.

---

[7] In the opening of its venue brief, Beagle claimed that AppFolio breached the status quo when it "continued" to display its in-app message regarding its intent to disable Beagle user accounts. (Dkt. 22.) "Continu[ing]" to display the message *maintained* the status quo; it did not change it. In any event, AppFolio removed the banner on December 18, prior to and independent of Beagle's allegations first raised on December 19. (Saxena Decl. ¶ 27.)

[8] To the extent that Beagle's interference or unfair competition claims are premised on allegedly false statements, that would not support the preliminary injunction Beagle seeks. "Injunctive relief . . . must be tailored to remedy the specific harm alleged. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009). An overbroad injunction is an abuse of discretion." *Id*. Even if AppFolio defamed Beagle (it hasn't), that wouldn't entitle Beagle to prevent AppFolio from disabling its accounts. At most, it would entitle Beagle to an injunction against making further false statements (which Beagle hasn't sought)—or, more likely, a claim for damages after trial.

Beagle's unfair competition claim[9] also fails because it cannot establish that AppFolio has monopoly power (AppFolio has less than 17% of the market) and because AppFolio has not and will not block Beagle's access to data; rather AppFolio has deliberately created multiple *secure* methods for Beagle to access the data it needs.

### A.    Beagle's Tortious Interference Claims Fail As A Matter of Law.

Tortious interference with contractual relations requires "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Ixchel Pharma, LLC v. Biogen, Inc.,* 9 Cal. 5th 1130, 1141 (2020). For at-will contracts such as those at issue here, a showing of "independent wrongfulness" is required. *Ixchel Pharma, LLC*, 9 Cal. 5th at 1141.

Interference with prospective economic relations is similar, but "a plaintiff asserting this tort must show that the defendant knowingly interfered with an economic relationship between the plaintiff and some third party, [which carries] the probability of future economic benefit to the plaintiff." (*Id.*) (citations omitted). Beagle cannot carry its burden as to *any* of these elements, let alone all of them.

***Beagle cannot establish the existence of a valid contract*** because it has not even identified the contracts at issue. Beagle has not included with the Motion a single customer contract, a template of a customer contract, or cited even one term of such a contract. It is entirely unclear what promises Beagle has made or what

---

[9] Beagle's unfair competition claim also incorporates the interference claims, which, as explained, are non-viable.

19

promises its customers have made in return, if any. Beagle is not entitled to injunctive relief based on some vague assertion that it has "contracts."

***Beagle cannot establish AppFolio's knowledge of these contracts.*** At most, Beagle alleges that AppFolio is aware that Beagle has a relationship with its customers. But there is no evidence that AppFolio has knowledge of any contract or the terms thereof. Indeed, AppFolio still does not know what Beagle has actually promised its customers, or what the customers have promised in return. The most AppFolio can glean is that, in the words of Beagle's own website,[10] Beagle has "no long-term contracts or commitments. Property managers can adjust or cancel their participation at any time. We earn your business every day." Beagle's motion includes no evidence to the contrary.

***Beagle cannot establish that AppFolio intended to disrupt Beagle's contracts.*** Obviously, if AppFolio does not know the terms of Beagle's contracts (if any), it cannot have intended to disrupt them. And Beagle cannot show intent to interfere because the evidence attached to Beagle's motion shows that AppFolio deliberately sought to *preserve* its customers' ability to work with Beagle. Specifically, as Beagle's CEO said, AppFolio's notice to customers "outlined a path" for Beagle to "provide [its customers] continued service that is compliant with our terms of service and does not create security risk." (Brown Decl. iso Motion, Exh. C (Dkt. 4-5).) Far from interfering, AppFolio has actively sought to help Beagle and its customers transition to scheduled reports—a feature AppFolio created specifically to allow its customers to work *securely* with third parties. (*Id.*, Saxena Decl. ¶ 12.) Conversely, Beagle offers no evidence that AppFolio did

---

[10] (https://www.joinbeagle.com/faq.)

anything other than enforce its pre-existing contractual rights to secure its platform and its customers' databases.

***Beagle cannot establish that AppFolio engaged in "independently wrongful" conduct.*** Beagle claims that interference with a contract alone is sufficient, without the need to show independently wrongful conduct (as is required for a prospective advantage claim). (Dkt. 4, at 12-13, citing *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 32 (1998).) The law Beagle cites does not apply to these facts.

