**GREENBERG TRAURIG, LLP**
Michael Burshteyn (SBN 295320)
Marcelo Barros (SBN 339069)
101 Second Street, Suite 2200
San Francisco, California 94105-3668
Telephone: 415.655.1300
Michael.Burshteyn@gtlaw.com
Marcelo.Barros@gtlaw.com

Jake Evans (*pro hac vice* forthcoming)
Jordana R. Sternberg (*pro hac vice* forthcoming)
Terminus 200, 3333 Piedmont Road NE, Suite 2500
Atlanta, Georgia 30305
Telephone: 678.553.2100
Jake.Evans@gtlaw.com
Jordana.Sternberg@gtlaw.com

*Attorneys for Plaintiffs Beagle Labs, Inc., Beagle Technologies, Inc., Big Beagle, Inc., Rental Property Managers Association LLC, and YRIG Risk Retention Group, Inc.*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

BEAGLE LABS, INC., a Delaware corporation, BEAGLE TECHNOLOGIES, INC., a Delaware corporation, BIG BEAGLE, INC., a Delaware corporation, RENTAL PROPERTY MANAGERS ASSOCIATION LLC, an Alabama limited liability company, and YRIG RISK RETENTION GROUP, INC., an Alabama corporation,

Plaintiffs,

v.

APPFOLIO, INC., a California corporation,

Defendant.

CASE NO. 2:25-cv-12248-JFW-SSC

**DECLARATION OF MICHAEL BROWN IN FURTHER SUPPORT OF PLAINTIFFS' EX PARTE TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION APPLICATION**

# DECLARATION OF MICHAEL BROWN

I, Michael Brown, declare as follows:

1. I am Chief Executive at Big Beagle, Inc. I have personal knowledge of the facts surrounding the present action and Plaintiffs' (collectively referenced as "Beagle") business, and all facts stated herein, unless otherwise stated on information and belief. If called upon to testify, I could and would competently do so under oath as to the truth of the matters stated herein.

2. An example of the contracts Beagle has with its customers is attached as **Exhibit A**. AppFolio works with many Beagle customers and should be familiar with Beagle's business and the services Beagle's customers contract for Beagle to do for them. AppFolio has studied Beagle's business and invested in Second Nature, a Beagle competitor, as well as developing its own in-house solutions to compete with Beagle.

3. Attached as **Exhibit B** is a message Beagle received from a customer where AppFolio attempted to persuade that customer to stop using Beagle based on the same types of false statements AppFolio has already made throughout the last few weeks and reflected in the prior messages Beagle has submitted with its papers.

4. In addition to the prior revenue at risk numbers ($10m) and lost revenue numbers ($500,000+) submitted in our prior papers, I have also conducted a careful review of AppFolio's conduct on our sales pipeline at Beagle. A conservative estimate of the deal value of the pipeline that has slowed down or said they would not move forward with Beagle since AppFolio began its platform ban threats earlier in December, 2025 is over $5,000,000 and over 10,000 doors, or individual rental units. These numbers are based on our individual sales leaders pipeline review, slowdown of expected to close deals, and direct communications from customers. Because the majority of Beagle's customers use AppFolio, I believe based on the information and business records I've reviewed that it is likely that AppFolio's platform ban threats are impacting the majority of Beagle's sales pipeline. Because there is no explicit order requiring AppFolio not ban Beagle, the customers we do speak with express confusion and do not believe the Beagle team when

Beagle states that AppFolio has not banned Beagle.

5. The email I sent about alternatives should AppFolio ban Beagle was meant to be damage control to stop customer panic. The idea of using Scheduled Reports is something we might try to pitch customers on if AppFolio were to ban Beagle, but it is not workable. Beagle's value proposition to customers is that they do not have to go through the onerous process of setting up Scheduled Reports in AppFolio. The Scheduled Reports approach shifts the labor from Beagle to property managers who are Beagle's customers, inverting the entire Beagle value proposition. Customers are not excited to sign up for Beagle when we discuss Scheduled Reports.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on December 31, 2025 in Salt Lake City, Utah.

