**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

<u>**CIVIL MINUTES -- GENERAL**</u>

Case No.   **CV 25-12248-JFW(SSCx)**                              Date:  January 7, 2026

Title:       Beagle Labs, Inc., et al. *-v-* AppFolio, Inc.

---

**PRESENT:   HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE**

| | |
|---|---|
| **Shannon Reilly** | **None Present** |
| **Courtroom Deputy** | **Court Reporter** |

**ATTORNEYS PRESENT FOR PLAINTIFFS:**              **ATTORNEYS PRESENT FOR DEFENDANTS:**
                    None                                                                          None

**PROCEEDINGS (IN CHAMBERS):**        **ORDER DENYING PLAINTIFFS' MOTION FOR EX PARTE TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION [filed 12/15/2025; Docket No. 4]**

On December 15, 2025, Plaintiffs Beagle Labs, Inc., Beagle Technologies, Inc., Big Beagle, Inc., Rental Property Managers Association LLC, and YRIG Risk Retention Group, Inc (collectively, "Plaintiffs" or "Beagle") filed a Motion for *Ex Parte* Temporary Restraining Order and Order to Show Cause Re Preliminary Injunction.  On December 29, 2025, Defendant AppFolio, Inc. ("Defendant" or "AppFolio") filed its Opposition.  On December 31, 2025, Plaintiffs filed a Reply.  The Court finds that this matter is appropriate for decision without oral argument.  After considering the moving, opposing, and reply papers, and the arguments therein, the Court rules as follows:

**I.       FACTUAL AND PROCEDURAL BACKGROUND**

**A.       AppFolio's Property Management Software**

AppFolio is one of the principal providers of property management software in the United States. Its software platform "AppFolio Property Manager" assists property managers to operate their businesses.  To access AppFolio Property Manager, property managers must pay a monthly subscription fee.  The software is not available to non-customers.

When a property manager subscribes to AppFolio Property Manager, the property manager receives a database, which provides it with a wide range of functionality, including accounting, payments, tenant screening, insurance-related services, maintenance management, and more.  By design, a property manager can create multiple user accounts to provide its employees' access to its database. For example, an employee tasked with monitoring rent payments can use his or her user account to perform that function.  For security and audit purposes, the actions of each employee's user account are logged in the system.  When an employee leaves the company, the user account is deleted.

The property manager's database will contain a large amount of data, which comes from a

Initials of Deputy Clerk  _sr_

number of sources, including the property manager, the property manager's tenants, and vendors of both AppFolio and the property manager.  Property managers and their residents store and use data for a wide variety of purposes through AppFolio's platform.  AppFolio does not own or create this data, but merely hosts this data on its software platform.  Indeed, the Terms of Service for AppFolio Property Manager (available on AppFolio's website) specifically provide:  "You represent and warrant that you are the rightful owner of your data and have the requisite authority to perform the migration of such data. You will retain all right, title and interest in and to your data."  Brown Decl., Ex. A (Docket No. 4-3) § 1.4;  Saxena Decl., Exh. C (Docket No. 33-6), § 1.4.

AppFolio offers its customers the ability to work with third parties that offer a particular service to the property manager, including internet listing sites, tenant screening companies, debt collection agencies, and maintenance management services.  While these third parties (known as "Point Solutions") sometimes compete with AppFolio's own offerings, AppFolio does not prohibit or penalize its customers for working with whatever Point Solutions they choose. Specifically, there are four authorized methods by which its customers can work with these third parties or "Point Solutions":[1]

(1)     **AppFolio Stack Marketplace:** The AppFolio Stack Marketplace offers its customers Point Solutions that AppFolio has vetted for security and performance and with whom AppFolio has built dedicated integrations into its platform.  Some of these Point Solutions compete directly with AppFolio.

(2)     **Database API**: If a customer wishes to integrate with a Point Solution that is not available in the AppFolio Stack Marketplace, the customer can use AppFolio's Database Application Programming Interface ("API"), which is an automated means for two computer programs to communicate.

(3)     **Scheduled Reports**:  A customer can also use Scheduled Reports to share data with any Point Solution of their choice.  Scheduled Reports allow the property manager to automate the data sharing process and share almost any data in the property manager's database. A customer can set up automated Scheduled Reports in a matter of five minutes.

