Brian Procel (Cal. Bar No. 218657)
Brian@Procel-Law.com
Jeremiah Levine (Cal. Bar No. 288377)
Jeremiah@ProcelLevine.com
Marty Pritikin (Cal. Bar No. 210845)
Marty@Procel-Law.com
**PROCEL LEVINE LLP**
401 Wilshire Blvd, Fl 12
Santa Monica, CA 90401-1456
Phone: 424-788-4538

*Attorneys for Defendant AppFolio, Inc.*

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BEAGLE LABS, INC., a Delaware corporation, BEAGLE TECHNOLOGIES, INC., a Delaware corporation, BIG BEAGLE, INC., a Delaware corporation, RENTAL PROPERTY MANAGERS ASSOCIATION LLC, an Alabama limited liability company, and YRIG RISK RETENTION GROUP, INC., an Alabama corporation,<br><br>Plaintiffs,<br><br>v.<br><br>APPFOLIO, INC., a California corporation,<br><br>Defendant. | Case No.  25-cv-12248-JFW-SSC<br><br>**APPFOLIO'S OPPOSITION TO PLAINTIFFS' MOTION FOR RECONSIDERATION OF ORDER DENYING TRO AND OSC RE PRELIMINARY INJUNCTION**<br><br>**[Declarations of Nathan Delage Sean Saxena and]** |

## **Table of Contents**

Introduction ......................................................................................... 1

Factual and Procedural Background ........................................................ 4

Legal Standards ................................................................................... 9

Argument ........................................................................................... 10

I. The Motion Is Untimely ................................................................... 10

II. The Motion Is Procedurally Improper Because It Addresses the Same Order as Beagle's Appeal ...................................................................... 11

III. The Read-Only Nature of Scheduled Reports and Database API Are Not New Facts, So There Is No Basis for Reconsideration ...................... 12

A. The Capabilities of Scheduled Reports and Database API Are Not New Facts Because They Did Not Change After the Court's Order ................. 12

B. The Capabilities of Scheduled Reports and Database API Were Either Known to Beagle or Knowable with a Modicum of Diligence ................. 13

a. The Capabilities of Scheduled Reports and Database API Were Accurately Presented to the Court .......................................................... 13

b. Beagle Knew the Capability of Scheduled Reports ............................ 14

c. Beagle Could Have Known the Capability of Database API with Even a Modicum of Diligence ......................................................................... 15

IV. AppFolio's Post-Order Statements Are Not New and Do Not Justify Reconsideration .................................................................................... 17

V. Even if Reconsideration Was Warranted, The Outcome Would Not Change ................................................................................................. 18

VI. Beagle Is Not Entitled to an Evidentiary Hearing ............................ 19

Conclusion .......................................................................................... 20

# Table of Authorities

**Cases**

*Collins v. U.S. Citizenship & Naturalization Serv.*, 2013 WL 776244 (C.D. Cal. Feb. 6, 2013)................................................................................................17

*Frederick S. Wyle Pro. Corp. v. Texaco, Inc.*, 764 F.2d 604 (9th Cir. 1985) .........14

*Hanson v. La Flamme*, 761 F. App'x 685 (9th Cir. 2019)....................................10

*Int'l Molders' & Allied Workers' Loc. Union No. 164 v. Nelson*, 799 F.2d 547 (9th Cir. 1986) ...............................................................................................20

*Kona Enters., Inc. v. Est. of Bishop*, 229 F.3d 877 (9th Cir. 2000) .........................9

*Kowalski v. Anova Food, LLC*, 958 F. Supp. 2d 1147 (D. Haw. 2013)..................16

*ML Prods. Inc. v. Ninestar Tech. Co. Ltd.*, 2025 WL 2670865 (C.D. Cal. Feb. 12, 2025)..........................................................................................................11

*Nat. Res. Def. Council, Inc. v. Sw. Marine Inc.*, 242 F.3d 1163 (9th Cir. 2001) ....11

*Stormans, Inc. v. Selecky*, 586 F.3d 1109 (9th Cir. 2009).......................................18

*Teixeira v. BMW of N. Am.*, LLC, 2023 WL 6194169 (C.D. Cal. July 3, 2023) ....11

*Thomas v. Cnty. of Los Angeles*, 978 F.2d 504 (9th Cir. 1992) .............................19

*Trust Corp. v. Aetna Casualty & Surety Co.*, 873 F. Supp. 1386 (D. Ariz. 1994)..17

*United States v. Vroman*, 997 F.2d 627 (9th Cir. 1993)..........................................11

**Statutes**

Federal Rule of Civil Procedure 59(e) ......................................................................9

**Rules**

C.D. Cal. Local Rule 7-18...................................................................................9, 10

## **Introduction**

Plaintiffs' ("Beagle") latest motion for reconsideration is: (1) untimely, without any showing of good cause for the delay; (2) procedurally improper due to the Notice of Appeal that Beagle previously filed; and (3) substantively baseless because no new evidence is offered.

