Brian Procel (Cal. Bar No. 218657)
Brian@ProcelLevine.com
Jeremiah Levine (Cal. Bar No. 288377)
Jeremiah@ProcelLevine.com
Marty Pritikin (Cal. Bar No. 210845)
Marty@ProcelLevine.com
**PROCEL LEVINE LLP**
401 Wilshire Blvd, Fl 12
Santa Monica, CA 90401-1456
Phone: 424-788-4538

*Attorneys for Defendant AppFolio, Inc.*

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

BEAGLE LABS, INC., a Delaware corporation, BEAGLE TECHNOLOGIES, INC., a Delaware corporation, BIG BEAGLE, INC., a Delaware corporation, RENTAL PROPERTY MANAGERS ASSOCIATION LLC, an Alabama limited liability company, and YRIG RISK RETENTION GROUP, INC., an Alabama corporation,

Plaintiffs,

v.

APPFOLIO, INC., a California corporation,

Defendant.

Case No. 25-cv-12248-JFW-SSC

**DECLARATION OF NATHANIEL DELAGE IN SUPPORT OF DEFENDANT APPFOLIO, INC.'S MOTION TO MODIFY SCHEDULING ORDER AND FOR LEAVE TO FILE AMENDED ANSWER AND COUNTERCLAIMS, OR IN THE ALTERNATIVE FOR LEAVE TO FILE SUPPLEMENTAL PLEADING ASSERTING COUNTERCLAIMS**

# DECLARATION OF NATHANIEL DELAGE

I, NATHANIEL DELAGE, declare as follows:

I make this declaration in support of Defendant AppFolio, Inc.'s Motion to Modify Scheduling Order and for Leave to File Amended Answer and Counterclaims. I have personal knowledge of the facts stated herein, and if called and sworn as a witness, I could and would testify competently thereto.

**Qualifications and Role**

1. My job title is Director, Software Engineering, for AppFolio. I have been employed by AppFolio for approximately eight years.

2. I am a duly authorized custodian of records for AppFolio and have authority to testify as to the authenticity of the records attached as exhibits to this declaration.

3. I am personally responsible for managing our technical security efforts related to Beagle. Managing this process requires deep knowledge of AppFolio's product architecture, typical customer behavior within a database, known Beagle behavior and other known Beagle markers, as well as access to and skill with the backend tools we use to examine and secure customers' databases.

4. I have taken on these responsibilities on an ad hoc basis. They are not part of my job description or core responsibilities, from which they have significantly distracted. Were I not forced to respond to Beagle's unauthorized efforts to access our system, my time would be spent doing what AppFolio hired me to do: lead a team of over thirty engineers, dedicated to two critical AppFolio services, insurance services and screening.

5. Since I first observed the access patterns described in this declaration in late February 2026, I have spent over 60 hours identifying and responding to them, including database analysis and customer-database forensic review. Despite that effort, the conduct continues.

**Discovery of New Access Patterns in Late February 2026**

6. Starting in late February 2026, in the course of my routine security work, I began to see two unfamiliar patterns of user access in our customer databases. The patterns did not match Beagle's previous methods of accessing customer databases.

7. Originally Beagle used largely identifiable domain names, such as reports@beagleforpm.com, across all customer accounts.

8. Beagle then switched to a variety of generic domain names, such as residentpm.cc, which they would use across multiple user accounts. We were able

to identify these generic accounts through markers associated with known Beagle accounts, including the email domain name, and through their use across multiple customer databases. Beagle would continue to use these generic domain names across multiple databases even as we identified and disabled the specific user accounts.

9. Security against these methods was relatively easy. We could maintain a list of known Beagle domain names and any user accounts using these domains would automatically be disabled within an hour of their creation. I would conduct manual weekly searches to identify previously unknown domains. Every time we found a new generic domain, we would add it to the list and new users under that domain would also be disabled within an hour.

