**GREENBERG TRAURIG, LLP**
Michael Burshteyn (SBN 295320)
Marcelo Barros (SBN 339069)
101 Second Street, Suite 2200
San Francisco, California 94105-3668
Telephone: 415.655.1300
Michael.Burshteyn@gtlaw.com
Marcelo.Barros@gtlaw.com

Jake Evans (*pro hac vice*)
Jordana R. Sternberg (*pro hac vice*)
Terminus 200, 3333 Piedmont Road NE, Suite 2500
Atlanta, Georgia 30305
Telephone: 678.553.2100
Jake.Evans@gtlaw.com
Jordana.Sternberg@gtlaw.com

*Attorneys for Plaintiff, Beagle Labs, Inc., Beagle Technologies, Inc., and Big Beagle Inc.*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BEAGLE LABS, INC., a Delaware corporation, BEAGLE TECHNOLOGIES, INC., a Delaware corporation, BIG BEAGLE, INC., a Delaware corporation, RENTAL PROPERTY MANAGERS ASSOCIATION LLC, an Alabama limited liability company, and YRIG RISK RETENTION GROUP, INC., an Alabama corporation, <br><br> Plaintiffs, <br><br> v. <br><br> APPFOLIO, INC., a California corporation, <br><br> Defendant. | CASE NO.  2:25-cv-12248-JFW-SSC <br><br> **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO MODIFY SCHEDULING ORDER AND FOR LEAVE TO FILE AMENDED ANSWER AND COUNTERCLAIMS** <br><br> Hon. John F. Walter <br><br> DATE:   6/15/26 <br> TIME:   1:30 p.m. <br> DEPT:   7A <br> JUDGE: Hon. John F. Walter <br> TRIAL:  9/28/27 |

CASE NO.  2:25-cv-12248-JFW-SSC

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO MODIFY SCHEDULING ORDER AND FOR LEAVE TO FILE AMENDED ANSWER AND COUNTERCLAIMS**

ACTIVE 724356123v4

## TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................. 1

II.     BACKGROUND ............................................................................................. 3

III.    LEGAL STANDARD ...................................................................................... 5

IV.     ARGUMENT .................................................................................................. 6

        A.    AppFolio Cannot Establish Rule 16(b)(4) Good Cause for Its Untimely
              Amendment. ......................................................................................... 6

              1.    AppFolio Was Not Diligent in Creating a Workable Rule 16 Order. ... 7

              2.    The Conduct AppFolio Alleges Was Reasonably Foreseeable and
                    Could Have Been Anticipated. ............................................................ 8

              3.    AppFolio Was Not Diligent in Seeking Amendment Even Once the
                    Alleged "Noncompliance" Became Apparent. ..................................... 9

              4.    Folio's Own Pleading Contradicts Its "New Conduct" Narrative. ....... 11

              5.    AppFolio Cannot Re-litigate the Same Claims. .................................. 12

        B.    AppFolio Cannot Satisfy Rule 15(a)(2) Because The Proposed Amendment
              Is Futile and Will Cause Undue Delay. ............................................... 13

              1.    Controlling Authority on Authorization Undermines the CFAA Claim.
                    ............................................................................................................ 14

              2.    AppFolio Cannot Prevail on its Proposed Tortious Interference Claim.
                    ............................................................................................................ 17

              3.    AppFolio's § 502 Claim Faces the Same Authorization Dilemma. ..... 19

              4.    AppFolio's Proposed Claim Under § 502(c)(7) is Futile Because
                    Beagle Had Permission. ...................................................................... 21

              5.    Permitting Amendment Will Cause Undue Delay ............................... 22

        C.    Rules 15(d) and 13(e) Do Not Independently Authorize AppFolio's Proposed
              Pleading. ............................................................................................. 23

V.      CONCLUSION .............................................................................................. 24

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO MODIFY SCHEDULING ORDER AND FOR LEAVE TO FILE AMENDED ANSWER AND COUNTERCLAIMS**

ACTIVE 724356123v4

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*ATPAC, Inc. v. Aptitude Solutions, Inc.*,
　　2010 WL 1779901 (E.D. Cal. Apr. 29, 2010) ................................................... 15

*Balboa Acquisition LLC v. Ratkovich*,
　　No. SACV0700091JVSRNBX, 2008 WL 11343355 (C.D. Cal. Feb. 27, 2008) ................................................................................................................ 14, 22

*Branch Banking & Tr. Co. v. D.M.S.I., LLC*,
　　871 F.3d 751 (9th Cir. 2017) ........................................................................... 11

*Brown v. California*,
　　No. 89-0811, 1990 U.S. Dist. LEXIS 16054 (N.D. Cal. Nov. 14, 1990) ........... 12

*C.F. v. Capistrano Unified Sch. Dist.*,
　　647 F. Supp. 2d 1187 (C.D. Cal. 2009) ............................................................. 6

*In re Celera Corp. Derivative Litig.*,
　　No. C 10-02935 JW, 2011 WL 1431692 (N.D. Cal. Apr. 14, 2011) ................. 12

*Cole v. Educ. Credit Mgmt. Corp.*,
　　No. ED CV 17-00974-JFW (SP), 2017 U.S. Dist. LEXIS 219032 (C.D. Cal. Oct. 13, 2017) (Walter, J.) .......................................................................... 23

*Coleman v. Quaker Oats Co.*,
　　232 F.3d 1271 (9th Cir. 2000) ........................................................................... 6

*Dreamroom Prods. v. Suavemente, Inc.*,
　　No. CV 11-6604-JFW, 2014 U.S. Dist. LEXIS 195468 (C.D. Cal. Feb. 26, 2014) (Walter, J.) ........................................................................................... 13

*Eid v. Alaska Airlines, Inc.*,
　　621 F.3d 858 (9th Cir. 2010) ....................................................................... 23, 24

*In re Exxon Valdez*,
　　318 Fed. Appx. 545 (9th Cir. 2009) ................................................................. 12

*Facebook, Inc. v. Power Ventures, Inc.*,
　　844 F.3d 1058 (9th Cir. 2016) ............................................................... 16, 17, 19

*Foman v. Davis*,
371 U.S. 178 (1962)..................................................................................13

*hiQ Labs, Inc. v. LinkedIn Corp.*,
31 F.4th 1180 (9th Cir. 2022) ...............................................................*passim*

*Holston v. Rosa*,
No. 220CV01076KJMCKDP, 2022 WL 3274350 (E.D. Cal. Aug. 11, 2022) ...................................................................................................23

*Jackson v. Bank of Hawaii*,
902 F.2d 1385 (9th Cir. 1990) ................................................................22

*Jackson v. Laureate, Inc.*,
186 F.R.D. 605 (E.D. Cal. 1999) ........................................7, 8, 10, 13

*Johnson v. Mammoth Recreations, Inc.*,
975 F.2d 604 (9th Cir. 1992) .......................................................6, 9, 13

*Kaneka Corp. v. SKC Kolon PI, Inc.*,
No. 11-CV-03397-JGB, 2013 WL 11237203 (C.D. Cal. May 6, 2013) ............13

*Koninklijke Philips N.V. v. Elec-Tech Int'l Co.*,
2015 WL 1289984 (N.D. Cal. Mar. 20, 2015) ....................................16

*Kuschner v. Nationwide Credit, Inc.*,
256 F.R.D. 684 (E.D. Cal. 2009) ...........................................................24

*LVRC Holdings LLC v. Brekka*,
581 F.3d 1127 (9th Cir. 2009) ................................................................15

*Parker v. Joe Lujan Enters., Inc.*,
848 F.2d 118 (9th Cir.1988) ...................................................................22

*Planned Parenthood of S. Ariz. v. Neely*,
130 F.3d 400 (9th Cir. 1997) ..................................................................12

*SecureInfo Corp. v. Telos Corp.*,
387 F. Supp. 2d 593 (E.D. Va. 2005) .....................................................15

*Smith v. Commanding Officer, Air Force Accounting & Finance Center*,
555 F.2d 234 (9th Cir. 1977) ..................................................................14

CASE NO.  2:25-cv-12248-JFW-SSC

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO MODIFY SCHEDULING ORDER AND FOR LEAVE TO FILE AMENDED ANSWER AND COUNTERCLAIMS**

