Brian Procel (Cal. Bar No. 218657)
Brian@Procel-Law.com
Jeremiah Levine (Cal. Bar No. 288377)
Jeremiah@ProcelLevine.com
Marty Pritikin (Cal. Bar No. 210845)
Marty@Procel-Law.com
**PROCEL LEVINE LLP**
401 Wilshire Blvd, Fl 12
Santa Monica, CA 90401-1456
Phone: 424-788-4538

*Attorneys for Defendant AppFolio, Inc.*

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BEAGLE LABS, INC., a Delaware corporation, BEAGLE TECHNOLOGIES, INC., a Delaware corporation, BIG BEAGLE, INC., a Delaware corporation, RENTAL PROPERTY MANAGERS ASSOCIATION LLC, an Alabama limited liability company, and YRIG RISK RETENTION GROUP, INC., an Alabama corporation,<br><br>               Plaintiffs,<br><br>v.<br><br>APPFOLIO, INC., a California corporation,<br><br>               Defendant. | Case No.  25-cv-12248-JFW-SSC<br><br>**DEFENDANT'S AMENDED ANSWER TO COMPLAINT, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS** |

Defendant AppFolio, Inc. ("Defendant" or "AppFolio"), by and through its attorneys, responds to the Complaint (the "Complaint") filed by Plaintiffs Beagle Labs, Inc.; Beagle Technologies, Inc.; Big Beagle, Inc.; Rental Property Managers Association LLC; and YRIG Risk Retention Group, Inc. ("Beagle") as follows:

**INTRODUCTION**

1. Paragraph 1 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 1.

2. Paragraph 2 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 2.

3. Paragraph 3 contains legal conclusions, arguments, and characterizations to which no response is required. Paragraph 3 also contains allegations about which Defendant does not have sufficient knowledge to respond. Defendant admits that customers add access for Beagle, and that Beagle can access customer data and provide services. To the extent a response is required to the remaining allegations, Defendant denies the allegations in Paragraph 3.

4. Defendant lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 4, and denies those allegations on that basis.

5. Defendant admits that it has known about Beagle for over a year; that Beagle approached AppFolio about certain cooperation in November 2024; and that AppFolio declined. Defendant denies the remaining allegations in Paragraph 5.

6.      Paragraph 6 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 6.

7.      Paragraph 7 contains legal conclusions, arguments, and characterizations to which no response is required. Defendant admits that it has informed AppFolio customers of the risks that improper methods of working with Beagle imposes; and that AppFolio users have provided Beagle access. To the extent a response is required to the remaining allegations, Defendant denies the allegations in Paragraph 7.

8.      Paragraph 8 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 8.

9.      Paragraph 9 contains legal conclusions, arguments, and characterizations to which no response is required. Defendant admits that it informed Beagle and AppFolio customers that it would disable Beagle's user access on December 16, 2025. To the extent a response is required to the remaining allegations, Defendant denies the allegations in Paragraph 9.

10.     Paragraph 10 contains legal conclusions, arguments, and characterizations to which no response is required. Defendant admits that it informed Beagle and AppFolio customers that it would disable Beagle's user access on December 16, 2025. Defendant admits that it partners with Second Nature. To the extent a response is required to the remaining allegations, Defendant denies the allegations in Paragraph 10.

11.     Paragraph 11 contains legal conclusions, arguments, and characterizations to which no response is required.

3

**THE PARTIES**

12.     Defendant lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 12, and denies those allegations on that basis.

13.     Defendant lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 13, and denies those allegations on that basis.

14.     Defendant lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 14, and denies those allegations on that basis.

15.     Defendant lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 15, and denies those allegations on that basis.

16.     Defendant lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 16, and denies those allegations on that basis.

17.     Defendant admits the allegations in Paragraph 17.

**JURISDICTION AND VENUE**

18.     Paragraph 18 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 8.

19.     Paragraph 19 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 19.

20.      Defendant admits that it is a citizen of California. The remainder of Paragraph 20 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 20.

21.     Defendants admits that events giving rise to the claims occurred in the Central District of California. The remainder of Paragraph 21 contains legal

4

conclusions, arguments, and characterizations to which no response is required. Paragraph 21 also contains allegations about which Defendant does not have sufficient knowledge to respond. To the extent a response is required, Defendant denies the allegations in Paragraph 20.

## FACTUAL BACKGROUND

22.    Paragraph 22 contains allegations about which Defendant does not have sufficient knowledge to respond, and Defendant denies the allegations on that basis.

23.    Paragraph 23 contains allegations about which Defendant does not have sufficient knowledge to respond. Paragraph 23 also contains legal conclusions, arguments, and characterizations to which no response is required. Defendant denies the allegations on these bases.

24.    Defendant admits that AppFolio customers created access for Beagle, which provided access to certain categories of data. Defendant further admits advertising an online portal for vendors. Paragraph 24 contains allegations about which Defendant does not have sufficient knowledge to respond; and contains legal conclusions, arguments, and characterizations to which no response is required. Defendant denies the remaining allegations in Paragraph 24.

25.    Defendant admits that Beagle publishes "Beagle Reports," which Defendant can see. Defendant denies the remaining allegations in Paragraph 25.

26.    Defendant admits that it is a publicly traded company. Defendant denies the remaining allegations in Paragraph 26.

27.    Paragraph 27 contains allegations about which Defendant does not have sufficient knowledge to respond; and contains legal conclusions, arguments,

and characterizations to which no response is required. On those bases, Defendant denies the allegations in Paragraph 27.

28.    Defendant admits the allegations in Paragraph 28.

29.    Defendant admits that Beagle approached it in 2024 regarding certain cooperation. Paragraph 29 contains allegations about which Defendant does not have sufficient knowledge to respond; and contains legal conclusions, arguments, and characterizations to which no response is required. Defendant denies the remaining allegations in Paragraph 29.

30.    Paragraph 30 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 30.

31.    Defendant admits that it emailed its customers who use Beagle on December 9, 2025, about improper methods of working with Beagle. AppFolio admits that it said that "the method by which Beagle has chosen to operate their business places you at risk"; that "noncompliant access" may cause "serious security risks." Elsewhere, Defendant referenced protecting the "integrity of customer and user data." Paragraph 31 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the remaining allegations in Paragraph 31.

32.    Defendant admits that its customers own their data, and that they are free to contract with Beagle. Paragraph 32 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the remaining allegations in Paragraph 32.

33.     Paragraph 33 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the remaining allegations in Paragraph 33.

34.     Defendant admits that it works with Second Nature, and that it stated it would disable Beagle's unpermitted access to AppFolio databases on December 16, 2025. Paragraph 34 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the remaining allegations in Paragraph 34.

35.     Paragraph 35 contains allegations about which Defendant does not have sufficient knowledge to respond; and contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 35.

36.     Paragraph 36 contains allegations about which Defendant does not have sufficient knowledge to respond; and contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 36.

37.     Paragraph 37 contains allegations about which Defendant does not have sufficient knowledge to respond; and contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 37.

38.     Paragraph 38 contains allegations about which Defendant does not have sufficient knowledge to respond; and contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 38.

39.     Paragraph 39 contains allegations about which Defendant does not have sufficient knowledge to respond; and contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 39.

## CLAIM 1

### (Tortious Interference with Contractual Relations)

40.     Paragraph 40 incorporates certain paragraphs of the Complaint by reference. No response by Defendant is required.

41.     Paragraph 41 contains allegations about which Defendant does not have sufficient knowledge to respond; and contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 41.

42.     Defendant admits that its customers grant access to certain types of third parties. AppFolio admits that it was aware that Beagle's email domain was associated with certain user access. AppFolio denies the remaining allegations in Paragraph 42.

43.     Defendant admits that it sought a temporary restraining order against Beagle, Inc., in Santa Barbara Superior Court, and that Beagle has recruited AppFolio customers. Defendant denies the remaining allegations in Paragraph 43.

44.     Paragraph 44 contains allegations about which Defendant does not have sufficient knowledge to respond; and contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 44.

45.     Defendant admits that it gave notice to customers that Defendant intended to disable Beagle's user access. Defendant admits it said that improper

8

methods of working with Beagle can pose a "security risk", and that improper methods of working with Beagle may not be compliant with Defendant's terms of service. Defendant admits that its customer service AI, after being fed information by a user, stated that Beagle is not listed as an official partner; used the words "potential scam", and "concerning." Paragraph 45 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 45.

46.     Paragraph 46 contains allegations about which Defendant does not have sufficient knowledge to respond; and contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 46.

47.     Paragraph 47 contains allegations about which Defendant does not have sufficient knowledge to respond; and contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 47.

48.     Paragraph 48 contains allegations about which Defendant does not have sufficient knowledge to respond; and contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 48.

49.     Paragraph 49 contains a statement of Beagle's future intent about which Defendant does not have sufficient knowledge to respond.

50.     Paragraph 50 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 50.

9

## CLAIM 2

### (Tortious Interference With Prospective Economic Relations)

51.    Paragraph 51 incorporates certain paragraphs of the Complaint by reference. No response by Defendant is required.

52.    Paragraph 52 contains allegations about which Defendant does not have sufficient knowledge to respond; and contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 52.

53.    Defendant does not have sufficient knowledge to respond to Beagle's allegations regarding Beagle's customers base or economic relationships. Defendant denies the remaining allegations in Paragraph 53.

54.    Defendant admits that it gave notice that it would disable Beagle's user access. Paragraph 54 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 54.

55.    Paragraph 55 contains allegations about which Defendant does not have sufficient knowledge to respond; and contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 55.

56.    Paragraph 56 contains allegations about which Defendant does not have sufficient knowledge to respond; and contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 56.

57.    Paragraph 57 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 57.

58.    Paragraph 58 contains allegations about which Defendant does not have sufficient knowledge to respond; and contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 58.

59.    Paragraph 59 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 59.

## CLAIM 3

### (Violation of Lanham Act § 43(a) – False Advertising)

60.    Paragraph 60 incorporates certain paragraphs of the Complaint by reference. No response by Defendant is required.

61.    Defendant admits that it has informed customers of the security risks posed by improper methods of working with Beagle. Paragraph 61 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 61.

62.    Paragraph 62 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 62.

63.    Paragraph 63 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 63.

11

64.     Paragraph 64 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 64.

65.     Paragraph 65 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 65.

66.     Paragraph 66 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 66.

67.     Paragraph 67 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 67.

**CLAIM 4**

**(Violations of Cal. Bus. & Prof. Code §17500, et seq. – False Advertising)**

68.     Paragraph 68 incorporates certain paragraphs of the Complaint by reference. No response by Defendant is required.

69.     Paragraph 69 is a statement of law to which no response is required.

70.     Defendant admits that it has informed customers of the security risks posed by improper methods of working with Beagle. Paragraph 70 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 70.

71.     Defendant admits that it has informed customers of the security risks posed by improper methods of working with Beagle. Paragraph 71 contains legal

conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 71.

72.	Paragraph 72 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 72.

**CLAIM 5**

**(Violations of Cal. Bus. & Prof. Code §17200, et seq. – Unfair Competition)**

73.	Paragraph 73 incorporates certain paragraphs of the Complaint by reference. No response by Defendant is required.

74.	Paragraph 74 is a statement of law to which no response is required.

75.	Paragraph 75 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 75.

76.	Defendant admits that it gave notice that it would disable Beagle's user access on December 16, 2025. Paragraph 76 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the remaining allegations in Paragraph 76.

77.	Paragraph 77 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the remaining allegations in Paragraph 77.

78.	Defendant denies the allegations in Paragraph 78.

13

79.    Paragraph 79 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 79.

80.    Paragraph 80 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 80.

## CLAIM 6

### (Violation of the Sherman Act § 2 – Monopolization / Attempted Monopolization)

81.    Paragraph 81 incorporates certain paragraphs of the Complaint by reference. No response by Defendant is required.

82.    Defendant admits that it claims to be the system of record for more than 20,000 property managers and over eight million units. Paragraph 82 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the remaining allegations in Paragraph 82.

83.    Paragraph 83 contains allegations about which Defendant does not have sufficient knowledge to respond; and legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 83.

84.    Defendant denies the allegations in Paragraph 84.

85.    Paragraph 85 contains allegations about which Defendant does not have sufficient knowledge to respond; and legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 85.

14

86.     Defendant admits Beagle is a direct competitor; that it partners with Second Nature for a resident benefit package; that Defendant offers FolioGuard Smart Ensure and liability to landlord insurance; that it has its "own internal insurance solution through FolioGuard Smart Ensure and the coinciding liability to landlord insurance policy." Defendant further admits that Smart Ensure is one of its most important services; and that renters obtain insurance through AppFolio Insurance Services or another provider. Defendant denies the remaining allegations in Paragraph 86.

87.     Defendants admits that it said "Beagle does not and will not integrate with AppFolio—not now, and not ever." Paragraph 87 contains legal conclusions, arguments, and characterizations to which no response is required. Defendant denies the remaining allegations in Paragraph 87.

88.     Defendant admits that in public filings, it has filed exhibits showing AppFolio representatives stating that "Under our Terms of Service and in order to protect the integrity of customer and user data and our systems, direct competitors such as Beagle are not permitted to access any portion of our services or application programming interface." Paragraph 88 contains legal conclusions, arguments, and characterizations to which no response is required. Defendant denies the remaining allegations in Paragraph 88.

