Brian Procel (Cal. Bar No. 218657)
Brian@ProcelLevine.com
Jeremiah Levine (Cal. Bar No. 288377)
Jeremiah@ProcelLevine.com
Marty Pritikin (Cal. Bar No. 210845)
Marty@ProcelLevine.com
**PROCEL LEVINE LLP**
401 Wilshire Blvd, Fl 12
Santa Monica, CA 90401-1456
Phone: 424-788-4538

*Attorneys for Defendant and Counter-Claimant AppFolio, Inc.*

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

BEAGLE LABS, INC., a Delaware corporation, BEAGLE TECHNOLOGIES, INC., a Delaware corporation, BIG BEAGLE, INC., a Delaware corporation, RENTAL PROPERTY MANAGERS ASSOCIATION LLC, an Alabama limited liability company, and YRIG RISK RETENTION GROUP, INC., an Alabama corporation,

Plaintiffs and Counter-Defendants,

v.

APPFOLIO, INC., a California corporation,

Defendant and Counter-Claimant.

Case No. 25-cv-12248-JFW-SSC

Hon. John F. Walter

**DEFENDANT AND COUNTER-CLAIMANT APPFOLIO, INC.'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

Hearing Date: November 2, 2026
Time: 1:30 PM
Trial: September 28, 2027

**TO THE COURT, ALL PARTIES, AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on November 2, at 1:30pm, or as soon thereafter as the matter may be heard, in Courtroom 7A of the United States District Court for the Central District of California, located at 350 West First Street, Los Angeles, California 90012, before the Honorable John F. Walter, Defendant and Counter-Claimant AppFolio, Inc. ("AppFolio") will and hereby does move this Court for a preliminary injunction enjoining Plaintiffs and Counter-Defendants Beagle Labs, Inc., Beagle Technologies, Inc., Big Beagle, Inc., Rental Property Managers Association LLC, and YRIG Risk Retention Group, Inc. (collectively, "Beagle") from:

1. Accessing, or causing any third party to access, AppFolio's password-protected software platform and customer databases without AppFolio's authorization, including by inducing AppFolio customers to create user accounts for Beagle's use, whether labeled with Beagle's own domain or any other domain;
2. Altering, disabling, or otherwise modifying any data, settings, or features within AppFolio's platform, including disabling AppFolio's insurance offerings, or configuring recurring charges through AppFolio's billing systems;

Nothing in the requested Order restricts Beagle from receiving scheduled reports or interfacing with AppFolio's password-protected software platform and customer databases via AppFolio's Database API tool.

This motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Declarations of Sean Saxena, Nathaniel Delage, Micaela Velasquez, and Jeremiah Levine, all pleadings

and papers on file in this action, and such other evidence and argument as the Court may consider.

## TABLE OF CONTENTS


I. INTRODUCTION ---------- 1

II. FACTUAL BACKGROUND ---------- 2

A. AppFolio Provides Property Management Software to its Customers ---------- 2

B. Third Parties Cannot Access the Platform Without Permission ---------- 2

C. Beagle Accesses AppFolio's Platform Without Permission ---------- 3

D. Beagle Knows It Does Not Have Permission To Access the Platform ---------- 4

E. Beagle Nevertheless Continues to Access AppFolio's Platform ---------- 5

F. AppFolio Cannot Fully Prevent Beagle's Unauthorized Access ---------- 6

G. Beagle's Unauthorized Access Harms AppFolio ---------- 7

1. AppFolio is forced to subsidize Beagle's competing business ---------- 7

2. AppFolio is forced into conflict with its own customers ---------- 7

3. AppFolio is forced to endure unknown security vulnerabilities ---------- 8

4. AppFolio is forced to spend time and resources to respond ---------- 9

III. LEGAL STANDARD ---------- 9

IV. ARGUMENT ---------- 10

A. AppFolio Is Likely to Succeed on the Merits ---------- 10

1. AppFolio is Likely to Succeed on Its Claim for Tortious Interference with Contractual Relations ---------- 10

a) Beagle knows AppFolio has valid customer contracts ---------- 10

b) Beagle knows it causes customers to breach those contracts ---------- 11

c) AppFolio is harmed by the breach of those contracts ---------- 11

2. AppFolio is Likely to Succeed on its Claim Under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ---------- 12

a) Beagle Intentionally Accessed AppFolio's Platform ---------- 12

b) Beagle is Not Authorized to Access AppFolio's Platform ---------- 13

i. Beagle knows its access is unauthorized ---------- 13

ii. Customers cannot grant Beagle authorization ---------- 15

c) Beagle Obtained Information from AppFolio's Platform ---------- 16

d) AppFolio's Platform is a "Protected Computer" ---------- 16

e) Beagle's Unauthorized Access Cost AppFolio Over $5,000 ---------- 16

3. AppFolio is Likely to Succeed on its Claim Under California Penal Code § 502 17

a) Beagle's conduct meets Section 502's "knowing" standard ---------- 17

b) Section 502(c)(2): Taking and Using Data ---------- 18

c) Section 502(c)(3): Use of a Computer System ---------- 18

d) Section 502(c)(4): Addition, Alteration, or Deletion of Data ---------- 19

e) Section 502(c)(7): Unauthorized Access ---------- 19

f) Damage and Loss ---------- 19

B. AppFolio Will Suffer Irreparable Harm Absent Injunctive Relief ---------- 20

1. The Violation of the CFAA and § 502 is Itself Irreparable Harm ---------- 20

2. The Ongoing Violation of AppFolio's Property Rights Creates a Presumption of Irreparable Harm that Beagle Cannot Overcome ---------- 22

3. Beagle's Unauthorized Access is Causing Incalculable Harm to AppFolio's Goodwill ---------- 23

C. The Balance of Hardships Tips Sharply in AppFolio's Favor ---------------- 23

D. The Public Interest Favors an Injunction ---------------------------------------- 25

V. CONCLUSION------------------------------------------------------------------------ 25

# TABLE OF AUTHORITIES

## CASES

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–35 (9th Cir. 2011) ---------------------------------------------------------------------------------------------- 10

*Amazon.com Servs., LLC v. Perplexity AI, Inc.*, 2026 WL 2237587 (9th Cir. Aug. 4, 2026) ------------------------------------------------------------------------------12, 13

*Blindlight, LLC v. Cubbison*, 2017 WL 4769460, at *12 (C.D. Cal. July 3, 2017)- ---------------------------------------------------------------------------------------------- 23

*Blizzard Entertainment, Inc. v. Ceiling Fan Software LLC*, 28 F.Supp.3d 1006, 1016 (C.D. Cal. 2013) ------------------------------------------------------------------- 10

*Chegg, Inc. v. Doe*, 2023 WL 7392290, at *8 (N.D. Cal. Nov. 7, 2023)---20, 21, 25

*eBay, Inc. v. Bidder's Edge, Inc*., 100 F. Supp. 2d 1058, 1066 (N.D. Cal. 2000) -12, 22, 24

