David S. Bloch (SBN 184530)
Blochd@gtlaw.com
Marcelo Barros (SBN 339069)
Marcelo.Barros@gtlaw.com
GREENBERG TRAURIG, LLP
101 Second Street, Suite 2200
San Francisco, California 94105-3668
Telephone: 415.655.1300

Jake Evans (pro hac vice)
Jordana R. Sternberg (pro hac vice)
Terminus 200, 3333 Piedmont Road NE, Suite 2500
Atlanta, Georgia 30305
Telephone: 678.553.2100
Attorneys for Plaintiffs and Counter-Defendants

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

BEAGLE LABS, INC., a Delaware corporation, BEAGLE TECHNOLOGIES, INC., a Delaware corporation, BIG BEAGLE, INC., a Delaware corporation, RENTAL PROPERTY MANAGERS ASSOCIATION LLC, an Alabama limited liability company, and YRIG RISK RETENTION GROUP, INC., an Alabama corporation,

Plaintiffs and Counter-Defendants,

v.

APPFOLIO, INC., a California corporation,

Defendant and Counter-Claimant.

Case No. 2:25-cv-12248-JFW-SSC
Hon. John F. Walter

**PLAINTIFFS AND COUNTER-DEFENDANTS' OPPOSITION TO APPFOLIO, INC.'S MOTION FOR PRELIMINARY INJUNCTION**

Hearing Date: November 2, 2026
Time: 1:30 p.m.
Courtroom: 7A
Trial: September 28, 2027

# TABLE OF CONTENTS

Page(s)


I. INTRODUCTION 1

II. BACKGROUND 2

A. Beagle Serves Property Managers Through Accounts They Create and Control. 2

B. AppFolio Sought This Relief in Santa Barbara and Was Denied—Twice. 2

C. AppFolio Represented Scheduled Reports Were Available to Beagle. 3

D. AppFolio Permits Others To Do What It Calls a Crime. 4

E. AppFolio's Own Recording Shows What Its Customers Stand To Lose. 5

III. LEGAL STANDARD 6

IV. ARGUMENT 6

A. AppFolio Has Not Shown Irreparable Harm. 6

AppFolio waited nine months to file this third injunctive request, all the while failing to point to single customer it lost or to a single adverse cybersecurity incident. 6

1. AppFolio's nine-month delay, after two denials, confirms there is no emergency. 6

2. There is no presumption of irreparable harm. 7

3. AppFolio's only quantified harm is $33,000, which by definition is reparable. 8

4. The "conflict with customers" is of AppFolio's own making. 8

5. The security harm is speculative. 9

B. AppFolio Is Not Likely To Succeed on Its CFAA Claim. 9

1. A contractual restriction is not a CFAA access barrier. 9

2. AppFolio's authorization rule is not generally applicable. 10

3. *Perplexity* confirms that a platform may not enforce its contract terms through the CFAA. 11

4. *Power Ventures* does not help AppFolio. 11

5. AppFolio has not shown $5,000 in qualifying loss. 12

C. AppFolio Is Not Likely To Succeed Under Penal Code Section 502. 12

D. AppFolio Is Not Likely To Succeed on its Tortious Interference Claim. ....... 12
E. The Balance of Equities Tips Sharply Against an Injunction. ....... 13
F. The Public Interest Weighs Against an Injunction. ....... 15

V. THE PROPOSED ORDER IS VAGUE, OVERBROAD, AND WOULD GRANT FINAL RELIEF. 16

VI. CONCLUSION 17

# TABLE OF AUTHORITIES


**Page(s)**

**Federal Cases**

*Amazon.com Servs., LLC v. Perplexity AI, Inc.*, 184 F.4th 1083 (9th Cir. 2026) ....14, 18, 23

*Andrews v. Sirius XM Radio Inc.*, 932 F.3d 1253 (9th Cir. 2019) ....19

*Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668 (9th Cir. 1988) ....15

*Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878 (9th Cir. 2003) ....23

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006)....13

*Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058 (9th Cir. 2016) ....17, 18

*Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989 (9th Cir. 2011) ....13

*Garcia v. Google, Inc.*, 786 F.3d 733 (9th Cir. 2015) (en banc) ....12

*GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199 (9th Cir. 2000) ....12

*Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239 (9th Cir. 2013) ....13, 14

*hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180 (9th Cir. 2022) ....6, 14, 17, 18

*Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211 (9th Cir. 1984) ....12

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873 (9th Cir. 2009) ....12

*Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679 (1978)....23

*Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374 (9th Cir. 1985) ....12

*Schmidt v. Lessard*,
414 U.S. 473 (1974) (per curiam) .......... 21

*Tanner Motor Livery, Ltd. v. Avis, Inc.*,
316 F.2d 804 (9th Cir. 1963) .......... 12, 22

*United States v. Nosal*,
676 F.3d 854 (9th Cir. 2012) (en banc) .......... 17

*Van Buren v. United States*,
593 U.S. 374 (2021) .......... 17, 19, 23

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......... 12, 13, 16

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*,
259 F.3d 1101 (9th Cir. 2001) .......... 16

