**GREENBERG TRAURIG, LLP**
David S. Bloch (SBN 184530)
Marcelo Barros (SBN 339069)
101 Second Street, Suite 2200
San Francisco, California 94105-3668
Telephone: 415.590.5110
Blochd@gtlaw.com
Marcelo.Barros@gtlaw.com

Jake Evans (*pro hac vice*)
Jordana R. Sternberg (*pro hac vice*)
Terminus 200, 3333 Piedmont Road NE, Suite 2500
Atlanta, Georgia 30305
Telephone: 678.553.2100
Jake.Evans@gtlaw.com
Jordana.Sternberg@gtlaw.com

*Attorneys for Plaintiffs and Counter-Defendants*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

BEAGLE LABS, INC., a Delaware corporation, BEAGLE TECHNOLOGIES, INC., a Delaware corporation, BIG BEAGLE, INC., a Delaware corporation, RENTAL PROPERTY MANAGERS ASSOCIATION LLC, an Alabama limited liability company, and YRIG RISK RETENTION GROUP, INC., an Alabama corporation,

Plaintiffs and Counter-Defendants,

v.

APPFOLIO, INC., a California corporation,

Defendant and Counter-Claimant.

CASE NO. 2:25-cv-12248-JFW-SSC

**[PROPOSED] STATEMENT OF DECISION DENYING DEFENDANT AND COUNTER-CLAIMANT APPFOLIO, INC.'S MOTION FOR PRELIMINARY INJUNCTION**

Hearing Date: November 2, 2026
Time: 1:30 p.m.
Courtroom: 7A
Judge: Hon. John F. Walter

# PROPOSED STATEMENT OF DECISION

The Court, having considered the papers filed by Defendant and Counter-Claimant AppFolio, Inc. ("AppFolio") and Plaintiffs and Counter-Defendants Beagle Labs, Inc., Beagle Technologies, Inc., Big Beagle, Inc., Rental Property Managers Association LLC, and YRIG Risk Retention Group, Inc. (collectively, "Beagle"), including AppFolio's Motion for Preliminary Injunction (Dkt. 104), Beagle's Opposition (Dkt. 106), and AppFolio's Reply (Dkt. 114), hereby **DENIES** AppFolio's Motion for the following reasons.

AppFolio asks the Court to bar Beagle from performing work that AppFolio's own customers engaged it to perform, through accounts those customers created, nine months after AppFolio first sought substantially the same relief in state court and was twice denied it. AppFolio quantifies its harm at roughly $33,000 in salary, identifies no security incident, and asks for relief that would decide the merits of this lawsuit a year before trial.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Beagle administers insurance-compliance and resident-services programs for residential property managers. Those programs include resident insurance verification, tenant liability programs, security deposit alternatives, pet damage waivers, and move-in utility services. (D'Angelo Decl. (Dkt. 106-1) ¶ 2.) Beagle serves approximately 3,000 property management companies, which manage more than 500,000 units across all 50 states. A large portion of Beagle's revenue comes from customers that use AppFolio's platform. (*Id.* ¶ 3.)

Beagle reaches a customer's AppFolio database only if the customer first creates a user account for it. The customer's own employee selects the account's role and permissions, and the customer may change, disable, or delete the account at any time. (*Id.* ¶ 7.) AppFolio admits that its customers own the data in their databases, that customers are free to contract with Beagle, and that customers may create user accounts. It further admits that AppFolio customers created the accounts Beagle used before January 9, 2026. (Barros

Decl. (Dkt. 106-2) Ex. 1, RFAs 1-3, 83.) AppFolio's own declarant describes Beagle reaching the platform "via user accounts supplied by customers." (Delage Decl. (Dkt. 104-2) ¶ 9.)

