Brian Procel (Cal. Bar No. 218657)
Brian@ProcelLevine.com
Jeremiah Levine (Cal. Bar No. 288377)
Jeremiah@ProcelLevine.com
Marty Pritikin (Cal. Bar No. 210845)
Marty@ProcelLevine.com
**PROCEL LEVINE LLP**
401 Wilshire Blvd, Fl 12
Santa Monica, CA 90401-1456
Phone: 424-788-4538

*Attorneys for Defendant and Counterclaimant AppFolio, Inc.*

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

BEAGLE LABS, INC., a Delaware corporation, BEAGLE TECHNOLOGIES, INC., a Delaware corporation, BIG BEAGLE, INC., a Delaware corporation, RENTAL PROPERTY MANAGERS ASSOCIATION LLC, an Alabama limited liability company, and YRIG RISK RETENTION GROUP, INC., an Alabama corporation,

Plaintiffs and Counter-Defendants,

v.

APPFOLIO, INC., a California corporation,

Defendant and Counterclaimant.

Case No. 2:25-cv-12248-JFW-SSC

Hon. John F. Walter

**DEFENDANT AND COUNTERCLAIMANT APPFOLIO, INC.'S [PROPOSED] STATEMENT OF DECISION ON ITS MOTION FOR PRELIMINARY INJUNCTION**

Hearing Date: November 2, 2026
Time: 1:30 p.m.
Trial: September 28, 2027

# STATEMENT OF DECISION

The Court, having considered the papers filed by Defendant and Counterclaimant AppFolio, Inc. ("AppFolio") and Plaintiffs and Counter-Defendants Beagle Labs, Inc., Beagle Technologies, Inc., Big Beagle, Inc., Rental Property Managers Association LLC, and YRIG Risk Retention Group, Inc. (collectively, "Beagle"), including AppFolio's Motion for Preliminary Injunction (Dkt. 104), Beagle's Opposition (Dkt. 106), and AppFolio's Reply (Dkt. 114), hereby GRANTS the Motion for the following reasons:

## I. FACTUAL AND PROCEDURAL BACKGROUND

AppFolio operates a password-protected, subscription-based software platform for property managers. (Dkt. 104-1 ¶ 8.) Its Terms of Service provide that "[t]hird parties are not permitted to access or use the Services . . . without our prior consent." (Dkt. 33-3 ¶ 19 & Ex. C.) Customers may share their data with other vendors through Scheduled Reports and the Database API. (Dkt. 39 at 5-6.)

Beagle induces AppFolio customers to create user accounts for Beagle, directing them to "Create Beagle user in Appfolio." (Dkt. 77-3 ¶ 13 & Ex. A at 6.) Beagle uses those accounts to obtain information and to make changes in the platform, including disabling AppFolio's insurance offerings, enrolling customers in Beagle's offerings, and charging residents for Beagle's services through AppFolio's billing system. (Dkt. 104 at 3-6.)

AppFolio has told Beagle at least six times that this access is unauthorized. (Dkt. 104 at 14-15.) After the Court denied Beagle's application for a temporary restraining order on January 7, 2026 (Dkt. 39), AppFolio disabled Beagle's known accounts and automatically disabled new accounts using known Beagle domains. (Dkt. 77-3 ¶¶ 8-9.) Beginning in late February 2026, Beagle defeated those

measures with "masked" accounts using customer-specific domains and "ghost" accounts deleted before AppFolio could find them. (*Id.* ¶¶ 10-12, 18-20; Dkt. 85 at 2-3.) The Court granted AppFolio leave to assert counterclaims for tortious interference with contract, violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, and violation of California Penal Code section 502 on June 15, 2026. (Dkt. 85.) Beagle then created approximately 174 new accounts. (Dkt. 104-2 ¶ 18.) AppFolio has spent approximately $33,000 of engineering time investigating and responding to Beagle's access. (*Id.* ¶¶ 4-5.)