As Beagle's website says, Beagle has "no long-term contracts or commitments," but allows its customers to "cancel their participation at any time." In other words, Beagle's contracts (if any) are at-will. The Supreme Court of California has held that, because there is no guarantee of future performance in an at-will contract, such a contract is treated as a prospective economic advantage, and a showing of "independent wrongfulness" *is* required. *Ixchel Pharma, LLC*, 9 Cal. 5th at 1148. Thus, Beagle must show independently wrongful conduct on *both* of its interference claims.

Beagle cannot make this showing. California law is clear that enforcement of one's contractual rights is *not* "independently wrongful" conduct. *See Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.,* 47 Cal. App. 4th 464, 480 (1996) ("[T]he exercise of contractual rights . . . is not wrongful conduct actionable as intentional interference with prospective economic relations"); *see also Damabeh v. 7-Eleven, Inc.*, 2013 WL 1915867. *9 (N.D. Cal. May 8, 2013) (relying on *Arntz* to dismiss tortious interference claim without leave to amend on ground that "Plaintiff has failed to establish that, in reclaiming the Merchandise, Defendant was doing anything more than exercising its contractual rights.'") Thus,

AppFolio's enforcement of its preexisting contractual rights does not support Beagle's interference claims.

*Beagle cannot establish that AppFolio actually disrupted a contractual relationship or caused harm.* All Beagle offers to show disruption is the conclusory statement that the "cutoff would prevent Beagle from verifying coverage, administering tenant-liability programs, processing compliance data, and performing other essential functions." (Dkt. 4 at 9-10.) Beagle does not explain whether these functions are required by the contracts; and Beagle does not explain why user accounts are required to perform these functions. At most, Beagle claims it needs access to data. But that cannot support Beagle's claim because, as shown above (and as admitted by its CEO), Beagle can obtain all the data it claims it needs through scheduled reports. (Saxena Decl. ¶ 12, Exh. D.) There is no evidence of disruption.

**B.    AppFolio Is Not Violating Any Antitrust Laws.**

**1.    AppFolio Lacks Sufficient Market Power.**

Beagle claims that "AppFolio possesses monopoly power in the Property Management Software Platform Market for residential property managers in the United States." (Dkt. 1 at ¶ 82.) But "a market share of less than 50 percent is presumptively insufficient to establish market power" to monopolize, and "[w]hen the claim involves attempted monopolization," even "30 percent is presumptively insufficient." *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995) (finding 44% market share raised a triable issue).

22

AppFolio has about nine million units on its platform, and there are approximately 52 million residential rental units in the United States.[11] (Saxena Decl. ¶ 6.) That means AppFolio has less than 17% of the residential rental units in the United States.[12] (*Id.*) Not only does that place AppFolio well below the "presumptively insufficient" 30% mark, but AppFolio is not even the market leader. (*Id.* ¶ 7.) AppFolio believes two other companies, Real Page, Inc. and Yardi System, Inc., have larger market share. (*Id.*) At third place and with less than 17% of the market, AppFolio is far from a monopoly power. *Rebel Oil Co.*, 51 F.3d at 1438.

### 2. Beagle Has Not Alleged Anticompetitive Conduct.

The United States Supreme Court has long held that the Sherman Act "does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004). "As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009).

---

[11] Beagle alleges AppFolio has eight million units, but AppFolio has chosen to present the Court with the largest possible number of units. Indeed, not all of the nine million units are rentals, and thus not candidates for Beagle's services. Should it become necessary, AppFolio reserves the right to demonstrate that applicable number of rental units for evaluation of its market power is lower than nine million.

[12] That 80% of Beagle's customers are purportedly on AppFolio's platform shows only the degree to which Beagle has targeted AppFolio and taken advantage of its functionality.

23

The lone established exception to this rule arises when "the only conceivable rationale or purpose is 'to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition.'" *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016). To use this exception, a plaintiff must show (1) "the unilateral termination of a voluntary and profitable course of dealing"; (2) "the defendant's refusal to sell [ ] to the plaintiff 'even if compensated at retail price,' thus 'suggesting a calculation that its future monopoly retail price would be higher'"; and (3) the defendant's refusal "to provide to their competitors products that were already sold in a retail market to other customers." *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124 (9th Cir. 2004); *see also Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601(1985) (establishing the exception). None of these elements are met here.