Michael Brown

# EXHIBIT A

# Rental Property Managers Association LLC

## MEMBERSHIP AGREEMENT

This is a contract (the "Membership Agreement") between Rental Property Managers Association LLC ("RPMA") and test________________________ ("Member"). RPMA and Member are referred to collectively as "Parties". Both Parties are bound by the terms of this Membership Agreement. In exchange for valuable consideration, the sufficiency of which is acknowledged by the Parties, the Parties agree as follows:

### 1. Benefits Provided by RPMA to Member

The Member is entitled to the following potential benefits, if selected in the Exhibit to this Agreement and subject to the amounts reflected in the Exhibit to this Agreement.

a. Liability Protections

If selected in the applicable **Lease Addendum**, RPMA will reimburse the **Member** for the following:

i) *Renter Contents* – RPMA will reimburse the **Member** for a maximum of [$A] in the aggregate during the **Lease Term** for the **Actual Cash Value** or **Replacement Cost** (as selected in the **Lease Addendum**) of a **Renter Contents Liability Loss**.

ii) *Renter Premises Legal Liability* – RPMA will reimburse the **Member** for a maximum of [$C] in the aggregate during the **Lease Term** for a **Renter Premises Legal Liability Loss**. As indicated on the **Lease Addendum**, **Bodily Injury** is:

1. excluded from **Renter Premises Legal Liability Loss**; or
2. included in **Renter Premises Legal Liability Loss**, subject to a [$D] sublimit per each **Renter Premises Legal Liability Loss.**

iii) *Accidental Pet Damages* – RPMA will reimburse the **Member** for a maximum of [$E] the aggregate during the **Lease Term** for damage to **Covered Property**, or other property owned or leased by the **Member**, caused by a pet owned or controlled by the **Renter**. However, this reimbursement excludes carpet cleaning and landscaping. RPMA also will reimburse the **Member** for a maximum of [$F] for **Bodily Injury** to others, caused by a pet owned or controlled by the **Renter**. RPMA does not agree to reimburse the **Member** for any cost associated with any legal defense provided to the **Renter** for such matters.

b. Security Deposit

If the "Security Deposit" box is checked in the **Lease Addendum**:

i) RPMA understands that the **Member**, has waived collection of the one-time **Security Deposit** during the **Lease Term**.

ii) RPMA will reimburse **Member** for amounts contractually recoverable from the **Renter** under the **Lease Agreement**, but not more than a total of the equivalent of one month's rent under the **Lease Agreement**.

c. Automated Tenant Communications

i) RPMA will utilize automated technology to promptly notify **Renters**, in the name of the **Member**, of:

1. Overdue rent;
2. Upcoming termination or renewal of the **Lease Term**;
3. Other informational messages reasonably requested by **Member** to be distributed to **Renters.**

d. Beagle Tenant Kit

i) RPMA will provide secure data management and supply the data to preferred vendors offering the benefits:
   1. ID Theft Protection
   2. Credit reporting services
   3. Move in concierge services
   4. Air filter delivery
   5. Marketing material will be provided such as Tenant Flyers and Videos
   6. Pest control services
   7. Deals dashboard

## 2. Defined Terms

a. **Actual Cash Value** means the cost to repair or replace **Renter Contents**, at the time of loss or damage, whether that property has sustained partial or total loss or damage, with material of like kind and quality, subject to a deduction for deterioration, depreciation and obsolescence.

b. **Bodily Injury** means bodily injury, bodily harm, sickness, disease, or death of a natural person who is not the **Renter**, directly resulting from a **Renter Premises Legal Liability Loss**.

c. **Covered Property** means the dwelling or unit occupied by the **Renter** and described in the **Lease Agreement**, including any accompanying physical property not owned by the **Renter**, but does not include any dwelling or unit vacant for 30 or more consecutive days.

d. **Lease Addendum** means the addendum provided to the **Renter** in conjunction with the **Lease Agreement** that indicates the benefits selected by the **Renter** and incorporated in to this Membership Agreement.

e. **Lease Agreement** means the contract between the **Member** and the **Renter** governing the **Covered Property**.