(4)     **Outside of AppFolio**:  A customer may share any data they input into AppFolio (such as tenant rosters) with Point Solutions or other platforms.

While AppFolio permits (and even encourages) its customers to work with third parties through these four authorized means, AppFolio's Terms of Service prohibit its customers from allowing third parties' direct access to the customer's respective database: "Third parties are not permitted to access or use the Services or any application programming interface we make available to you without [AppFolio's] prior consent."  Brown Decl., Ex. A (Docket No. 4-3) § 5.2; Saxena Decl., Exh. C (Docket No. 33-6), § 5.2.  This provision prohibiting third party access has been part of AppFolio's Terms of Service since 2019.  In the event a property manager violates

---

[1]Apart from these four methods, it appears that AppFolio offers a "Vendor Portal," which gives vendors access to view work order details, upload invoices, add notes and photos, and mark their work as complete. It is unclear from the current record how a customer sets up a vendor in the "vendor portal" and whether vendors differ from "Point Solutions."

Initials of Deputy Clerk __sr__

this provision, AppFolio reserves the right to "disable or delete access to the Services and any application programming interface for any of your authorized users to enforce these Terms of Service or to otherwise protect our interests."  *Id*.

### B.      Beagle's Services

Beagle provides insurance-related compliance services to property managers nationwide, including tenant liability waiver programs, renters' insurance verification, deposit alternative services, and pet damage waiver offerings. These services help property managers satisfy lease requirements, manage risk, and provide cost-effective protection to renters.  Beagle's platform serves over 40,000 properties in all 50 dates.

To administer these programs, Beagle requires access to limited categories of the property managers' operational data, including "tenant rosters, unit identifiers, lease and billing information, and insurance-compliance status."  D'Angelo Decl. (Docket No. 4-7) ¶ 4. Beagle, however, is not an AppFolio integration partner and its services are not available in AppFolio Stack Marketplace. Pursuant to Beagle's request, in order to give Beagle the access to the data it needs, its customers create user accounts giving Beagle direct access to their respective AppFolio Property Manager databases.[2]  The property manager is able to fully control the permissions that Beagle is granted in its accounts and can limit those permissions to facilitate the sharing of data that is needed by Beagle.  However, depending on the permissions granted by the property manager, Beagle could conceivably access the personally identifiable information of the property manger's residents, issue payments through the AppFolio payments platform, access and alter the customer's bank information, and view and take action across the property manager's entire account database.

When Beagle obtains user accounts, it allows Beagle to use the functionality that AppFolio provides only to its paying customers.  For example, Beagle uses AppFolio to charge residents for its offerings and products.  Notably, Beagle has never asked AppFolio for permission to access AppFolio's application programming interface and has never paid or provided any consideration for access to AppFolio's software.

### C.      AppFolio's Partnership with Second Nature

On April 11, 2025, AppFolio entered into a strategic partnership with Second Nature Brands, Inc. ("Second Nature") that enables AppFolio's property management customers to offer Second Nature's suite of residential property services within the AppFolio Stack Marketplace.  Second Nature is a competitor of, and offers similar services as, Beagle.  In connection with its strategic partnership, AppFolio purchased a minority, non-controlling equity interest in Second Nature Holdings, L.P., the indirect parent of Second Nature.

Beagle contends that Second Nature uses the same method of access to AppFolio Property Manager as Beagle.  *See* Brown Decl. (Docket No. 4-2) ¶ 8.  However, in light of Second Nature's partnership with AppFolio, it appears that Second Nature is operating in this manner with AppFolio's permission in accordance with AppFolio's Terms of Service (and after a vetting

---

[2]It is unclear how long Beagle has been operating in this manner, although it appears to be "over a year." *See* Reply (Docket No. 36) 2 ("Customers have for over a year contracted with Beagle to provide vital services . . . .").

Initials of Deputy Clerk  _sr_

process), whereas Beagle has never asked AppFolio for permission to access AppFolio's application programming interface.