As a threshold matter, the instant motion is untimely by 21 days. Local Rule 7-18 requires any motion for reconsideration to be filed within 14 days of the relevant order. Here, the Court issued its order (the "Order") denying Beagle's motion for a temporary injunction (the "TRO Motion") on January 7, 2026, which is when the 14-day clock began to run. Beagle waited until the final day, January 21, 2026, to move for reconsideration of the Order (the "First Reconsideration Motion"). The Court proceeded to strike the first Reconsideration Motion for failure to comply with Local Rules and Standing Order. Beagle then filed the instant motion for reconsideration (the "Motion") on February 11, 2026—35 days after the Order was issued and 21 days after the deadline for reconsideration had passed. While the Local Rules anticipate the possibility of extending this deadline upon a showing of good cause, none has been made here. Beagle admits that its failure to comply with the Local Rules and Standing Order was due entirely to its own misunderstanding of the rules. Such a mistake is not good cause.

The Motion is also procedurally improper because Beagle is attempting to litigate the same issue in two different courts. Five days before filing this Motion, Beagle filed a Notice of Appeal, effectively asking the Ninth Circuit to overturn the same Order that it now asks this Court to reconsider. So the instant motion amounts to a *fourth* bite at the apple, which is a further basis for denial of the Motion.

1

As for the substance of the Motion, Beagle cannot prevail because it has not provided any evidence, much less *new* evidence, to sustain its underlying claims. In its TRO Motion, Beagle claimed it faced an "extinction level event" because AppFolio "planned to block Beagle's access" to "limited categories of" its customers' "operational data." The Court denied Beagle's TRO Motion for failure to show irreparable harm after AppFolio demonstrated that its scheduled reports feature could "provide the exact information that Beagle claimed it needed in its moving papers." The Court further found AppFolio's database API feature may also provide the required data, as Beagle "fail[ed] to identify what data fields are missing." Beagle now asks the Court to reconsider its Order without providing any evidence that scheduled reports and database API cannot provide the data Beagle claims to need.

Beagle's Reply in Support of the TRO Motion (the "Reply") moved away from the data blocking theory, and now this Motion abandons the theory altogether. Instead, the Reply and the Motion both argue that Beagle is entitled to write information into AppFolio databases; in the words of the instant Motion, Beagle is entitled to "take action (i.e., write-in) within AppFolio's system." It is this theory on which Beagle rests its motion for reconsideration, claiming it discovered post-Order that Scheduled reports and database API do not provide the desired write access. Among other failings, these purportedly newly discovered facts do not meet the standard for reconsideration.

First, the fact that scheduled reports are read-only is not new: AppFolio and Beagle both addressed this while briefing the TRO Motion. In its Opposition to the TRO Motion, AppFolio explained scheduled reports, including the fact that, as the name suggests, scheduled reports provide a report—not access to the

2

functionality of AppFolio's system. And in its Reply, Beagle challenged the sufficiency of scheduled reports on the basis that they do not allow Beagle to "add or remove charges"—i.e., scheduled reports do not have write capability. Moreover, AppFolio's records show that Beagle has used scheduled reports over *fifty-four thousand* times since it began working with AppFolio's customers.

Second, new facts only justify reconsideration if the moving party could not have discovered them before the Court's order with reasonable diligence. Beagle offers no declaration or other evidence that it lacked prior knowledge. Beagle also had ample time to discover any complaints about scheduled reports and database API. Beagle told its own customers on December 9—the week before filing its *original* TRO Motion—that scheduled reports were the "fix" to losing direct access to AppFolio's databases, and that this was "simple" and "already in motion." Beagle should have checked the veracity of this representation *before* making it to its customers. At a minimum, Beagle could and should have investigated this immediately afterward. Tellingly, the declaration submitted by a Beagle engineer in support of the renewed Motion states that he wasn't even *asked* to investigate the viability of scheduled reports and database API until *January*. (Dkt. 52-3, ¶¶ 3-4.) That delay is only Beagle's fault.