10. It was during these manual searches that I began to see the new patterns of access. Instead of identifiable or generic domain names across multiple customer databases, I began to see markers of Beagle users occurring under domain names specific to the individual customer, where the domain name would match or closely resemble the name or domain name of the customer. Unlike the prior generic-domain accounts, where Beagle reused the same domains across many customer databases, these new accounts used a customer-specific domain for each customer. AppFolio's automated sweeps could not detect the new accounts. In other words,

the user access would facially appear to come from the property manager's employees, but upon deeper, manual investigation would carry markers that suggested (but did not confirm) it was actually Beagle. Collectively, I refer to these as "masked user-accounts," because they disguise themselves as those of the customer.

11. As I began to investigate this pattern of user access, I started to see another new pattern emerge. Whereas Beagle maintained the user access until we disabled it, some user accounts were now being deleted shortly after their creation, some within a week. This meant that if I did not manually find the account during that window, we would never know it existed and, therefore, could not identify its unauthorized behavior in the database; or learn from and block its access pattern. I refer to these as "ghost user-accounts."

12. I had not previously identified the masked or ghost methods as systematic Beagle conduct. Neither method appears in my earlier declarations in this matter, which described Beagle's access through January 2026. The conduct I previously described involved Beagle using identifiable Beagle domains and, after AppFolio's enforcement began, changing email addresses on existing accounts to Beagle-controlled generic domains. The masked and ghost methods are different in kind: they involve creating new user accounts under domains tailored to each

individual customer, and in the case of ghost accounts, deleting those accounts shortly after creation.

**Confirmation That Beagle Was the Source**

13. In fact, we are only certain this behavior exists because, on March 18, 2026, I learned of an email chain from Beagle to a customer, in which Beagle explained this method to the customer. The emails showed Beagle directing the customer, with step-by-step instructions, to create a user account for Beagle using the customer's domain name, and then delete that user account a week later, after Beagle had used the access to operate its business and create recurring resident charges. Attached hereto as Exhibit A is a true and correct copy of that email chain.

14. Using the email chain described above and other evidence I have collected in my investigation, I confirmed in late March that the access patterns I began seeing in late February were attributable to Beagle. I am, however, continuing to investigate. In some additional cases I have identified suspicious access markers but have not yet completed the forensic analysis necessary to confirm the access is attributable to Beagle. I have no way to determine how many ghost user-accounts have been created and deleted, because those accounts no longer exist when AppFolio's investigation reaches them. AppFolio's count of identified accounts continues to grow as Beagle creates new accounts and I confirm additional ones.

**Account Tracking**

15. As of the date of this declaration, AppFolio has identified more than 800 user accounts attributed to Beagle in total. Approximately 180 of those accounts were created on or after February 4, 2026. Of those, at least 70 are masked user-accounts using either the customer's own domain or a domain closely resembling the customer's name.

**Recent Access**

16. Since March 5, 2026, AppFolio has identified at least 100 additional instances of unauthorized Beagle user access. That figure does not include ghost user-accounts or accounts AppFolio's detection processes could not identify.

17. The conduct described in this declaration continues through the date of signing.

**Self-Help Is No Longer Sufficient**

18. The masked and ghost user-accounts create real, and largely insurmountable, security problems for us. Because Beagle uses a new and unique domain name for each customer, matching or closely resembling the customer's name, we can no longer automatically sweep for and disable the user access.

19. Instead, we must find the user access using other less certain markers[1] and then manually verify, as best we can, whether the user access is coming from Beagle or the customer. This last step is both crucial and risky because we have no desire to disable our customers' legitimate user access. Doing so could deeply damage our relationship with the customer.

20. The problem is all the more complicated because we are effectively on a clock. If we do not find the access in time, Beagle is free to use our platform to set up their business. By forcing us to undertake detailed investigations of each user-account, Beagle gains the time it needs to use our functionality to run their business, such as identifying residents' insurance coverage, and, most importantly, create recurring charges to residents that will continue to run long after Beagle has stopped directly accessing the platform. In three ghost accounts I studied, Plaintiffs created 633 recurring resident charges totaling approximately $9,575 each month, all set to run indefinitely. By the time we confirm the access (if we ever can), the damage is done.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

---

[1] I have intentionally not identified these markers because I fear that if I disclose them to Beagle, they will find new methods to disguise them as well.

Executed on the 1st day of May, 2026, at San Diego, California.

Nathaniel Delage