ACTIVE 724356123v4

*Steckman v. Hart Brewing, Inc.*,
143 F.3d 1293 (9th Cir. 1998) ................................................................................14

*Sunbelt Rentals, Inc. v. Victor*,
43 F. Supp. 3d 1026 (N.D. Cal. 2014) .............................................................20, 21, 22

*Torres v. UnitedHealthcare Ins. Co.*,
No. 24-4502, 2025 WL 3079972 (9th Cir. Nov. 4, 2025) ................................11

*Van Buren v. United States*,
593 U.S. 374 (2021) ...............................................................................3, 14, 17

*In re W. States Wholesale Nat. Gas Antitrust Litig.*,
715 F.3d 716 (9th Cir. 2013) .............................................................................6, 8, 11

**California Cases**

*Asahi Kasei Pharma Corp. v. Actelion Ltd.*,
222 Cal. App. 4th 945 (2013) .............................................................................19

*In re Oliveras*,
103 Cal. App. 5th 771 (2024) (applying *Van Buren* analogy to § 502 and
holding that authorized access used for a disapproved purpose "did not
engage in the type of conduct section 502 was designed to criminalize")...20, 21

*In re Oliveras*,
103 Cal. App. 5th at 781–82 ................................................................................21

*Pac. Gas & Elec. Co. v. Bear Stearns Co.*,
50 Cal. 3d 1118 (1990) .......................................................................................18

*Reeves v. Hanlon*,
33 Cal. 4th 1140 (2004) .......................................................................................18

**Federal Statutes**

18 U.S.C.
§ 1030...................................................................................................................14
§ 1030(c)(4)(A)(i)(I) ...........................................................................................17
§ 1030(e)(11) .......................................................................................................17

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO MODIFY SCHEDULING ORDER AND FOR LEAVE TO FILE AMENDED ANSWER AND COUNTERCLAIMS**

ACTIVE 724356123v4

**California Statutes**

Cal. Penal Code
§ 502(c)(2) ...................................................................................20
§ 502(c)(3) ...................................................................................20
§ 502(c)(4) ...................................................................................21
§ 502(c)(7) ...................................................................................21

California Penal Code 502 ...................................................................1

California Penal Code
§ 502...................................................................3, 19, 20, 21

Computer Fraud and Abuse Act ...........................................................1

**Other Authorities**

Fed. R. Civ. P. 15, 16(b) .....................................................................6

Fed. R. Civ. P. 16(b)(4)...............................................................6, 22, 24

Local Rule 7-3 ..................................................................................5, 10

3 Moore's Federal Practice ...................................................................7

Rule 13(e)............................................................................................24

Rule 15(a)....................................................................................*passim*

Rule 15(a)(2) .......................................................................................13

Rule 15(d)................................................................................12, 23, 24

Rule 16 ........................................................................................7, 8, 13

Rule 16(b)........................................................................................6, 13

Rule 16's ...............................................................................................6

Rules 15(d) and 13(e)..........................................................................23

CASE NO.  2:25-cv-12248-JFW-SSC

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO MODIFY SCHEDULING ORDER AND FOR LEAVE TO FILE AMENDED ANSWER AND COUNTERCLAIMS**

ACTIVE 724356123v4

Plaintiffs Beagle Labs, Inc., Beagle Technologies, Inc., Big Beagle, Inc., Rental Property Managers Association LLC, and YRIG Risk Retention Group, Inc. (collectively, "Beagle"), by and through their attorneys of record, Greenberg Traurig, LLP, hereby file this response in opposition to the Motion for Leave to Amend Answer, [Dkt. 77] ("Motion"), filed by Defendant AppFolio, Inc. ("AppFolio" or "Defendant") and states as follows:

## I.    INTRODUCTION

AppFolio seeks to amend to add three claims it knew about when it Answered in this action, when it filed its own offensive case in Santa Barbara State Court in December 2025 (where the amendments would be more proper, if they weren't so delayed), and for months prior to that, based on AppFolio's own allegations. All three claims – tortious interference, Computer Fraud and Abuse Act, and California Penal Code 502 – are not based on any new facts that AppFolio has discovered.

Putting aside the threshold timing issues which mandate denial of the motion, there are also significant substantive issues. Each claim suffers from insurmountable legal and factual issues. AppFolio's claims are all futile because, to the extent AppFolio's allegations would be true, they would relate to AppFolio's own customers consent to have Beagle perform services for them. The AppFolio customers own their own data, as contracted with AppFolio. They can decide to have Beagle help them in the same way that AppFolio's platform permits many other vendors to integrate.

AppFolio's proposed counterclaims are the next page of an anticompetitive playbook the Ninth Circuit addressed in *hiQ Labs v. LinkedIn Corp.*, where it rejected the platform's attempt to invoke the CFAA and TOS as a pretext for blocking a competitor. 31 F.4th 1180, 1202 (9th Cir. 2022). Among other things, Beagle has alleged that AppFolio maintains an unlawful monopoly, unfairly competes, falsely advertises, defames, and tortiously interferes with Beagle's business. This dispute began when AppFolio undertook a coordinated effort to falsely brand Beagle a "security risk" and deplatform Beagle, a customer-authorized competitor.

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO MODIFY SCHEDULING ORDER AND FOR LEAVE TO FILE AMENDED ANSWER AND COUNTERCLAIMS**
ACTIVE 724356123v4

AppFolio frames its motion around two purportedly "new" access methods it calls "masked accounts" and "ghost accounts," contending that these methods emerged after it filed its Answer on February 4, 2026, and that good cause therefore exists to modify the Court's Scheduling Order. That framing does not withstand scrutiny. AppFolio has known since at least November 2024 that Beagle's customers create user accounts for Beagle in their AppFolio databases. It alleged in its own pre-Answer TRO briefing that Beagle had already changed email addresses on accounts to evade detection. AppFolio articulated a complete tortious interference theory in a cease-and-desist letter sent to Plaintiffs counsel on March 5, 2026, one day after the motion-filing deadline and *thirty-nine days before the pleading-amendment deadline*. And it filed this motion fifty days after receiving what it claims was the documentary confirmation that supposedly justified the delay.

AppFolio's "new conduct" narrative relabels conduct it has known about, complained about, and litigated over.  AppFolio even built monitoring infrastructure specifically designed to detect this conduct before this case was filed.  The amendment is far too late.

The procedural record tells the real story. When the Court entered its Scheduling Order on February 12, 2026, Beagle had already stated that its business depended on access to AppFolio's platform, making continued access attempts foreseeable. AppFolio made no counterclaims at the scheduling stage and even pleaded mootness in its Eighth Affirmative Defense, representing to this Court that it had already disabled Beagle's access. It then let the March 4 motion-filing and the April 13 pleading-amendment deadlines pass without filing or seeking an extension.  Only on May 7, 2026, twenty-four days after the amendment deadline and well over two months after the motion-filing deadline, did AppFolio finally act.  This Court typically requires more diligence than that for amendments.

Beyond the timing issue, AppFolio also has a location problem.  The proposed counterclaims are duplicative of claims already asserted in Santa Barbara Superior Court.  AppFolio filed that lawsuit on December 9, 2025, alleging tortious interference and related claims premised on the same category of conduct it now seeks to inject into this proceeding

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO MODIFY SCHEDULING ORDER AND FOR LEAVE TO FILE AMENDED ANSWER AND COUNTERCLAIMS**

ACTIVE 724356123v4

(the "Santa Barbara Action"). Having voluntarily chosen that forum, AppFolio cannot now burden this Court and these Plaintiffs with overlapping counterclaims asserting the same legal theories against the same parties based on the same underlying dispute. It is notable that AppFolio twice sought a TRO in Santa Barbara and was denied. Now AppFolio comes to this Court for a third bite at the apple on its offensive claims.

Substantively, the proposed counterclaims are futile. AppFolio's CFAA and § 502 theories are foreclosed by *Van Buren* and *hiQ Labs*. Its tortious interference theory hinges on the undisputed fact that AppFolio's own customers voluntarily create vendor accounts using tools AppFolio itself built and advertises. And all three claims rest on the same fundamental contradiction that pervades AppFolio's litigation position: AppFolio simultaneously tells this Court that its platform offers "sufficient" alternative access methods and that it "does not prohibit or penalize its customers for working with whatever Point Solutions they choose," while arguing that when customers actually exercise that choice in Beagle's favor, the result is tortious interference and computer fraud.