89.     Paragraph 89 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 89.

90.     Paragraph 90 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 90.

15

91.    Paragraph 91 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 91.

92.    Paragraph 92 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 92.

93.    Paragraph 93 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 93.

94.    Paragraph 94 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 94.

95.    Paragraph 95 contains statements of Beagle's future intent to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 95.

## CLAIM 7

### (Defamation and Trade Libel)

96.    Paragraph 96 incorporates certain paragraphs of the Complaint by reference. No response by Defendant is required.

97.    Paragraph 97 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 97.

98.    Paragraph 98 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 98.

16

99.    Defendant admits that its customer service AI, after being fed information by a user, stated that Beagle is not listed as an official partner; used the words "potential scam", and "concerning" and encouraged the user to verify Beagle's identify on information. Paragraph 99 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the remaining allegations in Paragraph 99.

100.   Defendant admits the allegations in Paragraph 100.

101.   Paragraph 101 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the remaining allegations in Paragraph 101.

102.   Paragraph 102 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the remaining allegations in Paragraph 102.

103.   Paragraph 103 contains allegations about which Defendant does not have sufficient information to respond; and legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the remaining allegations in Paragraph 103.

104.   Paragraph 104 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the remaining allegations in Paragraph 104.

105.   Paragraph 105 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the remaining allegations in Paragraph 105.

106.    Paragraph 106 contains a statement of Beagle's future intent to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 106.

## CLAIM 8

### (Unjust Enrichment)

107.    Paragraph 107 incorporates certain paragraphs of the Complaint by reference. No response by Defendant is required.

108.    Paragraph 108 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the remaining allegations in Paragraph 108.

109.    Paragraph 109 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the remaining allegations in Paragraph 109.

110.    Paragraph 110 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the remaining allegations in Paragraph 110.

111.    Paragraph 111 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the remaining allegations in Paragraph 111.

112.    Paragraph 112 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the remaining allegations in Paragraph 112.

## CLAIM 9

### (Declaratory Judgment)

113.    Paragraph 113 incorporates certain paragraphs of the Complaint by reference. No response by Defendant is required.

114.    Paragraph 114 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the remaining allegations in Paragraph 114.

115.    Paragraph 115 contains a legal conclusion to which no response is required. To the extent a response is required, Defendant denies the allegation in Paragraph 115.

116.    Paragraph 116 contains a legal conclusion to which no response is required. To the extent a response is required, Defendant denies the allegation in Paragraph 116.

## PRAYER FOR RELIEF

Defendant admits that Plaintiffs' Prayer for Relief sets forth the relief Plaintiffs are seeking in this case. Defendant denies this Paragraph in all other respects.

## DEFENDANT'S AFFIRMATIVE DEFENSES

As separate and distinct affirmative defenses, Defendant states as follows:

### FIRST AFFIRMATIVE DEFENSE

### (Failure To State A Claim)

The Complaint, and each and every remaining claim for relief against Defendant, fails to state a claim upon which relief may be granted against

19

Defendant, and further fails to entitle Plaintiffs to the relief sought or to any relief whatsoever against Defendant.

## SECOND AFFIRMATIVE DEFENSE

### (Legitimate Business Conduct)

The Complaint is barred because Defendant's actions, as alleged in the Complaint, were within its contractual rights, were justified, were undertaken in good faith, with the absence of malicious intent, and were the result of lawful conduct carried out in furtherance of Defendant's mission.

## THIRD AFFIRMATIVE DEFENSE

### (Failure to Mitigate)

The Complaint, and each and every claim for relief against Defendant, is barred in whole or in part because Plaintiffs failed to make reasonable efforts to mitigate such purported injury or damage, which reasonable efforts would have prevented injury or damages, if any.

## FOURTH AFFIRMATIVE DEFENSE

### (Adequate Remedies at Law)

Equitable and injunctive relief are barred because Plaintiffs have available remedies at law.

## FIFTH AFFIRMATIVE DEFENSE

### (Unclean Hands)

Plaintiffs' conduct with respect to the matters alleged in the Complaint deprive Plaintiffs of clean hands and, by reason of not coming into court with clean hands, Plaintiffs are precluded from recovery from Defendant.

## SIXTH AFFIRMATIVE DEFENSE

### (Speculative Damages)

Plaintiffs' claims are barred in whole or in part, or alternatively Plaintiffs' recovery should be reduced, because the alleged damages, if any, are speculative.

## SEVENTH AFFIRMATIVE DEFENSE

### (Lack of Standing)

Plaintiffs have not been injured and therefore do not have standing to bring the Complaint.

## EIGHTH AFFIRMATIVE DEFENSE

### (Mootness)

Plaintiffs' requests for injunctive relief are mooted because Defendant has disabled Beagle's access.

## NINTH AFFIRMATIVE DEFENSE

### (Truth)

Plaintiffs' claims for defamation, trade libel, Lanham Act violations, and violations of the False Advertising Law fail because Defendant's statements were true.

## TENTH AFFIRMATIVE DEFENSE

### (Opinion)

Plaintiffs' claims for defamation, trade libel, Lanham Act violations, and violations of the False Advertising Law fail because Defendant's statements were opinion.

## ELEVENTH AFFIRMATIVE DEFENSE

### (Procompetitive Rational)

Plaintiffs' claims are barred because Defendant had procompetitive justifications for its actions.

## TWELTH AFFIRMATIVE DEFENSE

### (Privilege)

Defendant's alleged conduct was privileged, justified, and undertaken pursuant to lawful contractual, economic, and business interests, and therefore not tortious.

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Additional Affirmative Defenses)

Defendant hereby gives notice that it intends to rely upon such other affirmative defenses as may become available or apparent during the course of discovery and thus reserves the right to amend this Answer to assert such defenses.

DATED this 4th day of February, 2026.

/s/
Brian Procel
Jeremiah Levine
Marty Pritikin
**PROCEL LEVINE, LLP**
401 Wilshire Blvd, Fl 12
Santa Monica, CA 90401-1456
Phone: 424-788-4538

Attorneys for Plaintiff
AppFolio, Inc.

23

## COUNTERCLAIMS

Counter-claimant AppFolio, Inc. ("AppFolio"), by and through its counsel, hereby amends its previously-filed Answer and Affirmative Defenses (Dkt. #57) to add Counter-Claims, and alleges as follows for its Counter-Claims:

## INTRODUCTION

1.      AppFolio brings these Counter-Claims in an effort to stop Counter-Defendants Beagle Labs, Inc., Beagle Technologies, Inc., Big Beagle, Inc., Rental Property Managers Association LLC, and YRIG Risk Retention Group, Inc. (collectively "Beagle") from misusing the data contained on AppFolio's software and hijacking the functionality of AppFolio's software for Beagle's own ends.

2.      AppFolio offers a software platform for property managers. AppFolio offers its paying customers access to that software, which facilitates the creation of databases that help the property managers run their properties.

3.      In addition to storing and organizing data, AppFolio's platform is the system of record for property managers. It provides them with features such as accounting, billing, and insurance services. It also offers a convenient platform for residents to submit their data to the property managers. The unique data intake, storage, and organization features of AppFolio's software, and associated functionality, are proprietary and provide significant benefits to property managers.

4.      Third parties, including competitors like Beagle, are not allowed to access AppFolio's software, including the customer databases or functionality contained therein, without express permission.

5.      Each AppFolio customer agrees to AppFolio's Terms of Service, which prohibit the customers from granting third parties, such as Beagle, access to their database created and maintained via AppFolio's software platform.

6.      Beagle knows that it is forbidden from accessing AppFolio's software platform or the databases therein. Beagle knows that because (1) in December 2025, AppFolio told Beagle that it was terminating Beagle's access to the

24

databases on AppFolio's software platform; (2) AppFolio served Beagle with an application for a temporary restraining order seeking to enjoin Beagle from accessing AppFolio's software platform; (3) Beagle then filed its own application for a temporary restraining order in which Beagle quoted AppFolio's Terms of Service; (4) in January 2026, AppFolio disabled all known Beagle access to the databases on AppFolio's software platform; and (5) AppFolio sent Beagle a cease-and-desist letter demanding a stop to Beagle's unauthorized access.

7.     Despite all that, Beagle continues to access AppFolio's software platform and uses AppFolio's services to run its competing insurance business.

8.     Beagle is not content to have AppFolio customers share their data with Beagle outside of AppFolio's software, which they can do through "Scheduled Reports." Rather, Beagle insists on getting access to the data as it lives in AppFolio's software platform, and on hijacking the functionality of the platform. In fact, Beagle has admitted in court filings that "[t]he whole point of Beagle's value proposition to customers is that they don't have to go through the onerous process of setting up Scheduled Reports in AppFolio."

9.     To gain access, Beagle persuades AppFolio's customers to give it access to the customers' databases on AppFolio's software platform. Beagle thereby induces AppFolio's customers to breach the Terms of Service.

10.     Once inside the database, Beagle misappropriates customer data and the functionality of AppFolio's software to exploit for its competing business. Among other things, Beagle uses its unauthorized access to edit AppFolio databases so that the billing features of AppFolio's software platform charge AppFolio customers for Beagle's services (i.e., Beagle uses AppFolio's system as a de facto billing department).

11.     Beagle knows that it is engaging in misconduct by accessing AppFolio's software platform without authorization.

12.    And Beagle goes to great lengths to cover its tracks. AppFolio has now determined that Beagle attempts to avoid detection in the AppFolio software platform in at least two ways.

13.    First, Beagle accesses an AppFolio customer's database using an email account with the customer's email domain. In other words, Beagle disguises itself as an AppFolio customer (or customer employee) to avoid detection when accessing AppFolio's software platform.

14.    Second, Beagle instructs the AppFolio customer to give Beagle access *just* long enough to take access and use data from, and write changes into, the customer's database on AppFolio's software platform. As soon as Beagle is done, Beagle instructs the AppFolio customer to delete Beagle's access. In other words, Beagle breaks into AppFolio's software and uses data and makes changes to the databases, then tries to cover its tracks before AppFolio can detect it.

15.    Beagle does not dispute that it accesses AppFolio's software platform without AppFolio's authorization.

16.    Beagle admits that it knows of AppFolio's contracts with its customers.

17.    Beagle has repeatedly quoted AppFolio's Terms of Service in court filings, including the exact provisions it admits prohibit third parties like Beagle from accessing online databases on AppFolio's software platform.

18.    Beagle admits that it induces AppFolio's customers to give Beagle access to AppFolio databases, despite knowing that is prohibited by AppFolio's Terms of Service.

19.    And Beagle admits that once it obtains unauthorized access to AppFolio databases, it uses data from AppFolio's platform to run its own business.

20.    AppFolio has been substantially harmed by Beagle's conduct. Beagle deprives AppFolio of right to determine who uses AppFolio's subscription-only software. Beagle's stealthy, unpermitted access to AppFolio's software—

26

which Beagle itself called a "game of whack-a-mole"—requires time-consuming, expensive employee time to detect and remediate. And Beagle's inducement of AppFolio customers to breach their Terms of Service requires potentially confrontational interaction between AppFolio and those customers that can anger the customers, harming AppFolio's goodwill.

21.    AppFolio now seeks to hold Beagle accountable for its wrongdoing. AppFolio brings counter-claims for (1) tortious interference with contractual relations, (2) violations of the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030; and (3) violations of the California Computer Data Fraud and Access Act, Cal. Penal Code § 502.

### PARTIES

22.    Counter-Claimant AppFolio is a company incorporated in California and headquartered in Goleta, California.

23.    Counter-Defendant Beagle Labs, Inc. is a Delaware corporation with principal places of business in Chicago and Dallas.

24.    Counter-Defendant Beagle Technologies is a Delaware Corporation with a principal place of business in South Salt Lake, Utah.

25.    Counter-Defendant Big Beagle, Inc., is a company incorporated in Delaware with a principal place of business in South Salt Lake, Utah.

26.    Counter-Defendant Rental Property Managers Association, LLC is an Alabama limited liability company with its principal place of business in Alabama.

27.    Counter-Defendant YRIG Risk Retention Group, Inc. is an Alabama Corporation with its principal place of business in Alabama.

### JURISDICTION AND VENUE

28.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 for claims arising under the Computer Fraud and Abuse Act ("CFAA"). The Court also has supplemental jurisdiction over AppFolio's state

law claims under 28 U.S.C. § 1367 because those claims are so related to the federal CFAA claim—and to Beagle's own claims against AppFolio—that they form part of the same case or controversy.

29.    The Court also has jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are citizens of different States and the amount in controversy exceeds $75,000.

30.    The Court has personal jurisdiction over Counter-Defendants because Counter-Defendants have directed their activities to California residents, including to residents of California, by accessing AppFolio's databases that are operated by AppFolio, a resident of California, and which are licensed by AppFolio customers in California. The Court also has personal jurisdiction over Counter-Defendants because Counter-Defendants maintain employees and customers in California. And the Court has personal jurisdiction over Counter-Defendants because they have submitted to the jurisdiction of this Court through the filing of their claims against AppFolio.

31.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to AppFolio's claims occurred here. Counter-Defendants have accessed AppFolio databases here; have forced AppFolio, which is based here, to respond to Counter-Defendants' accessing AppFolio databases; and have harmed AppFolio here. Moreover, AppFolio is headquartered here, and the preponderance of its financial and human resources that Counter-Defendants have diverted through their wrongful conduct are here. And a substantial part of the property that is the subject of the action is situated here.

## FACTS

### AppFolio Offers a Software Platform for Property Managers.

32.    AppFolio offers its customers AppFolio Property Manager, which is a software platform that helps property management companies run their

28

businesses. To access AppFolio Property Manager, property managers must pay a monthly subscription fee.