*Facebook, Inc. v. Power Ventures, Inc.*, 252 F. Supp. 3d 765, 782–83 (N.D. Cal. 2017), aff'd, 749 F. App'x 557 (9th Cir. 2019) -----------------------------21, 24, 25

*Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1068 (9th Cir. 2016)- --------------------------------------------------------------------------------------passim

*Hilao v. Estate of Marcos*, 25 F.3d 1467, 1480 (9th Cir. 1994) ---------------------- 23

*hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1201 (9th Cir. 2022)---------13, 16

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 762 (9th Cir. 2014)---------------------------------------------------- 10

*LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1132 (9th Cir. 2009) -------------- 12

*Meta Platforms, Inc. v. Qibaa*, 2025 WL 2496129, at *9 (N.D. Cal. Aug. 1, 2025) ---------------------------------------------------------------------------------------------- 20

*Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990) ------ 10

*Probo Med., LLC v. Heart Med., LLC*, 2024 WL 3557458, at *6 (S.D. Cal. July 26, 2024)------------------------------------------------------------------------------10, 24

*Pyro Spectaculars N., Inc. v. Souza*, 861 F. Supp. 2d 1079, 1092 (E.D. Cal. 2012) ---------------------------------------------------------------------------------------------- 24

*Reeves v. Hanlon*, 33 Cal. 4th 1140, 1148 (2004)-------------------------------------- 11

*Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) ------------------------------------------------------------------------------ 23

*Smith Int'l, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1581 (Fed.Cir.1983) -------- 22

*Stackla, Inc. v. Facebook Inc.*, 2019 WL 4738288, at *6 (N.D. Cal. Sept. 27, 2019) ----------------------------------------------------------------------------------------23, 25

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001)-------------------------------------------------------------------------------------- 23

*WhatsApp Inc. v. NSO Grp. Techs. Ltd.*, 2025 WL 2961368, at *2–6 (N.D. Cal. Oct. 17, 2025)------------------------------------------------------------------------------- 21

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008)-------- 10

STATUTES

18 U.S.C. § 1030 ------------------------------------------------------------------------------ 12

California Penal Code § 502 ---------------------------------------------------------------- 17

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Beagle's filings and discovery responses are a confession. In them, Beagle admits "AppFolio's platform provides the foundational infrastructure for Beagle's services." It is the system Beagle uses to "make changes, fix problems, confirm accuracy, run processes," and "execute workflows." It is "[t]he way Beagle works," what "its customers expect," and its "entire value proposition."

The problem: Beagle admits it does not have AppFolio's permission to use the platform. Beagle concedes AppFolio has forbidden Beagle's access and taken measures to "block Beagle from servicing customers on the AppFolio platform." Yet, Beagle has circumvented AppFolio's security and maintained its unauthorized access by "play[ing] a game of whack-a-mole" in which AppFolio must "constantly" find and disable Beagle's user accounts. Beagle believes this conduct is "justified." The law disagrees.

AppFolio has, and is likely to succeed on, three causes of action—tortious interference with contractual relations, the Computer Fraud and Abuse Act, and California Penal Code § 502—each of which is supported by on-point precedent from this Circuit or District. But AppFolio cannot wait for a final verdict. Beagle's unauthorized access is causing irreparable harm now.

Beagle's use of over 1,000 unauthorized user accounts has and continues to deprive AppFolio of its fundamental property right to exclude others from its platform; force it to subsidize a competitor; push it into conflict with its customers; impose security vulnerabilities; and cost it unquantifiable time and resources to mitigate these irreparable harms. The balance of hardships is in AppFolio's favor because an injunction would only require Beagle to operate legally. And the public has a strong interest in the protection of computer systems against unauthorized access. A preliminary injunction is needed.

## II. FACTUAL BACKGROUND

### A. AppFolio Provides Property Management Software to its Customers

AppFolio has spent nearly 20 years building a Software-as-a-Service (SaaS) platform that helps property managers run their businesses. (Declaration of Sean Saxena ("Saxena Decl.") ¶ 3.) In the last six years alone, AppFolio has invested over $700 million to develop that platform for the benefit of its customers. (*Id.*) As a result of its investments, the platform today offers a wide array of functionality, including accounting, payments, billing, tenant screening, insurance-related services, maintenance management, and more. (*Id.*)

To become an AppFolio customer, a property manager must sign a minimum one-year contract, which includes AppFolio's Terms of Service. (*Id.* ¶ 4.) The customer is then provided with a database on AppFolio's platform and charged a subscription fee. (*Id.* ¶ 5.) That database becomes the system of record for the customer's entire business, containing information on their properties, tenants, vendors, and more. (*Id.* ¶ 6.) The database includes sensitive information, such as the full names, addresses, and Social Security numbers for many tenants who live in properties managed by AppFolio's customers; as well as access to the customer's bank account. (*Id.* ¶ 7.) The customer uses the functionality of the platform, in conjunction with their data, to run their business. (*Id.*)

To help its customers use the platform, AppFolio grants them access to its customer support team and written Help Center. (*Id.* ¶ 8.) The Help Center contains detailed descriptions of and instructions for almost all AppFolio's proprietary services and workflows. (*Id.*) AppFolio reserves these services for its customers, password-protecting both the platform and the Help Center. (*Id.*)

### B. Third Parties Cannot Access the Platform Without Permission

Customers may create user accounts for their employees, but they are not allowed to give third parties access without permission. (Dkt. 33-3 ¶¶ 19, 22-23 & Ex. C.) Section 5.2 of the Terms of Service states: "Third parties are not permitted

to access or use the Services or any application programming interface we may make available to you without [AppFolio's] prior consent." (*Id.* ¶ 19 & Ex. C.) In the event of a violation, Section 5.2 gives AppFolio the right "to disable or delete access to the Services and any application programming interface for any of your authorized users." (*Id.* ¶ 20 & Ex. C.)

The prohibition against third-party access serves multiple purposes, but at its core protects the security of AppFolio's platform, prevents the disclosure of AppFolio's confidential and proprietary information, and ensures third parties cannot use AppFolio's services without paying for them. (Saxena Decl. ¶ 10.)

AppFolio provides its customers with other means—besides direct user access—of sharing their data with third parties. (Dkt. 33-3 ¶¶ 8-13.) This includes AppFolio's Scheduled Report function. In a May 19, 2026 email, Beagle told a customer that "those reports are sufficient to administer the program without full system access." (Declaration of Jeremiah Levine ("Levine Decl.") ¶ 2 and Ex. A.)

### C. Beagle Accesses AppFolio's Platform Without Permission

Beagle is not a customer or partner of AppFolio. It is a third-party that sells competing services. It does not have AppFolio's permission to access the platform, but does so anyway. In Beagle's own words, "AppFolio's platform provides the foundational infrastructure for Beagle's services." Appellants' Opening Brief at 16, *Beagle Labs, Inc. v. AppFolio, Inc.*, No. 26-769 (9th Cir. Apr. 7, 2026).