**State Cases**

*Pac. Gas & Elec. Co. v. Bear Stearns & Co.*,
50 Cal. 3d 1118 (1990) .......... 20

**Federal Statutes**

18 U.S.C. § 1030(e)(11) .......... 19

**Rules**

Fed. R. Civ. P. 26 .......... 16

Fed. R. Civ. P. 37(c)(1) .......... 16

Fed. R. Civ. P. 65(c) .......... 22

Fed. R. Civ. P. 65(d) .......... 21

Fed. R. Civ. P. 65(d)(1) .......... 21

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

This is the third time in ten months that AppFolio has asked a court to stop property managers from giving Beagle access to their own databases. The Santa Barbara Superior Court denied that relief twice in December 2025. Appfolio then waited nine months and now asks this Court for the same relief on an emergency basis—with trial a year away. AppFolio says the Santa Barbara case concerned different conduct (ECF 104 at 4 n.1), but the order it cites made no finding about Beagle's conduct (ECF 85 at 2-3) and paragraph 2(g) of its Santa Barabara applications sought precisely what paragraph 1 of its proposed order seeks here. *Compare* ECF 95-1 and 95-3 *with* ECF 104-16.

There is no emergency. *Irreparable harm* is where this motion fails first. AppFolio admits that it has not identified a single customer contract terminated because of Beagle, and that no customer has filed a complaint, lawsuit, or claim alleging that Beagle's servicing caused it harm. Barros Dec. Ex. 1[1] at 47-48 (AppFolio Resp. to RFAs 93–94). It admits that it has no document showing that Beagle accessed any account without the customer's permission, circumvented a password, or stole customer data; that no customer has reported a data breach caused by Beagle; and that it has never reported any data-security incident caused by Beagle to any regulator. *Id.*, Ex. 1 at 44 (RFA 87) *and* Ex. 2 (SBA RFAs 10, 12, 14, 16). And its only quantified injury is $33,000 of an engineer's salary.

The motion also fails on the merits, because AppFolio does not have a rule against third-party user accounts. It has a rule against *Beagle*. AppFolio admits that customers own their data, may contract with Beagle, and may create user accounts, and that other vendors work through customer-created accounts without consequence. Barros Dec. Ex. 1 (RFA 1-3, 61, 68-71) *and* Ex. 2 (SBA RFA 5, 18). AppFolio's Vice President of Product Development swears that the rule protects security and ensures that third parties "cannot use AppFolio's services without paying for them." ECF 104-2 ¶ 10. But on a recorded call,

[1] All Exhibits are attached to the declaration of Marcelo Barros unless otherwise noted.

he told a customer that AppFolio is "not taking action against Foxen or others" that "technically violate terms of services also." Barros Dec. Ex.7 (AppFolio0003986). A rule enforced that way is not a "generally applicable rule[] regarding access permissions." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1201 (9th Cir. 2022).

The motion should be denied.

## II. BACKGROUND

### A. Beagle Serves Property Managers Through Accounts They Create and Control.

Beagle administers insurance-compliance and resident-services programs for property managers. Those programs include renters' insurance verification, tenant liability waivers, deposit alternatives, and move-in utility setup. Beagle serves approximately 3,000 property management companies managing approximately 500,000 units in all fifty states. D'Angelo Dec. ¶¶ 2-3. To do so, the property manager creates a user account for Beagle in its own AppFolio (or other) database. It selects the role and the permissions. It can revoke the account at any time. *Id.* ¶ 7. AppFolio admits that the customers, not AppFolio, own the data in their AppFolio accounts. Barros Dec. Ex. 1 (RFAs 1, 3, 83) *and* Ex. 6 (Terms § 1.4); *accord*, ECF 104-1 ¶ 9 (AppFolio declarant admitting Beagle reaches the AppFolio platform "via user accounts supplied by customers").

A customer AppFolio recorded described how that works in practice. Its staff set Beagle up in the Accountant role, with permissions "specifically tied in for the renter's insurance people," and adjusted those permissions themselves during the call. The customer explained that Beagle "monitor[s] our compliance" and "add[s] charges for new residents." Barros Dec. Ex. 7 (AppFolio0003986 at 12).

### B. AppFolio Sought This Relief in Santa Barbara and Was Denied—Twice.

Beagle has been serving shared customers in part through customer-created AppFolio accounts since 2023. D'Angelo Dec. ¶ 6. AppFolio was fully aware of these arrangements and raised no objections for two years. Barros Dec. Ex. 1 (RFAs 48-49). Then, on December 9, 2025, AppFolio emailed Beagle's customers to claim that Beagle's

"method" "places you at risk." That same day, it sued Beagle in Santa Barbara Superior Court and applied ex parte for an order barring Beagle from "inducing AppFolio customers . . . to give Beagle . . . access to their log-in credentials." ECF 95-1. The superior court rejected AppFolio's *ex parte* application on December 10. ECF 95-2. Undeterred, AppFolio filed again on December 15, ECF 95-3, citing additional evidence, but after briefing and argument, the superior court rejected AppFolio's TRO motion a second time on December 17. ECF 95-4. The Santa Barbara case has been ongoing since that time. AppFolio has not renewed its demand for emergency relief. It did, however, cut off Beagle's prior avenues for access to customer AppFolio databases on January 9, 2026.