AppFolio knew before December 9, 2025 that some customers had voluntarily created user accounts for Beagle, and it sent Beagle no written objection before that date. (Barros Decl. Ex. 1, RFAs 48-49.) On December 9, 2025, AppFolio told shared customers that Beagle's "method . . . places you at risk." (*Id.*, RFAs 16-17.) That same day, AppFolio sued Beagle in Santa Barbara Superior Court and applied ex parte for an order barring Beagle from inducing AppFolio customers to give Beagle access to their accounts. (*Id.*, RFAs 16-17; Dkt. 95-1.) The superior court denied the application on December 10, 2025. (Dkt. 95-2.) AppFolio renewed the request on December 16, 2025, and the court denied it a second time on December 17, 2025, after briefing and argument. (Dkt. 95-3, 95-4.) AppFolio has not renewed its request for emergency relief in that action.

Beagle filed this action on December 15, 2025. (Dkt. 1.) On January 7, 2026, the Court denied Beagle's application for a temporary restraining order, reasoning that the data Beagle identified was available through AppFolio's Scheduled Reports and Database API. (Dkt. 39 at 5-6.) The Court did not decide whether Beagle's access was authorized. (*Id.*) On or about January 9, 2026, AppFolio disabled every user account it knew to be associated with Beagle. (Barros Decl. Ex. 1, RFA 47.) AppFolio moved for leave to assert counterclaims on May 8, 2026 (Dkt. 77) and filed those counterclaims on June 19, 2026 (Dkt. 87). It filed this Motion on September 25, 2026 (Dkt. 104). Trial is set for September 28, 2027.

## II. <u>LEGAL STANDARDS</u>

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008). AppFolio must establish that "[it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that

the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Id.* at 20. AppFolio's burden is heavier than that, because the order it seeks would alter the status quo and stop Beagle from performing work for the property managers that engaged it. Such mandatory injunctions are "particularly disfavored," and courts do not grant them "unless extreme or very serious damage will result." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (quotations omitted). The showing is "doubly demanding," as AppFolio "must establish that the law and facts *clearly favor* [its] position, not simply that [it] is likely to succeed." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc).

AppFolio asserts that the order is prohibitory and preserves the status quo, which it places before Beagle's access began. (Dkt. 114 at 2.) But the "last uncontested status which preceded the pending controversy," *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000), included customer-created Beagle accounts that AppFolio knew of and had not objected to in writing. (Barros Decl. Ex. 1, RFAs 48-49.) The label does not matter, because AppFolio fails either standard. Nor does the sliding scale help AppFolio (Dkt. 114 at 9-10); the movant must still show likely irreparable harm. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131, 1135 (9th Cir. 2011).

## III. DISCUSSION

### A. AppFolio's New Reply Material

The Reply relies on material the Motion did not present: two supplemental declarations and their exhibits (Dkt. 114-1 to 114-4), new authority, and an alternative proposed order (Dkt. 114 at 12). A district court "need not consider arguments raised for the first time in a reply brief," *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007), and and should not consider new evidence submitted in reply without giving the opposing party an opportunity to respond, *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996). The Court applied that rule earlier in this action when Beagle raised a contention "for the first time in its Reply, and without any opportunity for AppFolio to respond." (Dkt. 39 at 6.) The

rule applies with greater force here. AppFolio had the new evidence when it filed the Motion, including the May 2021 vendor letter, the reported September 10, 2026 credential compromise, and the July and August 2026 account counts, yet offered it only in reply. The Court gives it no weight. The result would be the same if it did.

**B. AppFolio Has Not Shown a Likelihood of Irreparable Harm**

AppFolio must demonstrate that irreparable injury is likely, not merely possible, in the absence of an injunction. *Winter*, 555 U.S. at 22. It relies on a presumption of harm arising from the alleged statutory violations, the cost of its own investigation, strain on its customer relationships, and the security risk it attributes to Beagle's access. Its delay in seeking relief weighs against it at the outset, and none of those grounds establishes a likelihood of irreparable harm.