## II. LEGAL STANDARD

### A. The Preliminary Injunction Factors

A party seeking a preliminary injunction must establish that it is likely to succeed on the merits, that it is likely to suffer irreparable harm absent preliminary relief, that the balance of equities tips in its favor, and that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Under the Ninth Circuit's sliding scale, "a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

### B. The Injunction Is Prohibitory and Preserves the Status Quo

The injunction AppFolio seeks is prohibitory, not mandatory, because it bars Beagle from taking action. *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878-79 (9th Cir. 2009). It preserves the "last uncontested status which preceded the pending controversy," which is the status before Beagle's unauthorized access. *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000).

## III. THE REPLY DECLARATIONS ARE PROPERLY CONSIDERED

The Local Rules expressly permit a moving party to file with its reply "declarations or other rebuttal evidence." L.R. 7-10. Evidence submitted in reply is not "new" when it directly responds to arguments raised in the opposition. *Terrell v. Contra Costa County*, 232 F. App'x 626, 629 n.2 (9th Cir. 2007); *Edwards v. Toys "R" Us*, 527 F. Supp. 2d 1197, 1205 n.31 (C.D. Cal. 2007) ("Evidence is not 'new,' however, if it is submitted in direct response to proof adduced in opposition to a motion."). The supplemental declarations do exactly that. Beagle argued that AppFolio's security concerns are speculative (Dkt. 106 at 9), and the Supplemental Delage Declaration describes a hacker's use of another third party's user-access credentials to export approximately 228,000 work orders containing tenants' personal information. (Dkt. 114-3 ¶¶ 7-8.) Beagle argued that AppFolio lacks a generally applicable rule and enforces its terms only against Beagle (Dkt. 106 at 1, 10), and the Supplemental Saxena Declaration shows how AppFolio treats the other third parties Beagle named. (Dkt. 114-1 ¶¶ 3-5; Dkt. 114-2.) Beagle did not seek leave to file a response to the reply, as Local Rule 7-10 would have required, and it has addressed the declarations on the merits. (Dkt. 121-1 at 8, 10.)

In any event, the Court would grant the Motion without the supplemental declarations. As explained below, the moving papers independently establish irreparable harm, and AppFolio's Terms of Service state the generally applicable rule that Beagle says is lacking.

## IV. APPFOLIO IS LIKELY TO SUCCEED ON THE MERITS

### A. Computer Fraud and Abuse Act

Beagle does not dispute that it intentionally accesses a protected computer and obtains information. It disputes only authorization and loss.

*Authorization.* A password requirement is the archetypal gate separating authorized from unauthorized access. *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1201 (9th Cir. 2022). When AppFolio closes a Beagle account, Beagle cannot enter through it; that Beagle obtains new credentials to get back in does not mean the gate does not exist. *United States v. Nosal*, 844 F.3d 1024, 1028-30 (9th Cir. 2016). Nor does customer permission supply authorization. Once a platform revokes permission, a user's consent does not authorize the third party's access; a person holding the key to a safe deposit box still cannot enter the bank after the bank has banned him. *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1067-68 (9th Cir. 2016).

Beagle's efforts to distinguish *Power Ventures* fail. First, Beagle argues that a terms-of-service violation, "without more," cannot establish CFAA liability. *Id.* at 1067. AppFolio does not rely on its Terms of Service alone. As in *Power Ventures*, where Facebook sent Power a cease-and-desist letter and blocked its IP addresses, AppFolio expressly revoked Beagle's permission and then backed the revocation with technical measures, disabling Beagle's accounts and blocking new accounts on known Beagle domains. (Dkt. 104 at 14-15; Dkt. 77-3 ¶¶ 8-9.) Beagle's masked and ghost accounts are its response to those measures. (Dkt. 77-3 ¶¶ 10-12.) Second, that *Power's* access was automated while Beagle's personnel work manually is immaterial; the CFAA turns on authorization, not on the means of entry, and the defendant in *Nosal II* entered manually with a borrowed password. 844 F.3d at 1028-30. Third, that Beagle uses its own credentials rather than its customers' does not help it. A customer cannot convey a right of access it does not have, *Power Ventures*, 844 F.3d at 1068, and a customer-created account for a third party is precisely the kind of access the Terms of Service condition on