AppFolio did not terminate a "voluntary and profitable course of dealing" with Beagle; AppFolio has never had a business relationship with Beagle. (Saxena Decl., ¶¶ 28-29.) Nor is AppFolio sacrificing profits; AppFolio never received any money from Beagle for its use of AppFolio's platform. (*Id.*) Nor has AppFolio refused to sell its services to Beagle "at a retail price;" Beagle is not a property manager and has never openly[13] attempted to purchase AppFolio's services. (Id. ¶ 29.)

AppFolio merely seeks to enforce its Terms of Service that have been in place since 2019 (well before AppFolio was aware of Beagle) and prevent non-secure third-party access. (*Id.* ¶ 29.) Beagle has failed to articulate any legally

---

[13] At one point, a Beagle affiliate apparently created a fake property management company to defraud AppFolio into providing a demonstration of AppFolio's product. (Levine Decl. Exh. A; Saxena Decl. ¶¶ 32-34.)

cognizable reason that AppFolio should not be allowed to enforce its contracts, and should instead be forced to provide its platform and functionality to Beagle. The law is expressly to the contrary: "[b]usinesses are free to choose the parties with whom they will deal." *Pac. Bell Tel. Co.*, 555 U.S. at 448.

### 3. Beagle Cannot Rely On Narrow Exceptions for Public Data or Health Records.

Unable to overcome "the long recognized right of" a company to choose "parties with whom [it] will deal," Beagle attempts to portray AppFolio's actions as unlawful "data blocking." (Motion at 2.) To support this argument, Beagle cites two decisions in which companies blocked competitors' access to platforms or data that were otherwise publicly available. (Dkt. 4 at 2.) These decisions, if anything, show why Beagle's motion is unsupported.

In *WPEngine*, the defendant, WordPress, offered a "free and open-source software program that allow[ed] users to build and maintain websites" and was used by more that 40% of all websites on the internet. *WPEngine,* 2024 WL 5077610, at *2 (N.D. Cal. Dec. 10, 2024). The plaintiff, WPEngine, offered additional tools for WordPress users to improve their websites. *Id.* After a decade, and despite ***offering its software for free to the general public***, WordPress began charging WPEngine a substantial fee for the previously free software (which was still free to others). *Id*.

On these facts, the Court found WordPress had enticed WPEngine to use its software to build a customer base, and then used that customer base as leverage to charge WPEngine for software it made free to others. *Id*. at *13-14. Based on this enticement, the lack of a viable alternative, and the pending loss of customers, the

25

District Court entered a preliminary injunction enjoining the defendant from charging WPEngine for its free software. *Id*. at \*13-14.

In *hiQ Labs*, the plaintiff was a data analytics company that scraped publicly available LinkedIn data, analyzed it, and sold it to clients. *hiQ Labs v. LinkedIn Corp.*, 31 F.4th 1180, 1187 (9th Cir. 2022). It's "entire business depend[ed] on being able to access public LinkedIn member profiles . . ." *hiQ Labs*, 31 F.4th at 1189. There was "no current viable alternative to LinkedIn's member database to obtain data for hiQ's Keeper and Skill Mapper services." *Id.* Despite LinkedIn profiles being accessible to the general public, LinkedIn prevented hiQ from accessing them. *Id.* at 1185, 1189.

The Ninth Circuit affirmed the grant of a preliminary injunction, holding that it was at least probable that LinkedIn, "whose servers hold vast amounts of ***public data***," should not be permitted to selectively ban "only potential competitors from accessing and using that otherwise ***public data*** . . ." *Id.* at 1193–94 (emphasis added.)

This case has nothing in common with *hiQ* or *WPEngine*. AppFolio does not make software or data available to the public. (Saxena Decl. ¶ 5.) Nor is Beagle using publicly available data; to the contrary, the data is protected by password within customers' databases on AppFolio's platform. (*Id.* ¶¶ 5, 25; Delage Decl. ¶ 5.) And, AppFolio is not blocking access to this data. Rather, AppFolio has designed multiple methods for its customers to share data with third parties like Beagle. (*Id.* ¶¶ 10-13.) These include (1) using AppFolio's Scheduled Reports; (2) applying to become a recognized partner of AppFolio; and (3) using Database API functionality. (*Id.*) Beagle is not blocked at all.