f. **Lease Term** means the period reflected on the **Lease Agreement**.

g. **Member** means the landlord, owner, lessor or similarly identified person or entity indicated on the **Lease Agreement**, or entity providing services ancillary to the **Lease Agreement**. The **Member** is limited to the signatory to this Membership Agreement.

h. **Peril** means:

   i. Fire or lightning;
   ii. smoke, but not smoke caused by agricultural smudging or industrial operations;
   iii. explosion;
   iv. accidental discharge or overflow of water or steam;
   v. sprinkler leakage;
   vi. falling objects, but only if the roof or exterior wall of the **Covered Property** is damaged by the falling object, and damage to the falling object itself is not covered;
   vii. freezing of plumbing, heating or air conditioning;
   viii. discharge or overflow from appliances;
   ix. weight of **Renter's** personal property, but not for purposes of a **Renter Contents Liability Loss**;
   x. the unlawful taking of property within premises that has been closed and in which there are visible marks evidencing forcible entry (burglary), but only if a police report was promptly filed by the **Renter**, and this does not include mysterious disappearance, or lost or misplaced property; Proof of purchase is required.
   xi. riot and civil commotion; or
   xii. collapse of the building if directly caused by any of the aforementioned

**Peril** does not include any:

xiii. ordinance or law, the compliance with which results in the theft or destruction of **Renter Contents**;
xiv. earth movement, including earthquake, landslide, or sink hole;
xv. named storm or flood within a flood zone;
xvi. electrical power failure;
xvii. war, including undeclared war, civil war, insurrection, rebellion, or revolution;
xviii. nuclear hazard, however caused; or
xix. action caused by the **Renter** or the **Renter's** guests or agents, whether intentionally, recklessly, or negligently, provided that this is a **Peril** for purposes of **Renter Premises Legal Liability Loss**.
xx. Sewage or septic overflow

i. **Property Damage** means the damage to, destruction of, or loss of use of the specific part of the **Covered Property** or other property owned or leased by the **Member**, and does not include any:

i. contractual or vicarious liability;

ii. normal wear and tear;

iii. property owned by the **Renter**; or

iv. damage to, destruction of, or loss of use due to:

1. the ownership, maintenance, occupancy, operation, use, loading or unloading of any motorized vehicle;

2. actions expected or intended by a **Renter** over the age of 13, even if the resulting damage is of a different kind, quality or degree than initially expected or intended;

3. any business conducted or engaged in by the **Renter**, whether or not the business is owned or operated by the **Renter**, or employs the **Renter**; or

4. war including undeclared war, civil war, insurrection, rebellion, or revolution.

If Accidental Pet Damage is selected, **Property Damage** includes damage directly resulting from a pet owned or controlled by the **Renter**.

j. **Renter** means the renter, resident, lessee or similarly identified person or entity indicated on the **Lease Agreement**.

k. **Renter Contents** means personal property owned by the **Renter**, but does not include:

i. animals, birds, or fish;
ii. motorized vehicles or trailers;
iii. property owned by any roomer, boarder, or guest;
iv. commercial or business property;
v. property rented or held for rental to others by the **Renter**; or
vi. electronic data, however, **Renter Contents** does include blank storage media.

l. **Renter Contents Liability Loss** means the **Actual Cash Value** or **Replacement Cost** due to burglary or destruction of **Renter Contents** due to a **Peril** located within the **Covered Property**. **Renter Contents Liability Loss** cannot exceed:

i. $200 for money, bank notes, negotiable instruments, bullion, gold other than goldware, silver other than silverware, platinum, coins, medals, and numismatic property;

ii. $500 for any one item subject to a maximum of $1,000 for loss by burglary of jewelry, watches, furs, precious and semi-precious stones;
iii. $500 for loss by burglary of firearms or accessories;
iv. $500 on electronic data processing equipment and the recording or storage software used with such equipment; and
v. $1,000 for loss by burglary of tools while at the residence premises unless considered business personal property.

m. **Renter Premises Legal Liability Loss** means:

i. settlements or judgments fully or partially resolving the **Renter's** liability for **Property Damage** resulting from a **Peril**; and

ii. the cost of a lawyer, selected by the **Member**, to defend the **Renter** from liability for **Property Damage** resulting from a **Peril**.