### D.      AppFolio's Actions to Disable Beagle's User Accounts

On December 9, 2025, AppFolio emailed its customers who use Beagle's services notifying them they would remove Beagle's "noncompliant access" to the customers' accounts in five business days (on December 16, 2025).  AppFolio explained: "In addition to the serious security risks the noncompliant access poses for you, your residents, and your customers, [Beagle's noncompliant access] also constitutes a breach of AppFolio's terms of service, which are in place both to protect your account and to safeguard AppFolio's intellectual property."  Brown Decl. Ex. C. (Docket No. 4-5).  AppFolio also noted that there are multiple safe and secure methods for property managers to work with third-party providers, such as Beagle, including through AppFolio Stack Marketplace, Database API, and Scheduled Reports. *Id.*  In addition, AppFolio notified its customers through a banner inside its application that it would disable all Beagle-related user accounts on December 16, 2025.

Beagle's customers immediately began emailing Beagle, expressing confusion and concern. In order to allay one of its customer's concerns,  Beagle's CEO advised its customer that the "fix" was "simple and already in motion" and that it could "continue to run your Beagle program using scheduled reports from AppFolio instead of direct logins." Brown Decl., Ex. C (Docket No. 4-5); Saxena Decl., Ex. D (Docket No. 33-7).

On December 15, 2025, Beagle filed a Complaint against AppFolio in the United States District Court for the Northern District of California alleging the following claims for relief: (1) tortious interference with contractual relations; (2) tortious interference with prospective economic relations; (3) violation of the Lanham Act § 43(a), false advertising; (4) violations of Cal. Bus. & Prof. Code § 17500, false advertising; (5) violations of Cal. Bus. & Prof. Code § 17200, unfair competition; (6) violation of Sherman Act § 2, monopolization; (7) defamation and trade libel; (8) unjust enrichment; and (9) declaratory judgment.  On that same day, Beagle filed its Motion for *Ex Parte* Temporary Restraining Order and Order to Show Cause Re Preliminary Injunction ("Motion for TRO").   On December 15, 2025, AppFolio agreed not to disable Beagle's accounts until December 22, 2025.  On December 19, 2025, the district judge in the Northern District of California transferred the action to this Court, and ordered AppFolio to maintain the status quo pending further order of this Court.

Beagle has taken advantage of AppFolio's agreement and the transferor court's order to maintain the status quo. Since December 15, 2025, Beagle has changed fifty-seven of its user accounts in AppFolio's customers' databases to prevent AppFolio from locating those accounts and disabling them.

### E.      Beagle's Motion for TRO

In its Motion for TRO, Beagle asks the Court to enjoin AppFolio from disabling all of Beagle's customer-authorized accounts on the AppFolio Property Manager Platform or from otherwise interfering with Beagle's ability to access data through AppFolio's Property Manager Platform until the Court determines whether a preliminary injunction should be issued. Beagle contends that it faces "extinction" if AppFolio disables its user accounts and cuts off its access to

Initials of Deputy Clerk  _sr_

data, which it relies on to serve more than eighty percent of its customers.  According to Beagle, it has already suffered harm, as property managers have forwarded AppFolio's messages to tenants, revoked Beagle's access, and terminated their relationships with Beagle.

## II.    LEGAL STANDARD

The standard for issuing a temporary restraining order ("TRO") and preliminary injunction under Federal Rule of Civil Procedure 65 is the same.  *Six v. Newsom*, 462 F. Supp. 3d 1060, 1067 (C.D. Cal. 2020) (citation omitted); *see also Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (noting that a TRO and preliminary injunction involve "substantially identical" analysis).  And, like a preliminary injunction, a TRO is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

A plaintiff seeking a TRO must establish four elements: "(1) a likelihood of success on the merits, (2) that the plaintiff will likely suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tip in its favor, and (4) that the public interest favors an injunction." *Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.,* 758 F.3d 1069, 1071 (9th Cir. 2014) (*citing Winter*, 555 U.S. at 20).  Courts in this circuit also employ "an alternative 'serious questions' standard, also known as the 'sliding scale' variant of the *Winter* standard" (*Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 635 (9th Cir. 2021)), in which the four *Winter* elements are "balanced, so that a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  Under this approach, a TRO may be warranted where there are "'serious questions going to the merits' and a hardship balance . . . tips sharply toward the plaintiff," and so long as the other *Winter* factors are also met. *Id.* at 1132.