Third, distinct from its alternate "write access" theory, Beagle also accuses AppFolio of "new and escalating" post-order conduct that it claims justifies reconsideration. Specifically, Beagle complains of four statements made to a customer in a January 9, 2026, email. What Beagle fails to mention is these four statements are *identical* to those sent in the December 9, 2025, communications. AppFolio merely sent an updated version of *the same message* on January 9 to users who did not receive the December 9 message because they did not yet have

3

Beagle users in their database. These statements are not new. They were already fully briefed and decided on by the Court and, as such, are not grounds for reconsideration.

Lastly, Beagle claims it is entitled to an evidentiary hearing "to test" and "explore" whether "1) AppFolio's proffered alternatives actually cure the risk of Beagle's irreparable harm; and 2) whether AppFolio's new and escalating conduct is causing irreparable harm to Beagle." Beagle offers no authority for the proposition that a court must hold an evidentiary hearing when a party seeks an ex parte TRO. Beagle suggests—incorrectly—that evidentiary hearings are mandatory when the parties present sharply conflicting declarations. Beagle identifies no false statement of any AppFolio declarant and provides no opposing testimony of its own. Beagle is not entitled to substitute the Court's resources for its own diligence. Beagle's motion should be denied.

## Factual and Procedural Background

**December 9, 2025: AppFolio Gives Beagle Notice That AppFolio Will Enforce its Terms of Service.**

Seeking to enforce its Terms of Service, which prohibit third parties from having user access to customer databases, AppFolio notified its customers with Beagle user access that AppFolio intended to disable the noncompliant access. (Dkt. 33-8 ¶ 3; Dkt. 33-3 ¶ 19.) In the same communication, AppFolio identified alternative methods by which its customers could work with Beagle and provided five business days (until December 16) for its customers to transition. (Dkt. 4-5 Exh. C.) To assist with this transition, AppFolio also contacted Beagle directly, identifying alternate methods and offering that, if Beagle had "questions about

4

compliant access paths or need[s] clarification on transition steps, we are happy to provide additional guidance." (Saxena Decl. ¶ 4.) Beagle never responded. (*Id.*)

That same day, Beagle CEO, Mike Brown, emailed customer stating that the "fix" was "simple and already in motion" and that it could "continue to run your Beagle program using scheduled reports from AppFolio instead of direct logins." (Dkt. 33-3 Exh. D.)

**December 15, 2025: Beagle Seeks a TRO and OSC re Preliminary Injunction, Leading to Forum Shopping Finding**

The day before AppFolio intended to disable Beagle's user access, Beagle filed a complaint and application for a temporary restraining order and order to show cause why a preliminary injunction should not be issued. (Dkt. 1, 4.) In that motion, Beagle accused AppFolio of "data blocking" and creating an "extinction level event" by "plan[ning] to block Beagle's access" to "limited categories of" its customers' "operational data." (Dkt. 4 at 2, 6.) Beagle specifically identified four categories of required data: "tenant rosters, unit identifiers, lease and billing information, and insurance compliance." (*Id.* at 5.) Beagle emphasized that "AppFolio does not own or create this data," but "merely hosts the data on its software platform." (*Id.* at 6.)

Further briefing on Beagle's motion was, however, delayed by two weeks while the case was transferred from the Northern District of California to this Court, following a finding that "the apparent forum shopping by Beagle strongly favor[ed]" the transfer. (Dkt. 24.) The Northern District court directed AppFolio to stay enforcement of its Terms of Service until the case could be transferred and the motion heard. (*Id.*)

**December 29, 2025: AppFolio Files its Opposition Brief, Identifying That Scheduled Reports Only Transmit Data**

In its Opposition Brief, AppFolio explained that scheduled reports "allows Beagle to *receive* exactly the same data it receives through its unauthorized user accounts" (emphasis added) and provided a sample scheduled report. (Dkt. 33 at 5; Dkt. 33-3 Exh. B.) Because Beagle's CEO admitted scheduled reports would work, AppFolio focused on its capabilities and made no representations as to database API. (Dkt. 33-3 Exh. D.) AppFolio also posited that Beagle had filed this lawsuit—despite scheduled reports' ability to provide the required data—because Beagle was not after data, but after free access to AppFolio's functionality (i.e., write capability). (Dkt. 33 at 6.) As AppFolio explained, "user logs show Beagle is not just accessing data, it is *using AppFolio's platform* to issue charges to residents for its products" in violation of AppFolio's Terms of Service (emphasis in original). (*Id.*)

**December 31, 2025: Beagle Files Its Reply, Demanding the Write Access That Beagle Now Alleges It Just Discovered It Needs**

In its Reply, Beagle acknowledged that it sought not only read-access to data, but also the ability to write in AppFolio databases, including the ability issue residents charges for its products. It argued scheduled reports "will not work" as an alternative to user access because they "make[] it so Beagle cannot add or remove charges." (Dkt. 36 at 6.) Beagle said that without AppFolio's functionality (meaning write access), "the entire Beagle value proposition" is negated. (*Id.*) In addition, Beagle made a host of arguments about database API, but did not identify any data fields missing from its capabilities.  (*Id.* at 7.)