For these reasons, the Motion should be denied.

## II.   **BACKGROUND**

AppFolio operates a cloud-based property management platform that serves as the system of record for more than 20,000 property managers and over eight million units. (Dkt. 39 at 1; Dkt. 1 ¶ 82.)  AppFolio offers a variety of services including a product called Smart Ensure, which manages insurance compliance for property managers and their tenants – and, notably, generates revenue for AppFolio. (Dkt. 39 at 2.) Beagle also provides insurance compliance and resident services to property managers, including tenant liability waiver programs, renters' insurance verification, deposit alternative services, and pet damage waiver offerings. These services help property managers satisfy lease requirements, manage risk, and provide cost-effective protection to renters. (Dkt. 4-7 ¶¶ 2-3; Dkt. 1 ¶¶ 22-23.)

To use Beagle's services, Beagle's customers, the property managers themselves, create user accounts for Beagle in their AppFolio databases to facilitate Beagle's services.

CASE NO.  2:25-cv-12248-JFW-SSC

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO MODIFY SCHEDULING ORDER AND FOR LEAVE TO FILE AMENDED ANSWER AND COUNTERCLAIMS**

ACTIVE 724356123v4

(Dkt. 4 at 7; Dkt. 4-7 ¶¶ 4, 6; Dkt. 39 at 3.) Customers use AppFolio's built-in user-management features to do so, controlling the permissions granted and limiting those permissions to what is needed. (Dkt. 4-7 ¶ 6; Dkt. 39 at 3.) This is the same vendor-access workflow AppFolio explicitly advertises on its own website and makes available to other third parties, including its preferred partner Second Nature, in whom AppFolio invested $75 million in April 2025. (Dkt. 1 ¶¶ 3, 24; Dkt. 4-2 ¶ 8; Dkt. 36 at 2; Dkt. 4-9, Ex. B (AppFolio website screenshot advertising third-party vendor integration).)

The record shows that, for over a year, AppFolio was aware that its customers were creating these user accounts for Beagle on the AppFolio platform, and it raised no objection. (Dkt. 1 ¶ 29; Dkt. 57 ¶ 5; Dkt. 4-2 ¶ 4.) AppFolio discussed a potential partnership with Beagle as recently as November 2024. (Dkt. 1 ¶ 5; Dkt. 57 ¶ 5; Dkt. 4-2 ¶ 4.) It was only after Beagle began growing rapidly, and winning customers away from AppFolio's own competing in-house insurance products and from Second Nature, that AppFolio abruptly reversed course. (Dkt. 1 ¶¶ 6, 30; Dkt. 4-2 ¶¶ 5-9.) Rather than competing on the merits, AppFolio launched a campaign to eliminate Beagle from the market entirely. AppFolio sent mass emails to Beagle's customers containing false claims that Beagle posed serious security risks. (Dkt. 1 ¶¶ 31-33; Dkt. 4-2 ¶¶ 6-8, Ex. C.) It filed a complaint against Beagle in the Santa Barbara Action on December 9, 2025. (AppFolio Santa Barbara Complaint, attached hereto as Exhibit A.) And it moved to disable Beagle's access to its platform across the board. (Dkt. 4-2 ¶¶ 10-16; Dkt. 1 ¶¶ 34-35.)

On December 15, 2025, Beagle filed this action against AppFolio in the Northern District of California. That Court transferred the action to this Court. (Dkt. 1; Dkt. 24.) Contemporaneously, Beagle sought a temporary restraining order against AppFolio to prevent its deplatforming efforts and to put a stop to the harmful statements AppFolio was making about Beagle to Beagle's customers and potential customers. (Dkt. 4.) The TRO proceedings are significant for this motion because by the time AppFolio filed its Answer on February 4, 2026, it had already litigated in detail the precise category of conduct it now

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO MODIFY SCHEDULING ORDER AND FOR LEAVE TO FILE AMENDED ANSWER AND COUNTERCLAIMS**

ACTIVE 724356123v4

characterizes as "newly discovered." AppFolio's own engineer submitted a detailed declaration documenting Beagle's access method, the domain names associated with Beagle's accounts, and AppFolio's efforts to identify and disable those accounts. (Dkt. 33-8 ¶¶ 9-18.) AppFolio described at length its layered detection system, its automated database sweeps, and its weekly manual searches. *Id*.

AppFolio filed its Answer on February 4, 2026, asserting no counterclaims. (Dkt. 57). On February 12, 2026, the Court entered its Scheduling and Case Management Order (the "Scheduling Order"), setting March 4, 2026 as the deadline for filing motions to amend pleadings and April 13, 2026 as the deadline to amend pleadings. (Dkt. 67 § 3(b).) AppFolio accepted those deadlines without objection and without noting anticipated counterclaims.

As AppFolio's Motion admits and details, on March 4, 2026, AppFolio served Plaintiffs with written discovery directed at Beagle's access methods, but filed no motion to amend and did not seek an extension of the deadline to amend. (Dkt. 77 at 8.)  On March 5, 2026, AppFolio sent Plaintiffs a cease-and-desist letter demanding that Beagle cease obtaining user access to AppFolio's databases. (Cease-and-Desist Letter dated March 5, 2026, attached hereto as Exhibit B.)  On March 18, 2026, almost a full month before the deadline to amend the pleadings, AppFolio states it received a customer-forwarded email that it contends confirmed Beagle's use of the access methods at issue. (Dkt. 77 at 9.) On March 23, 2026, the parties conducted the required Local Rule 7-3 conference, at which Beagle declined to stipulate to AppFolio's filing of counterclaims. (Dkt. 73.) AppFolio then filed the required joint statement on March 25, 2026. (Dkt. 73.)

The pleading-amendment deadline passed on April 13, 2026. AppFolio filed neither a motion nor a request for an extension before that date. AppFolio filed this motion on May 7, 2026, 24 days after the pleading-amendment deadline and 63 days after the motion-filing deadline. (Dkt. 77.)

## III.   <u>LEGAL STANDARD</u>

When a motion for leave to amend a pleading is filed after the deadline set in a court's

CASE NO.  2:25-cv-12248-JFW-SSC

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO MODIFY SCHEDULING ORDER AND FOR LEAVE TO FILE AMENDED ANSWER AND COUNTERCLAIMS**

ACTIVE 724356123v4

scheduling order, the movant must first demonstrate good cause under Fed. R. Civ. P. 16(b)(4). *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 608-09 (9th Cir. 1992); Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent."). Good cause turns on a single question: the movant's diligence. *Johnson*, 975 F.2d at 608. This standard "primarily considers the diligence of the party seeking the amendment." *Id*. at 609. While a court may take into account any prejudice to the party opposing modification, "the focus of the [Rule 16(b)] inquiry is upon the moving party's reasons for seeking modification . . . [i]f that party was not diligent, the inquiry should end." *Id*.

Only upon the movant's demonstration of good cause will the more liberal standard of Rule 15(a) apply to the court's decision to grant or deny leave. *Id*.; Fed. R. Civ. P. 15, 16(b); *C.F. v. Capistrano Unified Sch. Dist.*, 647 F. Supp. 2d 1187, 1190 (C.D. Cal. 2009). "The good cause standard typically will not be met where the party seeking to modify the scheduling order has been aware of the facts and theories supporting amendment since the inception of the action." *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 737 (9th Cir. 2013). Nor is good cause established where the movant possessed the factual basis for its proposed claims before the deadline and offered no explanation for its failure to act. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1294-95 (9th Cir. 2000).