33.     When a property manager subscribes to AppFolio Property Manager, they receive access to an AppFolio database. The database is connected to the Internet. The database provides the property manager with a wide range of functionality, including accounting, billing, tenant screening, insurance-related services, maintenance management, and more. It also provides a convenient platform for residents that the property manager serves to upload their information. The database is password protected.

34.     In connection with these services, a property manager's AppFolio database will contain a large amount of data. This data comes from a number of sources, often from across the United States, including from the property manager, their tenants, credit rating agencies, and vendors of both AppFolio and the property manager.

35.     The way this data is organized, stored, and accessed within the databases on AppFolio's software platform, as well as the functionality within the platform, are valuable and proprietary features.

**AppFolio's Terms of Service Prohibit Unauthorized Third-Party Access.**

36.     AppFolio's relationships with its customers are governed by AppFolio's Terms of Service (the "Terms of Service").

37.     Section 5.2 of the Terms of Service, entitled Authorized Users, provides that "Third parties are not permitted to access or use the Services or any application programming interface we may make available to you without [AppFolio's] prior consent."

38.     Under this section, customers are not permitted to give third parties, like Beagle, user accounts that access the database on AppFolio's platform.

39.    In the event a customer violates Section 5.2, for example by giving a third party a user account in its database, Section 5.2 provides AppFolio the right "to disable or delete [that] access to the Services and any application programming interface for any of your authorized users."

40.    In sum, customers may freely export their data outside the AppFolio platform and then share that data with third parties like Beagle. But they may not give Beagle user accounts in their database on AppFolio's platform itself.

41.    And AppFolio has the right to disable that access if they do.

42.    These provisions have been in place since at least 2019.

**Beagle Focuses on Recruiting AppFolio Customers.**

43.    Beagle offers an insurance program that competes with AppFolio's insurance offering.

44.    Beagle focuses on recruiting AppFolio customers—that is, to use Beagle's insurance offering instead of AppFolio's.

45.    On December 15, 2025, Beagle admitted in a federal court filing that "[m]ore than eighty percent (80%) of Beagle's business, implicating at least hundreds of millions of dollars in enterprise value, is with customers who use AppFolio."

**Once Beagle Recruits an AppFolio Customer, Beagle Accesses the Database on the AppFolio Platform Without Authorization.**

46.    By design, an AppFolio customer can create user accounts to give their employees access to their database. For example, an employee tasked with monitoring rent payments can use their user account to perform that function.

47.    When Beagle recruits a new AppFolio customer, Beagle induces the customer to give Beagle user access to the customer's AppFolio database.

48.    Beagle then exploits the user access to connect with the customer's AppFolio database over the Internet.

49.     Once connected, Beagle writes changes into the customer's AppFolio database and extracts and/or uses data from it.

50.     Beagle exploits the user access to write changes in the AppFolio database, such as turning off the customer's subscription to AppFolio's insurance product; signing up the customer for Beagle's insurance product; setting up recurring charges for Beagle's insurance product; and automatically obtaining data from the AppFolio database.

51.     In so doing, Beagle takes unauthorized advantage of, among other things, the data intake and storage features of AppFolio's software platform to gain access to data in a convenient format and to manipulate and use that data, in ways Beagle could not do otherwise.

52.     Beagle makes these changes for its customers to make it easy for customers to switch from AppFolio to Beagle.

53.     And Beagle makes these changes so that it can rely on *AppFolio's* software infrastructure—which took years to build and which exists for the benefit of AppFolio's paying customers—to run *Beagle's* competing business.

54.     Beagle has avoided the cost and burden of developing their own technology to import, store, organize, and use this data. Instead, Beagle has chosen to hijack AppFolio's technology for its own use.

55.     In fact, in court filings, Beagle has admitted that "[t]he whole point of Beagle's value proposition to customers is that they don't have to go through the onerous process of setting up Scheduled Reports in AppFolio." (AppFolio enables customers to use Scheduled Reports to export data to third parties.)

56.     The AppFolio databases that Beagle accesses are hosted on AppFolio servers, which are connected to the Internet.

57.     The data that Beagle takes and/or uses from AppFolio databases is valuable data that Beagle uses for its own business.

31

58. For example, Beagle takes and/or uses data from AppFolio regarding "tenant rosters, unit identifiers, lease and billing information, and insurance compliance."

59. That data is valuable to Beagle because Beagle uses that data to run its insurance product.

60. The functionality within the databases on AppFolio's platform is also valuable to Beagle, as it uses that functionality for billing and other purposes.

61. In fact, in a federal court filing, Beagle stated that its access to AppFolio's database is so valuable that if it were cut off, "this will end Beagle's business overnight." Beagle admits that pirating AppFolio *is* its business model.

**Beagle's User Access Creates Security Risks for AppFolio Customers Who Use Beagle.**

62. When an AppFolio customer creates an account for its employee, the account is tied to a specific individual.

63. For security and audit purposes, the actions of each employee's user account are logged in the system.

64. That is a security feature because it allows tracking of the individual's actions in AppFolio, and for the user access to be terminated when the employee is terminated.

65. Unlike with an employee account, when a user account is created in an AppFolio database for Beagle, Beagle employees or agents share the user account across the company, with everyone using the same username and password.

66. Because Beagle shares the user account (including username and password), actions within the database are not traceable to any individual.

67. This provides bad actors with anonymity within the database.

32

68.     In addition, because the username and password are shared, former Beagle employees can retain their ability to access the database even after leaving Beagle.

69.     Any Beagle employee (current or former) with the access could take any number of nefarious actions in the database, such as stealing resident's personally identifiable information or accessing the customer's bank accounts. Beagle's CEO has admitted as much in writing.

**AppFolio Put Beagle on Notice that it was Forbidden from User Access.**

70.     On or about December 9, 2025, AppFolio informed Beagle that on December 16, 2025, AppFolio would close all unauthorized user accounts associated with Beagle. Specifically, AppFolio notified Beagle by email:

> We are reaching out to inform you that **all Beagle-created user accounts in AppFolio customer databases will be disabled on December 16, 2025**. This action is necessary to uphold the security and integrity of our platform and **to ensure compliance with AppFolio's terms of service**.

(emphasis added).

71.     That email put Beagle on notice that it was forbidden from user access to AppFolio.

72.     That same day, AppFolio filed a complaint and application for a temporary restraining order ("TRO") against Beagle in Santa Barbara County Superior Court.

73.     The TRO sought to enjoin Beagle's false advertising (e.g., claiming that Beagle was "partnered with" AppFolio); inducing AppFolio's customers to give Beagle their user-access login credentials; and otherwise inducing AppFolio customers to breach the Terms of Service.

74.     AppFolio's TRO application stated that: "Under our Terms of Service and in order to protect the integrity of customer and user data and our

33

systems, direct competitors such as Beagle are not permitted to access any portion of our services or application programming interface."

75.    AppFolio served its TRO application on Beagle on December 9, 2025.

76.    The TRO application provided Beagle with additional notice that it was forbidden from user access to AppFolio.

**Beagle Filed a TRO Application That Conceded Beagle Was on Notice of All Relevant Facts.**

77.    On December 15, 2025, Beagle filed a complaint and TRO application in this action that sought to enjoin AppFolio from terminating the user accounts Beagle was exploiting.

78.    Beagle's request for a TRO that would stop AppFolio from enforcing its Terms of Service and ending Beagle's user access shows that Beagle had notice that it was forbidden from user access to AppFolio.

79.    Beagle's TRO application also quoted AppFolio's Terms of Service.

80.    This demonstrates that no later than when Beagle filed its TRO application on December 15, 2025, Beagle knew of AppFolio's Terms of Service, which is the contract between AppFolio and its customers.

81.    In its TRO application, Beagle admitted that "[m]ore than eighty percent (80%) of Beagle's business, implicating at least hundreds of millions of dollars in enterprise value, is with customers who use AppFolio."

82.    This demonstrates that Beagle had notice of AppFolio's customer relationships.

83.    On January 7, 2026, the Court denied Beagle's TRO request.

84.    The following day, AppFolio identified all known user access accounts associated with Beagle. On January 8 and 9, 2026, AppFolio terminated or locked all known Beagle user access.

85. That termination and locking constituted a mechanical block to all Beagle user access of which AppFolio was aware at the time.

**AppFolio Discovers New Misconduct by Beagle.**

86. In March 2026, AppFolio learned that Beagle was using a virtually undetectable means of gaining unauthorized access to AppFolio databases.

87. Until approximately January 9, 2026—when AppFolio closed all known Beagle accounts—Beagle used one method to get user access. And AppFolio could relatively easily identify and terminate that user access.

88. Namely, Beagle's user account was typically associated with a Beagle email domain, such as @BeagleforPMs.com. Alternatively, the account was associated with one of several new email domains that Beagle created, which were more generic (by design) but which could still be associated with Beagle.

89. Because the user account could be associated with Beagle, AppFolio had been able identify and eventually terminate the access.

90. In fact, Beagle complained in a federal court filing that AppFolio was *too* effective in identifying its user accounts in order to close them. Specifically, Beagle wrote in reference to its user access associated with Beagle emails domains that "AppFolio has shown it can detect those domains and will block them too."

91. But on or about March 18, 2026, an AppFolio customer who used Beagle forwarded to AppFolio his emails with Beagle. The email indicated that Beagle now uses short-lived accounts so that Beagle can access an AppFolio database before AppFolio can detect and terminate the access.

92. For example, Beagle will obtain user access when it recruits a new AppFolio customer. Beagle will use the access to enter the customer's AppFolio database, make changes in the AppFolio database, and then have the customer delete the user account.

35

93. Because AppFolio can only sweep its databases for unauthorized Beagle users periodically, the Beagle accounts disappear before AppFolio can detect them.

94. In other words, Beagle acts like a ghost, causing harm and disappearing.

95. AppFolio cannot estimate how many customers Beagle has accessed using its ghost accounts strategy.

96. On information and belief, given that (1) Beagle claims that it needs AppFolio access to survive; and (2) Beagle—in writing—instructs AppFolio customers to give it user access and delete the access once Beagle is done accessing AppFolio, the ghost accounts strategy is widespread.

**Beagle Undertakes Even More New Subterfuge to Gain Unauthorized Access.**

97. AppFolio recently discovered additional conduct that Beagle was undertaking to secretly gain unauthorized access to AppFolio databases.

98. Beagle disguises itself as an AppFolio customer in order to avoid detection when it accesses the customer's AppFolio database.

99. That is, Beagle asks the AppFolio customer for an email address that uses the customer's email domain. Beagle uses that email address on its AppFolio user account.

100. That way, when AppFolio sweeps for illicit Beagle users, the Beagle user is disguised as a customer and is more likely to avoid access termination.

101. It is extremely difficult for AppFolio to detect Beagle accounts that use these tactics. AppFolio does not and cannot know exactly how many Beagle accounts use these tactics. AppFolio can merely attempt to identify Beagle accounts using aspects of Beagle's digital footprint other than the email address on the user account.

102. AppFolio has identified at least 70 masked accounts using the AppFolio customer's email domain, all created after the Answer was filed.

103. Because it is so difficult for AppFolio to identify unauthorized access that Beagle has set up through camouflaging itself as an AppFolio customer account, on information and belief, Beagle has set up many more masked accounts than the 70 AppFolio has identified so far.

**AppFolio Again Demands that Beagle Stop its Unauthorized Access.**

104. On March 5, 2026, AppFolio sent Beagle another notice letter.

105. The letter identified Beagle's prior unauthorized access to AppFolio databases; demanded that Beagle state by March 12, 2026, whether it would stop the conduct; and stated that Beagle's unauthorized access constituted tortious interference with contract.

106. Beagle never substantively responded to the letter.

107. Instead, Beagle stalled for time while continuing its unauthorized access to the database.

108. On or about March 12, 2026—the day by which AppFolio demanded to know whether Beagle would stop its unauthorized access—Beagle's counsel said that counsel would respond the next day.

109. But there was no response the next day.

110. AppFolio waited in good faith for the promised response.

111. On or about March 23, 2026, Beagle's counsel again said that Beagle would respond, this time with a proposal for cooperation.

112. The proposal never came.

113. All the while, Beagle was continuing its unauthorized access.

114. Since AppFolio sent its most recent cease and desist letter on March 5, 2026, Beagle obtained user access at least 100 additional times.

115. And those are only the Beagle accounts that AppFolio has identified—it does not include ghost accounts or other effectively disguised access.

**Beagle's Conduct Harms AppFolio's Customer Goodwill.**

116. AppFolio values its customers. AppFolio's relationships with its customers are important for the success of its customers and the success of AppFolio.

117. AppFolio is the system of record for its customers. That is, AppFolio's customers rely on AppFolio to organize data that is the basis of decisions for the customers and their residents. So AppFolio's customers must be able to trust that the information in their database is accurate.

118. AppFolio's customers must also be able to trust that the information in their database is secure because AppFolio databases may contain personal identifying and payment information for thousands of residents.

119. As a result, trust is a critical element of AppFolio's relationships with its customers.

120. Beagle's unauthorized access to AppFolio has damaged AppFolio's relationships with its customers.

121. Beagle disguises its unauthorized access to AppFolio databases. As a result, studying Beagle's digital footprint can provide strong suspicion, but not certainty, that a particular user is from Beagle. The only way to know for certain is for AppFolio to confront its own customer.

122. AppFolio needs certainty before closing a suspect account. AppFolio's Terms of Service do not authorize AppFolio to close accounts that comply with the Terms of Service (nor would it be good business to do so).