Beagle obtains access to AppFolio's platform through its customers. In Beagle's own words, the "way Beagle works is that customers add a vendor account for Beagle in their AppFolio" database, which allows Beagle to "access the customer's data and provide its services." (Dkt. 1 ¶ 3.) And as Beagle Partnership Executive Tom Hansen told a new customer the "Next Steps" are to "Create Beagle user in Appfolio." (Dkt. 77-3 ¶ 13 & Ex. A at 6.)

Once Beagle gains unauthorized access, it uses that access to "take action (i.e., write-in) within AppFolio's system." (Dkt. 64-1 at 5.) It will "make changes,

fix problems, confirm accuracy, run processes," "correct records," and "execute workflows." (*Id.*) Beagle's observed behavior includes:

- Asking AppFolio's Customer Service teams to turn off AppFolio's own services, so Beagle can replace them with its own;
- Reviewing tenants' information, including personally identifiable information, to identify which tenants are eligible for its services;
- Creating recurring charges to those tenants, using AppFolio's billing system, which run even after the account is disabled;
- Exporting all possible tenant data (beyond the data Beagle says it needs to run its business), running indefinitely on a recurring basis; and
- Accessing and saving the contents of AppFolio's Help Center, which contains detailed descriptions of AppFolio's products and workflows. (Declaration of Nathaniel Delage ("Delage Decl." ¶ 15).)

### D. <u>Beagle Knows It Does Not Have Permission To Access the Platform</u>

In early December 2025, AppFolio notified Beagle that "all Beagle associated user accounts in AppFolio customer databases will be disabled . . . to uphold the security and integrity of our platform and to ensure compliance with AppFolio's terms of service." (Dkt. 68-1 ¶ 4 & Ex. A.) AppFolio also sought to enjoin Beagle's access, filing a Complaint and Application for a Temporary Restraining Order (the "Application") that same day.[1] (Dkt. 33-2.) The Application expressly stated, "Beagle knows it is not allowed to access AppFolio's platform and that … AppFolio's terms of service forbid third party access." (*Id.* at 12.)

---

[1] The Santa Barbara case focuses on Beagle's false claims of partnership, which "deceived customers into violating the terms of service" by creating unauthorized user accounts. That conduct is different from and occurred before the facts in this case. AppFolio does not seek relief under Cal. Penal Code § 502 or 18 U.S.C. § 1030 and Beagle has no counterclaims. To the extent Beagle argues that the conduct at issue in this Motion is the same as the conduct in the Santa Barbara case, this Court has implicitly rejected that argument by acknowledging a difference between Beagle's old and new conduct. (Dkt. 85 at 2.)

Beagle followed with its own application for a TRO, in which it acknowledged AppFolio "plan[ned] to block Beagle's access;" attached the Terms of Service that prohibit that access; and quoted from AppFolio's notice to customers explaining why the access would be disabled. (Dkt. 4 at 2 and 8-9; dkt 4-3.) Following the denial of that application, AppFolio sent Beagle an additional notice that its access is unlawful and filed these counterclaims. (Dkt. 77-6 ¶ 4 & Ex. G.) Beagle knows it is not permitted to access AppFolio's platform; it is the gravamen of the parties' dispute.

**E. <u>Beagle Nevertheless Continues to Access AppFolio's Platform</u>**

While Beagle knows its access is unauthorized, it claims it has "no choice" but to continue using AppFolio's platform. (Dkt. 4-1 at 12.) It claims its efforts to circumvent AppFolio's security are "justified," and even previewed for the Court that it would be "force[d]" to "play a game of whack-a-mole" in which AppFolio would be forced to "constantly" try to find and disable Beagle's unauthorized user accounts. (Dkt. 36 at 8.) For nine months, Beagle has done just that.

Beagle first attempted to circumvent AppFolio's security while under a court order to preserve the status quo. It "changed fifty-seven of its user accounts in AppFolio's customers' databases to prevent AppFolio from locating those accounts and disabling them." (Dkt. 39 at 4.) Specifically, Beagle changed the email address associated with each account to a generic, facially untraceable address such as support@portfoliopm.cc. (Dkt. 33-8 ¶¶ 13-14.) Beagle admitted it used these generic email addresses to avoid AppFolio's security. (Dkt. 36 at 8.) AppFolio has identified and disabled 353 of these **generic accounts**. (Delage Decl. ¶ 10.)

When AppFolio disabled the first batch of generic accounts in January 2026, Beagle changed tactics and began directing customers to create replacement accounts using email addresses under the customer's own domain name (or one closely resembling it). (Dkt. 77-3 ¶¶ 10, 13.) These **masked accounts** make the

Beagle user appear facially indistinguishable from the customer's own users. (*Id.*) Since February, Beagle has used over 254 masked accounts. (Delage Decl. ¶ 11.)

In addition to disguising the names of the accounts, Beagle began instructing customers to quickly delete accounts before AppFolio could detect them. (Dkt. 77-3 ¶¶ 11, 13.) The account is kept active just long enough for Beagle to use AppFolio's platform to create recurring actions (such as charges to tenants) that continue even after the ghost account is disabled. (*Id.* ¶ 20.) AppFolio cannot know how many of these **ghost accounts** have been created, but has identified at least 33. (Delage Decl. ¶ 12.)

These methods have been confirmed in Beagle's own words. In a May 27, 2026 email, Beagle instructed an AppFolio customer to make a masked, ghost account. (Levine Decl. ¶ 3 & Ex. B.) Per Beagle's direction, the customer was to create a user account for Beagle using the customer's own domain name, and then delete that user account after Beagle had used AppFolio's platform. (*Id.*)

In total, Beagle has used at least 1,145 different user accounts to access AppFolio's platform without permission. (Delage Decl. ¶ 18.) Of those, 174 were created *after* AppFolio filed its counterclaim. (*Id.*) Beagle remains undeterred.

### F. <u>AppFolio Cannot Fully Prevent Beagle's Unauthorized Access</u>

AppFolio's security methods will always be ineffective in stopping Beagle. Beagle needs only brief access to turn off AppFolio's services, set up its own services, and create recurring charges and exports that will run long after the user account has been disabled. (Dkt. 77-3 ¶ 20.) Even when AppFolio identifies a generic, masked, or ghost account, the intervention is often too late. (Id.) Even if AppFolio disables the account on time, Beagle simply tries again with a new account. Were AppFolio to stop these tactics, Beagle would develop new ones.[2] It is as Beagle described: a game of whack-a-mole. Court intervention is needed.