**C. AppFolio Represented Scheduled Reports Were Available to Beagle.**

In response to AppFolio's efforts to block Beagle from serving shared customers (efforts that facially violate antitrust and unfair competition laws), Beagle sought declaratory relief in federal court. ECF 1. In January 2026, the Court denied Beagle's TRO motion because the data Beagle needed to service shared customer accounts was available through AppFolio's Scheduled Reports and the Database API. ECF 39 at 5-6. Scheduled Reports are generated by AppFolio and sent to the recipients a customer selects; Beagle does not log in to receive them. D'Angelo Dec. ¶ 10. But Scheduled Reports are read-only. They cannot record an enrollment, add or remove a program fee, or correct a ledger entry. Those steps—which Beagle performs for its customers at their express request and direction—require a user account in the customer's database, and Beagle performs those through the account *the customer creates*. *Id.* ¶ 11. Beagle has no access to a customer's database unless the customer creates an account for it; the customer's employee selects the account's role and permissions; and the customer can change, disable, or delete it at any time. *Id.* ¶ 7. The charges Beagle enters sit on the customer's own resident ledgers, where the customer can review or reverse them. *Id.* ¶ 8. AppFolio admits that Scheduled Reports provide no write-back and that its Database API does not match user access in functionality or write capability. Ex. 1 (RFA 101-102).

AppFolio claims that Beagle is instead creating "masked, ghost account[s]" on its own behalf. ECF 104 at 6. AppFolio is mistaken. The cited document (ECF 104-7) is in fact an unsent draft generated by an AI notetaker and addressed to Beagle's own employee. Its stated purpose is "so we can get the scheduled reports configured"—the very "reports" AppFolio says Beagle should use.

**D. AppFolio Permits Others To Do What It Calls a Crime.**

AppFolio claims that its Terms of Use prohibit third-party access to customer data. That is not quite true. Section 5.2 does not bar third-party user accounts. It bars them "without [AppFolio's] prior consent." Barros Dec. Ex. 6 at AppFolio0000090. How AppFolio grants that consent is the heart of this dispute.

AppFolio permits vendors other than Beagle to work through customer-created accounts, and does not treat their access as unauthorized, as a breach, or as a crime. Barros Dec. Ex. 1, RFA 69-71. Likewise, Beagle competitor Second Nature reaches AppFolio customer databases through customer-created accounts and yet AppFolio has taken no enforcement action against it. Barros Dec., Ex. 1 (RFA 68); Ex. 2 (SB RFA 5-6, 8). This Court observed that Second Nature "appears" to operate "with AppFolio's permission" after "a vetting process." ECF 39 at 3-4. AppFolio inexplicably refuses Beagle the same access.

Nor is this a secret. AppFolio's product leader told a shared customer that others do precisely what Beagle does: Beagle is "not supposed to be there anyways, but generally that's not something we lean on. We know other people are there." Barros Dec. Ex. 7. (excerpted of transcript of AppFolio0003986 at 2). Asked whether AppFolio was also removing vendors such as Foxen, he answered: "no, we are not taking action against Foxen or others," "nor do we intend to," though they "technically violate terms of services also." *Id* at 3. It appears that AppFolio's real objection is economic: Section 5.2 exists in part so that "third parties cannot use AppFolio's services without paying for them." ECF 104-2 ¶ 10. Economic harms do not require injunctive relief. *hiQ*, 31 F.4th at 1188.

AppFolio asserts a bad actor with Beagle's access "*could* theoretically" steal data or money. ECF 104-1 ¶ 8. He does not say it happened. AppFolio admits it has no evidence suggesting any theft of customer data or money by Beagle. Ex. 2 (SB RFA 14-16; RFA 87, 93-94). As an "theoretical" risk does not justify the extraordinary remedy of pretrial injunctive relief. *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("Speculative injury does not constitute irreparable injury").

**E. AppFolio's Own Recording Shows What Its Customers Stand To Lose.**

Every Beagle charge shown in AppFolio's production reflects fees for programs the customer engaged Beagle to administer. They are recorded on the customer's own resident ledgers, where the customer can review or reverse them, and are collected by the property manager. D'Angelo Dec. ¶¶ 4-5, 8. And residents *do* choose them, because Beagle offers a superior service: "It's up to the resident. ... [T]hey have to opt in." Barros Dec. Ex. 7 (AppFolio0003986 at 5). AppFolio's recording last December is telling. Once informed of the impending blocking efforts, the customer explained that: "We haven't had the negative experience that you're experiencing.," and that without Beagle, the new move-ins would be "devastating," putting the customer in breach of the contract with their own clients and put the residents' insurance coverage at risk. *Id.* at 4. The customer confirmed that "Beagle doesn't sweep any money," that Beagle's account was "on lockdown" and "can't approve payables," and, having reviewed its permissions, "I don't really think we have exposure, candidly." *Id*. at 5. AppFolio's product leader conceded he had not seen Beagle move money in that account.