***Delay.*** "By sleeping on its rights a plaintiff demonstrates the lack of need for speedy action." *Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) (quotation omitted). Delay "implies a lack of urgency and irreparable harm." *Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985). AppFolio first sought substantially this relief in December 2025. Paragraph 2(g) of its Santa Barbara applications and paragraph 1 of the order it now proposes seek the same thing. (*Compare* Dkt. 95-1, 95-3, *with* Dkt. 104 at 2.) Nine months passed before AppFolio asked this Court for that order.

AppFolio answers that it did not discover the conduct underlying its counterclaims until February 2026 and did not confirm it until March 2026. (Dkt. 85 at 2-3.) Even measured from March, more than six months passed before the Motion. The Court's prior finding that AppFolio was diligent in amending its pleading under Rule 16 does not establish an emergency warranting extraordinary relief. (Dkt. 85 at 3.) The rule AppFolio invokes is not new either. The consent provision in Section 5.2 "has been part of AppFolio's Terms of Service since 2019" (Dkt. 39 at 2), and it appears in every version AppFolio has produced, reaching back to at least April 2024. (Barros Decl. Ex. 6.) A party cannot

establish urgency by invoking a contract term it has had for years.

AppFolio argues that delay is "not particularly probative in the context of ongoing, worsening injuries." (Dkt. 114 at 8 (quoting *Arc of California v. Douglas*, 757 F.3d 975, 990 (9th Cir. 2014)).) That principle does not fit this record. In *Arc*, delay did not undercut the plaintiffs' showing because their injuries came from successive funding cuts whose cumulative harm became apparent only over time. 757 F.3d at 990-91. AppFolio's claimed injury was apparent from the start. It identified the conduct it challenges and sought this same relief in December 2025. Its only evidence that the injury has worsened is account counts first offered in Reply, which measure AppFolio's own detection efforts, not any change in Beagle's conduct. (Delage Supp. Decl. (Dkt. 114-3) ¶ 3.)

***Presumed* Harm.** AppFolio argues that a violation of the Computer Fraud and Abuse Act ("CFAA") or California Penal Code section 502 constitutes irreparable harm in itself, and that its right to exclude others from its platform creates a presumption Beagle cannot overcome. (Dkt. 104 at 20, 22.) The Court disagrees. Irreparable harm must be shown, not presumed. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391-94 (2006); *Winter*, 555 U.S. at 22; *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1249-51 (9th Cir. 2013). The two authorities AppFolio offers for a presumption predate that rule. (Dkt. 104 at 22.)

AppFolio argues that courts treat unauthorized computer access as irreparable harm. (Dkt. 114 at 7 & n.1.) Its authorities involved permanent injunctions entered after liability was established on records of bad faith or default, *Facebook, Inc. v. Power Ventures, Inc.*, 252 F. Supp. 3d 765, 782-83 (N.D. Cal. 2017); *Meta Platforms, Inc. v. Qibaa*, 2025 WL 2496129, at *4, *9 (N.D. Cal. Aug. 1, 2025); *WhatsApp Inc. v. NSO Grp. Techs. Ltd.*, 2025 WL 2961368, at *1, *5 (N.D. Cal. Oct. 17, 2025), or credentials "leaked in a data breach" and a denial-of-service attack. *Chegg, Inc. v. Doe*, 2023 WL 7392290, at *6 (N.D. Cal. Nov. 7, 2023). None resembles customer-authorized access, and each rested on a likely or established violation, which AppFolio has not shown. *See* *Amazon.com Servs., LLC v.*

*Perplexity AI, Inc.*, 184 F.4th 1083, 1089 (9th Cir. 2026). The further harms AppFolio says Beagle does not dispute (Dkt. 114 at 7) restate its merits theory; each assumes the access is unauthorized, which AppFolio has not clearly shown.

***Monetary Harm.*** AppFolio's only quantified injury is the cost of 234 hours of an engineer's time at his base salary, approximately $33,000. (Delage Decl. ¶¶ 4-5.) "[M]onetary injury is not normally considered irreparable." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1188 (9th Cir. 2022). A loss a declarant can calculate to the dollar is a loss a judgment can repay. The figure also reflects an internal reallocation of a salaried employee's time to a task AppFolio chose to undertake, not a payment AppFolio made to anyone. And AppFolio's own filings emphasize Beagle's financial resources, leaving no doubt that any judgment could be paid. (Dkt. 104 at 7; Levine Decl. ¶¶ 4-7, Exs. C-F (Dkt. 104-8 to 104-11).)