AppFolio's consent. Fourth, that AppFolio's customers administer their own subscriptions and that AppFolio permits some third parties to work through customer accounts shows only that AppFolio grants consent to some vendors. It does not show that AppFolio granted consent to Beagle, which AppFolio has refused and revoked. Finally, Beagle notes that *Power Ventures* limited recoverable loss to costs incurred after revocation. *Id.* at 1070. The costs AppFolio identifies were incurred detecting and disabling Beagle's accounts, which is the enforcement of a revocation that had already occurred. (Dkt. 104-2 ¶¶ 4-5.)

The CFAA does not require a uniform rule. *hiQ* describes "generally applicable rules regarding access permissions" as one type of gate, not as a prerequisite to liability. 31 F.4th at 1201. Permission may be withheld or revoked as to a particular person: in *Power Ventures*, a cease-and-desist letter directed to Power alone sufficed. 844 F.3d at 1067. AppFolio revoked Beagle's permission repeatedly and specifically. (Dkt. 104 at 14-15.) In any event, AppFolio has a generally applicable rule. Its Terms of Service bar every third party from accessing the platform without AppFolio's consent. (Dkt. 33-3 ¶ 19 & Ex. C.) A consent requirement does not stop being a rule because some parties obtain consent, and Beagle does not acquire authorization because others may also lack it.

Beagle relies on *Amazon.com Services, LLC v. Perplexity AI, Inc.*, 184 F.4th 1083 (9th Cir. 2026), for the proposition that a platform may not enforce its contract terms through the CFAA. (Dkt. 106 at 11.) *Perplexity* does not so hold. The question there was whether there was "access" at all, not whether the access was authorized. The court expressly limited its holding to "access" and declined to "address the remainder of the CFAA factors." *Id.* at 1091 n.4, 1092. It distinguished *Power Ventures* on the ground that "[t]he bulk of the analysis" in that

case "was devoted to authorization, not access." *Id.* at 1090. This case, like *Power Ventures*, turns on authorization.

Nor does *Perplexity*'s concern about exposing users to criminal liability apply here. In *Perplexity*, customers directed an AI agent to access the platform, and the defendant itself took no action, so the court was concerned that treating the access as unlawful would implicate the customers' own shopping activity. *Id.* at 1091-92. Here, Beagle admits that its "personnel perform [their] work manually." (Dkt. 106-1 ¶ 12.) Holding Beagle liable for its own access does not impose liability on AppFolio's customers. Beagle responds that the concern remains for the customers who create the accounts (Dkt. 121-1 at 10), but AppFolio seeks relief only against Beagle, and the injunction does not reach a customer's use of its own account.

*Loss.* Employee time spent analyzing, investigating, and responding to unauthorized access is a cognizable loss. *Power Ventures*, 844 F.3d at 1066. AppFolio has shown approximately $33,000 of such loss. (Dkt. 104-2 ¶¶ 4-5.) *Andrews v. Sirius XM Radio Inc.*, 932 F.3d 1253 (9th Cir. 2019), and *Van Buren v. United States*, 593 U.S. 374 (2021), did not address costs of this kind.

**B. California Penal Code Section 502**

The section 502 analysis parallels the CFAA. *Power Ventures*, 844 F.3d at 1069. Subdivisions (c)(3) and (c)(7) concern use of computer services and access to a computer system regardless of who owns any data, and the statute gives a right of action to the owner of the computer system. Cal. Penal Code § 502(c)(3), (c)(7), (e)(1). AppFolio's investigation costs are recoverable damages. *Id.* § 502(e)(1).