26

Beagle's reliance on the blocking of health record data is similarly unpersuasive. (Motion (Dkt. 4) at 3 n. 2, 14, 16.) Beagle cites to *Real Time* for the proposition that data blocking is unlawful when it would cause harm to a business. *Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*, 131 F. 4th 205 (4th Cir. 2025). That is not the law.

*Real Time* involved an attempt by a health records company to withhold medical files from a health analytics company that serviced skilled nursing facilities. *Id.* at 205. The decision rested on the 21st Century Cures Act, which, among other things, "seeks to prevent companies from engaging in 'information blocking' of electronic **health information**." *Id*. at 230. The public policy rationale of the statutory scheme was "designed to advance interoperability" and "support the access, exchange, and use of electronic health information." *Id*. at 231. Thus, in *Real Time*, there was an entire statutory scheme that prohibits companies in possession of medical records from refusing to share them with legitimate third-parties. *See id*. The court issued a preliminary injunction based on the 21st Century Cures Act that obligated the defendant to turn over its medical files. *Id.* at 241.

There is no statutory scheme here that governs data sharing among property managers. There is no body of law that regulates the exchange of data among property managers. There is no public policy reason that a privately-held company should be required to share its property management data with third-parties. AppFolio, like virtually all companies in the United States, is free to determine with whom it wants to do business. Beagle's decision to rely on *hiQ*, *WPEngine*., and *Real Time* is misguided.

27

### 4.    AppFolio is Justified in Enforcing its Terms of Service Against Beagle.

Beagle argues that AppFolio is only enforcing its Terms of Service because Beagle is a competitor. (Dkt. 4 at 1.) In fact, AppFolio is enforcing its Terms of Service to protect its customers and itself from the risks imposed by the unauthorized user accounts in its customers' databases. These accounts impose substantial security risks: Beagle, or any former Beagle employee with the password, can use the AppFolio services in the customer's database, such as charging a property manager's residents, sending other payments, or running background checks. (Saxena Decl. ¶ 25.) Beagle personnel (current or former) could also steal residents' personal and financial information, access and alter the customer's bank information, and more, depending on the permission level. (*Id.*) These risks are particularly concerning given Beagle's track record of dishonest behavior, including falsely advertising to AppFolio's customers that Beagle and AppFolio are partners; falsely telling customers that AppFolio failed an audit and brought Beagle in to offer insurance services (Levine Decl. Exh. A; Saxena Decl. ¶ 14); pretending to be a property manager to get a demonstration of AppFolio's product (*Id.* ¶¶ 32-35); and exploiting a stand-still order to hide Beagle's identifiers in AppFolio's customer databases. (Delage Decl. ¶ 16.)

## IV.    It Is Not In The Public Interest To Reward Beagle's Devious Conduct.

The public interest will rarely favor an injunction when the dispute is between private companies. *See Xport Forwarding LLC v. Mesitis DWC LLC*, 694 F. Supp. 3d 1258, 1271 (C.D. Cal. 2023) ("[T]his is a private dispute between two companies. When the reach of an injunction is narrow, limited only to the parties,

28

and has no impact on non-parties, the public interest will be at most a neutral factor in the analysis rather than one that favors granting or denying the preliminary injunction.") (quotation omitted). And as discussed above, Beagle's claim that countless renters will be affected is specious, since Beagle admits that the "fix" to disabling the unauthorized user accounts is "simple and already in motion." (Saxena Decl. Exh. D.)

The public interest is also in no way served by an injunction enabling a party to continue inequitable conduct. *See, e.g., Herrejon*, 980 F. Supp. 2d at 1211 ("Granting injunctive relief would be a disservice to public interest by allowing plaintiffs to preclude foreclosure after their default and without legitimate tender of outstanding amounts owed.").

Nor would the public interest be served by forcing AppFolio to tolerate an ongoing breach of its terms of service. *Frank B. Hall & Co. v. Alexander & Alexander, Inc.*, 974 F.2d 1020, 1025-26 (8th Cir. 1992) ("[T]he public interest does not favor forcing parties to an agreement to conduct themselves in a manner directly contrary to the express terms of the agreement.").

## CONCLUSION

For the foregoing reasons, the Court should deny the Motion in its entirety. DATED this 29th day of December, 2025.

*/s/*
Brian Procel
Jeremiah Levine
Marty Pritikin
**PROCEL LEVINE, LLP**

Attorneys for Defendant
AppFolio, Inc.

29

30