Provided, the **Member** shall not accept any further obligation to settle or defend the **Renter** once the **Member** has paid the maximum amount of **Renter Premises Legal Liability Loss** selected by the **Renter** on the **Lease Addendum**. Further provided, **Renter Premises Legal Liability Loss** does not include amounts incurred by or on behalf of any person or entity other than the **Renter**, unless constituting covered **Bodily Injury**.

If Accidental Pet Damages is selected, **Bodily Injury** and **Peril** include injury directly resulting from a pet owned or controlled by the **Renter**.

n. **Replacement Cost** means the cost to repair or replace **Renter Contents**, at the time of loss or damage, whether that property has sustained partial or total loss or damage, with material of like kind and quality, without a deduction for deterioration, depreciation and obsolescence.

o. **Security Deposit** means the amount indicated as the Security Deposit on the **Lease Agreement**.

## 3. Member's Obligations

a. As an express condition precedent to RPMA's obligation to pay a **Renter Contents Liability Loss**, the **Member** must:

i. provide written notice to the **RPMA** of any **Renter Contents Liability Loss** as soon as possible, and not later than 60 days following the cessation of the **Peril**;

ii. protect **Renter Contents** from further loss; and

iii. send RPMA, within 60 days of RPMA's request, a sworn affidavit setting forth the following to the best of the **Member's** knowledge and belief:

1. the time and date of the **Peril**;
2. the interests of all **Renters** and all others in the **Renter Contents**, including all liens on the **Renter Contents**;
3. the identity of any insurance that may provide coverage for the **Renter Contents**; and
4. a detailed inventory of all claimed **Renter Contents** and value claimed by the **Renter**.

b. As an express condition precedent to RPMA's obligation to pay a **Renter Premises Legal Liability Loss**, the **Renter** must:

i. provide written notice to RPMA of any written or oral demand or assertion that the **Renter** may be liable for **Renter Premises Legal Liability Loss** as soon as possible and thereafter:

1. promptly forward to RPMA every notice, demand, summons or other process relating to the **Renter Premises Legal Liability Loss**;

ii. provide written notice to RPMA of any **Property Damage** knowingly caused by the **Renter** (or any pet owned or controlled by the **Renter**) as soon as possible, and not later than 60 days following the **Member's** knowledge of the **Property Damage**;

iii. not voluntarily make any payment, assume any obligation, make any admission, or incur any expense in connection with any **Property Damage**;

iv. send RPMA, within 60 days of RPMA's request, a sworn affidavit setting forth the following to the best of the **Member's** knowledge and belief:

1. the time and date of the **Peril**;
2. any reasonably available information concerning the time, place and circumstances of the **Property Damage**;
3. the names and addresses of any witnesses to the **Property Damage** and the **Peril**; and
4. the identity of any insurance that may provide coverage for the **Property Damage**; and

v. fully cooperate with RMPA's investigation, settlement, and defense of any claim or suit based upon or arising out of the **Property Damage** or **Peril**, including assisting with:

1. securing and giving evidence;
2. attending depositions, hearings, mediations, and trials.
3. obtaining the attendance and testimony of witnesses; and
4. enforcing any right of contribution or indemnity against any person or entity potentially liable to the **Renter**.

## 4. Subrogation

a. Upon any payment by RPMA to **Member**, RPMA shall be subrogated to all of **Member's** rights against the **Renter** and may commence action against the **Renter** in **Member's** name.

b. If **Member** receives payment by or on behalf of the **Renter** for any amount reimbursed by RPMA, **Member** shall immediately remit same to RPMA.

**c.** Upon payment of **Renter Contents Liability Loss**, RPMA is deemed to have been transferred unencumbered title in the **Renter Contents** by the **Member**.