## III.    DISCUSSION

On this record, the Court concludes that Beagle has failed to demonstrate that it is entitled to the requested TRO.

Specifically, the Court concludes that Beagle has failed to demonstrate a likelihood that it will suffer irreparable harm. "[M]onetary injury is not normally considered irreparable." hiQ Labs, Inc. v. LinkedIn Corp., 31 F.4th 1180, 1188 (9th Cir. 2022) (quoting *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980)).  "Nonetheless, the threat of being driven out of business is sufficient to establish irreparable harm." *Id.* (cleaned up).  Beagle contends that it will face the threat of "extinction" if AppFolio disables its user accounts and cuts off its access to data, which it relies on to serve more than eighty percent of its customers.

In its moving papers, Beagle only identified four categories of data that is necessary for it to continue servicing its customers: "tenant rosters, unit identifiers, lease and billing information, and insurance compliance."  However, that data is available through alternative authorized means, such as through the use of Scheduled Reports. Indeed, AppFolio has attached a sample Scheduled Report showing the data Beagle claims to require.  *See* Saxena Decl., Ex. B (Docket No. 33-5). Moreover, in an email to a customer, Beagle's CEO expressly stated that the solution was "simple" and that Beagle could "continue to run your Beagle program using scheduled reports from AppFolio instead of direct logins." Saxena Decl., Ex. D (Docket No. 33-7)

Initials of Deputy Clerk _sr_

In its Reply, contrary to its CEO's representation to its customer, Beagle now contends that Scheduled Reports are not a viable alternative because "[t]he whole point of Beagle's value proposition to customers is that they don't have to go through the onerous process of setting up Scheduled Reports in AppFolio.  All they have to do is create an account for Beagle and then Beagle handles the rest."  Plaintiff's Reply (Docket No. 36) at 6.  However, Beagle has failed to demonstrate that the setting up of Scheduled Reports is particularly onerous (and, according to AppFolio, only takes five minutes), or that it is any more time consuming then a property manager setting up a user account with the appropriate permissions.

Beagle also contends that the Scheduled Reports do not provide the necessary information required by Beagle.  However, AppFolio tailored the sample report filed in conjunction with its Opposition to provide the exact information that Beagle claimed it needed in its moving papers.  For the first time in its Reply, and without any opportunity for AppFolio to respond, Beagle now contends that it needs to view existing insurance policies, and that Scheduled Reports do not give it access to that needed data.  However, customers can share that data with Beagle through other authorized means, including by using AppFolio's Database API.

Beagle contends that AppFolio's Database API is also insufficient, asserting that "AppFolio designed its API so that it would not expose all the data fields that Beagle customers contract with Beagle to manage." D'Angelo Decl. (Docket No. 36-2) ¶ 4.  Beagle, however, fails to identify what data fields are missing. Without knowing what data fields Beagle claims are missing, the Court is unable to determine the materiality of that data and the likelihood of irreparable harm.  Perhaps recognizing that Database API is a workable solution, Beagle also speculates that AppFolio will simply "ban Beagle from use of the API." *Id.*  However, AppFolio has made no such statement to its customers, and in fact advised its customers in connection with its plans to disable Beagle's user names that it supports "multiple safe methods for you to work with [third party providers], including AppFolio Stack, Database API, and scheduled reports."  Brown Decl., Ex. C (Docket No. 4-5).   Finally, Beagle also states that it would take them "months" to engineer new integrations using the Database API, without any meaningful explanation of what would be entailed.  *See id.*  It is unclear whether "months" means 2 months, 3 months, 4 months, or more.  Presumably, as soon as Beagle became aware that AppFolio intended to enforce its Terms of Service, Beagle began working on developing or engineering such integrations.  On this record, the Court cannot conclude that Beagle is likely to suffer irreparable harm.

Accordingly, the Court concludes that Beagle has failed to demonstrate that it is entitled to the extraordinary remedy of a temporary restraining order.

## IV.     CONCLUSION

For the foregoing reasons, Beagle's Motion for *Ex Parte* Temporary Restraining Order and Order to Show Cause Re Preliminary Injunction is **DENIED**.


IT IS SO ORDERED.


Initials of Deputy Clerk __sr__