6

**January 7, 2026: The Court Denies Beagle's Motion**

The Court denied Beagle's motion for failure to show irreparable harm citing the ability of scheduled reports to "provide the exact information that Beagle claimed it needed in its moving papers." (Dkt. 39 at 6.) The Court further found AppFolio's database API feature may provide the required data, as Beagle "fail[ed] to identify what data fields are missing." (*Id.*) In addition, the Court noted Beagle's failure to provide any evidence that transitioning to scheduled reports or database API would be overly arduous, despite having "presumably" begun "working on developing or engineering such integrations" as "soon as [it] became aware that AppFolio intended to enforce its Terms of Service." (*Id.*)

**Post-January 7, 2026: Beagle Begins to Investigate Alternatives**

In January, Beagle assigned an engineer to begin "exploration of and attempts to implement the proposed substitute methods." (Mot., Okpokowuruk Decl. at 1.)

**January 9, 2026: AppFolio Enforces its Terms of Service, and Beagle's Parent Company Announces that it Raises $108 million**

Following the Court's Order, and no longer bound by its agreement to maintain the status quo, AppFolio implemented security measures to identify and disable Beagle's user access. (Delage Decl. ¶ 3.) These measures identified customers who had not received the December 9, 2026, email because Beagle did not have user access to their database at that time. (*Id.*) AppFolio provided these customers the *same notice* it had previously sent, updating only the dates and timing. (*Id.*) Both the December and January notices contain the exact language complained of in Beagle's Motion: "the method by which Beagle has chosen to operate their business places you at risk;" Beagle can "access the personally

7

identifiable information of your residents," "issue payments through the AppFolio payments platform," and "view and take action across your entire account database." (*Id.*) Beagle CEO, Mike Brown had previously admitted these are things Beagle "*could* technically do in your account" (emphasis in original) (Dkt. 33-3 Exh. D.)

Also on January 9, 2026, Beagle's parent company, Corgi, announced it had raised $108 million in funding. (Saxena Decl. ¶ 6.) Corgi said that it was valued at $630 million, based in part on its $40 million in annual recurring revenue. (*Id.*) Based on Beagle's claim of $12.5 million in revenue (Dkt. 4 at 18), approximately one fourth of Corgi's revenue underlying the valuation appears to come from the purportedly imperiled Beagle.

**January 21, 2026: Beagle Files its First Motion for Reconsideration**

Two weeks after the Court's Order, Beagle sought reconsideration of its ex parte motion. (Dkt. 52.)

**February 4, 2026: The Court Strikes Beagle's First Motion for Reconsideration**

The Court issued a text-only order striking Beagle's First Motion for Reconsideration "for failure to comply with Local Rule 7-3, which requires the conference of counsel to take place at least seven days prior to the filing of the Motion, and paragraph 5(b) of the Court's Standing Order, which requires the Joint Statement to be filed not more than 2 days after the Local Rule 7-3 conference." (Dkt. 56.)

**February 6, 2026: Beagle Files a Notice of Appeal of the Order**

Two days after the Court struck Beagle's First Motion for Reconsideration of the Order, Beagle filed a Notice of Appeal of the Order.

8

**February 11, 2026: Beagle Files This Motion**

One week after the Court struck the First Motion for Reconsideration, Beagle filed the instant Motion, based on the threat of "immediately" facing "an extinction-level event." As its primary relief, Beagle seeks an evidentiary hearing, to be held sometime after the noticed March 23 hearing on its Motion. The Motion offers no new evidence of unavailable data, but instead contends AppFolio must provide it the ability "to take action (i.e., write-in) within AppFolio's system" and claims AppFolio's January 9, 2026, communications are a new source of irreparable harm. (Mot. at 5.)

## <u>Legal Standards</u>

Federal Rule of Civil Procedure 59(e) permits a "motion to alter or amend a judgment." The Ninth Circuit has elaborated that Rule 59(e) "offers an extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources. Indeed, a motion for reconsideration should not be granted, absent highly unusual circumstances, unless the district court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law." *Kona Enters., Inc. v. Est. of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000) (internal citations omitted).