## IV.   ARGUMENT

### A.   AppFolio Cannot Establish Rule 16(b)(4) Good Cause for Its Untimely Amendment.

The Motion should be denied at the threshold because the deadline to amend the pleadings has long since expired, and AppFolio cannot show good cause under Fed. R. Civ. P. 16(b)(4) for its untimely proposed amendment. To demonstrate diligence under Rule 16's "good cause" standard, the movant may be required to show the following: (1) that the movant was diligent in assisting the Court in creating a workable Rule 16 order;

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO MODIFY SCHEDULING ORDER AND FOR LEAVE TO FILE AMENDED ANSWER AND COUNTERCLAIMS**

ACTIVE 724356123v4

(2) that the movant's noncompliance with a Rule 16 deadline occurred or will occur, notwithstanding its diligent efforts to comply, because of the development of matters which could not have been reasonably foreseen or anticipated at the time of the Rule 16 scheduling conference; and (3) that the movant was diligent in seeking amendment of the Rule 16 order, once it became apparent that it could not comply with the order. *Jackson v. Laureate, Inc.*, 186 F.R.D. 605, 608 (E.D. Cal. 1999).  AppFolio fails all three, for the following reasons:

### 1.     AppFolio Was Not Diligent in Creating a Workable Rule 16 Order.

PParties anticipating possible amendments to their pleadings have an "unflagging obligation" to alert the Rule 16 scheduling judge of the nature and timing of such anticipated amendments in their status reports so the judge can consider whether such amendments may properly be sought solely under the Rule 15(a) standard, and whether structuring discovery pertinent to the parties' decision whether to amend is feasible. *See* 3 Moore's Federal Practice at § 16.36(3)(c) ("Addressing these matters assertively early in the pretrial period . . . [is] essential to coherent case development planning, and can avoid the delays and the wasteful repetition of discovery events that are often occasioned by amendments made later in the pretrial period."). A party who fails to assist the Rule 16 scheduling judge in "fashioning workable programmatic procedures must bear the reasonably foreseeable consequences for [its] failure to do so." *Jackson,* 186 F.R.D. at 608.

The record shows that when the Court entered its Scheduling Order on February 12, 2026, AppFolio was not operating in the dark. The dispute over access to AppFolio's platform was not a peripheral issue in this case, it was the central issue. AppFolio had spent the prior two months litigating this very question through TRO briefing, engineering declarations, and a court order addressing the matter in detail. (Dkt. 33-8 ¶¶ 9-18; Dkt. 39.) AppFolio had even filed an entirely separate lawsuit, the Santa Barbara Action, premised on the same category of conduct. *See generally* Ex. A ¶¶ 68-84. It had built a layered monitoring system for the express purpose of detecting ongoing access, a system consisting

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO MODIFY SCHEDULING ORDER AND FOR LEAVE TO FILE AMENDED ANSWER AND COUNTERCLAIMS**

ACTIVE 724356123v4

of automated database sweeps and weekly manual searches for the express purpose of detecting ongoing access. (Dkt. 33-8 ¶¶ 9-18.)

Against that backdrop, the possibility that Beagle's efforts to continue servicing its customers using AppFolio's platform would remain a live issue in this case was something AppFolio had every reason to anticipate. Yet it accepted the scheduling order without objection, said nothing about potential counterclaims, and affirmatively represented to this Court in its Eighth Affirmative Defense that it had already disabled Beagle's access, as though the matter were resolved. (Dkt. 57 at 21.)

At the time, AppFolio had already filed a tortious interference claim in state court. It had already built a monitoring system premised on the assumption that access would continue. Yet when this Court asked the parties to establish a litigation schedule, AppFolio did not flag that it would seek amendment. A party that has already sued on a theory in another forum, and then accepts a scheduling order in this forum without raising the possibility of asserting that same theory here, should not be permitted to modify the order. The record shows that AppFolio has not been diligent in creating a workable Rule 16 order.

## 2. The Conduct AppFolio Alleges Was Reasonably Foreseeable and Could Have Been Anticipated.

Beyond demonstrating diligence in creating a workable scheduling order, AppFolio must also show that its noncompliance with the deadline resulted from "the development of matters which could not have been reasonably foreseen or anticipated." *Jackson*, 186 F.R.D. at 608. AppFolio cannot make this showing. AppFolio has been aware of "the facts and theories supporting amendment since the inception of the action." *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d at 737.

AppFolio's motion characterizes "masked accounts" and "ghost accounts," as newly discovered conduct that could not have been anticipated. (Dkt. 77 at 1-2, 6-8.) But from the very beginning of this dispute, the operative facts have remained the same: AppFolio's own

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO MODIFY SCHEDULING ORDER AND FOR LEAVE TO FILE AMENDED ANSWER AND COUNTERCLAIMS**
ACTIVE 724356123v4

customers create user accounts in their own AppFolio databases to facilitate the services they have independently contracted with Beagle to provide. (Dkt. 4 at 7; Dkt. 4-7 ¶¶ 4, 6; Dkt. 39 at 3.) AppFolio's engineer documented Beagle-domain accounts in his TRO declaration. (Dkt. 33-8 ¶¶ 9-11.) This Court noted in its January 7 order that Beagle-use accounts had been created under different domain names. (Dkt. 39 at 4.) And that is what AppFolio now claims is happening through customer-owned domains and shorter-lived accounts. (Dkt. 77 at 7-8.) The underlying activity, customers creating vendor access using the same AppFolio features they have always used, has remained constant throughout.

What AppFolio calls "new" methods are all part of the same pattern AppFolio itself documented through three prior iterations in its own TRO briefing. AppFolio's motion describes (1) Beagle-domain accounts, (2) email-address switching during the stay, and (3) generic-domain accounts, and then claims the fourth iteration was a surprise. But a party that has watched its adversary adapt the same methods three time cannot credibly claim that a fourth adaptation was unforeseeable. AppFolio built its entire monitoring infrastructure on the premise that use of the platform would continue and evolve. The existence of that infrastructure is itself proof of foreseeability.

Moreover, AppFolio's own pre-deadline filings confirm that it did anticipate exactly what occurred. In the Santa Barbara Action, in December, AppFolio sought injunctive relief prohibiting Beagle from "accessing AppFolio's customer-facing software system" and from "inducing AppFolio's clients to share their log-in information or to otherwise violate their terms of service." Ex. A at ¶ 100. AppFolio sought that injunction precisely because it foresaw continued access. The relief AppFolio requested in state court is proof that it anticipated the very conduct it now calls unforeseeable. Carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief. *Johnson*, 975 F.2d at 609. AppFolio has not shown that failure to comply with the scheduling order's deadlines results from a situation not reasonably foreseeable.

### 3. AppFolio Was Not Diligent in Seeking Amendment Even Once the

CASE NO.  2:25-cv-12248-JFW-SSC

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO MODIFY SCHEDULING ORDER AND FOR LEAVE TO FILE AMENDED ANSWER AND COUNTERCLAIMS**

ACTIVE 724356123v4

**Alleged "Noncompliance" Became Apparent.**

Even if AppFolio could satisfy the first two prongs, it fails the third. Once it becomes apparent that a party cannot comply with a scheduling order deadline, diligence requires the party to act promptly to seek modification. *Jackson*, 186 F.R.D. at 608. AppFolio did not.

AppFolio's own motion identifies late February 2026 as the moment it "began to observe" the access patterns underlying its proposed counterclaims. (Dkt. 77 at 6.) By March 5, 2026, AppFolio had formulated a complete legal theory: its cease-and-desist letter to Beagle's counsel articulates every element of tortious interference with contractual relations, cites the governing California authority, quotes the specific Terms of Service provisions at issue, and references Beagle's own filings in this Court. *See* Ex. B. That letter is not the work of a party still investigating. It is the work of a party that has already concluded it has a claim and is demanding capitulation. Yet AppFolio filed nothing. The March 4 motion-filing deadline passed. AppFolio did not file a motion. It did not request an extension.

On March 18, 2026, AppFolio received what it describes as the documentary confirmation of Beagle's involvement, a customer-forwarded email that AppFolio contends confirmed Beagle's involvement in the access methods at issue. (Dkt. 77 at 9.) At that point, twenty-six days remained before the April 13 pleading-amendment deadline. AppFolio still filed nothing. It still did not request an extension. On March 23, 2026, five days after receiving its claimed confirmation, AppFolio conducted the Rule 7-3 conference and learned that Beagle would not stipulate. (Dkt. 73 at 4-5.) That is the expected outcome that necessitates a motion, not a reason to delay further. AppFolio filed the joint statement two days later. (Dkt. 73.) Then it waited. The April 13 deadline passed. AppFolio did not act. It waited for Plaintiffs' discovery responses, which arrived between April 16 and April 27. Then it waited further still. AppFolio finally filed on May 7, 2026, fifty days after receiving the March 18 email it identifies as the triggering event, and twenty-four days after the deadline it never sought to extend. And when a motion to amend is based on information a party possessed "long before the deadline to amend had passed," the party lacks such

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO MODIFY SCHEDULING ORDER AND FOR LEAVE TO FILE AMENDED ANSWER AND COUNTERCLAIMS**

ACTIVE 724356123v4

diligence. *Branch Banking & Tr. Co. v. D.M.S.I., LLC*, 871 F.3d 751, 765 (9th Cir. 2017).