123. So AppFolio must choose between not enforcing its Terms of Service and accusing its own customers of violating the Terms of Service and hiding such violation.

38

124. When AppFolio makes such accusation of its customers, the customers can become angry at AppFolio. This has already occurred with one or more customers. The customers' anger harms AppFolio's goodwill.

125. When AppFolio explains to its customers that it monitors who has user access in their database in order to identify unauthorized users like Beagle, some customers assert that AppFolio is infringing on their privacy. This, too, harms AppFolio's goodwill.

126. And when, alternatively, AppFolio declines to confront its customers about unauthorized user access by Beagle, AppFolio is deprived of the benefits of its Terms of Service. This means that AppFolio's customers are exposed to the serious security risks that arise from Beagle's unauthorized access to AppFolio. If AppFolio's customers suffered harm from use of AppFolio, that would reflect badly on AppFolio, further damaging AppFolio's goodwill.

### AppFolio Is Harmed When Forced To Give Away Its Product to a Competitor for Free.

127. AppFolio is also harmed when it declines to accuse its customers of breaching the Terms of Service. When AppFolio is forced to tolerate Beagle's unauthorized access, AppFolio is forced to give away the benefits of its subscription-only product for free.

128. For example, AppFolio's software platform includes a billing system. AppFolio intended for the billing system to (1) allow AppFolio's customers to charge residents, and (2) allow AppFolio to charge its customers.

129. But when Beagle accesses AppFolio, it uses AppFolio's billing system to charge residents for *Beagle's* services. That is, AppFolio is harmed by being forced to subsidize a competitor.

130. AppFolio has spent years, millions of dollars, and thousands of hours of labor developing its software infrastructure, including but not limited to its billing system.

131. When Beagle, a competitor, gains unauthorized access to use AppFolio's infrastructure for free, Beagle is relieved of the need to invest in developing its own infrastructure.

132. This provides Beagle a substantial, unfair advantage relative to AppFolio.

**Beagle's Unauthorized Access Requires Costly Remediation by AppFolio.**

133. To restore the integrity of its databases and enforce its Terms of Service, AppFolio must constantly attempt to identify Beagle users. AppFolio must then communicate with its customers to confirm the presence of a Beagle user and remind the customer of the Terms of Service; monitor activity by the forbidden account to ensure the security of AppFolio's customer; and close the user access.

134. The foregoing procedures require the time of highly specialized, expensive staff, the value of which has well exceeded $5,000 within a year.

135. Attempting to identify illicit Beagle users is a time-consuming process.

136. Because Beagle disguises itself as an AppFolio customer by using customer email domains, AppFolio must use other aspects of Beagle's digital footprint to try and identify Beagle users.[1]

137. Once AppFolio identifies Beagle's user access, AppFolio must close or lock the account.

138. But after AppFolio closes or locks Beagle's access to a particular AppFolio customer's databases, Beagle often accesses that same database again.

---

[1] AppFolio cannot disclose in detail the methods it uses to identify Beagle's digital footprint because Beagle will adapt its tactics to further evade detection.

139.   In fact, Beagle re-accessed at least 19 AppFolio customers' databases *after* AppFolio closed the access. It is likely impossible to know exactly how many times Beagle has engaged in this tactic.

140.   Identifying Beagle's digital footprint is impossible for a lay person. It requires the attention of a highly educated, highly experienced software engineer. In order to identify Beagle's intentionally disguised digital footprint, the engineer must be experienced with AppFolio's product, the needs of AppFolio's customers, and AppFolio's customers' typical actions in the database. The engineer must also be experienced in using the backend of AppFolio's software to conduct the searches necessary to reveal Beagle's digital footprint.

141.   These qualifications make the engineer's time highly valuable.

142.   AppFolio has an engineer who has taken the lead on identifying Beagle's digital footprint. The engineer is compensated at several hundred thousand dollars per year, and has already spent dozens of hours within the past year responding to Beagle's unauthorized access.

143.   When AppFolio's software engineer is responding to Beagle's unauthorized access, he is not doing the job for which AppFolio hired him: product development. That means he is not developing AppFolio's newest products and updates. That opportunity cost has impeded AppFolio's efforts to bring products and updates to market.

## FIRST CAUSE OF ACTION

### (For Tortious Interference with Contract)

144.   AppFolio incorporates paragraphs 1 through 143 by reference as if fully set forth herein.

145.   AppFolio has valid contracts with its customers, including the Terms of Service. The Terms of Service provide that third parties are not permitted to access or use AppFolio's software platform without AppFolio's prior consent.

41

The Terms of Service also prohibit AppFolio customers from making AppFolio's software platform available to direct or indirect competitors.

146.   At all times relevant to this Complaint, Beagle knew of the Terms of Service. At the latest, Beagle had actual knowledge of the Terms of Service by December 2025, when AppFolio notified Beagle that Beagle-created user accounts in AppFolio customer databases would be disabled pursuant to the Terms of Service; when AppFolio served Beagle with its TRO application expressly relying on the Terms of Service; and when Beagle itself quoted the Terms of Service in its own federal court filings.

147.   At all times relevant to this Counter-Complaint, Beagle knew of AppFolio's relationships with its customers. At the latest, Beagle had actual knowledge of AppFolio's customer relationships by December 15, 2025, when Beagle admitted in a federal court filing that "[m]ore than eighty percent (80%) of Beagle's business, implicating at least hundreds of millions of dollars in enterprise value, is with customers who use AppFolio."

148.   Beagle knowingly and intentionally engaged in acts to disrupt and interfere with AppFolio's Terms of Service. Beagle induced AppFolio customers to create user accounts for Beagle to access AppFolio databases.

149.   Beagle's interference was intentional and wrongful. Beagle used false claims of affiliation with AppFolio to obtain customer cooperation; continued seeking user access to AppFolio after being expressly told that such access was forbidden; and adopted evasive tactics including ghost accounts and accounts disguised through customer email domains in order to continue obtaining user access before AppFolio could detect and terminate it.

150.   Beagle had no privilege to engage in such false and deceptive conduct.

151.   Beagle's conduct caused actual breaches and disruption of AppFolio's contracts with its customers. By giving Beagle access to AppFolio, AppFolio customers breached the Terms of Service.

152.   Beagle's conduct has harmed AppFolio. Beagle's interference has damaged AppFolio's goodwill with customers, deprived AppFolio of the benefit of its subscription-only product, diverted employee and engineering resources, and caused AppFolio to incur costs investigating, detecting, confirming, monitoring, and terminating Beagle's unauthorized access.

153.   Beagle's interference was a substantial factor in causing AppFolio's harm.

154.   As a direct and proximate result of Beagle's tortious interference with AppFolio's contracts, AppFolio has suffered damages in an amount to be proven at trial, but which are believed to be in excess of $75,000.

155.   AppFolio is further entitled to injunctive and other appropriate relief to prevent continuation of Beagle's interference.

156.   Because Beagle's willful conduct is characterized by fraud, malice, and oppression, AppFolio is also entitled to punitive exemplary damages.

## SECOND CAUSE OF ACTION
### (For Violations of 18 U.S.C. § 1030 *et seq*.)

157.   AppFolio incorporates paragraphs 1 through 156 by reference as if fully set forth herein.

158.   AppFolio's servers, including those hosting its customer databases, are connected to the Internet. They are "protected computers" within the meaning of 18 U.S.C. § 1030(e)(2)(B) because they are used in and affect interstate commerce and communication.

159.   Beagle knowingly and intentionally accessed, and continues to access, AppFolio's protected computers.

160. Beagle does so without authorization or in excess of authorization, and thereby obtains and/or makes use of information from those protected computers. That information includes, among other things, customer data such as tenant rosters, unit identifiers, lease and billing information, and insurance compliance information.

161. Beagle also uses its unauthorized access to AppFolio's servers to write changes into AppFolio's systems. These changes include but are not limited to turning off AppFolio's customers' subscription to AppFolio's insurance product; signing up customers for Beagle's insurance product; setting up recurring charges for Beagle's insurance product; and automatically obtaining data from the AppFolio database.

162. Beagle's access was without authorization and/or exceeded authorization because AppFolio's Terms of Service prohibited third-party competitor access without AppFolio's prior consent; and because AppFolio expressly notified Beagle that such user access was forbidden: by email on December 9, 2025; in AppFolio's TRO application on December 9, 2025; in opposing Beagle's TRO application in December 2025; in erecting a mechanical block to Beagle's user access by terminating Beagle's user access in January 2026; and in directing Beagle to cease and desist accessing AppFolio databases in March 2026. Despite that notice and mechanical block, Beagle continues obtaining access through new, disguised, and ghost accounts.

163. Beagle's conduct caused loss to AppFolio, as defined in 18 U.S.C. § 1030(e)(11), during a one-year period in excess of $5,000, including the expenditure of resources to investigate, identify, monitor, and remediate Beagle's unauthorized access and to restore and protect the integrity of AppFolio's systems and customer databases.

164. As a direct and proximate result of Beagle's violations, AppFolio has suffered damage and loss in an amount to be proven at trial, in excess of $75,000.

165.    AppFolio seeks compensatory damages and injunctive relief, including a temporary restraining order, preliminary injunction, and/or permanent injunction.

166.    AppFolio has suffered and will continue to suffer irreparable harm from Beagle's conduct unless Beagle is enjoined from further unauthorized access to AppFolio's protected servers. AppFolio has no adequate remedy at law for that ongoing harm. It would be impractical for AppFolio to bring repeated actions for damages concerning Beagle's misconduct.  The balance of equities favors the granting of injunctive relief, as Beagle has no right to engage in unauthorized use of the data and functionality on AppFolio's software platform, or to engage in subterfuge to conceal its access and undermine AppFolio's ability to enforce its Terms of Service.

### THIRD CAUSE OF ACTION

### (For Violations of California Penal Code § 502 *et seq*.)

167.    AppFolio incorporates paragraphs 1 through 166 by reference as if fully set forth herein.

168.    AppFolio's computers, servers, systems, and customer databases constitute computers, computer systems, and computer networks within the meaning of California Penal Code § 502.

169.    Beagle knowingly accessed and without permission took, copied, and/or made use of data from AppFolio's computers, computer systems, and computer network, including customer data such as tenant rosters, unit identifiers, lease and billing information, and insurance compliance information, in violation of California Penal Code § 502(c)(2). Beagle exploited the data for use in its business.

170.    Beagle knowingly and without permission used and caused to be used AppFolio's computer services, including AppFolio's subscription-only platform, billing functionality, and customer-facing database infrastructure, in violation of

45

California Penal Code § 502(c)(3). Beagle used AppFolio's own systems to operate Beagle's competing insurance offering and to impose recurring charges for Beagle services.

171.   In violation of California Penal Code § 502(c)(4), Beagle knowingly and without permission accessed and altered databases or settings within customer databases in AppFolio's software, including, but not limited to, by turning off the customer's subscription to AppFolio's insurance product; signing up the customer for Beagle's insurance product; setting up recurring charges for Beagle's insurance product; and automatically obtaining data from the AppFolio database.

172.   In violation of California Penal Code § 502(c)(7), Beagle knowingly and without permission accessed or caused to be accessed AppFolio's computers, computer systems, and computer network, including by obtaining user access credentials, using those credentials to enter AppFolio-hosted databases, and continuing to obtain and exploit user access after AppFolio expressly revoked permission and terminated Beagle's user access.

173.   Beagle's access was without permission because AppFolio's Terms of Service prohibited third-party competitor user access without AppFolio's prior consent; AppFolio repeatedly informed Beagle that Beagle's user access was unauthorized and would be disabled; and AppFolio's TRO application stated that direct competitors such as Beagle were not permitted to access AppFolio's services. Beagle nonetheless continued exploiting user access through disguised and ghost accounts to evade detection, and continues to do so to this day.

174.   AppFolio has suffered and continues to suffer damages as a result of Beagle's violations of California Penal Code § 502, including diverted employee time, response and remediation costs, loss of goodwill, loss of the exclusive use and value of its subscription-only services, and impairment of the integrity and security of its systems and customer relationships.

46

175. Beagle's conduct has caused and, unless enjoined, will continue to cause irreparable and incalculable harm to AppFolio, for which AppFolio has no adequate remedy at law.

176. It would be impractical for AppFolio to bring repeated actions for damages concerning Beagle's misconduct.

177. Pursuant to California Penal Code § 502(e), AppFolio seeks compensatory damages, injunctive relief, and all other relief authorized by law.

178. Because Beagle's willful conduct was characterized by fraud, malice, and oppression, AppFolio is entitled to punitive or exemplary damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Counter-Plaintiff prays for judgment as follows:

1. For compensatory damages according to proof, but in no event less than $75,001;

2. For punitive or exemplary damages;

3. For injunctive relief preventing Counter-Defendants, or anyone acting in concert with them, from further unauthorized access to AppFolio's protected servers, proprietary software platform, or databases; and

///

4.     For such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Counter-Claimant hereby requests a jury on all claims for which a jury is available.

DATED this 19th day of June, 2026.

/s/
Brian Procel
Jeremiah Levine
Marty Pritikin
**PROCEL LEVINE, LLP**
401 Wilshire Blvd, Fl 12
Santa Monica, CA 90401-1456
Phone: 424-788-4538

Attorneys for Counter-

Claimant, AppFolio, Inc.