---

[2] Concerningly, Beagle has issued discovery asking AppFolio to "Describe in detail every method, technique, or technical mechanism used by AppFolio to

## G. Beagle's Unauthorized Access Harms AppFolio

### 1. AppFolio is forced to subsidize Beagle's business

AppFolio spent years and hundreds of millions of dollars developing its platform. (Dkt. 77-5 ¶ 4; Saxena Decl. ¶ 3.) Beagle accesses that platform, *for free*, to run its business, allowing Beagle to forgo investing in tools of its own. And its access to AppFolio's Help Center gives it AppFolio's proprietary product descriptions and workflows. Beagle has attributed "hundreds of millions of dollars in enterprise value" to this unauthorized access (Dkt. 36 at 2) and admits the "entire Beagle value proposition" is based upon it. (Dkt. 36 at 6.) That enterprise value appears multiples higher today, given the apparent $4 billion valuation of Beagle's parent company.[3] (Levine Decl. ¶¶ 4-7 & Exs. C-F.) The long-term impact of Beagle's theft is incalculable.

### 2. AppFolio is forced into conflict with its own customers

Beagle's unauthorized access brings AppFolio into conflict with its customers. (Declaration of Micaela Velasquez ("Velasquez Decl.") ¶¶ 3-4, 7-9.) To mitigate the harms from Beagle's unauthorized access, AppFolio must identify and disable Beagle's user accounts. But this is a perilous process. Beagle's efforts to disguise its accounts—especially the masked accounts which look like those of the customer—make it likely AppFolio will misidentify and wrongly disable a valid customer account, harming both the customer and its relationship with AppFolio. (Delage Decl. ¶ 13.) And harm is not limited to misidentified accounts.

When AppFolio accurately identifies an unauthorized Beagle account, it must disable an account its customer deliberately created, which often angers the

---

identify and control Beagle's ability to service customers on AppFolio's platform . . ." (Levine Decl. ¶ 10 & Ex. I.)

[3] The valuation is at least partly attributable to Beagle defendants Beagle and YRIG, which Corgi says "actually operate the insurance business" while "Corgi, as the parent company, is the main fundraiser." 2025 WL 3112484 (Ala.Cir.Ct.)

customer. (Velasquez Decl. ¶¶ 3-7.) Some customers have even lied to AppFolio, claiming known-Beagle accounts are not Beagle accounts, leaving AppFolio in the unenviable position of challenging its customer's integrity. (Delage Decl. ¶ 13; Velasquez Decl. ¶ 10.) Worse still, because Beagle frequently replaces disabled accounts, AppFolio is forced to repeat these confrontations, re-angering the same customers. (Delage Decl. ¶ 14.) This conflict takes a toll on AppFolio's otherwise harmonious relationships with its customers and causes considerable damage to its goodwill. (Velasquez Decl. ¶¶ 3-9.) As one customer recently said, the resulting confrontations are "quickly eroding our confidence in your company." (*Id.* ¶ 8.)

**3. AppFolio is forced to endure unknown security vulnerabilities**

Beagle's unauthorized access also poses significant security risks. Customer databases contain a huge amount of sensitive information and functionality. A bad actor with access could steal tenants' personally identifiable information or take money from the customer's bank account. (Delage Decl. ¶ 8.) Beagle's own CEO confirmed these risks are not theoretical: they are things anyone with access — including Beagle — "could technically do." (Dkt. 33-3 ¶ 31, Ex. D.)

AppFolio normally protects against these risks by employing a 34-person security team, as well as state-of-the-art software and practices. (Delage Decl. ¶ 7.) Those practices include mandatory security reviews of and baseline security requirements for all third-party partners with access to the platform. (*Id.*) Beagle's unauthorized access undermines these efforts. (*Id.* ¶ 8.)

AppFolio has already explained how Beagle's company-wide use of a single password creates opportunity and anonymity for bad actors. (*See* Dkt. 33 at 12; Dkt. 33-8 ¶¶ 21-23.) But that is just one of many risks. AppFolio has no visibility into or control over Beagle's security or information practices, including what access Beagle, in turn, provides to other software or AI companies that support its business. (Delage Decl. ¶ 8.) Beagle's unauthorized access creates a hole in

AppFolio's carefully constructed security layers, with potentially disastrous results for AppFolio, its customers, and their tenants.

**4. AppFolio is forced to spend time and resources to respond**

AppFolio must continually analyze, investigate, and respond to Beagle's unauthorized access. This process involves AppFolio's security, engineering, legal, and customer service teams; and detracts from the duties these teams would otherwise perform. (Delage Decl. ¶ 6.) The cost of responding to the over 1,000 unauthorized user accounts is difficult to calculate, but quickly compounds. For purposes of this motion, AppFolio will focus on the cost from a single employee: AppFolio's Senior Director of Software Engineering, Nathaniel Delage.

In his normal role, Mr. Delage leads a team of over 30 engineers dedicated to two of AppFolio's critical, regulated product lines: insurance and screening. (Delage Decl. ¶ 3.) AppFolio has, however, had to assign Mr. Delage the additional responsibility of responding to Beagle's unauthorized access. (Dkt. 77-3 ¶¶ 1-4; Delage Decl. ¶ 3.) Since December of 2025, Mr. Delage spent over 234 hours identifying and disabling unauthorized accounts—time he would have otherwise spent on his normal responsibilities. (Delage Decl. ¶ 4.) Based on Mr. Delage's base salary alone, this time equates to over $33,000 in expense to AppFolio. (*Id.* ¶ 5.) And Mr. Delage is just one of many employees forced to dedicate their time to mitigating Beagle's harms. (*Id.* ¶ 6.)

## III. LEGAL STANDARD

A preliminary injunction requires a movant to show: (1) likelihood of success on the merits; (2) likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in its favor; and (4) that an injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). Courts apply a sliding scale: a stronger showing on one element may offset a weaker showing on another. *Alliance for the Wild Rockies v.*

*Cottrell*, 632 F.3d 1127, 1131–35 (9th Cir. 2011). Here, each of the four factors independently supports the requested relief.

## IV. ARGUMENT

### A. AppFolio Is Likely to Succeed on the Merits

AppFolio need only show a likelihood of success on a single counterclaim to warrant a preliminary injunction. *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 762 (9th Cir. 2014) (granting preliminary injunction where moving party likely to succeed on only one of multiple causes of action). It is likely to succeed on all three.

#### 1. AppFolio is Likely to Succeed on Its Claim for Tortious Interference with Contractual Relations

Tortious interference with contractual relations requires: (1) a valid contract with a third party; (2) the defendant's knowledge of that contract; (3) intentional acts designed to induce breach; (4) actual breach or disruption; (5) resulting harm; and (6) causation. *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990). Courts routinely grant injunctions prohibiting such tortious interference with contractual relations. *Probo Med., LLC v. Heart Med., LLC*, 2024 WL 3557458, at *6 (S.D. Cal. July 26, 2024) (enjoining defendant from wrongful conduct that resulted in taking plaintiff's clients); *Blizzard Entertainment, Inc. v. Ceiling Fan Software LLC*, 28 F.Supp.3d 1006, 1016 (C.D. Cal. 2013) (permanently enjoining defendant where its "business was built entirely upon the very intentional interference with Blizzard's contracts[.]")