## III. LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008). AppFolio must establish that "[it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Id*. at 20. AppFolio's burden is heavier than that, because the order it seeks would alter the status quo and compel Beagle to stop performing contracts with hundreds of property managers. Such mandatory injunctions are "particularly disfavored," and courts do not grant them "unless extreme or very serious damage will result." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (quotations omitted). The showing is "doubly demanding," as AppFolio "must establish that the law and facts *clearly favor* [its] position, not simply that [it] is likely to succeed." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc).

## IV. ARGUMENT

### A. AppFolio Has Not Shown Irreparable Harm.

AppFolio waited nine months to file this third injunctive request, all the while failing to point to single customer it lost or to a single adverse cybersecurity incident.

#### 1. AppFolio's nine-month delay, after two denials, confirms there is no emergency.

"By sleeping on its rights a plaintiff demonstrates the lack of need for speedy action." *Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984)

(quotation omitted). Delay "implies a lack of urgency and irreparable harm." *Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985).

AppFolio knew well before December 2025 that customers were creating Beagle accounts. Barros Dec. Ex. 1, RFA 48. It twice sought the very relief it seeks here from the Santa Barbara Superior Court in December 2025—and lost both times. AppFolio claims that it did not discover Beagle's "alleged new methods" until February 2026 and only got "documentary confirmation" in March. ECF 85 at 2-3. That is *still* six months before it filed this motion—a delay comparable to the one that undercut the irreparable-harm showing in *Garcia*—and it is telling that AppFolio did not return to the Santa Barbara Superior Court for this relief. Rather, AppFolio moved here for leave to add counterclaims on May 8 (ECF 77), filed them on June 19 (ECF 87), and then waited *three more months*. By the time this motion is fully briefed trial will be only 10 months away.

AppFolio asserts that the "emergency" here is triggered by *its customers'* (not Beagle's) violations of Terms of Service Section 5.2. ECF 104. But that same language has appeared in every version of the Terms AppFolio has produced, back to at least April 2024. Barros Dec. ¶ 10 Ex. 6 (AppFolio0000001, 0000157, 0000312); *see id*. Ex 3 (YRIG Interrog. 2, claiming no changes since January 1, 2024). In fact, the one change AppFolio made to Section 5.2 cuts against any risk of harm to AppFolio: as of August 5, 2025, Section 5.2 provides that "[e]ven if we provide prior consent for a third party to access or use the Services, we disclaim all liability ... and you assume all risk." *Compare* Ex. 6 at AppFolio0000053 *with* Ex. 6 at AppFolio0000090; *see* AppFolio0000067. In other words, AppFolio has expressly disclaimed all risk and liability for third-party access to customer data stored by AppFolio. It thus faces *no* risk of harm when Beagle accesses customer data with customer permission.

**2. There is no presumption of irreparable harm.**

AppFolio argues that a CFAA or Section 502 violation "is itself irreparable harm," and that its "property right to exclude" creates a presumption Beagle "cannot overcome." ECF 104 at 20, 22. AppFolio mis-states the law. The Supreme Court rejected categorical

presumptions of that kind in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391-94 (2006), and *Winter* requires a movant to show irreparable harm, not assume it. 555 U.S. at 22. The Ninth Circuit applies that rule across statutory regimes. *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 998 (9th Cir. 2011) ("today we proclaim that the '*King*' is dead, referring to *Elvis Presley* the case—to the extent it supported the use of a presumption of irreparable harm in issuing injunctive relief."); *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1249-51 (9th Cir. 2013) ("likely irreparable harm must be demonstrated to obtain a preliminary injunction in a copyright infringement case and that actual irreparable harm must be demonstrated to obtain a permanent injunction . . ."). The two cases AppFolio cites date to 1983 and 2000, *see* ECF 104 at 22, and hence well predate the current rule regarding irreparable harm.

**3. AppFolio's only quantified harm is $33,000, which by definition is reparable.**

AppFolio prices its injury to the dollar: 234 hours of Mr. Delage's time at his base salary. ECF 104-1 ¶¶ 4-5. "[M]onetary injury is not normally considered irreparable." *hiQ*, 31 F.4th at 1188. A harm a party can compute in a declaration is a harm a jury can award. The $1.2 million per month Mr. Delage cites—which is an assumption he makes—is not even AppFolio's money at all. It reflects legitimate charges by Beagle to its customers. *Id.* ¶ 17. And AppFolio repeatedly emphasizes Beagle's solvency, *see* ECFs 104-9 to -12, removing any doubt that such a judgment could be paid if awarded.