Nor are the resident charges AppFolio cites AppFolio's money. By AppFolio's own account, they are paid to the property managers. (Delage Decl. ¶ 17.) They are fees for programs those property managers chose. (D'Angelo Decl. ¶ 2.)

***Customer Relationships.*** AppFolio contends that disabling customer-created Beagle accounts has strained its customer relationships. (Dkt. 104 at 7-8, 23.) That strain is of AppFolio's own making. As AppFolio's declarant acknowledges, each account AppFolio disables is one "the customer deliberately created." (Velasquez Decl. (Dkt. 104-3) ¶ 3.) AppFolio's principal example proves the point. The customer called to have a disabled Beagle account restored, then complained that AppFolio's representative had been "extremely rude" and that its treatment was "quickly eroding our confidence in your company." (*Id.* ¶¶ 4, 6, 8.) That customer wanted Beagle. Its complaint was about AppFolio. Nor has AppFolio measured any effect on its customer base. It admits it has no analysis, report, or assessment of how its account disabling or related customer communications affected customer retention or satisfaction. (Barros Decl. Ex. 3, YRIG Interrog. 7.) Lost

goodwill "grounded in platitudes rather than evidence" is not irreparable harm. *Herb Reed*, 736 F.3d at 1250.

*Disney Enterprises, Inc. v. VidAngel, Inc.*, 224 F. Supp. 3d 957 (C.D. Cal. 2016), on which AppFolio relies (Dkt. 114 at 8), does not help it. There, an executive attested that licensees had raised the defendant's service in negotiations, harming the plaintiffs' licensing relationships. *Id.* at 975-76. That harm ran from the defendant's conduct; here it runs from AppFolio's.

***Security.*** "Speculative injury does not constitute irreparable injury." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). AppFolio's security showing rests on the proposition that a bad actor with Beagle's level of access "could theoretically" misuse it. (Delage Decl. ¶ 8.) He does not state that this occurred. AppFolio has held the relevant access records for ten months, and it still identifies no security incident. It admits that it has reported no breach or data misuse caused by Beagle to any regulator. It identifies no customer contract terminated because of Beagle. No customer has filed a complaint, lawsuit, or other claim against AppFolio alleging that Beagle's work caused it harm. (Barros Decl. Ex. 1, RFAs 87, 93-94.) Beagle requires individual logins, multifactor authentication, and least-privilege access, and to its knowledge has experienced no data breach involving any AppFolio customer's data. (D'Angelo Decl. ¶¶ 14-16.) A theoretical risk does not establish a likelihood of irreparable harm.

The credential compromise first described in the Reply occurred at a different company, an AppFolio-approved partner that also held a user account in a customer's database, and AppFolio offers the social-media post about it "not . . . for the truth of the matter asserted." (Delage Supp. Decl. ¶¶ 5-8 & n.1, Ex. A.) Nothing suggests Beagle was involved. If anything, the incident shows that credentials can be compromised whoever holds them, including partners AppFolio approves. *See Perplexity*, 184 F.4th at 1093-94 (holding a single cybersecurity incident not involving the defendant insufficient).

### C. AppFolio Has Not Shown That the Law and Facts Clearly Favor It on the Merits

***The CFAA counterclaim.*** The CFAA is an anti-hacking statute. It "was enacted to prevent intentional intrusion onto someone else's computer." *hiQ*, 31 F.4th at 1195-96. Liability turns on a gates-up-or-down inquiry. The question is whether a person crossed a barrier closed to him, not whether he used information in a way a contract forbids. *Van Buren v. United States*, 593 U.S. 374, 390, 396-97 (2021). Even the authority on which AppFolio principally relies holds that "a violation of the terms of use of a website, without more, cannot establish liability under the CFAA." *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1067 (9th Cir. 2016).