### C. Tortious Interference with Contract

Beagle does not dispute the contracts or its knowledge of them. *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990). Each customer that gives Beagle user access without AppFolio's consent breaches the Terms of Service, whoever proposed it. AppFolio need not name each customer, *Catch Curve, Inc. v. Venali, Inc.*, 519 F. Supp. 2d 1028, 1039 (C.D. Cal. 2007), and Beagle must know which customers gave it access. That AppFolio consents to other vendors does not mean it consented to Beagle, and customers' ownership of their data does not entitle them to give Beagle access to AppFolio's platform.

AppFolio is likely to succeed on each counterclaim.

## V. APPFOLIO WILL SUFFER IRREPARABLE HARM

AppFolio must show that irreparable harm is likely, not merely possible. *Winter*, 555 U.S. at 22. AppFolio does not rely on a presumption of harm; it has shown several independent forms of irreparable injury with evidence. Evidence of threatened loss of goodwill and of control over one's business supports a finding of irreparable harm. *Disney Enters., Inc. v. VidAngel, Inc.*, 224 F. Supp. 3d 957, 975 (C.D. Cal. 2016).

### A. Ongoing Unauthorized Access

Ongoing unauthorized access to a computer system is irreparable harm, particularly where it is likely to continue absent an injunction. *Facebook, Inc. v. Power Ventures, Inc.*, 252 F. Supp. 3d 765 (N.D. Cal. 2017), *aff'd*, 749 F. App'x 557 (9th Cir. 2019); *WhatsApp Inc. v. NSO Grp. Techs. Ltd.*, 2025 WL 2961368 (N.D. Cal. Oct. 17, 2025). Beagle does not dispute that its access will continue unless enjoined, and the record shows it accelerating. Beagle created approximately 174 new accounts after AppFolio filed its counterclaims (Dkt. 104-2

¶ 18), and its pace is increasing: AppFolio detected 65 new Beagle accounts in July 2026 and 92 in August 2026, an increase of 41.5% in one month. (Dkt. 114-3 ¶ 3.) Each new account is a new entry into a customer database that AppFolio has not authorized. (Dkt. 77-3 ¶¶ 10-11, 18.) Damages cannot be calculated for access that, by Beagle's design, is difficult to detect. AppFolio cannot practically bring a new action for each new account.

**B. Loss of Control Over AppFolio's Platform**

Beagle does not dispute that AppFolio has lost control over who uses its platform and that an unauthorized party is running charges through AppFolio's billing system. (Dkt. 104 at 20-23.) Beagle argues that these harms restate AppFolio's merits theory and that the resident charges are paid to property managers rather than to AppFolio. The harm, however, is not the loss of the charges; it is Beagle's use of AppFolio's billing infrastructure, built for AppFolio's paying customers, to operate a competing business, including recurring charges that Beagle configures to continue running after its account is deleted. (Dkt. 77-3 ¶ 20.) That AppFolio's harm follows from the unauthorized character of the access does not make it less real; it is the injury that the CFAA and section 502 exist to prevent.

Nor does the quantifiable cost of AppFolio's investigation make its harm compensable. AppFolio relies on its investigation costs to establish loss under the CFAA and section 502, not as the irreparable injury. The irreparable injury is the continuing intrusion that those costs are spent trying, and failing, to stop.

**C. Customer Goodwill**

Harm to customer goodwill is irreparable, and Beagle does not argue otherwise. It argues instead that any strain on AppFolio's customer relationships is

of AppFolio's own making, because AppFolio disables accounts that its customers deliberately created. The Court disagrees. A party does not inflict harm on itself by enforcing its contractual rights. The strain arises because Beagle induces AppFolio's customers to breach their Terms of Service, directing them step by step to "Create Beagle user in Appfolio" (Dkt. 77-3 ¶ 13 & Ex. A at 6), and then forces AppFolio to choose between tolerating the breach and confronting its own customers. Beagle has made that choice harder still. Because masked accounts use the customer's own domain, AppFolio cannot disable a suspected Beagle account without first confirming whether it belongs to the customer's employee, and disabling a customer's legitimate access "could deeply damage our relationship with the customer." (*Id.* ¶ 19.) Beagle cannot engineer that dilemma and then attribute its consequences to AppFolio. *Cf. eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058, 1069 (N.D. Cal. 2000).