## 5. Other Terms

a. The Member and the **Renter** must be separate unrelated entities. The **Member** must not be a direct or indirect, full or partial, owner of the **Renter**.

b. This Membership Agreement shall have a twelve month term commencing on the last date both Parties have executed this Membership Agreement, and will automatically renew for additional twelve month terms until written notice of cancellation is provided to the other Party with thirty days' notice before such cancellation shall be effective.

c. RPMA is not an insurer and this Membership Agreement is not insurance. This Membership Agreement is a contract between the Parties dictating the rights and obligation of the Parties.

READ AND AGREED BY:

| | |
|---|---|
| **Rental Property Managers Association LLC** | test |
| Signed: *Nicolas Laqua* | Signed: test test |
| Name: Nicolas Laqua | Name: test test |
| Position: Manager | Position: test |
| Date: 13th day of October , 20 25 | Date: 13th day of October , 20 25 |

Rental Property Managers Association LLC

# MEMBERSHIP AGREEMENT

## EXHIBIT – BENEFIT SELECTIONS

Please check the applicable box to select the following Benefits and fill in the respecting amounts.

☐ a.i) Renter Contents

☐ **Actual Cash Value (in excess of $500)** only;

☐ **Replacement Cost (in excess of $250)** only; or

☐ as indicated on **Lease Addendum**

Indicate:
[A] – Maximum aggregate during **Lease Term** $

☐ a.ii) Renter Premises Legal Liability

**Bodily Injury** is:

☐ included only;

☐ excluded only; or

☐ as indicated on **Lease Addendum**

Indicate:
[C] – Maximum aggregate during **Lease Term** $

☐ a.iii) Accidental Pet Damage

**Bodily Injury** is:

☐ included only;

☐ excluded only; or

☐ as indicated on **Lease Addendum**

Indicate:
[E] – Maximum aggregate during **Lease Term** $
[F] – **Bodily Injury** Maximum aggregate during **Lease Term** $

☐ b. Security Deposit

☐ c. Automated Tenant Communications

☐ d. Beagle Tenant Kit

# EXHIBIT B

---------- Forwarded message ---------
From: **Arjun Vivek** <arjun-vivek@beagleforpm.com>
Date: Tue, Dec 30, 2025 at 6:31 PM
Subject: Fwd: Disabling FolioGuard
To: Bryce Hase <bryce@beagleforpm.com>

On Tue, Dec 30, 2025 at 6:06 PM [redacted] wrote:

Hi Arjun,

Sorry to bother you, but I'd like to respond to AppFolio on this and I'm fairly certain Beagle has some information as to the inaccuracies in what they're saying because this rings of the "beware of Beagle" message they sent out a couple of weeks ago. If you have a canned response that addresses this, please send or give me a call so that we can discuss.

From AppFolio:

" Hi [redacted]
This is Lisa with Appfolio Customer Care. I'm happy to help!
Before I send this case over to the team that would disable Folioguard, I need to make you aware of a few important details. I see that a user role has been created for Beagle in your database.
**AppFolio does not partner with Beagle and has no plans to integrate with their solutions. Any claims regarding a partnership are not true.**
All of our integration partners undergo a rigorous security and compliance vetting process. We evaluate every partner to ensure your technology ecosystem is not only secure but also optimized for your business and the customer experience.
To keep our ecosystem and your business safe, we cannot allow Beagle's noncompliant access. ***By creating user accounts in your database, Beagle has the ability to access the personally identifiable information of your residents, issue payments through the AppFolio payments platform and view and take action across your entire account database.***
We value your ability to choose the providers that work best for your business. Third-party providers are an important part of our industry and we support multiple safe methods for you to work with them, including AppFolio Stack, Database API, and scheduled reports.
The method by which Beagle has chosen to operate their business places your business at risk and violates our Terms of Service. As your trusted technology partner, we work to protect the integrity of your data and provide integrated experiences that enable you to have stable, seamless user experiences.
Let me know if you have any questions and how you would like to proceed.
Best,
Lisa
Lisa C • 11m
I just tried to give you a phone all at 661-303-0253. I went to voicemail so I left a message. I will be logging off shortly but will follow up with you first thing tomorrow morning to assist you with your request.
Thank you for your understanding and have a nice evening!"

**Best regards,**

[redacted]