Central District of California 7-18 provides more specific criteria for reconsideration, stating that:

> A motion for reconsideration of an Order on any motion or application may be made only on the grounds of (a) a material difference in fact or law from that presented to the Court that, in the exercise of reasonable diligence, could not have been known to the party moving for reconsideration at the time the Order was entered, or (b) the emergence of new material facts or a change of law occurring after the Order was entered, or (c) a manifest showing of a failure to consider material facts presented to the Court before the Order was entered….

9

> Absent good cause shown, any motion for reconsideration must be filed no later than 14 days after entry of the Order that is the subject of the motion or application.

C.D. Cal. L.R. 7-18; *Hanson v. La Flamme*, 761 F. App'x 685, 689 (9th Cir. 2019) (affirming denial of motion for reconsideration based on failure to comply with Local Rule 7-18).

## **Argument**

### **I.     The Motion is Untimely**

Beagle's Motion was filed three weeks too late. Local Rule 7-18 states that, "[a]bsent good cause shown, any motion for reconsideration must be filed no later than 14 days after entry of the Order that is the subject of the motion or application." The Order denying Beagle's TRO Motion was issued on January 7, 2026. Beagle's deadline to file a reconsideration motion was therefore January 21, 2026, which is precisely when Beagle filed its First Reconsideration Motion. The Court struck that motion, however, due to Beagle's "failure to comply with Local Rule 7-3, which requires the conference of counsel to take place at least seven days prior to the filing of the Motion, and paragraph 5(b) of the Court's Standing Order, which requires the Joint Statement to be filed not more than 2 days after the Local Rule 7-3 conference." (Dkt. 56.)  Beagle then proceeded to file the instant Motion on February 11, 2026, five weeks after the Order was issued, and three weeks after the deadline's passing. (Dkt. 64.)

Beagle's Motion makes no mention whatsoever of the missed deadline, nor does it offer any good cause for missing it.  Instead, Beagle attempts to explain itself in the Joint Statement filed on February 6, 2026, saying: "Counsel for Beagle mistakenly misunderstood the Local Rule and the Court's Standing Order to require pre-motion conferences for motions such as a motion to dismiss, but

not a motion for reconsideration of an underlying motion for a preliminary injunction." (Dkt. 62 at 2.)   In other words, Beagle simply misread the rules. While Beagle cites to two cases in the Joint Statement that address the "possibility of re-filing stricken motions upon a showing of good cause," (*Id*. at 3) in neither cited order did the court actually permit such a re-filing. In fact, the case law is clear that this type of mistake does not constitute good cause that would allow for a reconsideration motion to be filed after the deadline. *See ML Prods. Inc. v. Ninestar Tech. Co. LTD. et al*, 2025 WL 2670865, at *1 (C.D. Cal. Feb. 12, 2025) (denying reconsideration motion as untimely; finding that counsel's filing error and calendaring error did not constitute good cause for the delay); *see also Teixeira v. BMW of N. Am., LLC*, 2023 WL 6194169, at *4 (C.D. Cal. July 3, 2023) (denying reconsideration motion as untimely despite party's "good faith" mistake in reading the Local Rules).

## II.  **The Motion Is Procedurally Improper Because It Addresses the Same Order as Beagle's Appeal**

Beagle's Motion does not explain or even mention the Notice of Appeal (Dkt. 58) that Beagle filed on February 11, 2026, five days prior to this Motion, in which it seeks review by the Court of Appeals of the exact Order that it asks this Court to reconsider. Litigation cannot proceed in two courts over the same issue at the same time. Assuming Beagle believes its Notice of Appeal to be valid and proper, then its own actions would seem to have divested this Court of jurisdiction over a motion, this Motion, which it nonetheless subsequently filed. *See Nat. Res. Def. Council, Inc. v. Sw. Marine Inc.*, 242 F.3d 1163, 1166 (9th Cir. 2001) ("Once a notice of appeal is filed, the district court is divested of jurisdiction over the matters being appealed"); *United States v. Vroman*, 997 F.2d

11

627, 627 (9th Cir. 1993) ("The district court was without jurisdiction to respond to Vroman's motion for reconsideration because he filed it after having filed a notice of appeal."). AppFolio takes no position on the scope of this Court's jurisdiction, other than to identify the confusion and prejudice to AppFolio that arises from Beagle's decision to litigate the same issue in two courts simultaneously.

## III.  The Read-Only Nature of Scheduled Reports and Database API Are Not New Facts, So There is No Basis for Reconsideration

Beagle claims the purported read-only capabilities of scheduled reports and database API constitute both "new material facts occurring after the Order was entered" and "a material difference in fact from that presented to the Court that in the exercise of reasonable diligence, could not have been known to the party moving for reconsideration at the time the Order was entered." (Mot. at 5.) Neither is true.