Moreover, AppFolio did not request an extension of either deadline. A diligent party that recognizes it cannot meet a deadline seeks modification of that deadline promptly. AppFolio let both deadlines pass without action or request and then filed nearly a month after the second one expired. That is not diligence. That is the kind of unexplained tardiness that forecloses good cause. *See Torres v. UnitedHealthcare Ins. Co.*, No. 24-4502, 2025 WL 3079972, at *2 (9th Cir. Nov. 4, 2025) ("If a party has not demonstrated diligence establishing good cause to amend on an untimely motion, [the court] must deny it.").

### 4.    Folio's Own Pleading Contradicts Its "New Conduct" Narrative.

AppFolio's Eighth Affirmative Defense, filed February 4, 2026, states: "Plaintiffs' requests for injunctive relief are mooted because Defendant has disabled Beagle's access." (Dkt. 57 at 21.) That representation creates an irreconcilable tension with the motion now before the Court. If AppFolio believed on February 4 that Beagle's access had been disabled, then the conduct AppFolio claims it observed in "late February" should have triggered immediate action, not a two-month investigation culminating in a motion filed weeks after the deadline. (Dkt. 77 at 6.) A party that tells the Court the problem is solved, and then days later discovers it is not, acts immediately to address the discrepancy. It does not wait sixty-three days past the motion-filing deadline to inform the Court.

Alternatively, if AppFolio knew on February 4 that access to its platform was continuing in some form, then the mootness defense was not filed in good faith, and AppFolio already possessed the factual basis for its proposed counterclaims when it filed its Answer. Either way, good cause is absent. *In re W. States*, 715 F.3d at 737. AppFolio's awareness dates to at least November 2024. (Dkt. 57 ¶ 5 (admitting AppFolio "has known about Beagle for over a year"); Dkt. 4-2 ¶ 4.)  It articulated its legal theories in the Santa Barbara Action in December. Ex. A ¶¶ 68-84. Its factual record was developed through the TRO proceedings of December 2025 and January 2026. (Dkt. 33-8 ¶¶ 9-18; Dkt. 39.)

11                                    CASE NO.  2:25-cv-12248-JFW-SSC

No amount of relabeling converts this pre-existing awareness into good cause.

### 5.    AppFolio Cannot Re-litigate the Same Claims.

AppFolio has already asserted tortious interference and related claims against Beagle in the Santa Barbara Action. Ex. A ¶¶ 68-84. That complaint rests on the same facts as the proposed counterclaims here—Beagle's access to AppFolio's platform through customer-created accounts and the relevance of AppFolio's Terms of Service. *Id*. ¶¶ 68-84, 100. This alone forecloses amendment. When a claim "not only could have been the subject of a separate action, but it actually is the subject of a separate action, leave to amend is impermissible." *In re Celera Corp. Derivative Litig.*, No. C 10-02935 JW, 2011 WL 1431692, at *2 (N.D. Cal. Apr. 14, 2011); *In re Exxon Valdez*, 318 Fed. Appx. 545, 547 (9th Cir. 2009). Here, AppFolio's proposed counterclaims do not merely overlap with the Santa Barbara Action, they replicate it.

The same principle applies to AppFolio's attempt to invoke Rule 15(d). While supplemental pleadings are "favored," they "cannot be used to introduce a 'separate, distinct and new cause of action.'" *Planned Parenthood of S. Ariz. v. Neely*, 130 F.3d 400, 402 (9th Cir. 1997). And when "the facts alleged in the supplemental pleadings are based on facts which are completely unrelated to the facts at issue in the original complaint, allowing a plaintiff to add the additional claims would not serve the purpose of Rule 15(d), namely promoting as complete an adjudication of the dispute between the parties as possible." *Brown v. California*, No. 89-0811, 1990 U.S. Dist. LEXIS 16054, at 13-14 (N.D. Cal. Nov. 14, 1990). Here, the inverse problem exists: AppFolio's proposed counterclaims are not "unrelated" to this dispute, they are *the same dispute*. AppFolio chose to file separately in state court. Permitting AppFolio to inject them here does not promote "as complete an adjudication" as possible. It creates duplicative litigation, with the attendant risks of inconsistent rulings, wasted judicial resources, and compounded burden on Plaintiffs.

AppFolio chose Santa Barbara as its forum. It chose to file its tortious interference theory there before it filed its Answer in this case, and then filed its Answer without counterclaims. Having made that election, AppFolio cannot now repackage the same

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO MODIFY SCHEDULING ORDER AND FOR LEAVE TO FILE AMENDED ANSWER AND COUNTERCLAIMS**
ACTIVE 724356123v4

claims as new conduct in this Court to circumvent scheduling deadlines. The Motion should be denied on this basis alone.

**B.      AppFolio Cannot Satisfy Rule 15(a)(2) Because The Proposed Amendment Is Futile and Will Cause Undue Delay.**

Even if AppFolio could establish good cause (which it cannot), the Motion should be denied under Fed. R. Civ. P. 15(a)(2) in light of AppFolio's undue delay, the clear prejudice to Plaintiffs, and the facial futility of AppFolio's proposed arguments. "[O]nce the district court has filed a pretrial scheduling order pursuant to Rule 16 . . . a motion seeking to amend pleadings is governed first by Rule 16(b), and only secondarily by Rule 15(a)." Jackson, 186 F.R.D. at 607. Rule 15(a)(2) instructs the court to "freely give leave when justice so requires," Fed. R. Civ. P. 15(a)(2), however, "[l]eave to amend is not automatic." *Kaneka Corp. v. SKC Kolon PI, Inc.*, No. 11-CV-03397-JGB (RZx), 2013 WL 11237203, at *2 (C.D. Cal. May 6, 2013) (quoting *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003)).[1]

Because AppFolio has failed to show good cause under Rule 16, there is no need to reach the Rule 15(a) standard. *Johnson*, 975 F.2d at 609-10. Nevertheless, even if the Court proceeds to evaluate the motion under Rule 15(a), it should be denied. Under Rule 15(a)(2), courts consider five factors: (1) undue delay; (2) bad faith or dilatory motive; (3) repeated failure to cure deficiencies; (4) undue prejudice to the opposing party; and (5) futility. *Foman v. Davis*, 371 U.S. 178, 182 (1962). The undue delay and futility factors weigh heavily against AppFolio here.

A proposed amendment is futile if it "could not survive a motion to dismiss."

---

[1] Denial of leave does not leave AppFolio without recourse.  As Judge Walter previously recognized, where a defendant wishes to assert counterclaims that belong elsewhere, the defendant "may file a new action." *Dreamroom Prods. v. Suavemente, Inc.,* No. CV 11-6604-JFW (SSx), 2014 U.S. Dist. LEXIS 195468, at *3 (C.D. Cal. Feb. 26, 2014) (Walter, J.) AppFolio can amend its pending Santa Barbara complaint, file a new federal action, or both.  What it cannot do is convert its missed federal deadline into a fourth bite at the same theory.

13                          CASE NO.  2:25-cv-12248-JFW-SSC

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO MODIFY SCHEDULING ORDER AND FOR LEAVE TO FILE AMENDED ANSWER AND COUNTERCLAIMS**

ACTIVE 724356123v4

*Balboa Acquisition LLC v. Ratkovich*, No. SACV0700091JVSRNBX, 2008 WL 11343355, at *2 (C.D. Cal. Feb. 27, 2008); *Smith v. Commanding Officer, Air Force Accounting & Finance Center*, 555 F.2d 234, 235 (9th Cir. 1977); *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998). AppFolio's proposed counterclaims face significant legal obstacles that render them, at minimum, subject to serious questions about their viability.