48

Brian Procel (Cal. Bar No. 218657)
Brian@Procel-Law.com
Jeremiah Levine (Cal. Bar No. 288377)
Jeremiah@ProcelLevine.com
Marty Pritikin (Cal. Bar No. 210845)
Marty@Procel-Law.com
**PROCEL LEVINE LLP**
401 Wilshire Blvd, Fl 12
Santa Monica, CA 90401-1456
Phone: 424-788-4538

*Attorneys for Defendant AppFolio, Inc.*

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BEAGLE LABS, INC., a Delaware corporation, BEAGLE TECHNOLOGIES, INC., a Delaware corporation, BIG BEAGLE, INC., a Delaware corporation, RENTAL PROPERTY MANAGERS ASSOCIATION LLC, an Alabama limited liability company, and YRIG RISK RETENTION GROUP, INC., an Alabama corporation, | Case No.  25-cv-12248-JFW-SSC  **DEFENDANT'S AMENDED ANSWER TO COMPLAINT AND, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS** |
| Plaintiffs, | |
| v. | |
| APPFOLIO, INC., a California corporation, | |
| Defendant. | |

Defendant AppFolio, Inc. ("Defendant" or "AppFolio"), by and through its attorneys, responds to the Complaint (the "Complaint") filed by Plaintiffs Beagle Labs, Inc.; Beagle Technologies, Inc.; Big Beagle, Inc.; Rental Property Managers Association LLC; and YRIG Risk Retention Group, Inc. ("Beagle") as follows:

**INTRODUCTION**

1.     Paragraph 1 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 1.

2.     Paragraph 2 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 2.

3.     Paragraph 3 contains legal conclusions, arguments, and characterizations to which no response is required. Paragraph 3 also contains allegations about which Defendant does not have sufficient knowledge to respond. Defendant admits that customers add access for Beagle, and that Beagle can access customer data and provide services. To the extent a response is required to the remaining allegations, Defendant denies the allegations in Paragraph 3.

4.     Defendant lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 4, and denies those allegations on that basis.

5.     Defendant admits that it has known about Beagle for over a year; that Beagle approached AppFolio about certain cooperation in November 2024; and that AppFolio declined. Defendant denies the remaining allegations in Paragraph 5.

2

6.      Paragraph 6 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 6.

7.      Paragraph 7 contains legal conclusions, arguments, and characterizations to which no response is required. Defendant admits that it has informed AppFolio customers of the risks that improper methods of working with Beagle imposes; and that AppFolio users have provided Beagle access. To the extent a response is required to the remaining allegations, Defendant denies the allegations in Paragraph 7.

8.      Paragraph 8 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 8.

9.      Paragraph 9 contains legal conclusions, arguments, and characterizations to which no response is required. Defendant admits that it informed Beagle and AppFolio customers that it would disable Beagle's user access on December 16, 2025. To the extent a response is required to the remaining allegations, Defendant denies the allegations in Paragraph 9.

10.      Paragraph 10 contains legal conclusions, arguments, and characterizations to which no response is required. Defendant admits that it informed Beagle and AppFolio customers that it would disable Beagle's user access on December 16, 2025. Defendant admits that it partners with Second Nature. To the extent a response is required to the remaining allegations, Defendant denies the allegations in Paragraph 10.

11.      Paragraph 11 contains legal conclusions, arguments, and characterizations to which no response is required.

## THE PARTIES

12.     Defendant lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 12, and denies those allegations on that basis.

13.     Defendant lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 13, and denies those allegations on that basis.

14.     Defendant lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 14, and denies those allegations on that basis.

15.     Defendant lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 15, and denies those allegations on that basis.

16.     Defendant lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 16, and denies those allegations on that basis.

17.     Defendant admits the allegations in Paragraph 17.

## JURISDICTION AND VENUE

18.     Paragraph 18 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 8.

19.     Paragraph 19 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 19.

20.      Defendant admits that it is a citizen of California. The remainder of Paragraph 20 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 20.

21.     Defendants admits that events giving rise to the claims occurred in the Central District of California. The remainder of Paragraph 21 contains legal

4

conclusions, arguments, and characterizations to which no response is required. Paragraph 21 also contains allegations about which Defendant does not have sufficient knowledge to respond. To the extent a response is required, Defendant denies the allegations in Paragraph 20.

## FACTUAL BACKGROUND

22. Paragraph 22 contains allegations about which Defendant does not have sufficient knowledge to respond, and Defendant denies the allegations on that basis.

23. Paragraph 23 contains allegations about which Defendant does not have sufficient knowledge to respond. Paragraph 23 also contains legal conclusions, arguments, and characterizations to which no response is required. Defendant denies the allegations on these bases.

24. Defendant admits that AppFolio customers created access for Beagle, which provided access to certain categories of data. Defendant further admits advertising an online portal for vendors. Paragraph 24 contains allegations about which Defendant does not have sufficient knowledge to respond; and contains legal conclusions, arguments, and characterizations to which no response is required. Defendant denies the remaining allegations in Paragraph 24.

25. Defendant admits that Beagle publishes "Beagle Reports," which Defendant can see. Defendant denies the remaining allegations in Paragraph 25.

26. Defendant admits that it is a publicly traded company. Defendant denies the remaining allegations in Paragraph 26.

27. Paragraph 27 contains allegations about which Defendant does not have sufficient knowledge to respond; and contains legal conclusions, arguments,

5

and characterizations to which no response is required. On those bases, Defendant denies the allegations in Paragraph 27.

28.    Defendant admits the allegations in Paragraph 28.

29.    Defendant admits that Beagle approached it in 2024 regarding certain cooperation. Paragraph 29 contains allegations about which Defendant does not have sufficient knowledge to respond; and contains legal conclusions, arguments, and characterizations to which no response is required. Defendant denies the remaining allegations in Paragraph 29.

30.    Paragraph 30 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 30.

31.    Defendant admits that it emailed its customers who use Beagle on December 9, 2025, about improper methods of working with Beagle. AppFolio admits that it said that "the method by which Beagle has chosen to operate their business places you at risk"; that "noncompliant access" may cause "serious security risks." Elsewhere, Defendant referenced protecting the "integrity of customer and user data." Paragraph 31 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the remaining allegations in Paragraph 31.

32.    Defendant admits that its customers own their data, and that they are free to contract with Beagle. Paragraph 32 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the remaining allegations in Paragraph 32.

6

33.    Paragraph 33 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the remaining allegations in Paragraph 33.

34.    Defendant admits that it works with Second Nature, and that it stated it would disable Beagle's unpermitted access to AppFolio databases on December 16, 2025. Paragraph 34 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the remaining allegations in Paragraph 34.

35.    Paragraph 35 contains allegations about which Defendant does not have sufficient knowledge to respond; and contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 35.

36.    Paragraph 36 contains allegations about which Defendant does not have sufficient knowledge to respond; and contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 36.

37.    Paragraph 37 contains allegations about which Defendant does not have sufficient knowledge to respond; and contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 37.

38.    Paragraph 38 contains allegations about which Defendant does not have sufficient knowledge to respond; and contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 38.

7

39.     Paragraph 39 contains allegations about which Defendant does not have sufficient knowledge to respond; and contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 39.

## CLAIM 1

### (Tortious Interference with Contractual Relations)

40.     Paragraph 40 incorporates certain paragraphs of the Complaint by reference. No response by Defendant is required.

41.     Paragraph 41 contains allegations about which Defendant does not have sufficient knowledge to respond; and contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 41.

42.     Defendant admits that its customers grant access to certain types of third parties. AppFolio admits that it was aware that Beagle's email domain was associated with certain user access. AppFolio denies the remaining allegations in Paragraph 42.

43.     Defendant admits that it sought a temporary restraining order against Beagle, Inc., in Santa Barbara Superior Court, and that Beagle has recruited AppFolio customers. Defendant denies the remaining allegations in Paragraph 43.

44.     Paragraph 44 contains allegations about which Defendant does not have sufficient knowledge to respond; and contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 44.

45.     Defendant admits that it gave notice to customers that Defendant intended to disable Beagle's user access. Defendant admits it said that improper

8

methods of working with Beagle can pose a "security risk", and that improper methods of working with Beagle may not be compliant with Defendant's terms of service. Defendant admits that its customer service AI, after being fed information by a user, stated that Beagle is not listed as an official partner; used the words "potential scam", and "concerning." Paragraph 45 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 45.

46.    Paragraph 46 contains allegations about which Defendant does not have sufficient knowledge to respond; and contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 46.

47.    Paragraph 47 contains allegations about which Defendant does not have sufficient knowledge to respond; and contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 47.

48.    Paragraph 48 contains allegations about which Defendant does not have sufficient knowledge to respond; and contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 48.

49.    Paragraph 49 contains a statement of Beagle's future intent about which Defendant does not have sufficient knowledge to respond.

50.    Paragraph 50 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 50.

9

## CLAIM 2

### (Tortious Interference With Prospective Economic Relations)

51.    Paragraph 51 incorporates certain paragraphs of the Complaint by reference. No response by Defendant is required.

52.    Paragraph 52 contains allegations about which Defendant does not have sufficient knowledge to respond; and contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 52.

53.    Defendant does not have sufficient knowledge to respond to Beagle's allegations regarding Beagle's customers base or economic relationships. Defendant denies the remaining allegations in Paragraph 53.

54.    Defendant admits that it gave notice that it would disable Beagle's user access. Paragraph 54 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 54.

55.    Paragraph 55 contains allegations about which Defendant does not have sufficient knowledge to respond; and contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 55.

56.    Paragraph 56 contains allegations about which Defendant does not have sufficient knowledge to respond; and contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 56.

10

57.    Paragraph 57 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 57.

58.    Paragraph 58 contains allegations about which Defendant does not have sufficient knowledge to respond; and contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 58.

59.    Paragraph 59 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 59.

## CLAIM 3

### (Violation of Lanham Act § 43(a) – False Advertising)

60.    Paragraph 60 incorporates certain paragraphs of the Complaint by reference. No response by Defendant is required.

61.    Defendant admits that it has informed customers of the security risks posed by improper methods of working with Beagle. Paragraph 61 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 61.

62.    Paragraph 62 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 62.

63.    Paragraph 63 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 63.

11

64.    Paragraph 64 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 64.

65.    Paragraph 65 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 65.

66.    Paragraph 66 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 66.

67.    Paragraph 67 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 67.

### <u>CLAIM 4</u>

**(Violations of Cal. Bus. & Prof. Code §17500, et seq. – False Advertising)**

68.    Paragraph 68 incorporates certain paragraphs of the Complaint by reference. No response by Defendant is required.

69.    Paragraph 69 is a statement of law to which no response is required.

70.    Defendant admits that it has informed customers of the security risks posed by improper methods of working with Beagle. Paragraph 70 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 70.

71.    Defendant admits that it has informed customers of the security risks posed by improper methods of working with Beagle. Paragraph 71 contains legal

12

conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 71.

72.     Paragraph 72 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 72.

### CLAIM 5

### (Violations of Cal. Bus. & Prof. Code §17200, et seq. – Unfair Competition)

73.     Paragraph 73 incorporates certain paragraphs of the Complaint by reference. No response by Defendant is required.

74.     Paragraph 74 is a statement of law to which no response is required.

75.     Paragraph 75 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 75.

76.     Defendant admits that it gave notice that it would disable Beagle's user access on December 16, 2025. Paragraph 76 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the remaining allegations in Paragraph 76.

77.     Paragraph 77 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the remaining allegations in Paragraph 77.

78.     Defendant denies the allegations in Paragraph 78.

13

79.    Paragraph 79 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 79.

80.    Paragraph 80 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 80.

## CLAIM 6

### (Violation of the Sherman Act § 2 – Monopolization / Attempted Monopolization)

81.    Paragraph 81 incorporates certain paragraphs of the Complaint by reference. No response by Defendant is required.

82.    Defendant admits that it claims to be the system of record for more than 20,000 property managers and over eight million units. Paragraph 82 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the remaining allegations in Paragraph 82.

83.    Paragraph 83 contains allegations about which Defendant does not have sufficient knowledge to respond; and legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 83.

84.    Defendant denies the allegations in Paragraph 84.

85.    Paragraph 85 contains allegations about which Defendant does not have sufficient knowledge to respond; and legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 85.

14

86.     Defendant admits Beagle is a direct competitor; that it partners with Second Nature for a resident benefit package; that Defendant offers FolioGuard Smart Ensure and liability to landlord insurance; that it has its "own internal insurance solution through FolioGuard Smart Ensure and the coinciding liability to landlord insurance policy." Defendant further admits that Smart Ensure is one of its most important services; and that renters obtain insurance through AppFolio Insurance Services or another provider. Defendant denies the remaining allegations in Paragraph 86.

87.     Defendants admits that it said "Beagle does not and will not integrate with AppFolio—not now, and not ever." Paragraph 87 contains legal conclusions, arguments, and characterizations to which no response is required. Defendant denies the remaining allegations in Paragraph 87.

88.     Defendant admits that in public filings, it has filed exhibits showing AppFolio representatives stating that "Under our Terms of Service and in order to protect the integrity of customer and user data and our systems, direct competitors such as Beagle are not permitted to access any portion of our services or application programming interface." Paragraph 88 contains legal conclusions, arguments, and characterizations to which no response is required. Defendant denies the remaining allegations in Paragraph 88.

89.     Paragraph 89 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 89.

90.     Paragraph 90 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 90.

15

91.    Paragraph 91 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 91.

92.    Paragraph 92 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 92.

93.    Paragraph 93 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 93.

94.    Paragraph 94 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 94.

95.    Paragraph 95 contains statements of Beagle's future intent to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 95.