##### a) Beagle knows AppFolio has valid customer contracts

The first two elements are satisfied because Beagle has admitted both the existence and its knowledge of AppFolio's customer contracts. Beagle admitted their existence in its Complaint, where it alleges AppFolio has customer relationships and that AppFolio's Terms of Service govern those relationships. (Dkt. 1 ¶¶ 26–28.) And Beagle admitted its knowledge in its Answer, where it

states the Beagle defendants "were aware AppFolio maintains Terms of Service." (Dkt. 90 ¶ 80.) Beagle attached those Terms of Service to its TRO application, demonstrating its knowledge not just of the Terms of Service, but the specific provisions therein. (Dkt. 4-3.) The first two elements are therefore satisfied.

**b) Beagle knows it causes customers to breach those contracts**

To satisfy the third element, a plaintiff "need not prove that a defendant acted with the primary purpose of disrupting the contract, but must show the defendant's knowledge that the interference was certain or substantially certain to occur as a result of his or her action." *Reeves v. Hanlon*, 33 Cal. 4th 1140, 1148 (2004) (citing *Quelimane Co. v. Stewart Title Guaranty Co.*, 19 Cal. 4th 26, 56 (1998)). The record here plainly suffices.

As demonstrated above, Beagle was aware of AppFolio's Terms of Service and the specific provisions therein. AppFolio also repeatedly identified for Beagle the exact provisions prohibiting third-party access, including Section 5.2. (Dkts. 55-2; 33-1; 55-3 ¶¶ 3-4; 77-6 ¶ 4 & Ex. G; 77, 87.) In the face of this knowledge, Beagle nevertheless admits that customers "create a separate AppFolio user account for Beagle" to access the platform. (Dkt. 4 at 7.) And Beagle's own documents confirm Beagle instructs them to do so. For example, Beagle produced a May 27, 2026 email in which it instructed a customer to "add [a] new AppFolio Accountant user." (Levine Decl. ¶ 3 & Ex. B.) Because Beagle knows customers who follow its instructions will breach the Terms of Service, the third element is satisfied. And because Beagle has used at least 1,145 different user accounts, the fourth element, requiring actual breach, is also satisfied. (Delage Decl. ¶ 18.)

**c) AppFolio is harmed by the breach of those contracts**

The fifth and sixth elements are satisfied because Beagle's access causes AppFolio four distinct kinds of harm. ***First***, AppFolio is harmed by Beagle's violation of AppFolio's "fundamental property right to exclude others from its computer system." *eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058, 1066

(N.D. Cal. 2000). ***Second***, Beagle causes harm to AppFolio's customer relationships and goodwill by forcing AppFolio to disable user accounts in its customers' databases, thereby angering its customers. (See Section II.G.3.) ***Third***, Beagle causes harm to the security of AppFolio's platform by maintaining unregulated access, in violation of AppFolio's standard security protocols. (See Section II.G.2.) ***And fourth***, Beagle causes harm by forcing AppFolio to pull employees from their normal responsibilities to spend time and resources responding to Beagle's unauthorized access. (See Section II.G.4.) AppFolio, therefore, can establish all six elements of its Tortious Interference with Contractual Relations claim.

**2. AppFolio is Likely to Succeed on its Claim Under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030**

A violation of 18 U.S.C. § 1030(a)(2) occurs when a party: (1) intentionally accesses a computer; (2) without authorization or in a manner that exceeds authorized access; (3) thereby obtaining information; (4) from a protected computer; (5) causing a loss to one or more persons of at least $5,000 within any one-year period. 18 U.S.C. § 1030; *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1132 (9th Cir. 2009). AppFolio's counterclaim satisfies each element.

**a) Beagle Intentionally Accessed AppFolio's Platform**

AppFolio's platform qualifies as a "computer" under the CFAA, *see* § 1030(e)(2)(B), and there is no dispute that Beagle accesses AppFolio's platform intentionally.[4] In its Complaint, Beagle admits: "The way Beagle works is that

[4] AppFolio anticipates that Beagle may cite *Amazon.com Servs., LLC v. Perplexity AI, Inc.*, 2026 WL 2237587 (9th Cir. Aug. 4, 2026) for the proposition that it is not a "person" and never "accessed" AppFolio's platform under the CFAA. But the facts of that case are inapposite. In *Amazon*, there was no "person" because Perplexity's AI agent acted at the direction of the authorized user (not Perplexity). *Id.* at *5. And there was no "access" because the AI agent did not use Amazon's website; it merely took screenshots of the authorized user's web browser. *Id.*. This is wholly different than the case at bar where Beagle admits that it (not the

customers add a vendor account for Beagle in their AppFolio" database, which allows Beagle to "access the customer's data and provide its services." (Dkt. 1 ¶ 3.) Beagle has gone to great lengths to preserve its access in the face of AppFolio's security. (*See* Section II.E.) It is intentional. The element is satisfied.

**b) Beagle is Not Authorized to Access AppFolio's Platform**

Beagle cannot dispute it lacks AppFolio's authorization to access the platform: it is the basis of both parties' complaints in this action. AppFolio has expressly notified Beagle on at least six occasions that it is *not authorized* to access the platform. And Beagle admits AppFolio has taken steps to block its access. (Dkt. 64, at 1–2.) There is no dispute. Beagle's access is unauthorized.

**i. Beagle knows its access is unauthorized**

"[T]he CFAA's prohibition on accessing a computer 'without authorization' is violated when a person circumvents a computer's generally applicable rules regarding access permissions, such as username and password requirements, to gain access to a computer." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1201 (9th Cir. 2022). AppFolio's platform follows simple rules for access permission. AppFolio password-protects its platform, providing log-in credentials only to its paying customers. Those customers are, in turn, allowed to provide additional log-in credentials (i.e., user accounts) to third parties only if they have AppFolio's permission. Customers do not have permission to provide user accounts to Beagle.

The law is clear that in these exact circumstances—where a third party obtains access via a customer-provided log-in—a single cease-and-desist letter will suffice to establish that subsequent access is unauthorized. *See Facebook, Inc. v.*

---

customer) runs its business on AppFolio's platform. (*See e.g.,* Dkt. 50 at 5 (Beagle will "make changes, fix problems, confirm accuracy, run processes, [and] actually do the work . . . through the AppFolio platform.") Beagle also admits that it "did not use any automated script, bot, scraper, or other means of automated access." (Levine Decl. ¶ 8 & Ex. G at 26-27.)

*Power Ventures, Inc.*, 844 F.3d 1058, 1068 (9th Cir. 2016). AppFolio has told Beagle at least six times its access is not authorized.

***First Notice:*** On December 9, 2025, AppFolio sent Beagle an email stating: "We are reaching out to inform you that all Beagle-created user accounts in AppFolio customer databases will be disabled on December 16, 2025. This action is necessary to uphold the security and integrity of our platform and to ensure compliance with AppFolio's terms of service." (Dkt. 68-1 & Ex. A.)