**4. The "conflict with customers" is of AppFolio's own making.**

AppFolio devotes pages to the proposition that disabling customer-authorized Beagle accounts angers its customers. ECF 104 at 7-8, 23. That is a problem entirely of AppFolio's making: it has interposed itself between its customers and the services they wish to obtain from Beagle. The quotation AppFolio offers—that the situation is "quickly eroding our confidence in your company"—shows a customer criticizing *AppFolio*, not Beagle. ECF 104-3. In the transcript, AppFolio tells a customer who wanted to send tenant newsletters via Beagle that the locked email address "will not be unlocked" despite the

customer's request and offers an inadequate AppFolio substitute solution; the clearly dissatisfied customer responds, "[w]ell, that doesn't work for us, so we'll ... figure it out." ECF 104-4. **AppFolio is damaging its own customer relationships by interfering with their desire to also work with Beagle**. The "friction" that AppFolio creates by overriding its customers' choices is not harm Beagle inflicts. The effects of AppFolio's campaign may well be significant, but it has never analyzed whether its activities are impacting customer retention or satisfaction Barros Dec. Ex. 3 (YRIG Interrog. 7). A goodwill claim resting on *one complaint email* and a declarant's characterization based on her "experience assisting customers with suspected Beagle user accounts" is "eroding" confidence is "grounded in platitudes rather than evidence." *Herb Reed*, 736 F.3d at 1250.

**5. The security harm is speculative.**

"Speculative injury does not constitute irreparable injury." *Caribbean Marine Servs. Co*, 844 F.2d at 674. AppFolio's security showing is expressly "theoretical[]." ECF 104-2 ¶ 8 ("A bad actor with the same user-level access Beagle has could theoretically steal tenants' personally identifiable information or take money from the customer's bank account"). AppFolio's motion identifies no incident, no breach, and no document showing that Beagle ever acted without a customer's permission. Ex. 2 (SB RFA 12-16). The customer AppFolio recorded, having reviewed Beagle's permissions, saw no "exposure." Barros Dec. Ex. 7. (AppFolio0003986 at 13). Beagle, for its part, requests only limited roles. Its employees use individual logins to Beagle's systems, and it shares AppFolio credentials with no third party. It maintains multifactor authentication, credential rotation, and access controls. To its knowledge, it has never experienced a security incident involving any AppFolio customer's data. D'Angelo Dec. ¶¶ 14-16; ECF 36-2 ¶ 7.

**B. AppFolio Is Not Likely To Succeed on Its CFAA Claim.**

**1. A contractual restriction is not a CFAA access barrier.**

The CFAA "was enacted to prevent intentional intrusion onto someone else's computer—specifically, computer hacking." *hiQ*, 31 F.4th at 1195-96. Liability turns on a "gates-up-or-down inquiry": whether a person crossed a technological gate closed to him,

not whether he used information in a way a contract forbids. *Van Buren v. United States*, 593 U.S. 374, 390, 396-97 (2021). A broader reading "would attach criminal penalties to a breathtaking amount of commonplace computer activity." *Id.* at 393; *accord United States v. Nosal*, 676 F.3d 854, 862-63 (9th Cir. 2012) (en banc). Even the case AppFolio relies on, *Power Ventures*, holds that "a violation of the terms of use of a website, without more, cannot establish liability under the CFAA." *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1067 (9th Cir. 2016). AppFolio admits to not having any evidence that Beagle accessed any account without customer permission (Barros Dec. Ex. 1, RFA 12) and that no customers have complained that Beagle has access the account without permission. (Barros Dec. Ex. 1, RFAs 12-13).

And there is no technical barrier (a "gate") being circumvented. AppFolio users remain freely able to create new accounts; AppFolio subsequently *locking* those accounts is post-hoc and thus clearly not a gatekeeping mechanism. Barros Dec. Ex. 5 (Beagle Labs Interrog. 8; Ex. 1 RFA 54). And AppFolio refuses to describe any technical mechanism it uses against Beagle for fear (despite the protective order) that Beagle "could" and "likely would" use the answer to evade it. Barros Dec. Ex. 5, Beagle Labs Interrog. 7. AppFolio cannot assert circumvention and then refuse to disclose what barrier was circumvented.

Those facts will eventually require summary judgment in Beagle's favor; for now, they more than suffice to defeat any likelihood of success on the merits.

**2. AppFolio's authorization rule is not generally applicable.**

AppFolio relies on *hiQ*'s statement that the CFAA reaches one who "circumvents a computer's generally applicable rules regarding access permissions, *such as username and password requirements*." *hiQ*, 31 F.4th at 1201 (emphasis added); see ECF 104 at 13. That formulation defeats its claim. **First**, AppFolio already admitted that it has no evidence Beagle circumvented passwords. Barros Dec. Ex. 2, SB RFA 10. **Second**, AppFolio admits it permits paid subscribers (i.e. customers) to grant account access to *some* third parties through user accounts. Barros Dec. Ex. 1, RFA 10. The fact that AppFolio reserves the right to pick and choose amongst these third party accounts does not, standing alone, create

CFAA liability. A permission regime administered this way is a matter of commercial judgment, not federal criminal statutes. And whether AppFolio's discrimination against Beagle is lawful is the subject of Beagle's claims against AppFolio.