On this record, the property manager opened the gate. The accounts Beagle used were created by AppFolio customers that own the data in their own databases, administer their own subscriptions, issued the credentials, and selected the permissions the accounts carry. (Barros Decl. Ex. 1, RFAs 1, 3, 83; D'Angelo Decl. ¶ 7.) AppFolio admits it has no document showing that Beagle circumvented a password. (Barros Decl. Ex. 2, SB RFA 10.) AppFolio replies that locking accounts is a gate and that entering through a new customer-created account is the back-door access condemned in *United States v. Nosal*, 844 F.3d 1024 (9th Cir. 2016) (*Nosal II*). (Dkt. 114 at 3-4.) There, the employer "unequivocally" revoked the defendants' own credentials, and they used a current employee's password though she had "no mantle or authority" to admit them. *Id.* at 1035-36. The court reserved cases of "more sympathetic access through an authorized third party." *Id.* at 1036. Here, the third party is the customer, administering its own subscription through a feature AppFolio provides. (Barros Decl. Ex. 1, RFAs 3, 10.)

The restriction AppFolio invokes also does not operate as a generally applicable access rule. AppFolio permits its customers to grant account access to third parties it approves. (*Id.* Ex. 1, RFA 10.) It admits that vendors other than Beagle work through customer-created accounts, and that it does not treat their access as unauthorized, as a

breach, or as a crime. (*Id.*, RFAs 69-71.) A consent regime administered in that manner reflects commercial judgment. It is not a "generally applicable rule[] regarding access permissions" whose circumvention the CFAA reaches. *hiQ*, 31 F.4th at 1201.

Even if considered, AppFolio's new showing that every vendor Beagle names either has consent or has faced enforcement does not change the conclusion. (Dkt. 114 at 4; Saxena Supp. Decl. (Dkt. 114-1) ¶¶ 3-4) It identifies a single 2021 letter which objected to another vendor's automated "bot," its use of AppFolio's name and logo, and its status as a competitor: "AppFolio's terms of service make clear that competitors are not permitted to access or login to our services." (Dkt. 114-2). The same declarant attests that AppFolio "prioritizes its enforcement actions according to risk" because it lacks "the resources to lock the illicit user accounts of all third parties at once" and "cannot afford multiple such cases at once," meaning suits by third parties whose accounts it locks. (Saxena Supp. Decl. ¶ 5.) That is selective enforcement, not a generally applicable rule. Although *Perplexity* addressed only the "access" element, 184 F.4th at 1091 n.4, 1092, its reasoning still applies here. The court vacated an injunction premised on access "with the . . . user's permission but without authorization by" the platform, applied the rule of lenity, and warned against making the CFAA "an expansive misappropriation statute." *Id.* at 1089, 1091-92. A platform may regulate access through its terms of service, but not "by invoking the CFAA." *Id.* at 1094 n.5. AppFolio's characterization of Beagle's work as manual (Dkt. 114 at 5) does not dispel that concern for the customers who create the accounts AppFolio challenges. *See id.* at 1092.

*Power Ventures* does not supply the rule AppFolio needs. There, the defendant ran an automated campaign through users' own logins and continued after Facebook individually revoked its permission and blocked its IP addresses. 844 F.3d at 1063, 1067-69. Those users could share only their own data. AppFolio's customers administer their own subscriptions, its platform lets them grant account access to approved third parties, and AppFolio admits other vendors work through customer-created accounts unchallenged.

(Barros Decl. Ex. 1, RFAs 3, 10, 69-71.) AppFolio replies that customers "cannot convey rights they do not have." (Dkt. 114 at 5.) Whether AppFolio's objections withdrew authority its customers could otherwise confer is a contested question of contract and of Beagle's competition claims, and it does not clearly favor AppFolio. *Garcia*, 786 F.3d at 740.