Beagle also argues that the Velasquez Declaration is inadequate because the customer it describes wanted Beagle and blamed AppFolio. That is the point. The declaration describes a specific customer that called to have a disabled Beagle account restored and then told AppFolio in writing that its treatment was "quickly eroding our confidence in your company." (Dkt. 104-3 ¶¶ 3-9.) That is evidence of lost goodwill from an identified customer. It is not the kind of unsupported, conclusory assertion rejected in *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013). And the harm runs from Beagle's conduct. But for Beagle's inducement, there would have been no Beagle account to disable and no confrontation with the customer.

That AppFolio has not quantified the effect on customer retention, and has not identified a contract terminated as a direct result of Beagle's conduct, does not

defeat this showing. (Dkt. 106-2 Ex. 1, RFA 93; Ex. 3, Interrog. 7.) Goodwill encompasses more than terminated contracts, and harm to goodwill is irreparable precisely because its effects are difficult to measure and trace. If AppFolio could quantify the loss, it would be compensable. Beagle's own declarant makes the same point about Beagle's claimed harm, testifying that Beagle cannot know "which [customers] or how many" it will lose. (Dkt. 106-1 ¶ 21.)

**D. Security**

AppFolio has demonstrated that Beagle poses an imminent security risk. Each Beagle account provides access to a property manager's AppFolio database (Dkt. 114-3 ¶ 4), which Beagle uses to review residents' information and to create recurring charges to residents. (Dkt. 77-3 ¶ 20.) The form of access Beagle uses has already been exploited: a hacker used another third party's user-access credentials to export approximately 228,000 work orders containing tenants' personally identifiable information. (Dkt. 114-3 ¶¶ 7-8.) Beagle responds that the incident involved a different company. But the risk arises from the form of access, a third-party user account outside AppFolio's approved integrations, not only from the identity of the account holder, and Beagle maintains that form of access across hundreds of customer databases. Beagle cannot evade detection in AppFolio's system and claim it is not a security risk. The Court's finding of irreparable harm does not depend on this incident, but the incident confirms the risk.

Each of the harms described in Sections V.A through V.C independently establishes a likelihood of irreparable harm.

**E. Timing**

AppFolio did not unreasonably delay. Delay "is not particularly probative in the context of ongoing, worsening injuries." *Arc of California v. Douglas*, 757 F.3d

975, 990 (9th Cir. 2014). Beagle starts the clock in December 2025, when AppFolio first sought relief in state court. But after this Court denied Beagle's application for a temporary restraining order, AppFolio's self-help measures worked. AppFolio disabled Beagle's known accounts, and any new account using a known Beagle domain was automatically disabled within an hour of its creation. (Dkt. 77-3 ¶¶ 8-9.) The need for judicial relief arose when Beagle defeated those measures. Beginning in late February 2026, Beagle shifted to masked accounts, which AppFolio's automated sweeps cannot detect, and ghost accounts, which are deleted before AppFolio's searches can find them. (*Id.* ¶¶ 10-12, 18-20.) That change in Beagle's conduct, not the December 2025 dispute, is the injury this Motion addresses, and it has worsened since.

The Court has already found that AppFolio did not discover these methods until February 2026, did not receive documentary confirmation that Beagle was responsible until March 18, 2026, and acted diligently thereafter. (Dkt. 85 at 2-3.) AppFolio served discovery directed at Beagle's access methods, sent a cease-and-desist letter, met and conferred, and moved for leave to assert its counterclaims eleven days after Beagle served its discovery responses. (*Id.* at 3.) The Court granted leave on June 15, 2026, and rejected Beagle's argument that AppFolio unduly delayed. (*Id.*) The CFAA and section 502 claims on which this Motion rests did not enter the case until AppFolio filed its counterclaims on June 19, 2026. (Dkt. 87.) Beagle responded by creating approximately 174 new accounts (Dkt. 104-2 ¶ 18), and its pace then spiked: new Beagle accounts rose from 65 in July 2026 to 92 in August 2026, an increase of 41.5% in one month. (Dkt. 114-3 ¶ 3.) AppFolio moved quickly once that spike became apparent, filing this Motion in September 2026, weeks after the August increase and approximately three months