### A. The Capabilities of Scheduled Reports and Database API Are Not New Facts Because They Did Not Change After the Court's Order

Beagle's claim that the purported read-only capability of scheduled reports and database API are "new material facts occurring after the Order" can be dismissed out of hand. Beagle does not make any claim that the capabilities of these features changed after the Order. Indeed, the capabilities of scheduled reports and database API have not changed since before this litigation began. (Delage Decl. ¶ 5.) The argument appears to be no more than a throwaway line in Beagle's brief and should be treated accordingly.

12

### B. The Capabilities of Scheduled Reports and Database API Were Either Known to Beagle or Knowable with a Modicum of Diligence

Beagle claims that its purported recent discovery that scheduled reports and database API "do not have the write access necessary for Beagle to service its customer contracts" constitutes "a material difference in fact from that presented to the Court that in the exercise of reasonable diligence, could not have been known to the party moving for reconsideration at the time the Order was entered." (Mot. at 5.) The argument fails.

### a. The Capabilities of Scheduled Reports and Database API Were Accurately Presented to the Court

Beagle claims that it has recently discovered that scheduled reports and database API do not have write capabilities and that this is a material difference in fact from "AppFolio's claim that scheduled reports, the API, and other means can permit Beagle to service its customers' contracts." (Mot. at 3.) The argument has three problems.

*First*, AppFolio never claimed that any of its features would allow Beagle to service its customers' contracts. To the contrary, AppFolio expressly stated that because Beagle had not attached a contract or identified any term thereof, AppFolio "does not know what Beagle has actually promised its customers." (Dkt. 33 at 21.) AppFolio instead focused on the data Beagle told the Court itneeded. [1] (*Id*. at 9-10.)

*Second*, AppFolio never claimed that scheduled reports or database API have write capability. To the contrary, AppFolio argued only that scheduled

---

[1] Given the shifting nature of Beagle's claims, AppFolio does not claim to know what data Beagle actually needs.

reports "allows Beagle to receive exactly the same data it receives through its unauthorized user accounts."[2] (*Id.* at 5.) AppFolio then provided "a sample scheduled report showing the data Beagle claims to require." (*Id*. at 15.) As the name suggests, scheduled reports provide a report—not write access to AppFolio's system. AppFolio never represented otherwise.[3]

*Third,* Beagle itself told the Court scheduled reports did not have the write access it claims to require (the same fact it now claims to have newly discovered). In its Reply in Support of the TRO Motion, Beagle argued that scheduled reports were insufficient because it "makes it so Beagle cannot add or remove charges" —i.e., it did not allow Beagle to write into the customer's database. (Dkt. 36 at 7.)

Because, in briefing the original motion, both parties accurately represented the capability of scheduled reports (and AppFolio made no representation as to database API), there is no "material difference in fact from that presented to the Court."

### b. Beagle Knew the Capability of Scheduled Reports

The law is clear that reconsideration cannot be justified by evidence that was already known to the moving party. *Frederick S. Wyle Pro. Corp. v. Texaco, Inc.*, 764 F.2d 604, 609 (9th Cir. 1985) (Applying FRCP 59 and affirming denial

---

[2] While database API does in fact have robust write capability (Delage. Decl. ¶ 5.), AppFolio made no representations regarding its capabilities, choosing instead to focus on scheduled reports, given that Beagle's own CEO claimed it would provide the data required. (Dkt. 33 at 22.)

[3] AppFolio, in fact, posited that Beagle sued AppFolio, rather than use Scheduled reports, because Beagle was "not just accessing data, it is using AppFolio's platform to issue charges to residents for its products." (Opp. at 6.) In other words, Beagle wanted write capability.

14

of motion for reconsideration where moving party's "new" fact was known before disposition of the order for which he sought reconsideration).

Beagle's motion claims that it did not know that scheduled reports were read-only until after the Court issued its Order. (Mot. at 4-5.) That is simply not true. As detailed above, AppFolio fully explained and demonstrated scheduled reports read-only functionality in its Opposition. (Dkt. 33 at 5.) And Beagle itself argued on Reply that scheduled reports were insufficient because they did not allow it to make changes to charges in the customer's database. (Dkt. 36 at 7.) In addition, AppFolio's user logs show that Beagle is familiar with scheduled reports, having used them with 346 AppFolio customers, sending over *fifty-four thousand* scheduled reports. (Delage Decl. ¶ 6.) Perhaps this is why no Beagle declarant states that Beagle was unaware, prior to the Court's Order, that scheduled reports were read-only.