### 1. Controlling Authority on Authorization Undermines the CFAA Claim.

A AppFolio's CFAA counterclaim rests on the theory that Beagle accessed AppFolio's platform "without authorization" within the meaning of 18 U.S.C. § 1030. But the Supreme Court and Ninth Circuit have made clear that this provision of the CFAA does not reach the conduct alleged here. In *Van Buren v. United States*, 593 U.S. 374, 376 (2021), the Supreme Court held that CFAA liability turns on a "gates-up-or-down inquiry—one either can or cannot access a computer system, and one either can or cannot access certain areas within the system." The Court rejected the argument that violating a purpose-based or policy-based restriction on computer use gives rise to CFAA liability, warning that such a reading would mean "millions of otherwise law-abiding citizens are criminals." *Id*. at 394.

In *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1185 (9th Cir. 2022), the Ninth Circuit held that *Van Buren* "reinforces" a narrow interpretation of the CFAA's "without authorization" provision. The court concluded that "the CFAA's prohibition on accessing a computer 'without authorization' is violated when a person circumvents a computer's generally applicable rules regarding access permissions, such as username and password requirements, to gain access to a computer." *Id*. at 1201. Where access is not obtained by circumventing an authentication gate, but rather through means the platform itself provides, the CFAA's "without authorization" provision *does not apply*. *Id*. at 1198-1202. The CFAA "was enacted to prevent intentional intrusion onto someone else's computer — specifically, computer hacking." *Id*. at 1196. Because the CFAA "is primarily a criminal statute" interpreted consistently in civil and criminal contexts, the rule of lenity applies and "requires

14

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO MODIFY SCHEDULING ORDER AND FOR LEAVE TO FILE AMENDED ANSWER AND COUNTERCLAIMS**

ACTIVE 724356123v4

courts to limit [its] reach [to the] clear import of its text." *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1134–35 (9th Cir. 2009). Courts therefore "favor a narrow interpretation of the CFAA's 'without authorization' provision so as not to turn a criminal hacking statute into a sweeping Internet-policing mandate." *hiQ Labs*, 31 F.4th at 1201 (citing *United States v. Nosal*, 676 F.3d 854, 858 (9th Cir. 2012) (en banc)).

Here, AppFolio's own customers create user accounts for Beagle using AppFolio's built-in user management functionality, the same functionality AppFolio advertises as enabling third-party vendor access and – notably – the same functionality through which AppFolio's preferred partner Second Nature accesses the platform. (Dkt. 4-9, Ex. B; Dkt. 4-2 ¶ 8; Dkt. 36 at 2.) The customers who create these accounts are authorized users who exercise their own access privileges to create vendor accounts, a feature AppFolio designed into its platform. (Dkt. 4 at 7; Dkt. 4-7 ¶¶ 4, 6; Dkt. 39 at 2-3.) AppFolio's own Terms of Service confirm that customers "retain all right, title and interest in and to [their] data." (Dkt. 4-3 § 1.4; Dkt. 39 at 2.) This Court observed that AppFolio "does not own or create this data, but merely hosts data on its software platform." (Dkt. 39 at 2.) The customers own the data, control their databases, and granted Beagle access. Under the CFAA's gates-up-or-down framework, those customers—not AppFolio—control whether the gate is open. AppFolio's objection is not that someone bypassed a gate. It is that AppFolio disagrees with how its customers are using a gate AppFolio itself built and left open.

Without hacking, where authorization comes from the customer rather than the platform vendor, courts hold that no CFAA claim lies against the third party the customer invited. *SecureInfo Corp. v. Telos Corp.*, 387 F. Supp. 2d 593, 609 (E.D. Va. 2005) (no CFAA liability where "[e]ven if [the licensee] allowed the defendants access to the server and SecureInfo's materials in violation of the license agreements, under [the licensee's] grant of authority to the defendants, they were entitled to obtain the information on the server"); *see also* *ATPAC, Inc. v. Aptitude Solutions, Inc.*, 2010 WL 1779901, at *6 (E.D. Cal. Apr. 29, 2010) (no CFAA liability where "County of Nevada gave Aptitude access to

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO MODIFY SCHEDULING ORDER AND FOR LEAVE TO FILE AMENDED ANSWER AND COUNTERCLAIMS**

ACTIVE 724356123v4

the servers located in its offices . . . [t]his does not allege the sort of subterfuge this court believes is necessary to find a defendant not party to a license agreement civilly liable under the CFAA where the licensee grants it authority to access information in violation of the license agreement"). Reading the CFAA "in its context as an anti-hacking statute, 'access' means something more than persuading someone to procure information you desire." *Koninklijke Philips N.V. v. Elec-Tech Int'l Co.*, 2015 WL 1289984, at \*4 (N.D. Cal. Mar. 20, 2015). The statute is violated only where the party "[it]self physically engaged in the hacking." *Id.* at \*5.

AppFolio relies on *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058 (9th Cir. 2016), for the proposition that a cease-and-desist letter is sufficient to revoke authorization and that "once permission has been revoked, technological gamesmanship or the enlisting of a third party to aid in access will not excuse liability." *Id*. at 1067. But the *hiQ* court expressly limited *Power Ventures* to its facts, explaining that "*Nosal II* and *Power Ventures* control situations in which authorization generally is required and has either never been given or has been revoked," and that those cases "do not control the situation present here, in which information is 'presumptively open to all comers.'" *hiQ*, 31 F.4th at 1199 (quoting *Power Ventures*, 844 F.3d at 1067 n.2).

*Power Ventures* is distinguishable in another critical respect. In that case, the platform operator had "tried to limit and control access to its website" for the purposes at issue, and the third party accessed user data that was protected by Facebook's username and password authentication system. *Power Ventures*, 844 F.3d at 1067. Power Ventures used Facebook users' credentials to access Facebook's own servers and send mass messages impersonating "The Facebook Team." *Id*. at 1063. When Facebook revoked Power Ventures' access, it revoked Power Ventures' own permission as the system owner. *Id*. at 1067–68 ("Power deliberately disregarded the cease and desist letter and accessed Facebook's computers without authorization to do so."). Here, AppFolio's customers granted the authorization. AppFolio cannot revoke authorization that its customers, not AppFolio, granted because those customers created the user accounts, set the permissions,

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO MODIFY SCHEDULING ORDER AND FOR LEAVE TO FILE AMENDED ANSWER AND COUNTERCLAIMS**
ACTIVE 724356123v4

and designated Beagle as their vendor. (Dkt. 4-7 ¶¶ 4, 6; Dkt. 4-2 ¶¶ 4–5.)  Here, AppFolio has not limited access to the customer-created vendor account functionality. To the contrary, it designed that functionality, advertises it, and permits other third parties to use it. (Dkt. 4-9, Ex. B; Dkt. 4-2 ¶ 8; Dkt. 39 at 2-3 (noting four authorized methods by which customers work with third parties, and that AppFolio "does not prohibit or penalize its customers for working with whatever Point Solutions they choose.")).

*Power Ventures* itself recognized that "a violation of the terms of use of a website—without more—cannot establish liability under the CFAA." 844 F.3d at 1067. AppFolio's theory ultimately depends on its Terms of Service prohibition against third-party access. As this Court itself noted, AppFolio's platform supports multiple authorized methods for customers to work with third-party vendors, and AppFolio "does not prohibit or penalize its customers for working with whatever Point Solutions they choose." (Dkt. 39 at 2.)

The "loss" element raises further questions. The CFAA requires "loss" aggregating at least $5,000 during any one-year period. 18 U.S.C. § 1030(c)(4)(A)(i)(I). The statute defines "loss" to include "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense." 18 U.S.C. § 1030(e)(11). The Supreme Court discussed that "loss" under the CFAA focus on "technological harms—such as the corruption of files—of the type unauthorized users cause to computer systems and data" and that such provisions are "ill fitted . . . to remediating 'misuse' of sensitive information that employees permissibly access using their computers." *Van Buren*, 593 U.S. at 391–92. AppFolio's Delage Declaration cites engineering time spent on manual database reviews. (Dkt. 77-3 ¶ 5.) But investigating whether a user account belongs to Beagle or a customer's employee is not a "technological harm" to AppFolio's systems.  AppFolio will not be able to show loss sufficient for CFAA.