## CLAIM 7

### (Defamation and Trade Libel)

96.    Paragraph 96 incorporates certain paragraphs of the Complaint by reference. No response by Defendant is required.

97.    Paragraph 97 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 97.

98.    Paragraph 98 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 98.

16

99. Defendant admits that its customer service AI, after being fed information by a user, stated that Beagle is not listed as an official partner; used the words "potential scam", and "concerning" and encouraged the user to verify Beagle's identify on information. Paragraph 99 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the remaining allegations in Paragraph 99.

100. Defendant admits the allegations in Paragraph 100.

101. Paragraph 101 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the remaining allegations in Paragraph 101.

102. Paragraph 102 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the remaining allegations in Paragraph 102.

103. Paragraph 103 contains allegations about which Defendant does not have sufficient information to respond; and legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the remaining allegations in Paragraph 103.

104. Paragraph 104 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the remaining allegations in Paragraph 104.

105. Paragraph 105 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the remaining allegations in Paragraph 105.

17

106.   Paragraph 106 contains a statement of Beagle's future intent to which no response is required. To the extent a response is required, Defendant denies the allegations in Paragraph 106.

## CLAIM 8

### (Unjust Enrichment)

107.   Paragraph 107 incorporates certain paragraphs of the Complaint by reference. No response by Defendant is required.

108.   Paragraph 108 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the remaining allegations in Paragraph 108.

109.   Paragraph 109 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the remaining allegations in Paragraph 109.

110.   Paragraph 110 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the remaining allegations in Paragraph 110.

111.   Paragraph 111 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the remaining allegations in Paragraph 111.

112.   Paragraph 112 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the remaining allegations in Paragraph 112.

## CLAIM 9

### (Declaratory Judgment)

113.   Paragraph 113 incorporates certain paragraphs of the Complaint by reference. No response by Defendant is required.

114.   Paragraph 114 contains legal conclusions, arguments, and characterizations to which no response is required. To the extent a response is required, Defendant denies the remaining allegations in Paragraph 114.

115.   Paragraph 115 contains a legal conclusion to which no response is required. To the extent a response is required, Defendant denies the allegation in Paragraph 115.

116.   Paragraph 116 contains a legal conclusion to which no response is required. To the extent a response is required, Defendant denies the allegation in Paragraph 116.

### PRAYER FOR RELIEF

Defendant admits that Plaintiffs' Prayer for Relief sets forth the relief Plaintiffs are seeking in this case. Defendant denies this Paragraph in all other respects.

### DEFENDANT'S AFFIRMATIVE DEFENSES

As separate and distinct affirmative defenses, Defendant states as follows:

### FIRST AFFIRMATIVE DEFENSE

### (Failure To State A Claim)

The Complaint, and each and every remaining claim for relief against Defendant, fails to state a claim upon which relief may be granted against

19

Defendant, and further fails to entitle Plaintiffs to the relief sought or to any relief whatsoever against Defendant.

## SECOND AFFIRMATIVE DEFENSE

### (Legitimate Business Conduct)

The Complaint is barred because Defendant's actions, as alleged in the Complaint, were within its contractual rights, were justified, were undertaken in good faith, with the absence of malicious intent, and were the result of lawful conduct carried out in furtherance of Defendant's mission.

## THIRD AFFIRMATIVE DEFENSE

### (Failure to Mitigate)

The Complaint, and each and every claim for relief against Defendant, is barred in whole or in part because Plaintiffs failed to make reasonable efforts to mitigate such purported injury or damage, which reasonable efforts would have prevented injury or damages, if any.

## FOURTH AFFIRMATIVE DEFENSE

### (Adequate Remedies at Law)

Equitable and injunctive relief are barred because Plaintiffs have available remedies at law.

## FIFTH AFFIRMATIVE DEFENSE

### (Unclean Hands)

Plaintiffs' conduct with respect to the matters alleged in the Complaint deprive Plaintiffs of clean hands and, by reason of not coming into court with clean hands, Plaintiffs are precluded from recovery from Defendant.

## SIXTH AFFIRMATIVE DEFENSE

### (Speculative Damages)

Plaintiffs' claims are barred in whole or in part, or alternatively Plaintiffs' recovery should be reduced, because the alleged damages, if any, are speculative.

## SEVENTH AFFIRMATIVE DEFENSE

### (Lack of Standing)

Plaintiffs have not been injured and therefore do not have standing to bring the Complaint.

## EIGHTH AFFIRMATIVE DEFENSE

### (Mootness)

Plaintiffs' requests for injunctive relief are mooted because Defendant has disabled Beagle's access.

## NINTH AFFIRMATIVE DEFENSE

### (Truth)

Plaintiffs' claims for defamation, trade libel, Lanham Act violations, and violations of the False Advertising Law fail because Defendant's statements were true.

## TENTH AFFIRMATIVE DEFENSE

### (Opinion)

Plaintiffs' claims for defamation, trade libel, Lanham Act violations, and violations of the False Advertising Law fail because Defendant's statements were opinion.

## ELEVENTH AFFIRMATIVE DEFENSE

### (Procompetitive Rational)

Plaintiffs' claims are barred because Defendant had procompetitive justifications for its actions.

## TWELTH AFFIRMATIVE DEFENSE

### (Privilege)

Defendant's alleged conduct was privileged, justified, and undertaken pursuant to lawful contractual, economic, and business interests, and therefore not tortious.

22

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Additional Affirmative Defenses)

Defendant hereby gives notice that it intends to rely upon such other affirmative defenses as may become available or apparent during the course of discovery and thus reserves the right to amend this Answer to assert such defenses.

DATED this 4th day of February, 2026.

/s/
Brian Procel
Jeremiah Levine
Marty Pritikin
**PROCEL LEVINE, LLP**
401 Wilshire Blvd, Fl 12
Santa Monica, CA 90401-1456
Phone: 424-788-4538

Attorneys for Plaintiff
AppFolio, Inc.

23

## COUNTERCLAIMS

Counter-claimant AppFolio, Inc. ("AppFolio"), by and through its counsel, hereby amends its previously-filed Answer and Affirmative Defenses (Dkt. #57) to add Counter-Claims, and alleges as follows for its Counter-Claims:

## INTRODUCTION

1. AppFolio brings these Counter-Claims in an effort to stop Counter-Defendants Beagle Labs, Inc., Beagle Technologies, Inc., Big Beagle, Inc., Rental Property Managers Association LLC, and YRIG Risk Retention Group, Inc. (collectively "Beagle") from misusing the data contained on AppFolio's software and hijacking the functionality of AppFolio's software for Beagle's own ends.

2. AppFolio offers a software platform for property managers. AppFolio offers its paying customers access to that software, which facilitates the creation of databases that help the property managers run their properties.

3. In addition to storing and organizing data, AppFolio's platform is the system of record for property managers. It provides them with features such as accounting, billing, and insurance services. It also offers a convenient platform for residents to submit their data to the property managers. The unique data intake, storage, and organization features of AppFolio's software, and associated functionality, are proprietary and provide significant benefits to property managers.

4. Third parties, including competitors like Beagle, are not allowed to access AppFolio's software, including the customer databases or functionality contained therein, without express permission.

5. Each AppFolio customer agrees to AppFolio's Terms of Service, which prohibit the customers from granting third parties, such as Beagle, access to their database created and maintained via AppFolio's software platform.

6. Beagle knows that it is forbidden from accessing AppFolio's software platform or the databases therein. Beagle knows that because (1) in December 2025, AppFolio told Beagle that it was terminating Beagle's access to the

24

databases on AppFolio's software platform; (2) AppFolio served Beagle with an application for a temporary restraining order seeking to enjoin Beagle from accessing AppFolio's software platform; (3) Beagle then filed its own application for a temporary restraining order in which Beagle quoted AppFolio's Terms of Service; (4) in January 2026, AppFolio disabled all known Beagle access to the databases on AppFolio's software platform; and (5) AppFolio sent Beagle a cease-and-desist letter demanding a stop to Beagle's unauthorized access.

7.    Despite all that, Beagle continues to access AppFolio's software platform and uses AppFolio's services to run its competing insurance business.

8.    Beagle is not content to have AppFolio customers share their data with Beagle outside of AppFolio's software, which they can do through "Scheduled Reports." Rather, Beagle insists on getting access to the data as it lives in AppFolio's software platform, and on hijacking the functionality of the platform. In fact, Beagle has admitted in court filings that "[t]he whole point of Beagle's value proposition to customers is that they don't have to go through the onerous process of setting up Scheduled Reports in AppFolio."

9.    To gain access, Beagle persuades AppFolio's customers to give it access to the customers' databases on AppFolio's software platform. Beagle thereby induces AppFolio's customers to breach the Terms of Service.

10.    Once inside the database, Beagle misappropriates customer data and the functionality of AppFolio's software to exploit for its competing business. Among other things, Beagle uses its unauthorized access to edit AppFolio databases so that the billing features of AppFolio's software platform charge AppFolio customers for Beagle's services (i.e., Beagle uses AppFolio's system as a de facto billing department).

11.    Beagle knows that it is engaging in misconduct by accessing AppFolio's software platform without authorization.

25

12.     And Beagle goes to great lengths to cover its tracks. AppFolio has now determined that Beagle attempts to avoid detection in the AppFolio software platform in at least two ways.

13.     First, Beagle accesses an AppFolio customer's database using an email account with the customer's email domain. In other words, Beagle disguises itself as an AppFolio customer (or customer employee) to avoid detection when accessing AppFolio's software platform.

14.     Second, Beagle instructs the AppFolio customer to give Beagle access *just* long enough to take access and use data from, and write changes into, the customer's database on AppFolio's software platform. As soon as Beagle is done, Beagle instructs the AppFolio customer to delete Beagle's access. In other words, Beagle breaks into AppFolio's software and uses data and makes changes to the databases, then tries to cover its tracks before AppFolio can detect it.

15.     Beagle does not dispute that it accesses AppFolio's software platform without AppFolio's authorization.

16.     Beagle admits that it knows of AppFolio's contracts with its customers.

17.     Beagle has repeatedly quoted AppFolio's Terms of Service in court filings, including the exact provisions it admits prohibit third parties like Beagle from accessing online databases on AppFolio's software platform.

18.     Beagle admits that it induces AppFolio's customers to give Beagle access to AppFolio databases, despite knowing that is prohibited by AppFolio's Terms of Service.

19.     And Beagle admits that once it obtains unauthorized access to AppFolio databases, it uses data from AppFolio's platform to run its own business.

20.     AppFolio has been substantially harmed by Beagle's conduct. Beagle deprives AppFolio of right to determine who uses AppFolio's subscription-only software. Beagle's stealthy, unpermitted access to AppFolio's software—

26

which Beagle itself called a "game of whack-a-mole"—requires time-consuming, expensive employee time to detect and remediate. And Beagle's inducement of AppFolio customers to breach their Terms of Service requires potentially confrontational interaction between AppFolio and those customers that can anger the customers, harming AppFolio's goodwill.

21.     AppFolio now seeks to hold Beagle accountable for its wrongdoing. AppFolio brings counter-claims for (1) tortious interference with contractual relations, (2) violations of the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030; and (3) violations of the California Computer Data Fraud and Access Act, Cal. Penal Code § 502.

## PARTIES

22.     Counter-Claimant AppFolio is a company incorporated in California and headquartered in Goleta, California.

23.     Counter-Defendant Beagle Labs, Inc. is a Delaware corporation with principal places of business in Chicago and Dallas.

24.     Counter-Defendant Beagle Technologies is a Delaware Corporation with a principal place of business in South Salt Lake, Utah.

25.     Counter-Defendant Big Beagle, Inc., is a company incorporated in Delaware with a principal place of business in South Salt Lake, Utah.

26.     Counter-Defendant Rental Property Managers Association, LLC is an Alabama limited liability company with its principal place of business in Alabama.

27.     Counter-Defendant YRIG Risk Retention Group, Inc. is an Alabama Corporation with its principal place of business in Alabama.

## JURISDICTION AND VENUE

28.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 for claims arising under the Computer Fraud and Abuse Act ("CFAA"). The Court also has supplemental jurisdiction over AppFolio's state

27

law claims under 28 U.S.C. § 1367 because those claims are so related to the federal CFAA claim—and to Beagle's own claims against AppFolio—that they form part of the same case or controversy.

29.    The Court also has jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are citizens of different States and the amount in controversy exceeds $75,000.

30.    The Court has personal jurisdiction over Counter-Defendants because Counter-Defendants have directed their activities to California residents, including to residents of California, by accessing AppFolio's databases that are operated by AppFolio, a resident of California, and which are licensed by AppFolio customers in California. The Court also has personal jurisdiction over Counter-Defendants because Counter-Defendants maintain employees and customers in California. And the Court has personal jurisdiction over Counter-Defendants because they have submitted to the jurisdiction of this Court through the filing of their claims against AppFolio.

31.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to AppFolio's claims occurred here. Counter-Defendants have accessed AppFolio databases here; have forced AppFolio, which is based here, to respond to Counter-Defendants' accessing AppFolio databases; and have harmed AppFolio here. Moreover, AppFolio is headquartered here, and the preponderance of its financial and human resources that Counter-Defendants have diverted through their wrongful conduct are here. And a substantial part of the property that is the subject of the action is situated here.

## FACTS

### AppFolio Offers a Software Platform for Property Managers.

32.    AppFolio offers its customers AppFolio Property Manager, which is a software platform that helps property management companies run their

28

businesses. To access AppFolio Property Manager, property managers must pay a monthly subscription fee.