***Second Notice:*** On December 9, 2025, AppFolio filed and served a complaint and TRO application against Beagle in Santa Barbara County Superior Court. The TRO application stated that: "Beagle knows it is not allowed to access AppFolio's platform and that . . . AppFolio's terms of service forbid third party access." (Dkt. 33-2 at 12.)

***Third Notice:*** On December 29, 2025, AppFolio filed its opposition to Beagle's motion for a TRO, which stated that "customers are not permitted to give third parties, like Beagle, user accounts that access the database. AppFolio's services are available only to AppFolio's paying customers." (Dkt. 33 at 9.)

***Fourth Notice:*** Since January 2026, AppFolio has disabled over 1,000 confirmed Beagle user accounts. (Delage Decl. ¶ 18.)

***Fifth Notice:*** On March 5, 2026, AppFolio sent a letter to Beagle demanding that it stop its unauthorized access. (Dkt. 77-6 ¶ 4 & Ex. G.)

***Sixth Notice:*** On June 19, 2026, AppFolio filed its complaint in this case, stating "Beagle knows that it is engaging in misconduct by accessing AppFolio's software platform without authorization." (Dkt. 87 at 25.)

Beagle admits it has accessed AppFolio's platform after these notices. (*See, e.g.,* Levine Decl. ¶ 9 & Ex. H at 9 ("Following AppFolio's

unilateral deactivation of BLI's customer-authorized user accounts, BLI continued to service certain of its customers pursuant to those customers' express authorization and direction.").) Under *Power Ventures,* that access is "without authorization."

**ii. Customers cannot grant Beagle authorization**

Despite being repeatedly told its access is unauthorized, Beagle has persisted under the purported loophole that the customers "themselves create a separate AppFolio user account for Beagle." (Dkt. 4 at 7.) The loophole does not exist. If a party knows access is not permitted, "the enlisting of a third party to aid in access will not excuse liability." *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1067 (9th Cir. 2016). As the Ninth Circuit explained:

> **The consent that Power had received from Facebook users was not sufficient to grant continuing authorization to access Facebook's computers after Facebook's express revocation of permission.** An analogy from the physical world may help to illustrate why this is so. Suppose that a person wants to borrow a friend's jewelry that is held in a safe deposit box at a bank. The friend gives permission for the person to access the safe deposit box and lends him a key. Upon receiving the key, though, the person decides to visit the bank while carrying a shotgun. The bank ejects the person from its premises and bans his reentry. The gun-toting jewelry borrower could not then reenter the bank, claiming that access to the safe deposit box gave him authority to stride about the bank's property while armed. In other words, to access the safe deposit box, the person needs permission both from his friend (who controls access to the safe) and from the bank (which controls access to its premises). Similarly, for Power to continue its campaign using Facebook's computers, it needed authorization both from individual Facebook

> users (who controlled their data and personal pages) and from Facebook (which stored this data on its physical servers). **Permission from the users alone was not sufficient to constitute authorization after Facebook issued the cease and desist letter.**

844 F.3d at 1068.

The present case is square with the Ninth Circuit's decision. While some AppFolio customers consent to Beagle accessing their online databases (i.e., their 'safe deposit boxes'), AppFolio (i.e., the 'bank') has affirmatively and repeatedly ejected Beagle from the platform (i.e., the 'premises'). Permission from AppFolio's customers is not sufficient to constitute authorization.

**c) Beagle Obtained Information from AppFolio's Platform**

The CFAA broadly prohibits a party from obtaining "information" from a protected computer. While the statute does not define "information," the data Beagle accessed indisputably qualifies. Beagle admits in its interrogatory responses that its use of AppFolio's platform included "reviewing tenant rosters, unit identifiers, lease and billing information, and insurance-compliance status; verifying insurance coverage; [and] administering tenant liability waiver programs[.]" (Levine Decl. ¶ 9 & Ex. H at 6.) Such data constitutes "information" under any definition. The third element is therefore satisfied.

**d) AppFolio's Platform is a "Protected Computer"**

Under the CFAA, "[t]he term 'protected computer' refers to any computer used in or affecting interstate or foreign commerce or communication—effectively any computer connected to the Internet." *hiQ Labs, Inc.*, 31 F.4th at 1195. AppFolio's platform is connected to the Internet and services customers nationwide. (Delage Decl. ¶ 7.) It is therefore a "protected computer."

**e) Beagle's Unauthorized Access Cost AppFolio Over $5,000**

The CFAA permits a private right of action when a party has suffered a loss of at least $5,000 during any one-year period. The statute defines "loss" to mean

"any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11). In *Power Ventures*, the Ninth Circuit held that Facebook satisfied the loss requirement when its "employees spent many hours, totaling more than $5,000 in costs, analyzing, investigating, and responding to Power's actions." *Power Ventures, Inc.*, 844 F.3d at 1066.

The same is true for AppFolio. While many AppFolio employees have been forced to respond to Beagle's unauthorized access, AppFolio can account for the $5,000 statutory requirement in the cost of a single employee's time. As detailed above in Section II.G.4, Director of Software Engineering, Nathaniel Delage, has spent over 234 hours responding to Beagle's unauthorized access at an expense to AppFolio of over $33,000, nearly seven times the statutory requirement.

### 3. AppFolio is Likely to Succeed on its Claim Under California Penal Code § 502

Beagle's conduct independently violates four subsections of California Penal Code § 502: § 502(c)(2) (knowingly accessing and without permission taking or making use of data); § 502(c)(3) (knowingly and without permission using computer services); § 502(c)(4) (knowingly and without permission adding, altering, damaging, or destroying any data residing internal or external to a computer); and § 502(c)(7) (knowingly and without permission accessing or causing to be accessed any computer system). Section 502(e)(1) provides a civil remedy for the owner of the computer system who "suffers damage or loss by reason of a violation." The section further "allows a plaintiff to obtain injunctive relief." *Power Ventures, Inc.*, 252 F. Supp. 3d at 781.

**a) Beagle's conduct meets Section 502's "knowing" standard**

The "*knowing and without permission*" standard of Section 502 is effectively identical to the "*unauthorized*" standard of the CFAA. *See Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d at 1069 ("despite differences in wording, the analysis under both statutes is similar in the present case"). As demonstrated above, Beagle has been notified at least six times that its access is unauthorized, yet it continues to circumvent AppFolio's security. Thus, Beagle's unauthorized access is "knowing and without permission." *Id.* ("[W]hen Facebook sent the cease and desist letter, Power, as it conceded, knew that it no longer had permission to access Facebook's computers at all. Power, therefore, knowingly accessed and without permission took, copied, and made use of Facebook's data.")

**b) Section 502(c)(2): Taking and Using Data**

In its Answer, Beagle admits that it would "use data from the customer's own database," on AppFolio's platform, to deliver its services. (Dkt. 90 ¶¶ 49, 59.) This is consistent with Beagle's prior admissions that customers "require that Beagle access the data at issue to provide them services." (Dkt. 4 at 16.) Beagle further admitted that it used AppFolio's platform to "review[] tenant rosters, unit identifiers, lease and billing information, and insurance-compliance status; verify[] insurance coverage; [and] administer[] tenant liability waiver programs[.]" (Levine Decl. ¶ 9 & Ex. H at 6.) AppFolio's investigation also shows Beagle has exported thousands of pages of tenant data from AppFolio's platform. (Delage Decl. ¶ 16.)