**3. *Perplexity* confirms that a platform may not enforce its contract terms through the CFAA.**

Several weeks before this motion, the Ninth Circuit vacated a preliminary injunction premised on the theory AppFolio advances here: that a third party acted "with the Amazon user's permission but without authorization by Amazon." *Perplexity*, 184 F.4th at 1089. The court reiterated that the CFAA must not be transformed "from an anti-hacking statute into an expansive misappropriation statute." *Perplexity*, 184 F.4th at 1089. It held that the rule of lenity governs civil CFAA claims, and that liability requiring "a novel interpretation far afield from the statute's purpose" should be rejected. *Id.* at 1092. It declined a reading that "could expose users themselves to criminal liability (under a conspiracy or aiding-and-abetting theory)." *Id*. And it explained that a platform remains free to regulate access "via private terms of service," but not "by invoking the CFAA." *Id.* at 1094 n.5.

AppFolio's theory has every one of those defects. It would make each property manager who created an account for Beagle a participant in a federal crime. And it would convert a consent term in a commercial contract into a criminal prohibition.

**4. *Power Ventures* does not help AppFolio.**

*Power Ventures* is AppFolio's principal authority. It is distinguishable on the point that matters: the Facebook users there handed Power *their own* log-in credentials. Here, the customer uses a feature AppFolio built for this purpose: a created separate user, with a role the customer selects, with its own permissions, and that the customer can revoke at any time. Barros Dec. Ex. 1 (RFA 3, 10); ECF 104-1 ¶ 9. *Power Ventures* also involved an automated campaign that sent bulk messages through Facebook's servers and circumvented Facebook's IP blocks. 844 F.3d at 1063, 1067-68. Beagle ran no campaign and circumvented no IP block; its personnel perform setup manually, with no script, bot, or scraper. D'Angelo Dec. ¶ 12.

**5. AppFolio has not shown $5,000 in qualifying loss.**

The CFAA embodies "a narrow conception of 'loss.'" *Andrews v. Sirius XM Radio Inc.*, 932 F.3d 1253, 1262-63 (9th Cir. 2019). It reaches the costs of responding to an offense, assessing damage, and restoring data or systems, and revenue lost "because of interruption of service." 18 U.S.C. § 1030(e)(11). The statute addresses "technological harms." *Van Buren*, 593 U.S. at 391-92. But AppFolio assessed no damage, because none is alleged; restored nothing, because nothing was impaired; and no service was interrupted. AppFolio's Mr. Delage searched for accounts. Treating that as "loss" would let any platform manufacture a $5,000 threshold at will, and worse yet, would transform a contractual decision into a CFAA claim.

**C. AppFolio Is Not Likely To Succeed Under Penal Code Section 502.**

AppFolio concedes that its Cal. Penal Code § 502 theory tracks its CFAA theory. ECF 104 at 18. It fails for the same reasons, and two additional ones. **First**, Beagle was not acting "without permission" because every subdivision of § 502 AppFolio invokes concerns data the customer owns and authorized Beagle to use. The charges AppFolio cites are entries the customer engaged Beagle to create, in the customer's own ledger, paid "to the property manager," not AppFolio. ECF 104-1 ¶ 17; D'Angelo Dec. ¶ 4-5, 8. **Second**, Section 502(e)(1) affords a civil remedy only to one "who suffers damage or loss by reason of a violation." AppFolio's platform was not impaired, its data was not damaged, and its service was not interrupted—and AppFolio does not claim otherwise.

**D. AppFolio Is Not Likely To Succeed on its Tortious Interference Claim.**

Tortious interference requires an "actual breach or disruption of the contractual relationship" and "resulting damage." *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990).[2] AppFolio identifies no particular customer that breached any

[2] The elements of intentional interference with contractual relations are (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship;

specific contract; nor can it identify any lost contracts. Barros Dec. Ex. 1 (RFA 93). Besides, as noted, Section 5.2 permits customers to allow third-party access to their data (which they own), and AppFolio grants that consent routinely—by practice, by acquiescence, and other means. Beagle acts at the direction of the customers that own the data and administer the accounts. D'Angelo Dec. ¶¶ 4, 7. At no point is it inducing these customers to breach their AppFolio contracts merely by deciding who can access *their own data*.