AppFolio also has not established loss, which the CFAA conceives narrowly. *Andrews v. Sirius XM Radio Inc.*, 932 F.3d 1253, 1262-63 (9th Cir. 2019); *Van Buren*, 593 U.S. at 391-92. AppFolio relies on *Power Ventures*, which counted time spent "analyzing, investigating, and responding to" the defendant. 844 F.3d at 1066. But loss is "the cost of responding to an offense," 18 U.S.C. § 1030(e)(11), and *Power Ventures* limited recovery to costs incurred after Facebook's revocation, 844 F.3d at 1070. AppFolio identifies no impairment or interruption of service, and whether its search for customer-created accounts responded to an offense at all is the disputed question. (Delage Decl. ¶¶ 4-5.)

***The Section 502 counterclaim.*** AppFolio acknowledges that its section 502 theory tracks its CFAA theory. (Dkt. 104 at 18.) It fails for the same reasons. Each subdivision AppFolio invokes requires action "without permission," which turns on the same dispute. AppFolio's reliance on section 502(e)(1)'s provision for costs to verify whether a system or data "was or was not altered, damaged, or deleted" (Dkt. 114 at 6-7) fails because Mr. Delage describes identifying and disabling accounts, not verification. (Delage Decl. ¶¶ 4-5.)

***The tortious interference counterclaim.*** Intentional interference with contractual relations requires, among other elements, an "actual breach or disruption of the contractual relationship" and "resulting damage." *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990). AppFolio identifies no particular customer that breached any specific contract, and it has not identified no contract terminated as a result of Beagle's conduct. (Barros Decl. Ex. 1, RFA 93.) Nor has any customer filed a claim against AppFolio arising from Beagle's work. (*Id.*, RFA 94.) AppFolio's authorities for dispensing with that showing addressed pleadings. (Dkt. 114 at 3 (citing *Unite Eurotherapy, Inc. v. Walgreen Co.*, 2017

WL 513008, at *3 (S.D. Cal. Feb. 7, 2017); *Catch Curve, Inc. v. Venali, Inc.*, 519 F. Supp. 2d 1028, 1039 (C.D. Cal. 2007)).) A preliminary injunction requires a clear evidentiary showing. *Winter*, 555 U.S. at 22.

Whether AppFolio consented to the access at issue, and whether it was obliged to consent, remains genuinely disputed. Section 5.2 permits third-party access with AppFolio's consent, and the record indicates that AppFolio has extended that consent to other vendors by practice and by acquiescence. (Barros Decl. Ex. 1, RFAs 10, 69-71.) Those questions are the subject of Beagle's own claims in this action, and they cannot be resolved in AppFolio's favor on this record.

Taken together, these disputes foreclose the finding AppFolio must obtain. AppFolio has not shown that the law and facts clearly favor its position. *Garcia*, 786 F.3d at 740.

### D. The Balance of Equities and the Public Interest Weigh Against an Injunction

On AppFolio's side sits approximately $33,000 in salary and risks that have not materialized. On Beagle's side sits its business. The proposed order would bar Beagle from recording enrollments, adjusting program fees, or correcting ledger entries for any AppFolio customer, including customers that want it to do that work. (D'Angelo Decl. ¶¶ 11, 17.) Scheduled Reports are read-only and cannot do that work, and AppFolio admits its Database API does not match user access in functionality or write capability. (*Id.* ¶¶ 10-11; Barros Decl. Ex. 1, RFAs 101-102.) Nor can AppFolio point Beagle to the Database API. Its assertion that the API "is available anyway" (Dkt. 114 at 12) conflicts with its admission that it has said "direct competitors such as Beagle are not permitted to access any portion of our services or application programming interface." (Barros Decl. Ex. 1, RFA 15.) This Court relied on the API in denying Beagle's TRO because AppFolio had then "made no such statement." (Dkt. 39 at 6.) When AppFolio locks a Beagle account, the work falls to the property manager's staff, delaying enrollments and resident notifications. (D'Angelo Decl. ¶ 13.)