after the counterclaims entered the case. (Dkt. 104.) A delay of a few months does not undermine a showing of irreparable harm. *Arc of California*, 757 F.3d at 990 (reversing denial of preliminary injunction where the movant waited two years after some of the challenged conduct began and several months after the rest); *Kettle Range Conservation Grp. v. U.S. Forest Serv.*, 971 F. Supp. 480, 484 (D. Or. 1997) (granting preliminary injunction and holding that "a delay of a few months is categorically distinct from a five-year delay"). A movant's decision to plead its claims and develop an evidentiary record before seeking extraordinary relief is not the kind of delay that undermines irreparable harm.

Beagle's authorities involved delays of years, not months. *Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) (five years); *Oakland Trib., Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374 (9th Cir. 1985) (several years); *see Arc of California*, 757 F.3d at 990 (distinguishing both).

## VI. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR AN INJUNCTION

Beagle's hardships are of its own making. It continued and expanded its access after repeated notice. (Dkt. 104 at 14-15; Dkt. 104-2 ¶ 18.) "[A] defendant who builds a business model based upon a clear violation of the property rights of the plaintiff cannot defeat a preliminary injunction by claiming the business will be harmed if the defendant is forced to respect those property rights." *eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058, 1069 (N.D. Cal. 2000). The injunction leaves Beagle able to serve its customers through Scheduled Reports, which Beagle told a customer are "sufficient to administer the program without full system access." (Dkt. 104-6 ¶ 2 & Ex. A; Dkt. 39 at 5-6.) And a business has no

general duty to deal with its rivals. *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004).

The public interest also favors an injunction. "The public has an interest in ensuring that computers are not accessed without authorization." *Power Ventures*, 252 F. Supp. 3d at 785; *see also Stackla, Inc. v. Facebook Inc.*, 2019 WL 4738288, at *6 (N.D. Cal. Sept. 27, 2019). The public interest in competition does not extend to unauthorized access.

## VII. THE INJUNCTION COMPLIES WITH RULE 65

AppFolio's proposed injunction states its terms specifically and describes the acts restrained. Fed. R. Civ. P. 65(d)(1). It does not reach a customer's use of its own account, and it expressly preserves Beagle's ability to receive scheduled reports and to interface with AppFolio's platform through AppFolio's Database API. It lasts only pending final resolution of this action and leaves AppFolio's damages claims unresolved. *Cf. Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 808 (9th Cir. 1963). The amount of security under Rule 65(c) rests in the Court's discretion. *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882-83 (9th Cir. 2003). Beagle's Opposition requests a "substantial" bond but offers no amount (Dkt. 106 at 15), and its own declarant testifies that its claimed losses cannot be calculated. (Dkt. 106-1 ¶ 21.) AppFolio has stated that it will post any bond the Court sets. (Dkt. 114 at 12.)

## CONCLUSION

IT IS HEREBY ORDERED that AppFolio's Motion for Preliminary Injunction is GRANTED.

IT IS SO ORDERED.

Dated: ______________________

______________________________

Hon. John F. Walter

United States District Judge

**CERTIFICATION REGARDING USE OF GENERATIVE ARTIFICIAL INTELLIGENCE**

Pursuant to the Court's Order Re: Artificial Intelligence, counsel certifies that generative artificial intelligence was used in the preparation of this filing. Counsel has personally reviewed and verified the accuracy of all legal citations, quotations, factual statements, and legal analysis contained herein.

/s/ Jeremiah Levine
Jeremiah Levine
PROCEL LEVINE LLP
*Attorneys for Defendant and Counterclaimant AppFolio, Inc.*