### c. Beagle Could Have Known the Capability of Database API with Even a Modicum of Diligence

As explained above, Beagle cannot establish that database API's capability is materially different than that presented to the Court in the prior motion because AppFolio made no representations as to database API's capabilities. But even if it had, Beagle would still need to establish that "the exercise of reasonable diligence" would not have revealed those capabilities prior to the Court's Order. That it cannot do.

The Court has already recognized that "[p]resumably, as soon as Beagle became aware that AppFolio intended to enforce its Terms of Service, Beagle began working on developing or engineering such integrations." (Dkt. 39 at 6.) But that is not the case. Beagle's own declarant, Ayanga Okpokowuruk, states that

15

he was not tasked with evaluating Scheduled reports and Database API *until January*. (Mot. Okpokowuruk Decl. ¶ 3.) And Beagle's Motion further specifies that its "exploration of and attempts to implement the proposed substitute methods" occurred sometime "after the Order" on January 7.[4]

Placing this in context, AppFolio notified Beagle of its intent to enforce its Terms of Service on December 9, 2025, and, in that same letter, offered to answer Beagle's "questions about compliant access paths" and provide "clarification on transition steps." (Saxena Decl. ¶ 4.) Beagle never responded. Beagle instead told its customers they could "continue to run [their] Beagle program using scheduled reports" (Dkt. 33-3 Exh. D); brought this lawsuit against AppFolio; and filed an *ex parte* motion based on the threat of "extinction;" and fully briefed that motion all before assigning Mr. Okpokowuruk to investigate viable alternatives.

If Beagle had wanted to know the capabilities of database API, all it had to do was ask. When Beagle did ask on January 14—after the Order—AppFolio provided explanatory materials on January 30. (Delage Decl. ¶ 5.) Beagle's lack of diligence is fatal to its motion. *Kowalski v. Anova Food, LLC*, 958 F. Supp. 2d 1147, 1157 (D. Haw. 2013) (denying motion for reconsideration based on new fact because party could have obtained new fact by diligent investigation).

---

[4] Beagle's motion does separately claim it began working on solutions "as soon as Beagle became aware that AppFolio intended to sever its existing access." (Mot at 4.) But Beagle cites no evidence to support this claim; and it is inconsistent with Mr. Okpokowuruk's declaration.. (Mot. Okpokowuruk Decl. ¶ 3.)

**IV.   AppFolio's Post-Order Statements Are Not New and Do Not Justify Reconsideration**

Beagle accuses AppFolio of "new and escalating" post-order conduct that it claims justifies reconsideration. (Mot. at 3.) Specifically, Beagle complains of four statements made to a customer in a January 9, 2026, email. (*Id.* at 6.) What Beagle fails to mention is these four statements are *identical* to those sent in the December 9, 2025, communications.

| December 9 Communication (Dkt. 4-5 Exh. C) | January 9, 2026 Communication (Mot. D'Angelo Decl., Ex B) |
|---|---|
| We value your ability to choose providers, but the *method* by which Beagle has chosen to operate their business places you at risk. By creating user accounts in your database, Beagle has the ability to:<br><br>• access the personally identifiable information of your residents<br>• issue payments through the AppFolio payments platform<br>• view and take action across your entire account database | We value your ability to choose providers, but the *method* by which Beagle has chosen to operate their business places you at risk. By creating user accounts in your database, Beagle has the ability to:<br><br>• access the personally identifiable information of your residents<br>• issue payments through the AppFolio payments platform<br>• view and take action across your entire account database |

AppFolio merely sent an updated version of *the same message* on January 9, 2026, to users who did not receive the December 9, 2025, message because they did not yet have Beagle user access to their databases. (Delage Decl. ¶¶ 3-4.) Far from new, these statements were already fully briefed in response to Beagle's TRO Motion and, as such, are not grounds for reconsideration. *Trust Corp. v. Aetna Casualty and Surety Co.,* 873 F.Supp. 1386, 1393 (D.Ariz.1994) (denying motion for reconsideration where new deposition testimony merely reinforced old facts that court previously addressed) (cited approvingly in *Collins v. U.S. Citizenship & Naturalization Serv.*, 2013 WL 776244, at *1 (C.D. Cal. Feb. 6,

17

2013) (Walter, J.) (denying motion for reconsideration for failure to meet Local Rule 7-18).