### 2. AppFolio Cannot Prevail on its Proposed Tortious Interference Claim.

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO MODIFY SCHEDULING ORDER AND FOR LEAVE TO FILE AMENDED ANSWER AND COUNTERCLAIMS**

ACTIVE 724356123v4

TThe tortious interference counterclaim fails at its core elements. California tortious interference with contract requires, among other elements, "intentional acts designed to induce breach or disruption." *Pac. Gas & Elec. Co. v. Bear Stearns Co.*, 50 Cal. 3d 1118, 1126 (1990).[2] The tort "has long been held" to apply only where "a stranger to a contract may be liable in tort for intentionally interfering with the performance of the contract." *Reeves v. Hanlon*, 33 Cal. 4th 1140, 1148 (2004) (quoting *Pac. Gas & Elec. Co.*, 50 Cal. 3d at 1126). "The tort duty not to interfere with the contract falls only on strangers—interlopers who have no legitimate interest in the scope or course of the contract's performance." *Id.* (quoting *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 514 (1994)). Beagle is not a stranger to the customers' contracts with AppFolio.

AppFolio's tortious interference counterclaim alleges that Beagle induced AppFolio's customers to breach their Terms of Service by creating user accounts for Beagle. But the customers are sophisticated property managers who independently contract with Beagle and who voluntarily create accounts for Beagle using AppFolio's own user management tools. (Dkt. 4 at 7; Dkt. 4-7 ¶¶ 4, 6; Dkt. 4-2 ¶¶ 4-5.) Where a contracting party voluntarily exercises its own business judgment to create a vendor account for a service provider it has independently selected, the inducement element of tortious interference is substantially weakened. *See hiQ*, 31 F.4th at 1193. The *hiQ* court further noted that the defendant's "asserted private business interests" in "protecting its members' data" and "enforcing its User Agreements' prohibitions" were "relatively weak" where the defendant had "only a non-exclusive license to the data shared on its platform, not an ownership interest" and where its "core business model . . . does not require prohibiting [the plaintiff's] use of that information." *Id.* at 1194.

---

[2] "The elements which a plaintiff must plead to state the cause of action for intentional interference with contractual relations are (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Id.*

18                                    CASE NO.  2:25-cv-12248-JFW-SSC

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO MODIFY SCHEDULING ORDER AND FOR LEAVE TO FILE AMENDED ANSWER AND COUNTERCLAIMS**

AppFolio concedes the customers acted deliberately and followed instructions. (Dkt. 77 at 9.) A vendor that offers services and whose customer voluntarily takes them up has not committed the independently wrongful act California law requires. *See also Asahi Kasei Pharma Corp. v. Actelion Ltd.*, 222 Cal. App. 4th 945, 962 (2013) (holding that interference with contract is actionable only where the defendant is "a stranger to the contract").

The same reasoning applies here. AppFolio does not own the data its customers store on its platform as its own Terms of Service provide that customers "retain all right, title and interest in and to [their] data." (Dkt. 4-3 § 1.4; Dkt. 39 at 2.) AppFolio's core business model does not require prohibiting Beagle from providing insurance compliance services to customers who independently choose Beagle over AppFolio's competing offerings. And AppFolio's decision to target Beagle occurred only *after* Beagle's rapid growth began threatening AppFolio's own in-house insurance products, and its $75 million investment in Second Nature—a timeline that, as in *hiQ*, raises serious questions about whether AppFolio's asserted justifications are pretextual. *See hiQ*, 31 F.4th at 1194 (finding serious questions where the defendant's decision to act "occurred within a month of the announcement" that it planned to launch a competing product).

AppFolio designed its platform to facilitate exactly this type of access. (Dkt. 39 at 2-3.) It advertises third-party vendor integration as a feature. (Dkt. 4-9, Ex. B.) It permits Second Nature to access its platform through the same workflow. (Dkt. 4-2 ¶ 8.) The Terms of Service therefore are subject to competing interpretations regarding whether customer-authorized vendor access falls within the prohibition, an ambiguity that undermines the plausibility of AppFolio's interference theory at the pleading stage.

### 3.    AppFolio's § 502 Claim Faces the Same Authorization Dilemma.

AppFolio's California Penal Code § 502 counterclaim rests on the same theory as its CFAA claim, that Beagle "knowingly" accessed AppFolio's computers "without permission." (Dkt. 77 at 22-23.) As the *Power Ventures* court recognized, the § 502 analysis "is similar" to the CFAA analysis. *Id*. Here, Beagle accesses accounts that AppFolio's own customers create for Beagle using AppFolio's built-in functionality. (Dkt. 4 at 7; Dkt. 4-7

19

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO MODIFY SCHEDULING ORDER AND FOR LEAVE TO FILE AMENDED ANSWER AND COUNTERCLAIMS**

ACTIVE 724356123v4

¶¶ 4, 6.) The customers grant permission through the very tools AppFolio provides them. (Dkt. 39 at 2-3.) The same questions about customer authorization, platform design, and selective enforcement that plague AppFolio's CFAA theory apply with equal force to its § 502 claim.

AppFolio invokes § 502(c)(2), which prohibits "[k]nowingly access[ing] and without permission tak[ing], copy[ing], or mak[ing] use of any data from a computer, computer system, or computer network." Cal. Penal Code § 502(c)(2). AppFolio alleges Beagle "extracted and used customer data from AppFolio's servers." (Dkt. 77 at 22.) But the data at issue belongs to the customers, not AppFolio. (Dkt. 4–3 § 1.4; Dkt. 39 at 2.) Those customers created user accounts for Beagle, set the permissions, and authorized Beagle to access their data to perform insurance-compliance services. (Dkt. 4–7 ¶¶ 4, 6; Dkt. 4–2 ¶¶ 4–5.) Accessing data at the direction and with the permission of the data owner is not accessing data "without permission" under (c)(2). "Without permission" under § 502 requires circumventing "technical or code-based barriers in place to restrict or bar a user's access." *Sunbelt Rentals, Inc. v. Victor*, 43 F. Supp. 3d 1026, 1032 (N.D. Cal. 2014). Beagle circumvented nothing.

AppFolio invokes § 502(c)(3), which prohibits "[k]nowingly and without permission us[ing] or caus[ing] to be used computer services." Cal. Penal Code § 502(c)(3). AppFolio alleges Beagle "used AppFolio's billing and payment systems to schedule and issue recurring resident charges." (Dkt. 77 at 22.) But AppFolio's own Saxena Declaration concedes that Beagle "is fully entitled to access this information through Scheduled Reports or Database API, if our customers choose to use those tools." (Dkt. 77-5 ¶ 4 n.1.) A vendor whose access is concededly proper when the customer selects one pathway does not lack "permission" when the customer selects another pathway the platform also built. *See In re Oliveras*, 103 Cal. App. 5th 771, 782 (2024) (applying *Van Buren* analogy to § 502 and holding that authorized access used for a disapproved purpose "did not engage in the type of conduct section 502 was designed to criminalize"). The customers authorized Beagle to use these services on their behalf. That is permission.

CASE NO.  2:25-cv-12248-JFW-SSC

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO MODIFY SCHEDULING ORDER AND FOR LEAVE TO FILE AMENDED ANSWER AND COUNTERCLAIMS**

ACTIVE 724356123v4

AppFolio invokes § 502(c)(4), which prohibits "[k]nowingly access[ing] and without permission add[ing], alter[ing], damag[ing], delet[ing], or destroy[ing] any data, computer software, or computer programs." Cal. Penal Code § 502(c)(4). AppFolio alleges Beagle "altered customer databases" by disabling AppFolio's insurance offerings and configuring recurring charges. (Dkt. 77 at 22.) But the Legislature intended (c)(4) to address "vandalism" not ordinary configuration of services. *In re Oliveras*, 103 Cal. App. 5th at 783 (examining legislative history and concluding that the Legislature "summarized section 502, subdivision (c)(4) . . . as creating criminal liability for 'accessing, altering, damaging, etc. data, software, programs or supporting documentation, in other words, *vandalism*'"). The customers hired Beagle to manage their insurance compliance. (Dkt. 4-2 ¶¶ 4–5.) Applying (c)(4) to a vendor's customer-directed database configuration would stretch the statute far beyond its anti-hacking purpose. *In re Oliveras*, 103 Cal. App. 5th at 781–82 (§ 502 was enacted to address "computer crime" and provide "increased penalties for computer 'hackers'"); *Sunbelt Rentals*, 43 F. Supp. 3d at 1032 (explaining that § 502 is "an anti-hacking statute intended to prohibit the unauthorized use of any computer system for improper or illegitimate purposes"). The fact that a competitor rather than AppFolio's preferred partner made the changes does not transform authorized database management into criminal data alteration.