33.    When a property manager subscribes to AppFolio Property Manager, they receive access to an AppFolio database. The database is connected to the Internet. The database provides the property manager with a wide range of functionality, including accounting, billing, tenant screening, insurance-related services, maintenance management, and more. It also provides a convenient platform for residents that the property manager serves to upload their information. The database is password protected.

34.    In connection with these services, a property manager's AppFolio database will contain a large amount of data. This data comes from a number of sources, often from across the United States, including from the property manager, their tenants, credit rating agencies, and vendors of both AppFolio and the property manager.

35.    The way this data is organized, stored, and accessed within the databases on AppFolio's software platform, as well as the functionality within the platform, are valuable and proprietary features.

**AppFolio's Terms of Service Prohibit Unauthorized Third-Party Access.**

36.    AppFolio's relationships with its customers are governed by AppFolio's Terms of Service (the "Terms of Service").

37.    Section 5.2 of the Terms of Service, entitled Authorized Users, provides that "Third parties are not permitted to access or use the Services or any application programming interface we may make available to you without [AppFolio's] prior consent."

38.    Under this section, customers are not permitted to give third parties, like Beagle, user accounts that access the database on AppFolio's platform.

29

39. In the event a customer violates Section 5.2, for example by giving a third party a user account in its database, Section 5.2 provides AppFolio the right "to disable or delete [that] access to the Services and any application programming interface for any of your authorized users."

40. In sum, customers may freely export their data outside the AppFolio platform and then share that data with third parties like Beagle. But they may not give Beagle user accounts in their database on AppFolio's platform itself.

41. And AppFolio has the right to disable that access if they do.

42. These provisions have been in place since at least 2019.

**Beagle Focuses on Recruiting AppFolio Customers.**

43. Beagle offers an insurance program that competes with AppFolio's insurance offering.

44. Beagle focuses on recruiting AppFolio customers—that is, to use Beagle's insurance offering instead of AppFolio's.

45. On December 15, 2025, Beagle admitted in a federal court filing that "[m]ore than eighty percent (80%) of Beagle's business, implicating at least hundreds of millions of dollars in enterprise value, is with customers who use AppFolio."

**Once Beagle Recruits an AppFolio Customer, Beagle Accesses the Database on the AppFolio Platform Without Authorization.**

46. By design, an AppFolio customer can create user accounts to give their employees access to their database. For example, an employee tasked with monitoring rent payments can use their user account to perform that function.

47. When Beagle recruits a new AppFolio customer, Beagle induces the customer to give Beagle user access to the customer's AppFolio database.

48. Beagle then exploits the user access to connect with the customer's AppFolio database over the Internet.

49. Once connected, Beagle writes changes into the customer's AppFolio database and extracts and/or uses data from it.

50. Beagle exploits the user access to write changes in the AppFolio database, such as turning off the customer's subscription to AppFolio's insurance product; signing up the customer for Beagle's insurance product; setting up recurring charges for Beagle's insurance product; and automatically obtaining data from the AppFolio database.

51. In so doing, Beagle takes unauthorized advantage of, among other things, the data intake and storage features of AppFolio's software platform to gain access to data in a convenient format and to manipulate and use that data, in ways Beagle could not do otherwise.

52. Beagle makes these changes for its customers to make it easy for customers to switch from AppFolio to Beagle.

53. And Beagle makes these changes so that it can rely on *AppFolio's* software infrastructure—which took years to build and which exists for the benefit of AppFolio's paying customers—to run *Beagle's* competing business.

54. Beagle has avoided the cost and burden of developing their own technology to import, store, organize, and use this data. Instead, Beagle has chosen to hijack AppFolio's technology for its own use.

55. In fact, in court filings, Beagle has admitted that "[t]he whole point of Beagle's value proposition to customers is that they don't have to go through the onerous process of setting up Scheduled Reports in AppFolio." (AppFolio enables customers to use Scheduled Reports to export data to third parties.)

56. The AppFolio databases that Beagle accesses are hosted on AppFolio servers, which are connected to the Internet.

57. The data that Beagle takes and/or uses from AppFolio databases is valuable data that Beagle uses for its own business.

31

58.     For example, Beagle takes and/or uses data from AppFolio regarding "tenant rosters, unit identifiers, lease and billing information, and insurance compliance."

59.     That data is valuable to Beagle because Beagle uses that data to run its insurance product.

60.     The functionality within the databases on AppFolio's platform is also valuable to Beagle, as it uses that functionality for billing and other purposes.

61.     In fact, in a federal court filing, Beagle stated that its access to AppFolio's database is so valuable that if it were cut off, "this will end Beagle's business overnight." Beagle admits that pirating AppFolio *is* its business model.

**Beagle's User Access Creates Security Risks for AppFolio Customers Who Use Beagle.**

62.     When an AppFolio customer creates an account for its employee, the account is tied to a specific individual.

63.     For security and audit purposes, the actions of each employee's user account are logged in the system.

64.     That is a security feature because it allows tracking of the individual's actions in AppFolio, and for the user access to be terminated when the employee is terminated.

65.     Unlike with an employee account, when a user account is created in an AppFolio database for Beagle, Beagle employees or agents share the user account across the company, with everyone using the same username and password.

66.     Because Beagle shares the user account (including username and password), actions within the database are not traceable to any individual.

67.     This provides bad actors with anonymity within the database.

68. In addition, because the username and password are shared, former Beagle employees can retain their ability to access the database even after leaving Beagle.

69. Any Beagle employee (current or former) with the access could take any number of nefarious actions in the database, such as stealing resident's personally identifiable information or accessing the customer's bank accounts. Beagle's CEO has admitted as much in writing.

**AppFolio Put Beagle on Notice that it was Forbidden from User Access.**

70. On or about December 9, 2025, AppFolio informed Beagle that on December 16, 2025, AppFolio would close all unauthorized user accounts associated with Beagle. Specifically, AppFolio notified Beagle by email:

> We are reaching out to inform you that **all Beagle-created user accounts in AppFolio customer databases will be disabled on December 16, 2025**. This action is necessary to uphold the security and integrity of our platform and **to ensure compliance with AppFolio's terms of service**.

(emphasis added).

71. That email put Beagle on notice that it was forbidden from user access to AppFolio.

72. That same day, AppFolio filed a complaint and application for a temporary restraining order ("TRO") against Beagle in Santa Barbara County Superior Court.

73. The TRO sought to enjoin Beagle's false advertising (e.g., claiming that Beagle was "partnered with" AppFolio); inducing AppFolio's customers to give Beagle their user-access login credentials; and otherwise inducing AppFolio customers to breach the Terms of Service.

74. AppFolio's TRO application stated that: "Under our Terms of Service and in order to protect the integrity of customer and user data and our

33

systems, direct competitors such as Beagle are not permitted to access any portion of our services or application programming interface."

75. AppFolio served its TRO application on Beagle on December 9, 2025.

76. The TRO application provided Beagle with additional notice that it was forbidden from user access to AppFolio.

**Beagle Filed a TRO Application That Conceded Beagle Was on Notice of All Relevant Facts.**

77. On December 15, 2025, Beagle filed a complaint and TRO application in this action that sought to enjoin AppFolio from terminating the user accounts Beagle was exploiting.

78. Beagle's request for a TRO that would stop AppFolio from enforcing its Terms of Service and ending Beagle's user access shows that Beagle had notice that it was forbidden from user access to AppFolio.

79. Beagle's TRO application also quoted AppFolio's Terms of Service.

80. This demonstrates that no later than when Beagle filed its TRO application on December 15, 2025, Beagle knew of AppFolio's Terms of Service, which is the contract between AppFolio and its customers.

81. In its TRO application, Beagle admitted that "[m]ore than eighty percent (80%) of Beagle's business, implicating at least hundreds of millions of dollars in enterprise value, is with customers who use AppFolio."

82. This demonstrates that Beagle had notice of AppFolio's customer relationships.

83. On January 7, 2026, the Court denied Beagle's TRO request.

84. The following day, AppFolio identified all known user access accounts associated with Beagle. On January 8 and 9, 2026, AppFolio terminated or locked all known Beagle user access.

34

85. That termination and locking constituted a mechanical block to all Beagle user access of which AppFolio was aware at the time.

**AppFolio Discovers New Misconduct by Beagle.**

86. In March 2026, AppFolio learned that Beagle was using a virtually undetectable means of gaining unauthorized access to AppFolio databases.

87. Until approximately January 9, 2026—when AppFolio closed all known Beagle accounts—Beagle used one method to get user access. And AppFolio could relatively easily identify and terminate that user access.

88. Namely, Beagle's user account was typically associated with a Beagle email domain, such as @BeagleforPMs.com. Alternatively, the account was associated with one of several new email domains that Beagle created, which were more generic (by design) but which could still be associated with Beagle.

89. Because the user account could be associated with Beagle, AppFolio had been able identify and eventually terminate the access.

90. In fact, Beagle complained in a federal court filing that AppFolio was *too* effective in identifying its user accounts in order to close them. Specifically, Beagle wrote in reference to its user access associated with Beagle emails domains that "AppFolio has shown it can detect those domains and will block them too."

91. But on or about March 18, 2026, an AppFolio customer who used Beagle forwarded to AppFolio his emails with Beagle. The email indicated that Beagle now uses short-lived accounts so that Beagle can access an AppFolio database before AppFolio can detect and terminate the access.

92. For example, Beagle will obtain user access when it recruits a new AppFolio customer. Beagle will use the access to enter the customer's AppFolio database, make changes in the AppFolio database, and then have the customer delete the user account.

35

93.     Because AppFolio can only sweep its databases for unauthorized Beagle users periodically, the Beagle accounts disappear before AppFolio can detect them.

94.     In other words, Beagle acts like a ghost, causing harm and disappearing.

95.     AppFolio cannot estimate how many customers Beagle has accessed using its ghost accounts strategy.

96.     On information and belief, given that (1) Beagle claims that it needs AppFolio access to survive; and (2) Beagle—in writing—instructs AppFolio customers to give it user access and delete the access once Beagle is done accessing AppFolio, the ghost accounts strategy is widespread.

**Beagle Undertakes Even More New Subterfuge to Gain Unauthorized Access.**

97.     AppFolio recently discovered additional conduct that Beagle was undertaking to secretly gain unauthorized access to AppFolio databases.

98.     Beagle disguises itself as an AppFolio customer in order to avoid detection when it accesses the customer's AppFolio database.

99.     That is, Beagle asks the AppFolio customer for an email address that uses the customer's email domain. Beagle uses that email address on its AppFolio user account.

100.   That way, when AppFolio sweeps for illicit Beagle users, the Beagle user is disguised as a customer and is more likely to avoid access termination.

101.   It is extremely difficult for AppFolio to detect Beagle accounts that use these tactics. AppFolio does not and cannot know exactly how many Beagle accounts use these tactics. AppFolio can merely attempt to identify Beagle accounts using aspects of Beagle's digital footprint other than the email address on the user account.

36

102.   AppFolio has identified at least 70 masked accounts using the AppFolio customer's email domain, all created after the Answer was filed.

103.   Because it is so difficult for AppFolio to identify unauthorized access that Beagle has set up through camouflaging itself as an AppFolio customer account, on information and belief, Beagle has set up many more masked accounts than the 70 AppFolio has identified so far.

**AppFolio Again Demands that Beagle Stop its Unauthorized Access.**

104.   On March 5, 2026, AppFolio sent Beagle another notice letter.

105.   The letter identified Beagle's prior unauthorized access to AppFolio databases; demanded that Beagle state by March 12, 2026, whether it would stop the conduct; and stated that Beagle's unauthorized access constituted tortious interference with contract.

106.   Beagle never substantively responded to the letter.

107.   Instead, Beagle stalled for time while continuing its unauthorized access to the database.

108.   On or about March 12, 2026—the day by which AppFolio demanded to know whether Beagle would stop its unauthorized access—Beagle's counsel said that counsel would respond the next day.

109.   But there was no response the next day.

110.   AppFolio waited in good faith for the promised response.

111.   On or about March 23, 2026, Beagle's counsel again said that Beagle would respond, this time with a proposal for cooperation.

112.   The proposal never came.

113.   All the while, Beagle was continuing its unauthorized access.

114.    Since AppFolio sent its most recent cease and desist letter on March 5, 2026, Beagle obtained user access at least 100 additional times.

115.    And those are only the Beagle accounts that AppFolio has identified—it does not include ghost accounts or other effectively disguised access.

**Beagle's Conduct Harms AppFolio's Customer Goodwill.**

116.    AppFolio values its customers. AppFolio's relationships with its customers are important for the success of its customers and the success of AppFolio.

117.    AppFolio is the system of record for its customers. That is, AppFolio's customers rely on AppFolio to organize data that is the basis of decisions for the customers and their residents. So AppFolio's customers must be able to trust that the information in their database is accurate.

118.    AppFolio's customers must also be able to trust that the information in their database is secure because AppFolio databases may contain personal identifying and payment information for thousands of residents.

119.    As a result, trust is a critical element of AppFolio's relationships with its customers.

120.    Beagle's unauthorized access to AppFolio has damaged AppFolio's relationships with its customers.

121.    Beagle disguises its unauthorized access to AppFolio databases. As a result, studying Beagle's digital footprint can provide strong suspicion, but not certainty, that a particular user is from Beagle. The only way to know for certain is for AppFolio to confront its own customer.

122.    AppFolio needs certainty before closing a suspect account. AppFolio's Terms of Service do not authorize AppFolio to close accounts that comply with the Terms of Service (nor would it be good business to do so).