Beagle may contend the data belongs to the customers, not AppFolio. But it is a distinction without a difference. Section 502(e)(1) provides a private right of action for "the owner…of the…*computer system*… who suffers damage or loss by reason of a violation of *any* of the provisions of subdivision c." (Emphasis added.) Beagle violated subdivision (c)(2) by using data hosted on AppFolio's platform (i.e., "computer system") without AppFolio's permission. Statutorily, it makes no difference who owns the data.

**c) Section 502(c)(3): Use of a Computer System**

Beagle admits that it uses AppFolio's platform to "actually do the work" its customers have "contracted with Beagle to do through the AppFolio platform," including using AppFolio's platform to "make changes, fix problems, confirm accuracy, run processes," "correct records," and "execute workflows." (Dkt. 64 at 5.) AppFolio's own monitoring confirms as much: Beagle has used AppFolio's platform to turn off AppFolio's offerings, review and export tenant data, create charges for its services, and more. (*See* Section II.F.) That use of AppFolio's computer services, without AppFolio's permission, violates Section 502(c)(3).

**d) Section 502(c)(4): Addition, Alteration, or Deletion of Data**

Beagle admits it will "take action (i.e., write-in) within AppFolio's system;" "make changes," "correct records," "organize property-level data," "maintain updated contract records," "add[ ] or edit[ ] charge categories," and "reconcile recurring Beagle-related charges." (Dkt. 64 at 5.) In examining just three user accounts, AppFolio found 633 recurring charges to tenants, totaling over $9,500 a month—all set to run indefinitely. (Dkt. 77-3 ¶ 20.) Each unauthorized addition, alteration, or destruction of data is a violation of § 502(c)(4).

**e) Section 502(c)(7): Unauthorized Access**

In Beagle's own words, the way the company works "is that customers add a vendor account for Beagle in their AppFolio or other building management software. Beagle then can access the customer's data and provide its services to the building." (Dkt. 1 ¶ 3.) As described in detail above, AppFolio expressly forbids this type of third-party access through unauthorized user accounts. Yet Beagle has executed this scheme using more than 1,000 user accounts, approximately 174 of which were created after AppFolio filed its counterclaims. (Delage Decl. ¶ 18.) Beagle continues to violate Section 502(c)(7).

**f) Damage and Loss**

Section 502(e)(1) provides a civil remedy for "damage or loss by reason of a violation." As discussed in Section II.G.4, AppFolio has incurred damages, including the costs of analyzing, investigating, and responding to Beagle's unauthorized access.

## B. AppFolio Will Suffer Irreparable Harm Absent Injunctive Relief

### 1. The Violation of the CFAA and § 502 is Itself Irreparable Harm

"Numerous courts have found that unauthorized access of computers and the acquisition of data in violation of the CFAA constitute irreparable harm." *Power Ventures, Inc.*, 252 F. Supp. 3d at 782. Because the unauthorized access is itself irreparable harm, the only remaining inquiry is whether the defendant is likely to continue that access unless enjoined. *See id*. at 783 ("Defendants' actions suggest that Defendants may continue to access Facebook's servers unless they are strongly deterred. Thus, not only has Facebook suffered irreparable harm, it is very likely that in the absence of a permanent injunction, Facebook will suffer irreparable harm again in the future."). Courts apply the same analysis to Section 502. *See Chegg, Inc. v. Doe*, 2023 WL 7392290, at *8 (N.D. Cal. Nov. 7, 2023).

In determining whether the access is likely to continue, courts look to whether the defendant has (1) disregarded demands to stop; (2) circumvented responsive security measures; or (3) otherwise implied it will continue the access. Each alone is sufficient. Beagle has done all three.

***First,*** courts find access is likely to continue, absent an injunction, when the defendant has ignored prior demands to stop. *See Chegg, Inc. v. Doe*, 2023 WL 7392290, at *8 (N.D. Cal. Nov. 7, 2023) (finding likelihood of irreparable harm where "Defendants' unauthorized access . . . has continued despite Chegg's attempts to halt the access, including by sending a cease-and-desist letter."). Here, Beagle has openly disregarded numerous demands, including AppFolio's December letter, December TRO application, March demand letter, and June

counterclaims. Beagle did not stop in the face of these demands and lawsuits; it will not stop unless enjoined. *See Meta Platforms, Inc. v. Qibaa*, 2025 WL 2496129, at *9 (N.D. Cal. Aug. 1, 2025)[5] ("Defendants' continued access . . . after Meta sent a cease-and-desist letter and revoked their access to Instagram gives rise to irreparable injury.").

***Second,*** courts find the access is likely to continue, absent an injunction, when the defendant has already circumvented security measures aimed at stopping the access. *See WhatsApp Inc. v. NSO Grp. Techs. Ltd.*, 2025 WL 2961368, at *2–6 (N.D. Cal. Oct. 17, 2025) (finding likelihood of irreparable harm based on defendant's "repeated efforts to circumvent plaintiffs' security measures"). Here, Beagle has engaged in a nine-month-long battle with AppFolio's security, during which Beagle has evolved its tactics—employing generic, masked, and ghost accounts—to replace the over 1,000 disabled user accounts AppFolio has disabled. (Delage Decl. ¶¶ 9-12, 18.) Beagle's persistence demonstrates it will not stop unless it is enjoined. *Facebook, Inc. v. Power Ventures, Inc.*, 252 F. Supp. 3d 765, 782–83 (N.D. Cal. 2017), aff'd, 749 F. App'x 557 (9th Cir. 2019) (defendants' attempt to avoid security "indicates that they will not easily be deterred from attempting to access Facebook's servers without authorization in violation of the CFAA and § 502.").

***Third,*** courts find the access is likely to continue, absent an injunction, when the defendant implies through words or action that it will not stop. *See WhatsApp Inc. v. NSO Grp. Techs. Ltd.* 2025 WL 2961368, at *2–6 (N.D. Cal. Oct. 17, 2025) (likelihood of irreparable harm established by implied admissions that conduct would continue); *Chegg, Inc. v. Doe*, 2023 WL 7392290 at *8 ("This unauthorized access is also likely to continue absent court intervention, particularly in light of Defendants' recent cyberattack on Chegg's servers. Therefore, Chegg has

[5] Report and recommendation adopted as modified, 2025 WL 2494241 (N.D. Cal. Aug. 29, 2025).

demonstrated that there is a likelihood of irreparable harm absent preliminary relief."). Here, Beagle directly told the Court it had "no choice" but to continue accessing AppFolio and would "play a game of whack-a-mole" in which AppFolio must "constantly" work to find and disable Beagle's numerous hidden accounts. (Dkt. 36 at 8.) More remarkably, Beagle made these admissions to explain why it "[took] advantage of . . . the transferor court's order to maintain the status quo." If Beagle believed it was "justified" in circumventing both AppFolio's security *and a court order*, there is every likelihood its access will continue unless enjoined.