**E. The Balance of Equities Tips Sharply Against an Injunction.**

On AppFolio's side are $33,000 in reallocated salary and risks that have not materialized in ten months. On Beagle's side is its business. A large portion of Beagle's revenue comes from customers who use AppFolio. D'Angelo Dec. ¶ 3. The setup-only access that remains is what lets Beagle place the program charges its customers direct. *Id.* ¶¶ 4, 11, 17. And the order would force Beagle to breach contracts with hundreds of property managers before any court decides whether AppFolio's exclusion is lawful. AppFolio answers that an injunction "would only require Beagle to operate legally." ECF 104 at 1. That assumes the answer to the central question in the case.

AppFolio's own admissions supply the motive. It considers Beagle a "direct competitor." It admits Smart Ensure competes with Beagle, and that it weighed that competition when it evaluated Beagle's partnership request. It earns revenue from FolioGuard, Smart Ensure, and Second Nature. And it has declared that Beagle "does not and will not integrate with AppFolio," "not now, and not ever." Barros Dec. Ex. 1 (RFAs 5, 13, 34-35, 58).

The sequence matters. Beagle sought a partnership in late 2024. AppFolio's only answer was that "[g]iven our current priorities, it does not make sense for us to continue this conversation right now." ECF 4-4; Barros Dec. Ex. 1 (RFA 50-51). It said nothing about the competitive considerations it now admits drove the decision. Barros Dec. Ex 1

---

and (5) resulting damage. *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990).

(RFA 58). Beagle's later request to join the Stack Marketplace "was never considered." Barros Dec. Ex. 1 (RFA 52). AppFolio's customer-service statement that Beagle is "a direct competitor of our FolioGuard insurance product line" traces back to an internal message of September 2, 2025, saying "there would not be any integration" — months before AppFolio raised security at all. Barros Dec. Ex. 1 (RFA 14); Ex 3 (YRIG Interrog. 5). AppFolio's stated justification for refusing Beagle is that "customers have multiple options for the type of service Beagle offers." Barros Dec. Ex. 4 (RPMA Interrog. 7). If Beagle is enjoined, its customers will not stop needing these services. They presumably will be routed to FolioGuard, Smart Ensure, and Second Nature for an inferior substitute that they have already rejected in the marketplace.

On the December 9, 2025 recorded call—the same day AppFolio launched its deplatforming campaign, ten months ago—AppFolio pitched its own "insurance enforcement tool," which it had "brought ... up before," "this isn't a sales call by any means, ... but ... we can explore a solution through AppFolio." Barros Dec. Ex. 7 (AppFolio0003986 at 4). On the follow-up call, AppFolio's self-described "licensed insurance agent" told the same customer that AppFolio has "similar products that ... do similar things." Barros Dec. Ex. 8(AppFolio0003987 at 3). And it admitted that the decision to deplatform Beagle was "made above all the people on this call and because of this larger event," which had "a legal component" and reflected "much bigger things at play between the two companies." Barros Dec. Ex. 8 (AppFolio0003987 at 7).

The record shows who is interfering with whom. AppFolio admits it told Beagle's customers that Beagle's "method" "places you at risk" and that Beagle could "issue payments through the AppFolio payments platform" "for the purpose of inducing or encouraging" customers to stop giving Beagle access. Barros Dec. Ex. 1, RFA 21. None of those statements are true.

AppFolio even programmed its customer-facing chatbot to offer customers who mention Beagle the prompt "am I being scammed." Barros Dec. Ex. 3 (YRIG Interrog. 10). AppFolio admits it reviewed or approved each of the chatbot's Beagle responses before

any customer saw them. Barros Dec. Ex. 1 (RFA 79). And it knows that customers dropped Beagle after those communications. Barros Dec. Ex. 1 (RFA 57). AppFolio wrote the message itself ("Am I being scammed by Beagle?"), and the answer it scripted did not say no. It said only that AppFolio has no affiliation with Beagle and urged customers to "carefully evaluate the companies you choose to work with." On the call it recorded, AppFolio asked the customer to keep the conversation "private," calling it "a very unique strategy we are taking with your company." Barros Dec. Ex. 7 (AppFolio0003986 at 15). It planned that campaign with counsel: the "today notice to everybody using Beagle" was the work of "all of the lawyers and all of the people," who "plan[ned] this out for a very specific purpose." *Id.*

The injury to Beagle is already under way. More than 200 property managers on AppFolio's platform have cancelled their rollouts, left, or stopped expanding with Beagle. Customers have written to Beagle calling it "scumbags" and a "scam." D'Angelo Dec. ¶ 19. Customers report that AppFolio representatives encouraged them to use FolioGuard or Second Nature instead. *Id.* ¶ 20. An injunction would deepen those losses in ways that cannot be calculated in advance. *Id.* ¶ 21. Should the Court grant any relief, Rule 65(c) requires security for the costs and damages Beagle would sustain if wrongfully enjoined. On this record, that figure would be substantial. *Id.* ¶¶ 3, 21. *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 883 (9th Cir. 2003).

**F. The Public Interest Weighs Against an Injunction.**

AppFolio frames the public interest as computer security. This record contains no security event and AppFolio admits as much in discovery responses. The order would create no additional security.