The harm is already under way. More than 200 property managers on AppFolio's platform have cancelled rollouts, stopped using Beagle, or stopped expanding, and prospective customers have ended sales discussions. (*Id.* ¶ 19.) Beagle cannot know in advance which or how many customers an injunction would cost, or repair its standing with them later. (*Id.* ¶ 21.)

AppFolio admits it regards Beagle as a direct competitor, that its Smart Ensure product competes with Beagle, and that it weighed that competition in evaluating Beagle's partnership request. (Barros Decl. Ex. 1, RFAs 5, 34, 58.) Customers report AppFolio representatives steering them to FolioGuard or Second Nature. (D'Angelo Decl. ¶ 20.) AppFolio states that a firm has no general duty to deal with rivals, *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004), but that is a rule of antitrust liability; AppFolio's competitive stake in the relief it seeks still bears on the equities. Its reliance on *eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058, 1069 (N.D. Cal. 2000), presupposes "a clear violation," which has not been shown, and the Beagle message it cites about Scheduled Reports does not show they can do ledger work. (Dkt. 114 at 10; D'Angelo Decl. ¶ 11.) The balance of equities tips sharply against an injunction.

The public interest points the same way. The record contains no security incident, and an injunction would leave the same property managers with the same databases and vendors, less one, while disrupting insurance-verification and resident-services programs across tens of thousands of units. (D'Angelo Decl. ¶¶ 2-4, 17.) The public has an interest in competition, *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 695 (1978), and in confining a criminal anti-hacking statute to its intended scope, *Van Buren*, 593 U.S. at 393-94. AppFolio's interest in policing its platform, *see Stackla, Inc. v. Facebook Inc.*, 2019 WL 4738288, at *6 (N.D. Cal. Sept. 27, 2019), remains protected by its contractual remedies. *Perplexity*, 184 F.4th at 1094 & n.5.

### E. The Proposed Order Does Not Satisfy Rule 65(d)

Rule 65(d) requires an injunction to "state its terms specifically" and "describe in

reasonable detail . . . the act or acts restrained." Fed. R. Civ. P. 65(d)(1); *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (per curiam). Paragraph 1 of the proposed order would bar Beagle from "causing any third party to access" AppFolio's platform, without saying whether Beagle "causes" access when a property manager creates an account itself, and it reaches only access "without AppFolio's authorization," the central disputed question here. AppFolio's Reply adds that the order reaches "Beagle, and anyone Beagle enlists to do its work" (Dkt. 114 at 11), a gloss that appears nowhere in the order and leaves a property manager's own staff to guess whether working at Beagle's request violates it. Paragraph 2 would bar altering any data within the platform, the ordinary work of a user, even at the customer's instruction. (Dkt. 104 at 2.) The order would also grant, a year before trial, substantially the final relief the counterclaims seek. *See Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 808 (9th Cir. 1963).

The Reply's alternative order (Dkt. 114 at 12), first proposed there, fares no better. It keeps the same "without AppFolio's authorization" limit and adds a ban on Beagle's "accept[ing] the creation of a user account," reaching further than the original.

## IV. CONCLUSION

For the foregoing reasons, AppFolio's Motion for Preliminary Injunction is **DENIED**. The Court finds that AppFolio has not shown a likelihood of irreparable harm, has not shown that the law and facts clearly favor it on the merits, and has not shown that the balance of equities or the public interest favors an injunction. Because the Motion is denied, the Court does not reach the amount of security under Rule 65(c).

It is so **ORDERED**.

DATED: _______________, 2026

_________________________________

Hon. John F. Walter, United States District Judge

**CERTIFICATION REGARDING USE OF GENERATIVE ARTIFICIAL INTELLIGENCE**

Pursuant to the Court's Order Re: Artificial Intelligence, counsel certifies that generative artificial intelligence was used in the preparation of this filing. Counsel has personally reviewed and verified the accuracy of all legal citations, quotations, factual statements, and legal analysis contained herein.

By: *<u>/s/ Marcelo Barros</u>*