Even if these statements were new and therefore warranted reconsideration, they would not change the outcome. First, Beagle does not even contend they are false. Indeed, Beagle's CEO admitted these are "things a user *could* technically do in your account" (emphasis in original). (Dkt. 33-3 Exh. D.) And, as also fully briefed, *see* Opp. at 18 fn. 8, false statements would not support Beagle's request that the Court enjoin AppFolio from disabling Beagle's user access. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009) ("Injunctive relief . . . must be tailored to remedy the specific harm alleged.")

## V. <u>Even if Reconsideration Was Warranted, The Outcome Would Not Change</u>

In its original motion, Beagle claimed it faced an "extinction level event" because AppFolio "planned to block Beagle's access" to "limited categories of" its customers' "operational data." (Dkt. 4 at 2, 6.) The Court, however, denied Beagle's motion for failure to show irreparable harm after AppFolio demonstrated that its scheduled reports feature could "provide the exact information that Beagle claimed it needed in its moving papers." (Dkt. 39 at 6.) The Court further found AppFolio's database API feature may also be a viable alternative, with Beagle having "fail[ed] to identify what data fields are missing." (*Id.*) Beagle's purportedly new facts do not change this outcome: Beagle still has no evidence that scheduled reports and database API cannot provide the data Beagle claimed to need as the basis for its original motion.

But even if write access were relevant to Beagle's motion, it would still fail to show a likelihood of irreparable harm because Beagle has not offered any evidence that its contracts require it to take action in its customer's databases. Beagle attached a customer contract to its reply in support of the TRO Motion, but

18

that contract showed only that Beagle is obligated to provide insurance to its customers. (Dkt. 36-1 Exh. A.) The contract made no mention of AppFolio, much less promise to use its functionality.

In addition, the credibility of Beagle's claim of irreparable harm is called into question by the recent announcement that Beagle's parent company, Corgi, raised $108 million dollars in funding, with a $630 million valuation, based in part on $40 million in annual recurring revenue. Whether true or not, Corgi's announcement—*made two days after the Court's Order*—tells a different story than Beagle, which claimed that, by disabling its user access, AppFolio would "with the click of a button . . . collapse more than $10 million dollars of revenue and "eviscerate hundreds of millions of dollars in enterprise value." (Dkt. 4 at 18.)

### VI.     **Beagle is Not Entitled to an Evidentiary Hearing**

Lastly, Beagle claims it is entitled to an evidentiary hearing "to test" and "explore" whether "1) AppFolio's proffered alternatives actually cure the risk of Beagle's irreparable harm; and 2) whether AppFolio's new and escalating conduct is causing irreparable harm to Beagle." But, according to Beagle's own authority in *Thomas v. Cnty. of Los Angeles*, 978 F.2d 504, 508 (9th Cir. 1992), *as amended* (Feb. 12, 1993), evidentiary hearings are appropriate where there are "diametrically opposing declarations and counter-declarations" on a material fact, not just because a party seeks to explore an issue. Beagle identifies no false statement of any AppFolio declarant, and it is not entitled to a hearing to "explore" the technical issues it should have investigated a month ago.

Unsurprisingly, Beagle offers no authority for the proposition that a court must hold an evidentiary hearing to enter an ex parte TRO. The Ninth Circuit

19

cases Beagle does cite address preliminary injunctions, not TROs. Beagle's cases are inapplicable for that reason.

Beagle's cases are inapt for additional reasons. In *Thomas*, the Ninth Circuit criticized the District Court for failing to hold an evidentiary hearing because there were conflicting declarations *and the district made no specific factual findings*. *Thomas v. Cnty. of Los Angeles*, 978 F.2d 504, 508 (9th Cir. 1992), *as amended* (Feb. 12, 1993). Here, by contrast, the Court made detailed factual findings about each category of data Beagle sought, and each way Beagle could get it. (Dkt. 39 at 6-7.) Beagle's other Ninth Circuit case helps Beagle even less because it went *against* Beagle's current position. It found that "The district court did not abuse its discretion in granting the preliminary injunction without an evidentiary hearing." *Int'l Molders' & Allied Workers' Loc. Union No. 164 v. Nelson*, 799 F.2d 547, 555 (9th Cir. 1986).

### Conclusion

For the foregoing reasons, the Court should deny the Motion in its entirety.

DATED this 2nd day of March, 2026.

/s/
Brian Procel
Jeremiah Levine
Marty Pritikin
**PROCEL LEVINE, LLP**
401 Wilshire Blvd, Fl 12
Santa Monica, CA 90401-1456
Phone: 424-788-4538

Attorneys for Plaintiff
AppFolio, Inc.

20