### 4.   AppFolio's Proposed Claim Under § 502(c)(7) is Futile Because Beagle Had Permission.

AppFolio invokes § 502(c)(7), which prohibits "[k]nowingly and without permission access[ing] or caus[ing] to be accessed any computer, computer system, or computer network." Cal. Penal Code § 502(c)(7). AppFolio argues that the "causes to be accessed" language reaches Beagle's conduct because Beagle "directed AppFolio's own customers to create user accounts, grant Plaintiffs entry into AppFolio's systems." (Dkt. 77 at 22–23.) But AppFolio's own framing defeats its theory. The *customers* accessed the system, using AppFolio's own account-creation tools. They followed Beagle's onboarding instructions willingly and knowingly. AppFolio's motion concedes precisely this:

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO MODIFY SCHEDULING ORDER AND FOR LEAVE TO FILE AMENDED ANSWER AND COUNTERCLAIMS**
ACTIVE 724356123v4

"Customers did not act independently—they followed Plaintiffs' written instructions." (Dkt. 77 at 9.) A party acts "without permission" only when it circumvents "technical or code-based barriers in place to restrict or bar a user's access." *Sunbelt Rentals*, 43 F. Supp. 3d at 1032. Beagle did not circumvent any barrier. Its customers invited Beagle in through the front door AppFolio built for those customers.  Subdivision (c)(7) is narrower than the CFAA on this point. Here, the customers  controlled their databases, created user accounts, and set permissions. (Dkt. 39 at 2–3.) The customers' permission defeats (c)(7) directly, regardless of AppFolio's platform-level preferences. A platform vendor that built user-management tools for its customers cannot then claim those customers lacked permission to use them. (Dkt. 77-5 ¶ 4 n.1.) A vendor that is "fully entitled" to access information when customers choose one method cannot be accessing "without permission" when customers choose another method, particularly when AppFolio built both methods into its platform.

### 5.     Permitting Amendment Will Cause Undue Delay.

The same record that defeats good cause under Rule 16(b)(4) establishes undue delay under Rule 15(a). Leave to amend should be denied where it is apparent that the party's request is in bad faith or the party has unduly delayed. *Balboa Acquisition LLC*, No. SACV0700091JVSRNBX, 2008 WL 11343355, at *1; *see, e.g., Parker v. Joe Lujan Enters., Inc.,* 848 F.2d 118, 121 (9th Cir.1988) (affirming district court's denial of motion to amend in part on ground of undue delay). Relevant to evaluating the undue delay factor is determining whether the moving party knew or should have known the facts and theories raised by the amendment in the original pleading. *Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1388 (9th Cir. 1990). AppFolio possessed both the factual predicate and the legal theory for its proposed counterclaims well before the amendment deadline. Its March 5, 2026 cease-and-desist letter articulates every element of tortious interference, identifying the contract, the defendant's knowledge, the intentional acts, the disruption, and the resulting damage, and it also cites the governing authority and quotes the specific contractual provisions at issue. Ex. B. And, AppFolio articulated the same legal theories

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO MODIFY SCHEDULING ORDER AND FOR LEAVE TO FILE AMENDED ANSWER AND COUNTERCLAIMS**
ACTIVE 724356123v4

even earlier in the Santa Barbara Action nearly two months before the Answer and nearly four months before the amendment deadline. Ex. A ¶¶ 68-84. AppFolio reduced its claims to a fully formed legal demand letter thirty-nine days before the amendment deadline and has shown no justification for waiting sixty-three days past that deadline to file.

### C.   Rules 15(d) and 13(e) Do Not Independently Authorize AppFolio's Proposed Pleading.

AAppFolio invokes Rules 15(d) and 13(e) as alternative bases for its motion, arguing that the Scheduling Order's silence on supplemental pleadings means no deadline applies and that its counterclaims "matured" after the Answer. Neither argument saves the motion. Rule 15(d) permits a supplemental pleading setting out "any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d). But Rule 15(d) does not provide an end-run around a scheduling order. *See Holston v. Rosa*, No. 220CV01076KJMCKDP, 2022 WL 3274350, at *1 (E.D. Cal. Aug. 11, 2022) (showing that a party's "reliance on Rule 15(d) of the Federal Rules of Civil Procedure to justify [its] untimeliness is not sufficient to support an end-run around the court's deadline.").

This Court has already applied the Rule 15(a) framework to Rule 15(d) motions. *Cole v. Educ. Credit Mgmt. Corp.*, No. ED CV 17-00974-JFW (SP), 2017 U.S. Dist. LEXIS 219032, at *2 (C.D. Cal. Oct. 13, 2017) (Walter, J.) ("[a]lthough the Ninth Circuit has not specifically addressed the issue, many district courts have found that the legal standard for granting or denying a motion to supplement a pleading under Rule 15(d) is the same as the standard for granting or denying a motion for leave to amend a pleading under Rule 15(a)").

Moreover, Rule 15(d) is designed for genuinely post-pleading events, or, circumstances that did not exist in any form when the party filed its original pleading. *Eid v. Alaska Airlines, Inc.*, 621 F.3d 858, 874 (9th Cir. 2010) ("Rule 15(d) provides a mechanism for parties to file additional causes of action based on facts that didn't exist when the original complaint was filed."). Where a party seeks to add claims "arising from conduct which happened" before the original pleading was filed, "[t]hese claims could not,

23

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO MODIFY SCHEDULING ORDER AND FOR LEAVE TO FILE AMENDED ANSWER AND COUNTERCLAIMS**
ACTIVE 724356123v4

therefore, be brought as supplemental pleadings under Rule 15(d)." *Id*. The only available mechanism for AppFolio is an amendment under Rule 15(a), subject to the good cause requirement of Rule 16(b)(4) where a scheduling order governs.

The conduct underlying AppFolio's proposed counterclaims is not new. AppFolio's own customers have been creating user accounts for Beagle in their AppFolio databases since at least late 2024. (Dkt. 1 ¶ 29; Dkt. 57 ¶ 5; Dkt. 4-2 ¶ 4; Dkt. 4-7 ¶¶ 4, 6.) AppFolio has known about this conduct, litigated over it in TRO proceedings, and filed a separate state court action premised on it, all before filing its Answer. (Dkt. 33-8 ¶¶ 9-18; Dkt. 39; Ex. A.) Under *Eid*, the relevant question is whether the conduct underlying the claims existed before the pleading, not whether the most recent instance postdates it. 621 F.3d at 874. AppFolio's proposed counterclaims are not a supplement. They are governed by Rule 15(a) and, because the scheduling deadlines have passed, by Rule 16(b)(4). AppFolio's attempt to circumvent those requirements simply by relabeling its filings fails. *See Eid*, 621 F.3d at 874-75 (holding that claims arising from pre-pleading conduct "could not . . . be brought as supplemental pleadings under Rule 15(d).").

Rule 13(e) authorizes a supplemental pleading asserting a counterclaim that "matured or was acquired by the party after serving an earlier pleading." Fed. R. Civ. P. 13(e). But courts apply the Rule 15(a) standard to Rule 13(e) motions. *See Kuschner v. Nationwide Credit, Inc.*, 256 F.R.D. 684, 689 (E.D. Cal. 2009). Because AppFolio cannot satisfy Rule 15(a) for the reasons set forth above, Rule 13(e) provides no independent basis for relief.

## V.   **CONCLUSION**

For the foregoing reasons, Beagle respectfully requests that the Court deny AppFolio's Motion.

CASE NO.  2:25-cv-12248-JFW-SSC

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO MODIFY SCHEDULING ORDER AND FOR LEAVE TO FILE AMENDED ANSWER AND COUNTERCLAIMS**

ACTIVE 724356123v4

DATED: May 22, 2026          **GREENBERG TRAURIG, LLP**


By  */s/ Michael Burshteyn*
　　Michael Burshteyn
　　Marcelo Barros
　　Jake Evans (*pro hac vice*)
　　Jordana R. Sternberg (*pro hac vice*)
　　Attorneys for Plaintiffs

CASE NO.  2:25-cv-12248-JFW-SSC

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO MODIFY SCHEDULING ORDER AND FOR LEAVE TO FILE AMENDED ANSWER AND COUNTERCLAIMS**

ACTIVE 724356123v4