123.    So AppFolio must choose between not enforcing its Terms of Service and accusing its own customers of violating the Terms of Service and hiding such violation.

38

124. When AppFolio makes such accusation of its customers, the customers can become angry at AppFolio. This has already occurred with one or more customers. The customers' anger harms AppFolio's goodwill.

125. When AppFolio explains to its customers that it monitors who has user access in their database in order to identify unauthorized users like Beagle, some customers assert that AppFolio is infringing on their privacy. This, too, harms AppFolio's goodwill.

126. And when, alternatively, AppFolio declines to confront its customers about unauthorized user access by Beagle, AppFolio is deprived of the benefits of its Terms of Service. This means that AppFolio's customers are exposed to the serious security risks that arise from Beagle's unauthorized access to AppFolio. If AppFolio's customers suffered harm from use of AppFolio, that would reflect badly on AppFolio, further damaging AppFolio's goodwill.

**AppFolio Is Harmed When Forced To Give Away Its Product to a Competitor for Free.**

127. AppFolio is also harmed when it declines to accuse its customers of breaching the Terms of Service. When AppFolio is forced to tolerate Beagle's unauthorized access, AppFolio is forced to give away the benefits of its subscription-only product for free.

128. For example, AppFolio's software platform includes a billing system. AppFolio intended for the billing system to (1) allow AppFolio's customers to charge residents, and (2) allow AppFolio to charge its customers.

129. But when Beagle accesses AppFolio, it uses AppFolio's billing system to charge residents for *Beagle's* services. That is, AppFolio is harmed by being forced to subsidize a competitor.

130. AppFolio has spent years, millions of dollars, and thousands of hours of labor developing its software infrastructure, including but not limited to its billing system.

39

131.    When Beagle, a competitor, gains unauthorized access to use AppFolio's infrastructure for free, Beagle is relieved of the need to invest in developing its own infrastructure.

132.    This provides Beagle a substantial, unfair advantage relative to AppFolio.

**Beagle's Unauthorized Access Requires Costly Remediation by AppFolio.**

133.    To restore the integrity of its databases and enforce its Terms of Service, AppFolio must constantly attempt to identify Beagle users. AppFolio must then communicate with its customers to confirm the presence of a Beagle user and remind the customer of the Terms of Service; monitor activity by the forbidden account to ensure the security of AppFolio's customer; and close the user access.

134.    The foregoing procedures require the time of highly specialized, expensive staff, the value of which has well exceeded $5,000 within a year.

135.    Attempting to identify illicit Beagle users is a time-consuming process.

136.    Because Beagle disguises itself as an AppFolio customer by using customer email domains, AppFolio must use other aspects of Beagle's digital footprint to try and identify Beagle users.[1]

137.    Once AppFolio identifies Beagle's user access, AppFolio must close or lock the account.

138.    But after AppFolio closes or locks Beagle's access to a particular AppFolio customer's databases, Beagle often accesses that same database again.

---

[1] AppFolio cannot disclose in detail the methods it uses to identify Beagle's digital footprint because Beagle will adapt its tactics to further evade detection.

40

139.   In fact, Beagle re-accessed at least 19 AppFolio customers' databases *after* AppFolio closed the access. It is likely impossible to know exactly how many times Beagle has engaged in this tactic.

140.   Identifying Beagle's digital footprint is impossible for a lay person. It requires the attention of a highly educated, highly experienced software engineer. In order to identify Beagle's intentionally disguised digital footprint, the engineer must be experienced with AppFolio's product, the needs of AppFolio's customers, and AppFolio's customers' typical actions in the database. The engineer must also be experienced in using the backend of AppFolio's software to conduct the searches necessary to reveal Beagle's digital footprint.

141.   These qualifications make the engineer's time highly valuable.

142.   AppFolio has an engineer who has taken the lead on identifying Beagle's digital footprint. The engineer is compensated at several hundred thousand dollars per year, and has already spent dozens of hours within the past year responding to Beagle's unauthorized access.

143.   When AppFolio's software engineer is responding to Beagle's unauthorized access, he is not doing the job for which AppFolio hired him: product development. That means he is not developing AppFolio's newest products and updates. That opportunity cost has impeded AppFolio's efforts to bring products and updates to market.

### FIRST CAUSE OF ACTION

### (For Tortious Interference with Contract)

144.   AppFolio incorporates paragraphs 1 through 143 by reference as if fully set forth herein.

145.   AppFolio has valid contracts with its customers, including the Terms of Service. The Terms of Service provide that third parties are not permitted to access or use AppFolio's software platform without AppFolio's prior consent.

41

The Terms of Service also prohibit AppFolio customers from making AppFolio's software platform available to direct or indirect competitors.

146.   At all times relevant to this Complaint, Beagle knew of the Terms of Service. At the latest, Beagle had actual knowledge of the Terms of Service by December 2025, when AppFolio notified Beagle that Beagle-created user accounts in AppFolio customer databases would be disabled pursuant to the Terms of Service; when AppFolio served Beagle with its TRO application expressly relying on the Terms of Service; and when Beagle itself quoted the Terms of Service in its own federal court filings.

147.   At all times relevant to this Counter-Complaint, Beagle knew of AppFolio's relationships with its customers. At the latest, Beagle had actual knowledge of AppFolio's customer relationships by December 15, 2025, when Beagle admitted in a federal court filing that "[m]ore than eighty percent (80%) of Beagle's business, implicating at least hundreds of millions of dollars in enterprise value, is with customers who use AppFolio."

148.   Beagle knowingly and intentionally engaged in acts to disrupt and interfere with AppFolio's Terms of Service. Beagle induced AppFolio customers to create user accounts for Beagle to access AppFolio databases.

149.   Beagle's interference was intentional and wrongful. Beagle used false claims of affiliation with AppFolio to obtain customer cooperation; continued seeking user access to AppFolio after being expressly told that such access was forbidden; and adopted evasive tactics including ghost accounts and accounts disguised through customer email domains in order to continue obtaining user access before AppFolio could detect and terminate it.

150.   Beagle had no privilege to engage in such false and deceptive conduct.

151.    Beagle's conduct caused actual breaches and disruption of AppFolio's contracts with its customers. By giving Beagle access to AppFolio, AppFolio customers breached the Terms of Service.

152.    Beagle's conduct has harmed AppFolio. Beagle's interference has damaged AppFolio's goodwill with customers, deprived AppFolio of the benefit of its subscription-only product, diverted employee and engineering resources, and caused AppFolio to incur costs investigating, detecting, confirming, monitoring, and terminating Beagle's unauthorized access.

153.    Beagle's interference was a substantial factor in causing AppFolio's harm.

154.    As a direct and proximate result of Beagle's tortious interference with AppFolio's contracts, AppFolio has suffered damages in an amount to be proven at trial, but which are believed to be in excess of $75,000.

155.    AppFolio is further entitled to injunctive and other appropriate relief to prevent continuation of Beagle's interference.

156.    Because Beagle's willful conduct is characterized by fraud, malice, and oppression, AppFolio is also entitled to punitive exemplary damages.

## SECOND CAUSE OF ACTION

### (For Violations of 18 U.S.C. § 1030 *et seq.*)

157.    AppFolio incorporates paragraphs 1 through 156 by reference as if fully set forth herein.

158.    AppFolio's servers, including those hosting its customer databases, are connected to the Internet. They are "protected computers" within the meaning of 18 U.S.C. § 1030(e)(2)(B) because they are used in and affect interstate commerce and communication.

159.    Beagle knowingly and intentionally accessed, and continues to access, AppFolio's protected computers.

43

160. Beagle does so without authorization or in excess of authorization, and thereby obtains and/or makes use of information from those protected computers. That information includes, among other things, customer data such as tenant rosters, unit identifiers, lease and billing information, and insurance compliance information.

161. Beagle also uses its unauthorized access to AppFolio's servers to write changes into AppFolio's systems. These changes include but are not limited to turning off AppFolio's customers' subscription to AppFolio's insurance product; signing up customers for Beagle's insurance product; setting up recurring charges for Beagle's insurance product; and automatically obtaining data from the AppFolio database.

162. Beagle's access was without authorization and/or exceeded authorization because AppFolio's Terms of Service prohibited third-party competitor access without AppFolio's prior consent; and because AppFolio expressly notified Beagle that such user access was forbidden: by email on December 9, 2025; in AppFolio's TRO application on December 9, 2025; in opposing Beagle's TRO application in December 2025; in erecting a mechanical block to Beagle's user access by terminating Beagle's user access in January 2026; and in directing Beagle to cease and desist accessing AppFolio databases in March 2026. Despite that notice and mechanical block, Beagle continues obtaining access through new, disguised, and ghost accounts.

163. Beagle's conduct caused loss to AppFolio, as defined in 18 U.S.C. § 1030(e)(11), during a one-year period in excess of $5,000, including the expenditure of resources to investigate, identify, monitor, and remediate Beagle's unauthorized access and to restore and protect the integrity of AppFolio's systems and customer databases.

164. As a direct and proximate result of Beagle's violations, AppFolio has suffered damage and loss in an amount to be proven at trial, in excess of $75,000.

44

165.   AppFolio seeks compensatory damages and injunctive relief, including a temporary restraining order, preliminary injunction, and/or permanent injunction.

166.   AppFolio has suffered and will continue to suffer irreparable harm from Beagle's conduct unless Beagle is enjoined from further unauthorized access to AppFolio's protected servers. AppFolio has no adequate remedy at law for that ongoing harm. It would be impractical for AppFolio to bring repeated actions for damages concerning Beagle's misconduct.  The balance of equities favors the granting of injunctive relief, as Beagle has no right to engage in unauthorized use of the data and functionality on AppFolio's software platform, or to engage in subterfuge to conceal its access and undermine AppFolio's ability to enforce its Terms of Service.

**THIRD CAUSE OF ACTION**

**(For Violations of California Penal Code § 502 *et seq*.)**

167.   AppFolio incorporates paragraphs 1 through 166 by reference as if fully set forth herein.

168.   AppFolio's computers, servers, systems, and customer databases constitute computers, computer systems, and computer networks within the meaning of California Penal Code § 502.

169.   Beagle knowingly accessed and without permission took, copied, and/or made use of data from AppFolio's computers, computer systems, and computer network, including customer data such as tenant rosters, unit identifiers, lease and billing information, and insurance compliance information, in violation of California Penal Code § 502(c)(2). Beagle exploited the data for use in its business.

170.   Beagle knowingly and without permission used and caused to be used AppFolio's computer services, including AppFolio's subscription-only platform, billing functionality, and customer-facing database infrastructure, in violation of

45

California Penal Code § 502(c)(3). Beagle used AppFolio's own systems to operate Beagle's competing insurance offering and to impose recurring charges for Beagle services.

171.   In violation of California Penal Code § 502(c)(4), Beagle knowingly and without permission accessed and altered databases or settings within customer databases in AppFolio's software, including, but not limited to, by turning off the customer's subscription to AppFolio's insurance product; signing up the customer for Beagle's insurance product; setting up recurring charges for Beagle's insurance product; and automatically obtaining data from the AppFolio database.

172.   In violation of California Penal Code § 502(c)(7), Beagle knowingly and without permission accessed or caused to be accessed AppFolio's computers, computer systems, and computer network, including by obtaining user access credentials, using those credentials to enter AppFolio-hosted databases, and continuing to obtain and exploit user access after AppFolio expressly revoked permission and terminated Beagle's user access.

173.   Beagle's access was without permission because AppFolio's Terms of Service prohibited third-party competitor user access without AppFolio's prior consent; AppFolio repeatedly informed Beagle that Beagle's user access was unauthorized and would be disabled; and AppFolio's TRO application stated that direct competitors such as Beagle were not permitted to access AppFolio's services. Beagle nonetheless continued exploiting user access through disguised and ghost accounts to evade detection, and continues to do so to this day.

174.   AppFolio has suffered and continues to suffer damages as a result of Beagle's violations of California Penal Code § 502, including diverted employee time, response and remediation costs, loss of goodwill, loss of the exclusive use and value of its subscription-only services, and impairment of the integrity and security of its systems and customer relationships.

46

175.   Beagle's conduct has caused and, unless enjoined, will continue to cause irreparable and incalculable harm to AppFolio, for which AppFolio has no adequate remedy at law.

176.   It would be impractical for AppFolio to bring repeated actions for damages concerning Beagle's misconduct.

177.   Pursuant to California Penal Code § 502(e), AppFolio seeks compensatory damages, injunctive relief, and all other relief authorized by law.

178.   Because Beagle's willful conduct was characterized by fraud, malice, and oppression, AppFolio is entitled to punitive or exemplary damages.

## PRAYER FOR RELIEF

WHEREFORE, Counter-Plaintiff prays for judgment as follows:

1.     For compensatory damages according to proof, but in no event less than $75,001;

2.     For punitive or exemplary damages;

3.     For injunctive relief preventing Counter-Defendants, or anyone acting in concert with them, from further unauthorized access to AppFolio's protected servers, proprietary software platform, or databases; and

///

47

4.    For such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Counter-Claimant hereby requests a jury on all claims for which a jury is available.

DATED this 19th day of June, 2026.

/s/
Brian Procel
Jeremiah Levine
Marty Pritikin
**PROCEL LEVINE, LLP**
401 Wilshire Blvd, Fl 12
Santa Monica, CA 90401-1456
Phone: 424-788-4538

Attorneys for Cross-Complainant,
AppFolio, Inc.

48