**2. The Ongoing Violation of AppFolio's Property Rights Creates a Presumption of Irreparable Harm that Beagle Cannot Overcome**

Separate from, but similar to, the analysis under the CFAA and Section 502, courts have recognized an "ongoing violation of [a party's] fundamental property right to exclude others from its computer system" creates a presumption of irreparable harm. *eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058, 1066 (N.D. Cal. 2000); *cf Smith Int'l, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1581 (Fed.Cir.1983) (in patent claims, where a violation of "the right to exclude others" is established "immediate irreparable harm is presumed"). This rule rests on the rationale that, absent injunctive relief, "a trespasser could take a compulsory license to use another's personal property for as long as the trespasser could perpetuate the litigation." *Id*. at 1067.

Beagle admits it continues to access AppFolio's platform. That access violates AppFolio's property right to exclude others. *Id.* at 1066-67. It is therefore Beagle's burden to rebut the presumption of irreparable harm. *Id.* It cannot.

Here, as in *eBay,* Beagle's access creates a host of harms that are "neither easily calculable, nor easily compensable." (*See* Section II.G.) These include lost profits from Beagle's free use of AppFolio's platform; the forced subsidizing of Beagle's business; the imposed security vulnerabilities; the resulting harm to

goodwill; and the costs of responding to Beagle's access. *See id*. ("Harm resulting from lost profits and lost customer goodwill is irreparable").

Further, as recognized in *eBay*, the denial of an injunction would "encourage an increase in the complained activity" by signaling to the hundreds of other point solutions that AppFolio's platform can be accessed at will, unless and until AppFolio obtains a final verdict against them. *Id* ("Facebook's enforcement activities would be compromised if judicial review were expected to precede rather than follow its enforcement actions."). Such an increase would further burden AppFolio's already-strained security and operations, and expand the irreparable harms already caused. Under these circumstances, the presumption of irreparable harm cannot be overcome and the injunction should issue.

**3. Beagle's Unauthorized Access is Causing Incalculable Harm to AppFolio's Goodwill**

The Ninth Circuit has long held that harm to customer relationships is irreparable. *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991); *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001). As explained above, Beagle's unauthorized access forces AppFolio into conflict with its customers. (Section II.G.2.) AppFolio must disable user accounts created by its customers; and must have conversations with those customers about the disabled accounts. (Velasquez Decl. ¶ 3.) Despite AppFolio's best efforts, the disablements and ensuing conversations leave customers angry, frustrated, and confused. (Id. ¶ 4.) As one customer recently put it, the conflict is "quickly eroding our confidence in your company." (Id. ¶ 8.) Beagle is irreparably harming AppFolio's customer relationships. *See Blindlight, LLC v. Cubbison*, 2017 WL 4769460, at *12 (C.D. Cal. July 3, 2017) (customer

confusion and concern sufficient to show irreparable harm to a company's goodwill).[6] An injunction is required.

### C. <u>The Balance of Hardships Tips Sharply in AppFolio's Favor</u>

"Under Ninth Circuit case law, a preliminary injunction may issue where plaintiff demonstrates serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff." *Probo Med., LLC*, 2024 WL 3557458, at *5 (quotations and citation omitted). Here, the comparison is stark.

On AppFolio's side: absent injunctive relief, AppFolio faces continued unauthorized access to its proprietary systems, ongoing alteration of its customer databases, continuing use of its billing infrastructure to benefit a competitor, escalating evasion tactics that require ever-greater engineering resources to detect and remediate, and sustained damage to customer relationships and platform integrity that compounds with each new unauthorized account.

On Beagle's side: the law is clear that "a defendant who builds a business model based upon a clear violation of the property rights of the plaintiff cannot defeat a preliminary injunction by claiming the business will be harmed if the defendant is forced to respect those property rights." *eBay, Inc*, 100 F. Supp. 2d. at 1069 ("harm alleged to result from being forced to cease an ongoing trespass may not be legally cognizable"). Said another way, a preliminary injunction "would not cause any significant hardship to defendant, because it would essentially only require [it] to abide by existing law." *Pyro Spectaculars N., Inc. v. Souza*, 861 F. Supp. 2d 1079, 1092 (E.D. Cal. 2012).

Courts have applied this exact rationale in a directly analogous case involving unauthorized access. *See Power Ventures, Inc.*, 252 F. Supp. 3d at 784 ("although Facebook's proposed injunction restricts Defendants from using

---

[6] To the extent Beagle still claims AppFolio's security poses an "extinction-level event," Dkt. 4 at 2, AppFolio's monetary harms are also irreparable harm. *See Hilao v. Estate of Marcos*, 25 F.3d 1467, 1480 (9th Cir. 1994).

Facebook for commercial purposes without Facebook's prior permission, this restriction is warranted to prevent future violations of the law. Additionally, Defendants' [use of] Facebook for commercial purposes is not legal if, as in the instant case, Facebook has explicitly revoked Defendants' authorization to do so."). Beagle's illegal and unauthorized access tips the balance of hardships sharply in AppFolio's favor, particularly when Beagle tells its customers that AppFolio's Scheduled Report function is "sufficient to administer" Beagle's services "without full system access." (Levine Decl. ¶ 2 and Ex. A.)

### D. The Public Interest Favors an Injunction

"The public has an interest in ensuring that computers are not accessed without authorization." *Power Ventures, Inc.*, 252 F. Supp. 3d at 785. Courts have recognized this interest in the context of CFAA and § 502 preliminary injunctions. *Chegg*, 2023 WL 7392290, at *8.

Beagle may argue that an injunction is contrary to the public interest in competition. That interest does not extend to competition through unauthorized access to password-protected systems. *Stackla, Inc. v. Facebook Inc.*, 2019 WL 4738288, at *6 (N.D. Cal. Sept. 27, 2019) ("Although the public certainly has some interest in avoiding the dissolution of companies and the accompanying loss of employment, Facebook's ability to decisively police the integrity of its platforms is without question a pressing public interest. In particular, the public has a strong interest in the integrity of Facebook's platforms, Facebook's policing of those platforms for abuses, and Facebook's protection of its users' privacy."). Beagle's circumvention of AppFolio's security is precisely the conduct the CFAA and § 502 were enacted to deter. Granting the injunction upholds that purpose.

## V. CONCLUSION

For the foregoing reasons, the Court should grant AppFolio's motion for a preliminary injunction.

Dated: September 21, 2026

Respectfully Submitted,
PROCEL LEVINE LLP

By: */s/ Jeremiah Levine*
Brian Procel
Marty Pritikin
Jeremiah Levine
*Attorneys for Defendant and Counter-Claimant AppFolio, Inc.*