The interests actually at stake run the other way. Property managers and residents rely on these programs, and the order would disrupt insurance verification, liability waivers, and move-in services across tens of thousands of units, leaving new residents, in one customer's words, without "any coverages." The public also has a strong interest in competition, *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 695 (1978), and

in keeping a criminal anti-hacking statute out of ordinary commercial disputes, *Van Buren*, 593 U.S. at 393-94. An injunction against conduct that likely does not violate the CFAA "would impair consumer choice." *Perplexity*, 184 F.4th at 1094.

## V. THE PROPOSED ORDER IS VAGUE, OVERBROAD, AND WOULD GRANT FINAL RELIEF.

Rule 65(d) requires an injunction to "state its terms specifically" and to "describe in reasonable detail ... the act or acts restrained." Fed. R. Civ. P. 65(d)(1); *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (per curiam). Here, the proposed order extends well beyond that limited scope. Paragraph 1 would bar Beagle from "causing any third party to access" AppFolio's platform. If a property manager reads Beagle's public materials and then creates an account on its own, has Beagle "caused" that access? Paragraph 1 also is circular: it reaches only access "without AppFolio's authorization," which is the very question this case exists to decide. Paragraph 2 would bar "[a]ltering, disabling, or otherwise modifying any data, settings, or features within AppFolio's platform." That describes the ordinary work of every user in every AppFolio database, including work done by the customer or at the customer's express instruction.

The carve-out does not save either paragraph, because the two alternatives it names cannot do the job. AppFolio admits that Scheduled Reports provide no write-back, and that its Database API does not match user access in "functionality, data fields, latency, write capability, or pricing." Barros Dec. Ex. 1, RFA 101-102. Scheduled Reports are read-only and arrive on a schedule rather than in real time. They cannot record an enrollment, add or remove a program fee, or correct a ledger entry. D'Angelo Dec. ¶ 11. When AppFolio locks a customer's Beagle account, that work falls to the property manager's own staff, which has delayed enrollments and resident notifications and added manual reconciliation. *Id.* ¶ 13. The proposed order would make that the rule for every AppFolio customer, including one that has engaged Beagle and wants Beagle to do the work. *Id.* ¶ 17.

The customer AppFolio recorded explains why. Beagle uses "reports to monitor compliance" but needs its "login to add charges," because it must see "the lease and reports

and ... attachments," and "I don't see how that could be sent in a report." Barros Dec. Ex. 7 (AppFolio0003986 at 7). Asked on that call how Beagle could add charges without user access, AppFolio's product leader answered: "I don't know exactly." *Id.*

The API carve-out fails for a simpler reason. When this Court denied Beagle's TRO, it treated the Database API as a "workable solution," noting that AppFolio had "made no such statement" barring Beagle from it. ECF 39 at 6. AppFolio now admits it has said exactly that: "direct competitors such as Beagle are not permitted to access any portion of our services or application programming interface," and Beagle's marketplace request "was never considered." Barros Dec. Ex. 1 (RFA 15, 52); *see also* Ex. 3 (YRIG Interrog. 17 (Database API available only to customers on "a higher tier subscription"). A solution the movant controls, prices, and describes one way to customers and another to this Court is no solution at all.

Granting AppFolio's request would run counter to the "well settled ... usual function of a preliminary injunction [which] is to preserve the status quo ante litem pending a determination of the action on the merits," and that it is "not usually proper to grant the moving party the full relief to which he might be entitled if successful at the conclusion of a trial." *Tanner Motor*, 316 F.2d at 808. It would also hand AppFolio, a year before trial and on a thin paper record, the complete relief its counterclaims seek.

## VI. CONCLUSION

AppFolio sought this relief from a different court in December 2025 and was refused twice. It abandoned the request for nine months only to forum-shop the request here instead. But there is no emergency here. By its own admissions, it cannot show: a security incident, a breach, a customer who says Beagle acted without permission, a lost customer due to Beagle's conduct or any measured effect on customer retention, a trampling of a technical barrier, or any violation of the law. AppFolio's rule applies to one company: a "competitor" AppFolio has vowed will never integrate with its platform, "not now, and not ever."

The motion should be denied.

DATED: October 9, 2026

GREENBERG TRAURIG, LLP

By: */s/ David S. Bloch*
David S. Bloch
*Attorneys for Plaintiffs and Counter-Defendants*

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Plaintiffs and Counter-Defendants, certifies that this brief contains 5,894 words, which complies with the word limit of L.R. 11-6.1.

By: */s/ David S. Bloch*

**CERTIFICATION REGARDING USE OF GENERATIVE ARTIFICIAL INTELLIGENCE**

Pursuant to the Court's Order Re: Artificial Intelligence, counsel certifies that generative artificial intelligence was used in the preparation of this filing. Counsel has personally reviewed and verified the accuracy of all legal citations, quotations, factual statements, and legal analysis contained herein.

By: */s/ David S. Bloch*